**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:                                                  Chapter 11

GREAT LAKES COMNET, INC.                    Case No. 16-00290 ( )

                Debtor.
_____

In re:                                                  Chapter 11

COMLINK, L.L.C.                                   Case No. 16-00292 ( )

                Debtor.

_____/          Honorable _____

**DECLARATION OF JOHN SUMMERSETT IN SUPPORT OF**
**CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

      I, John Summersett, make this declaration under 28 U.S.C. § 1746:

      1.      I am the Chief Executive Officer ("CEO") of Great Lakes Comnet, Inc.

("GLC") and the sole Manager of Comlink, L.L.C. ("Comlink" and collectively with GLC,

"Debtors").

      2.      I have been the CEO of GLC since September 5, 2015.  I was the Chief

Operating Officer during the 8 years prior to becoming the CEO.

      3.      I have been the Manager of Comlink since 2011.

      4.      I am knowledgeable and familiar with the operations, business and

finances of the Debtors.  Unless otherwise indicated in this Declaration, these statements of fact

are based upon my own personal knowledge; my review of the relevant documents; information

provided to me by my employees, working either directly and indirectly under my supervision,

and the financial and consulting professionals engaged in these matters; or my opinion based

upon my experience, knowledge and information concerning the operations of these Debtors in

1

particular and the telecommunication and data management industries generally.  If called to testify, I would testify competently to the facts set forth in my Declaration.  Defined terms that I use that are not defined in my Declaration are defined in the related motions and application.

5.    On January 25, 2016 ("Petition Date"), each Debtor filed a petition for relief under chapter 11 of title 11 of the United States Code ("Bankruptcy Code"), thereby commencing these bankruptcy cases ("Bankruptcy Cases").

6.    The Debtors are continuing in possession of their property and operating and managing their businesses.

**I.    History and Description of the Debtors' Businesses**

**A.    Great Lakes Comnet, Inc.**

7.    GLC, based in East Lansing, Michigan, owns and operates a 6,500 mile fiber network serving the carrier and enterprise sectors in Michigan, with the network extending to Ohio, Indiana, Illinois, Wisconsin, and Minnesota.  GLC's services include transport, dark fiber sales, cloud and datacenter operations, toll resale, toll routes, local switching, tandem switching and SS7.[1]  Its fiber and data center-related customers include Verizon, Spectrum Health, Consumers Energy, Google, and the City of East Lansing.  Its fiber network borders or serves key Michigan markets, such as Detroit, Grand Rapids, Lansing, and Ann Arbor.

8.    GLC provides telecommunications services to telecommunications carrier customers.  GLC provides tandem switching and tandem transport services through its tandem switch located in Westphalia, Michigan.

9.    In simple terms, GLC's tandem switch is used - in conjunction with tandem transport services provided by GLC and Westphalia Telephone Company ("WTC") - to

---

[1] Signaling System 7, or "SS7" for short, refers to the basic services provided to establish and route telephone calls, along with related services (e.g., billing).

send long distance calls from the network of one telecommunications carrier to the network of another telecommunications carrier. By using the services provided by GLC and WTC, interexchange carriers (i.e., long distance carriers providing long distance telecommunications services), such as AT&T, are able to exchange interstate long distance calls with local telecommunications service providers, namely, rural Incumbent Local Exchange Carriers ("ILECs") and competitive LECs ("CLECs"), located throughout Michigan, where the rural ILECs and CLECs operate "end office switches" homing on GLC's tandem switch.

   10. GLC does not serve (*i.e.*, terminate traffic to or originate traffic from) end users. Rather, GLC's switched access services are used only to send traffic to or from other telecommunications carriers. The interexchange carriers are able to deliver and receive traffic to and from small rural ILECs and CLECs located throughout and, in most cases, in remote parts of Michigan, without having to build and maintain fiber optic facilities to each LEC end office that homes on the GLC tandem. By using GLC's services, interexchange carriers avoid having to create their own infrastructure and directly connect with each LEC's end office switch homing on GLC's tandem switch. Interexchange carriers thereby avoided and continue to avoid significant expenses they would have otherwise incurred to connect to these small rural ILECs and CLECs. GLC also provides the interexchange carriers with other technical benefits such as better service and quality assurance, greater customer responsiveness, increased network reliability, advanced services and redundant routing from GLC's tandem switch.

   11. GLC is registered as a Competitive Access Provider (also referred to as a "CAP"), but is not licensed to operate as a CLEC in Michigan.

   12. GLC has two wholly-owned subsidiaries: Comlink and Clinton County Telephone Company ("CCTC"). CCTC serves residential and business customers through its

two wholly-owned subsidiaries:  WTC, operating across the towns of Westphalia, Portland, St.

Johns, and Dewitt, Michigan, serving nearly 850 residential and 75 business customers with

voice, data, and video services and Westphalia Broadband, Inc. ("WBI"), offering triple play

services with nearly 875 customers, including over 235 business customers across the same

geographic territory.  CCTC, WTC and WBI are non-debtor subsidiaries and affiliates of GLC

and are not participants in these Bankruptcy Cases.

13.     WTC is a rural ILEC with offices in Westphalia, Michigan and in addition

to being a rural residential telephone service provider, it serves as a billing agent for certain other

carriers, including GLC.  WTC also provides transport services in conjunction with GLC, which

services are used to route traffic between the GLC tandem and the end office switch of a LEC.

14.     GLC and WTC provide both interstate and intrastate tariffed access

services.  The rates, terms and conditions of these interstate services are set forth in GLC's Tariff

and WTC's interstate access tariff, the National Exchange Carriers Association, Inc. Tariff

F.C.C. No. 5, which are on file with the FCC.  Tariffs are binding on anyone that uses the

service.

15.     *GLC History*.  GLC was founded in 1996 as Michigan Independent

Network, Inc., an independent network organization, by a group of ILECs located in rural areas

throughout Michigan.  It was renamed Great Lakes Comnet, Inc. in 1997.  GLC was created to

establish a network of transmission facilities to provide advanced services, such as Ethernet and

IPTV, as well as a centralized tandem switch through which to route traffic in and out of the

rural ILECs' end offices in their respective service areas and the end offices of other local

exchange carriers.  GLC's tandem switch was installed in Westphalia, Michigan, due to its

centralized location relative to the locations of the rural ILECs and the major metropolitan areas of Michigan, and went into service on December 1, 2001.

### B.    Comlink, LLC

16.    Comlink provides data and communication services, including dedicated ultra-high-speed bandwidth data transmission, Ethernet private line services and virtual private network services, cloud-based and colocation data center services, and data management services to Consumers Energy, several hospital systems, municipalities and state correctional facilities.

17.    Comlink owns and operates a portion of GLC's fiber network and the majority of its data center assets, servicing enterprise and carrier customers.

18.    *Comlink History*.  Comlink was founded in 2003 but first became active in 2011 as a wholly-owned subsidiary of GLC.

## II.    Description of the Debtors' Pre-Petition Financing Arrangements

19.    GLC, as a borrower, is indebted to CoBank, ACB, a federally chartered instrumentality of the United States ("Prepetition Senior Lender").   The Prepetition Senior Lender has provided GLC with a series of loans and other extensions of credit in the aggregate principal amount and accrued and unpaid interest outstanding, as of the Petition Date, of approximately $ 25,165,732.05 ("Prepetition Debt").   The Prepetition Debt is evidenced by an Amended and Restated Master Loan Agreement dated as of August 11, 2011, as subsequently amended and supplemented from time to time ("Prepetition Financing Agreement"), and the documents executed in connection therewith (such documents, together with the Master Loan Agreement, the "Prepetition Financing Documents").

20.    As collateral security for the Prepetition Debt (and among the Prepetition Financing Documents), GLC executed and delivered to Prepetition Senior Lender (a) the

Prepetition Financing Agreement; (b) a CoBank ACB Security Agreement dated as of March 8, 2000, granting Prepetition Senior Lender a first lien on substantially all of GLC's business assets, including, all rents, profits, and proceeds derived therefrom ("Cash Collateral");[2] (c) an Amended and Restated Real Estate Mortgage dated as of July 8, 2013, as amended, encumbering real property located in Ingham County, Michigan; (d) a Second Amended and Restated Real Estate Mortgage dated as of January 2, 2012, as amended, encumbering real property located in Ingham and Clinton Counties, Michigan; (e) a Pledge Agreement dated August 1, 2011, pledging 100% of GLC's equity interests in CCTC; and (f) a Membership Interests Pledge Agreement dated as of August 1, 2011, pledging 100% of GLC's membership interests in Comlink. The assets and other property subject to the Prepetition Financing Documents executed and delivered by GLC to the Prepetition Secured Lender are referred to as "GLC Collateral".

21.    Comlink, as guarantor of the Prepetition Debt, guaranteed the payment of the Prepetition Debt, pursuant to the terms of the Subsidiary Guarantee of Payment (Continuing) executed as of August 1, 2011 (as amended, "Guarantee" and a Prepetition Financing Document).

22.    As collateral security for the Guarantee, Comlink executed and delivered to the Prepetition Senior Lender the CoBank, ACB Security Agreement dated as of August 11, 2011 (a Prepetition Financing Document), granting Prepetition Senior Lender a first lien on substantially all of its business assets, including, all Cash Collateral. The assets and other property subject to the Prepetition Financing Documents executed and delivered by Comlink to

---

[2] The legal and factual characterizations of the documents identified in Section II of this Declaration are for the convenience of the Court and parties in interest and are subject in all respects to the terms and legal effects of the documents themselves.

the Prepetition Senior Lender are referred to as "Comlink Collateral" and, together with the GLC Collateral, the "Prepetition Collateral").

23.     Since November, 2015, the Debtors and the Prepetition Senior Lender have been operating under the terms of a Forbearance Agreement dated as of November 16, 2015, as amended by a First Amendment to Forbearance Agreement dated as of December 8, 2015 (as amended, the "Forbearance Agreement"), together with other documents executed in connection with the Forbearance Agreement (and among the Prepetition Financing Documents). Under the Forbearance Agreement, the Prepetition Secured Lender agreed to and has continued to finance the Debtors to enable the Debtors to pursue a sales process and otherwise consider restructuring options.   The term of the forbearance under the Forbearance Agreement has expired and the Prepetition Debt is now due and payable in full.

24.     In addition to the UCC financing statements that have been filed in connection with the liens of the Prepetition Secured Lender in the Prepetition Collateral and the Prepetition Financing Documents, the only other financing statements of record according to a UCC search conducted in the State of Michigan through January 19, 2016 (the "UCC Search") are the following filings: (a) Cisco Systems Capital Corporation (a filing in connection with a master equipment lease); (b) Merit Network, Inc. (record notice of the purchase of specified property); and (c) National Telecommunications and Information Administration, U.S. Department of Commerce (specified equipment held in trust for the benefit of the NTIA Broadband Technology Opportunities Program (BTOP) ("BTOP Equipment") and the Federal Government's retained undivided equitable reversionary interest in the BTOP Equipment for the useful life of the BTOP Equipment).

### III.    The Need for Chapter 11 Relief and Events Leading to the Filing of These Cases

25.    On October 22, 2014, AT&T Services, Inc. and AT&T Corp. (collectively, "AT&T") filed a formal complaint against GLC and WTC alleging that GLC and WTC charged unlawful tariffs for interstate access services.

26.    The Federal Communication Commission ("FCC") adopted its Memorandum Opinion and Order on March 17, 2015, granting AT&T's complaint in part.

27.    In accordance with the FCC's rules, the liability and damage claims are bifurcated, and to date, the FCC has ruled only on liability and has not determined an amount of damages.

28.    In March of 2015, GLC and WTC filed a new tariff that complied with the ruling by the FCC.

29.    Despite damages remaining unresolved by the FCC, AT&T has resorted to self-help to collect on the judgment it hopes to attain in the future.  To date, GLC estimates that AT&T has taken by way of setoff or withheld payment on invoices totaling over $24,000,000. Some of this was billed under the disputed tariff, but AT&T continues, without explanation, to withhold amounts billed by GLC and WTC under the new, undisputed tariff.

30.    AT&T actually began withholding payment on certain charges in 2012 (2 years before filing its formal complaint), alleging that GLC and WTC were charging an improper tariff.  GLC and WTC sued AT&T before the Michigan Public Service Commission May 13, 2014, and on January 27, 2015, the MPSC ruled in favor of GLC and WTC on the very same tariff that the FCC later ruled against them.

31.    For several years, AT&T has not paid and presently does not pay the full amount of its bills for the services it receives, despite the new, complying tariff.  Despite

nonpayment, Federal and state regulations prevent GLC from terminating service to or otherwise blocking calls to or from AT&T.  AT&T has not ceased doing business with GLC and WTC, however it has reduced the amount of business it does with GLC and WTC.

32.     The effect of AT&T's resort to self-help (both premature and presumptive), and its reduced usage of GLC's services, have been catastrophic for GLC and is the prime cause of its bankruptcy filing.

33.     Comlink's financial difficulties result directly from the AT&T dispute, as well.

34.     Comlink's business is capital intensive.  When Comlink enters into an agreement to provide services to a new customer, Comlink has to build the infrastructure from its fiber lines to the business and procure equipment to make the physical connection.

35.     Comlink has to work with the Michigan Department of Transportation, municipalities, utilities and state government to secure the path to the business over and under roads and railroads and through private easements.  Laying fiber cable is expensive.

36.     GLC provided intercompany loans to Comlink to finance the infrastructure build as Comlink acquired customers.  Since AT&T began withholding payments, GLC cannot fund new business opportunities for Comlink.

37.     Around April of 2015, I began to take on some of the duties of CEO for GLC and by that summer had determined that the company's financial condition was deteriorating more rapidly than had be previously thought.

38.     In June 2015, I began consulting with the bankruptcy lawyers of Miller Canfield, one of GLC's law firms, about the lawsuits with AT&T.  At their suggestion, I had Miller Canfield engage AlixPartners in mid-August to, among other things, evaluate the Debtors'

cash flow and business plans and projections.  It soon became evident that the Debtors would run out of cash much sooner than previously anticipated.

39.     On September 1, 2015, the board of directors of GLC adopted a resolution to employ Media Venture Partners ("MVP") or another investment banker to explore strategic alternatives, including but not limited to a sale of the assets of the Debtors.

40.     MVP entered into an engagement letter with GLC on September 25, 2015.

41.     MVP was asked to secure financing immediately to provide sufficient working capital to allow time for the Debtors to seek a potential purchaser.

42.     MVP assisted the Debtors in obtaining additional financing through CoBank and conducted its due diligence to prepare a confidential information memorandum and identify a pool of prospective purchasers.

43.     On or about November 4, 2015, MVP contacted over 50 prospective purchasers.

44.     I reviewed the expressions of interest that MVP received in response to its marketing efforts on or about November 21, 2015, and instructed MVP to continue to pursue these offers to obtain a stalking horse bidder for the bankruptcy sale.

45.     As a result of MVP's continuing efforts, on December 24, 2015, the Debtors and Everstream Solutions, LLC ("Everstream") entered into a non-binding letter of intent outlining the general terms of a proposed sale transaction.  The Debtors and Everstream agreed to negotiate an asset purchase agreement to accomplish a sale of the Debtors' assets under section 363 of the United States Bankruptcy Code.

46.    The Debtors continue to negotiate with Everstream and document the proposed asset sale, and the Debtors hope to file a motion for an order approving bidding procedures and a sale in the next few days.

## IV.    First Day Motions and Application

47.    Contemporaneous with my submission of this Declaration, the Debtors have filed their first day papers requesting expedited relief so that the Debtors can transition seamlessly into chapter 11 without the immediate negative financial consequences that may well happen if the requested relief is not granted.  The Debtors have file jointly the Motion For Interim and Final Orders (A) Authorizing Debtors In Possession To Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363 and 364; (B) Granting Liens, Security Interests and Superpriority Claims; (C) Authorizing Use Of Cash Collateral and Granting Adequate Protection; (D) Modifying the Automatic Stay; and (E) Scheduling a Final Hearing ("Interim DIP Financing Motion").  My declaration, particularly Sections I, II and III, is submitted in support of the Interim DIP Financing Motion.  The other motions and application are addressed below.

### A.    Debtors' Motion For An Order Directing Joint Administration Of Their Chapter 11 Cases

48.    The Debtors seek an order granting joint administration of their respective cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.  Specifically, the Debtors request that the Court keep one file, that the docket for each case contain a notice indicating joint administration of the cases, and that the Court enter an order directing that any creditor filing a proof of claim against either Debtor or its estate should file that proof of claim

11

only in the particular chapter 11 case of the Debtor against whom the claim is asserted unless the claim is asserted against both Debtors or their estates.

49.     As stated above, GLC owns Comlink, and the Debtors are affiliates.

50.     Many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect the Debtors jointly.  By jointly administering these chapter 11 cases, I believe the Debtors will be able to reduce fees and costs resulting from the administration of these cases and ease the onerous administrative burden of having to file multiple and duplicative documents.

51.     Further, the rights of the Debtors' respective creditors will not be adversely affected by the joint administration of these chapter 11 cases because this Motion requests only administrative, not substantive, consolidation of the estates.  Any creditor may still file a claim against either Debtor or its estate.

52.     Finally, I believe supervision of the cases will be eased by joint administration.  The Court will not need to enter duplicative orders or maintain duplicative files. Joint administration should also simplify the Office of the United States Trustee's task of supervising these cases. Thus, all parties in interest should benefit from reduced costs as a result of joint administration.

53.     For the foregoing reasons, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their creditors and equity security holders, and all parties in interest.

**B.     Debtors' Motion For An Order Authorizing Continued Use Of Their Existing Bank Accounts, Business Forms And Cash Management System**

54.     The size and scale of the Debtors' operations necessitates the collection, concentration, and ultimate disbursement of significant funds each month.  The Debtors and their

subsidiaries use in the ordinary course of their business a cash management system ("Cash Management System") commonly used by comparably-sized companies to collect, transfer, and disburse funds through the Debtors' operations and to accurately record such transactions. As part of the Cash Management System, the Debtors maintain the bank accounts listed below.

| Bank | Acct # | Nature of Account |
|------|--------|-------------------|
| Comerica Bank | xxxxxx8520 | GLC Checking Account |
| Comerica Bank | xxxxxx8538 | GLC Money Market Account |
| Comerica Bank | xxxxxx9049 | Comlink Checking Account |

55. All of the bank accounts are in the United States and with a well-known and respected banking institution having insurance with the Federal Deposit Insurance Corporation. The Debtors believe Comerica Bank to be financially stable.

56. Funds collected by each Debtor are deposited into its respective Comerica Bank checking account. As needed, funds are drawn from the Debtors' Comerica Bank checking accounts. Only the GLC checking account is used to pay payroll. The GLC checking account is mainly used to pay professional fees, though a small amount is paid via the Comlink checking account. Both checking accounts are used for all other operating disbursements.

57. The following chart generally summarizes the basic cash flow mechanisms. (For completeness, the bank accounts of the Debtors' subsidiaries are also depicted.)

**Cash Management Chart**



58.    Additionally, in the ordinary course of business, the Debtors use a number of business forms, including checks, letterhead, purchase orders, and invoices.  If the Debtors were required to obtain all new business forms as a result of the filing of these cases, the Debtors would incur significant expense and attendant delay in effectuating their ordinary course, post-petition business transactions.  Notwithstanding the foregoing, the Debtors will order checks, for delivery as soon as can be reasonably obtained, that are imprinted with the notification "Debtor in Possession, Case # _____" or similar language as may be acceptable to the United States Trustee's Office and will begin using them as soon as practicable after they have been received.  Until these new checks are received, however, the Debtors request permission to use

14

their existing checks.  Checks that are printed by Debtors directly will be adjusted to incorporate

language acceptable to the United States Trustee's Office as soon as practicable after such

language is determined.

59.     The Cash Management System is also used to pay certain expenses for the

Westphalia Subsidiaries.  In addition to paying certain professional expenses, the Cash

Management System manages the payroll and benefits for 12 employees of the Westphalia

Subsidiaries, as described in greater detail in the portion of this declaration addressing the

*Debtors' Motion for an Order (I) Authorizing Payment of (A) Prepetition Employee Wages,*

*Salaries and Related Items; (B) Prepetition Contributions Under Employee Benefit Plans; and*

*(C) Prepetition Employee Payroll Deductions; and (II) Granting Further Relief*.  The Westphalia

Subsidiaries reimburse GLC each week for these expenses, with such reimbursements averaging

approximately $29,000 per week.  Because GLC is made whole on a weekly basis for these

expenses, and to avoid the expense of setting up a separate system, GLC wishes to continue to

manage the payroll and other expenses for the non-debtor Westphalia Subsidiaries.

**C.    Debtors' Motion For An Order (I) Authorizing Payment Of (A) Prepetition Employee Wages, Salaries And Related Items; (B) Prepetition Contributions Under Employee Benefit Plans; And (C) Prepetition Employee Payroll Deductions; And (II) Granting Further Relief**

60.     The Debtors' work force totals approximately 58 employees, all of whom

are full time ("Debtors' Employees").  The Debtors' Employees perform critical functions for the

Debtors including marketing and providing the Debtors' products and services as well as

providing management, customer service, finance, accounting, human resources and employee

benefits services to the Debtors.  The Debtors' Employees have specialized knowledge of

Debtors' business operations and infrastructure and are vital to Debtors' continued operations

and efforts to reorganize.  The Debtors' Employees are all nominally employed by GLC, though they service both Debtors.

61.     In the normal course of business, the Debtors' Employees customarily receive their salary and wages every two weeks on a Friday.  Wages are paid one week following the end of the two-week period in which they were earned; *i.e.*, one week in arrears.  The usual, gross payroll amount for all Debtors' Employees is approximately $189,000 per pay period, or $4.5 million annually.[3]

62.     The last regularly-scheduled payroll was run on January 15, 2016, covering payroll earned though January 8.  An additional payroll run of approximately $181,700 occurred on January 22, 2016, to pay down approximately $54,800 in outstanding commissions owed, approximately $64,800 in accrued paid time off ("PTO") and severance pay owed to employees who were laid off, and approximately $62,100 to reduce the amount of payroll owed in arrears on my contract.  As a result, the Debtors believe there will be two weeks of pre-petition wages owing to the Debtors' Employees as of the Petition Date, or approximately $165,000[4] ("Prepetition Payroll").

63.     In addition, sales commissions are paid each month for the prior month's sales.  Each month, this normally averages approximately $91,500.  The Debtors anticipate that a number of Debtors' Employees were owed or had accrued a right to payment for sales commissions for the month of December and for the portion of January that occurred prepetition ("Prepetition Commissions"), although the payroll run on January 22, 2016, reduced the outstanding Prepetition Commissions.  The Debtors estimate that the Prepetition Commissions

---

[3] The figures referenced are slightly higher when employees who perform work for the Westphalia Subsidiaries (defined below) are included, as discussed in greater detail below.

[4] The Prepetition Payroll does not include amounts for employees who perform work for the Westphalia Subsidiaries, which is discussed in greater detail below.

for December that will come due during the week ending January 29, 2016, will be under $2,000. Additional amounts will be due in February for commissions earned in January prepetition.

64.     Also, as of the Petition Date, many of the Debtors' Employees were owed or had accrued a right to payment for various sums for (a) PTO or holiday pay, and other similar forms of earned compensation (collectively with the Prepetition Payroll and the Prepetition Commissions, the "Prepetition Compensation"), and (b) reimbursement of expenses (averaging approximately $8,000 per pay period) incurred by the Debtors' Employees in connection with services rendered for the benefit of the Debtors, including travel, meals, and lodging ("Expense Reimbursements") that are generally paid in tandem with each payroll.

65.     Finally, as of the Petition Date, the Debtors were obligated to remit deductions taken from the Debtors' Employees' paychecks for the purpose of making payments on behalf of the Debtors' Employees with respect to (i) income tax withholdings, (ii) employee contributions towards 401(k) savings programs or employee premiums relating to employee health benefit plans, and (iii) possible garnishments, child support, or other employee wage deduction orders under which the Debtors are obligated to deduct a portion of a Debtors' Employee's paycheck and pay that amount to a third party (collectively, the "Prepetition Deductions").

66.     Prepetition Compensation, Expenses Reimbursements, and Prepetition Deductions were due and owing as of the Petition Date because, among other things,

    a.     sales commissions are paid monthly, and certain earned commissions are not yet due to be paid;

    b.     it is possible (but not expected) that certain checks issued to the Debtors' Employees prior to the Petition Date may not yet have been presented for

17

payment or may not yet have cleared the banking system and, accordingly, may not have been honored and paid as of the Petition Date; and

c.      certain of the Debtors' Employees may have not yet submitted in the normal course requests for reimbursement of business expenses or commission payments relating to items and transactions that occurred pre-petition.

67.      The Debtors estimate that, as of the Petition Date, approximately $280,0000 in Prepetition Compensation has accrued but not been paid, including approximately $165,000 in Prepetition Payroll, $2,000 in Prepetition Commissions, and PTO that will not exceed $113,000 (after application of the statutory $12,475 limit per employee for Prepetition Compensation is applied).  Additionally, there are approximately $80,700 in Prepetition Deductions withheld but not paid over to the appropriate third parties, and the Debtors estimate that roughly $8,000 in prepetition Expense Reimbursements have accrued but have not yet been paid to the Debtors' Employees.

68.      The Debtors' records indicated that none of the Debtors' Employees will be owed gross Pre-Petition Compensation in excess of the $12,475 priority amount provided by § 507(a)(4) of the Bankruptcy Code for unpaid wages and compensation owed to employees (with the possible exception of one or two of the Debtors' Employees who may slightly exceed the priority amount).  The Debtors will not, in any case, seek authority to pay Prepetition Compensation to any of the Debtors' Employees where it would exceed the statutory priority.

69.      The Debtors maintain certain employee benefit programs, including health, dental, 401(k) retirement plans, and life and disability insurance for their Debtors' Employees, and other similar programs (collectively, the "Benefit Programs").  The Debtors

maintain a self-insured benefit program for health and dental coverage, paying individual claim amounts up to a stop loss level of $175,000.

70.     As of the Petition Date, certain benefits ("Prepetition Benefits") may be owed but remain unpaid because certain obligations under the Benefit Programs accrued either in whole or in part prior to the Petition Date, but will not become payable in the ordinary course of the Debtors' businesses until a later date.  The Debtors estimate that, as of the Petition Date, approximately $5,000 in Prepetition Benefits have accrued but may not have been paid. Debtors seek authority to pay in their sole discretion these Prepetition Benefits.

71.     GLC also manages the payroll and other expenses for certain non-debtor subsidiaries, namely WTC and WBI ("Westphalia Subsidiaries").

72.     The Westphalia Subsidiaries have 12 employees.  Nominally, these employees are listed as employees of GLC and paid through GLC's cash management system.  Their benefits programs are administered in the same fashion.

73.     Each week, the Westphalia Subsidiaries reimburse GLC for the costs of paying the employees of the Westphalia Subsidiaries and for all other costs GLC pays on behalf of the Westphalia Subsidiaries.  These reimbursements average approximately $29,000 per week.

**D.     Debtors' Motion For An Order Extending The Deadline For Filing Their Schedules And Statements Of Financial Affairs**

74.     The Debtors seek a 21-day extension of the deadline for filing their schedules of assets and liabilities and statement of financial affairs required under Federal Rule of Bankruptcy Procedure 1007(b)(1) (collectively, the "Schedules and Statements").  The current deadline is February 8, 2016.  The requested extension would be through February 29, 2016.

75.     The Debtors have approximately one thousand creditors and other parties-in-interest.  The Debtors also are party to approximately two thousand contracts and unexpired leases.

76.     Given the size and complexity of the Debtors' operations, and the fact that certain prepetition invoices have not been received and/or entered into the Debtors' financial systems, the Debtors have not had the opportunity to gather the necessary information to prepare and file their respective Schedules and Statements.

77.     The Debtors believe they will be unable to complete and file the Schedules and Statements by the current deadline due to (a) the complexity and volume of their financial affairs, and (b) the general press of business attendant to the commencement of the Debtors' chapter 11 cases.

### E.     Debtors' Motion For An Order Establishing Certain Notice, Case Management, And Administrative Procedures

78.     The Debtors seek an order establishing certain notice, case management, and administrative procedures (the "Case Management Procedures") which include (a) establishing notice procedures; and (b) providing procedures for the timely filing of pleadings and other papers.

79.     The Debtors have identified potentially one thousand entities to which notice must be given under certain circumstances under the Bankruptcy Code, the Bankruptcy Code and/or the Local Bankruptcy Rules.  Providing such notice would be extremely burdensome to the Debtors, costly to their estates, and in many instances unnecessary, as certain motions would have no bearing on certain parties.

80.     I believe that by directing that certain notices be mailed only to a shortened mailing list and to those creditors who file with this Court a request that they receive

such notices, parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to such matters. Further, a shortened mailing list will significantly reduce the substantial administrative and financial burden that would otherwise be placed on the Debtors' estates and other parties in interest in connection with any Filings in these chapter 11 cases.

81.     Similarly, allowing electronic service of documents in accordance with the Case Management Procedures will further reduce the administrative and financial burden on the Debtors' estates, as well as on other serving parties and will, in many cases, allow for more expedient service of documents.

### F.      Debtors' Motion For An Order (A) Prohibiting Utilities From Terminating Services To The Debtors And (B) Establishing Procedures For Resolving Disputes Relating To Adequate Assurance Requests

82.     The Debtors seek entry of an order establishing procedures for resolving any disputes regarding adequate assurance requests and prohibiting utilities from terminating services to the Debtors pending resolution of any such disputes.

83.     Utility services are essential to the Debtors' ability to sustain its operations while these Chapter 11 cases are pending.  Although electric service to power the Debtors' operations is essential, telephone, electric, gas, water, sewer, waste management, and other services to the Debtors are also critical.  A list of the utilities from which the Debtors receive service is attached as Exhibit A to the Motion.

84.     Any interruption of utility service to the Debtors' businesses would be severely disruptive and diminish the Debtors' chance for a successful reorganization.  In particular, without electrical service, the Debtors' operations would essentially cease entirely.

21

85.     The Debtors are generally current on their utility bills and they anticipate sufficient ability to pay all post-petition utilities current and on time.

**G.     Debtors' Application For an Order Authorizing the Retention and Employment of Kurtzman Carson Consultants, LLC as Official Claims, Balloting and Noticing Agent *Nunc Pro Tunc* to the Petition Date**

86.     The Debtors seek entry of an order authorizing the appointment of Kurtzman Carson Consultants, LLC ("KCC") as the official claims agent, balloting agent, and a noticing agent for specified purposes.  After consulting with counsel, I believe that KCC is well-qualified to serve in this capacity and that KCC's retention is in the best interests of the Debtors' estates and their creditors.

87.     Guided by the assistance of the Debtors' counsel, I reviewed and competitively compared the engagement proposal from KCC with one other claims and noticing agent.  I believe that KCC's rates are competitive and reasonable given KCC's quality of services and expertise.  KCC has agreed to a 10% discount on hourly rates for the duration of the engagement.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  January 25, 2016

                            /s/ John C. Summersett_____
                            JOHN C. SUMMERSETT
                            CHIEF EXECUTIVE OFFICER
                            GREAT LAKES COMNET, INC. AND
                            MANAGER OF COMLINK, L.L.C.

25833378.4\130050-00009