# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:                                                              Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                                 Case No. 16-00290 (JTG)
                                                                    (Jointly Administered)

                              Debtors.

_____/                                  Honorable John T. Gregg

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) ESTABLISHING SALE PROCEDURES, (II) SCHEDULING AN AUCTION AND A SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (III) SETTING CERTAIN DATES AND DEADLINES IN CONNECTION THEREWITH, (IV) APPROVING THE FORM OF THE PURCHASE AND SALE AGREEMENT, INCLUDING THE TERMINATION FEE, AND (V) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, AND (III) GRANTING RELATED RELIEF**

Great Lakes Comnet, Inc. and Comlink L.L.C. (collectively, the "<u>Debtors</u>"), by and through their undersigned counsel, file this motion the ("<u>Sale Motion</u>"), pursuant to §§ 105, 363, and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of (a) an order (the "<u>Sale Procedures Order</u>") (i) establishing sale procedures, (ii) scheduling an auction and a sale hearing in connection with the sale of substantially all of Debtors' assets pursuant to 11 U.S.C. §§ 105, 363 and 365, (iii) setting certain dates and deadlines in connection therewith, (iv) approving the form of the Purchase and Sale Agreement,

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

including the Termination Fee,[2] and (v) granting related relief; and (b) an order (the "Sale Order") (i) authorizing the sale of substantially all of Debtors' assets free and clear of liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §§ 105, 363 and 365, (ii) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to 11 U.S.C. § 365, and (iii) granting related relief.

In this Motion, Debtors seek, among other things, approval of bidding and sale procedures to be followed by the sale ("Sale") of substantially all of Debtors' assets ("Assets") to Everstream GLC Holding Company LLC or an affiliate thereof ("Buyer"), subject to Debtors' receipt of a higher or, in the exercise of the Debtors' business judgment, better bid (taking into account both price and other factors, including execution risk, that Debtors determine to be appropriate) at the Auction. Debtors have determined that an auction sale of substantially all assets (as proposed herein) is in the best interests of their estates because it will maximize the value of the estates. In support of this Motion, Debtors state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

4.      The bases for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014.

---

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Procedures.

## BACKGROUND

5.      On January 25, 2016, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

6.      Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### Form of Proposed Sale

7.      Debtors have agreed to sell and Buyer has agreed to purchase the Assets through a Sale outside of the ordinary course of business under section 363 of the Bankruptcy Code. Debtors and Buyer have entered into a Purchase and Sale Agreement ("APA") memorializing their agreement.  The APA is attached to this Sale Motion as **Exhibit A**.

8.      Following entry of the Sale Procedures Order requested herein, Debtors will market the Assets in accordance with the Sale Procedures attached as **Exhibit B** to this Sale Motion ("Sale Procedures") with the purpose of obtaining a higher or better offer, in the Debtors' business judgment, than the offer submitted by Buyer.

### RELIEF REQUESTED

### Approval of the Proposed Sale of the Assets to Buyer and Form of Purchase and Sale Agreement

9.      Debtors have agreed to sell the Assets to Buyer and Buyer has agreed to buy the Assets, subject to the terms and conditions of the APA ("Stalking Horse Bid").  As set forth in the APA, the Buyer, as stalking horse bidder, may be outbid or Debtors may otherwise receive a better bid by another Qualified Bidder submitting a sufficiently higher or better Qualified Bid for the Assets.  The bidder submitting the highest or best Qualified Bid for the Assets, as determined by the Debtors in the exercise of their business judgment, will be designated as the "Winning Bidder."  Among the factors that the Debtors will consider in determining the Winning Bidder

- 3 -

are the net proceeds that will be made available to the Debtors' bankruptcy estates upon a sale of the Assets.

10.    The following is a summary of the primary terms contained in the APA.  This summary is not intended to be a comprehensive discussion of all of the provisions of the APA and is qualified in all respects by the terms of the APA itself.  In the event of a discrepancy between the following summary and the terms of the APA, the APA will control.

(a)    <u>Purchased Assets.</u> The Assets to be sold will consist of substantially all of Debtors' assets.

(b)    <u>Stalking Horse Bid</u>.  The aggregate consideration (the "<u>Purchase Price</u>") for the Assets is an amount that shall be equal (subject to the adjustments set forth in Section 2.1(a) of the APA) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Debtors' bankruptcy estate ("<u>Estate Payment</u>**"),** minus the Excess Cure Credit, if any (the "<u>Cash Purchase Price</u>").   The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction.  If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter.  On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Debtors utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**.  Upon the execution of the APA, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed.   **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of the APA.  Moreover, if the Additional CoBank DIP Liability utilized by the Debtors is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Debtors; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

(c)    <u>Deposit Amount</u>.  Pursuant to the terms of an escrow agreement attached to the APA as **Exhibit D** (the "<u>Escrow Agreement</u>"), within seven (7) days of the date of the APA, the Buyer shall deposit with the escrow agent identified in the Escrow Agreement (the "<u>Escrow Agent</u>"), the sum of $3,210,000 (USD) (the "<u>Deposit</u>") by wire transfer of immediately available funds.  The Deposit shall be distributed in accordance with the APA, the Bidding Procedures Order and/or the Escrow Agreement, as applicable.  For all purposes under the APA, the Deposit shall be treated

- 4 -

as an advance of the Cash Purchase Price that shall be refundable to the Buyer under certain conditions set forth in the APA.

(d)    <u>Termination Fee</u>.  Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA, (ii) the APA has not been terminated (other than in accordance with **Section 9.1(d), (f), (g), (h), (i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more Persons (a "<u>Third Party</u>") other than the Buyer or an Affiliate of the Buyer (a "<u>Third Party Sale</u>"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "<u>Termination Fee</u>").  Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale.  For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Debtors or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale.  For the avoidance of doubt, the termination of the APA pursuant to **Section 9.1(d), (f), (g), (h), (i) or (j)** shall not prevent Buyer from recovering its Termination Fee.

(e)    <u>Assumed and Rejected Leases and Contracts</u>.

    (1)    The Debtors shall take all actions reasonably required to assume and assign the Assumed Contracts to the Buyer (other than payment of Cure Costs, if so required), including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Assumed Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code and as otherwise acceptable in form and substance to the Buyer.

(2) At Closing, (x) the Debtors shall, pursuant to the Sale Order and the Assignment and Assumption Agreements, assume and assign to the Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts, and (y) the Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among the various counterparties, the Buyer and the Debtors, or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreements.

(f) <u>Assignment of Bid.</u>  Pursuant to Section 11.3 of the APA, the APA will be binding upon, and inure to the benefit of, the Parties thereto and their respective successors and permitted assigns, but will not be assignable or delegable by the Buyer prior to Closing without the prior written consent of the Debtors. Notwithstanding the foregoing, the Buyer shall be permitted to assign, in whole or in part, its right to purchase the Assets, or to transfer the APA to its lenders or to one or more affiliates of, or one or more entities controlled by, the Buyer.

(g) <u>Conditions to Closing.</u> The obligation of Buyer to close the Sale is conditioned upon the matters described in Sections 7.1 of the APA, which include, but are not limited to, (i) entry of the Sale Order as a Final Order, (ii) the accuracy of the representations and warranties of Debtors contained in the APA, (iii) the execution and delivery of the closing documents, and (iv) the performance by Debtors of their obligations under the APA.

(h) <u>Closing Date.</u>  The closing of the transactions contemplated by the APA ("<u>Closing</u>") shall take place remotely via electronic exchange of documents, on the date ("<u>Closing Date</u>") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in Sections 7.1(e) and 7.2(e), whichever is last to occur, absent written agreement of the Parties.

(i) <u>Sale Free and Clear.</u>  All of Debtors' right, title, and interest in and to the Assets will be sold to Buyer pursuant to the Sale Order "AS IS AND WHERE IS", free and clear of all liens, claims, encumbrances, and interests of any kind or nature (except Permitted Liens), with any such liens, claims, encumbrances and interests attaching to the Sale Proceeds according to their pre-Closing Date priority.

- 6 -

11.     The proposed Sale Order includes the following findings and provisions, among others: (a) that the Winning Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; and (b) that the sale price for the Assets was not controlled by a collusive agreement among potential bidders within the meaning of section 363(n) of the Bankruptcy Code.

### Approval of Proposed Sale Procedures

12.     Debtors propose to offer the Assets for sale as a whole with Debtors' businesses being sold as a going concern. Any Qualified Bidder shall bid on all of the Assets together.  If no Qualified Bid other than Buyer's Stalking Horse Bid is received for the Assets, Debtors shall move the Court to approve the Stalking Horse Bid as the highest or otherwise best bid for the Assets.  The Sale Procedures contemplate an auction process whereby only bidders having submitted a Qualified Bid are eligible to participate.  The bid submitted by Buyer pursuant to the APA establishes a baseline bid for the Assets, which Debtors will use to solicit Qualified Bids from other bidders.  The highest or otherwise best Qualified Bid submitted prior to the Auction will serve as the opening bid at the Auction.

13.     The following is a summary of the primary terms of the Sale Procedures.  This summary is not intended to be a complete discussion of all of the provisions of the Sale Procedures and is qualified in all respects by the terms of the Sale Procedures.  For a complete recital of all of the terms and conditions of the Sale Procedures, parties are encouraged to consult the Sale Procedures.

(a)     <u>Assets</u>.  The assets to be sold are substantially all of the assets of the Debtors.

(b)     <u>Due Diligence</u>.  Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from Debtors. Interested parties must execute a form nondisclosure agreement acceptable to Debtors ("<u>NDA</u>") before any due diligence materials will be provided.  Parties that

- 7 -

have previously executed an NDA do not need to execute a new NDA. All due diligence requests should be directed to Jason Hill, Media Venture Partners, 990 Washington Street, Suite 200, Dedham, MA 02026; phone: 617.345.7316; email: jhill@mediaventurepartners.com. Debtors will comply with other reasonable due diligence requests made by such interested parties, and all due diligence shall be completed by the Auction.

(c)    <u>Qualified Bidders</u>.

(i)    Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(ii)    A "Qualified Bidder" is any entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures and includes Buyer.

(iii)    A "Qualified Bid" is a written offer to purchase the Assets that complies with the following requirements:

(1)    <u>Deadline to Submit Qualified Bids</u>: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received by Debtors' counsel no later than 5:00 p.m. prevailing Eastern Time on April 8, 2016 (the "<u>Qualified Bid Deadline</u>").

(2)    <u>Where to Submit Bids</u>:  Bids must be submitted by electronic mail to Counsel for Debtor and Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

Counsel for Debtors
Timothy A. Fusco & Stephen S. LaPlante
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
fusco@millercanfield.com
laplante@millercanfield.com

Office of the United States Trustee
c/o Michelle Wilson
The Ledyard Building, 2nd Floor
125 Ottawa, NW, Suite 202R
Grand Rapids, MI 49503
Michelle.m.wilson@usdoj.gov

(3)    <u>Content of Qualified Bids</u>:    The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("<u>Bid Package</u>"):

    a.    An unconditional cash offer for substantially all of the Debtors' assets.

    b.    An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors.

    c.    Propose a cash purchase price that is not less than $32,350,000.

    d.    Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("<u>Buyer's Premium</u>"), in order to compensate the Debtors for the Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer.

    e.    A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (c) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

    f.    A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (c) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder.

    g.    A disclosure of the identity of each person or entity that will be bidding for the Assets.

    h.    A binding and irrevocable offer.

- 9 -

   i. The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank and the Official Committee of Unsecured Creditors ("<u>Committee</u>", and together with CoBank, the "<u>Consultation Parties</u>")(provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction.

   j. A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

   k. A deposit in cash or other immediately available funds ("<u>Deposit</u>") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid.

   l. The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

 (d) <u>Designation of Qualified Bids</u>.

  (i) On or before April 13, 2016, at 5:00 p.m. prevailing Eastern Time and after consultation with the Consultation Parties, Debtors will in their sole discretion designate those submitted bids, if any, that are Qualified Bids. After consultation with the Consultation Parties, Debtors may, in their sole discretion, determine, at the Auction, that a previously Qualified Bidder has altered its bid in a way that causes it no longer to be a Qualified Bidder.

  (ii) If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, Debtors will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

(e)     Auction.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, the Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

(i)     Only representatives of Debtors, the Committee, the United States Trustee, Buyer, CoBank and any Qualified Bidder will be entitled to attend the Auction.

(ii)    Debtors may announce at the Auction additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances (e.g., regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

(iii)   After consultation with the Consultation Parties, Debtors shall designate in their sole discretion at the start of the Auction the Qualified Bid determined by the Debtors in the exercise of their business judgment to be the highest and best bid as the initial bid for the Assets ("Initial Qualified Bid").

(iv)    The first overbid above the Initial Qualified Bid and each subsequent overbid must be in the form of cash consideration and must be determined by Debtors to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).  Each Qualified Bid, including the Initial Qualified Bid, made by a Qualified Bidder (other than Buyer) must agree to pay, in addition to its Qualified Bid, the Buyer's Premium should its Qualified Bid become the Winning Bid.

(v)     After each round of bidding and consultation with the Consultation Parties, Debtors will announce the identity of the Qualified Bidder deemed by Debtors at that point to have made the highest or otherwise best offer for the Assets.

(vi)    Promptly after the conclusion of the Auction and after consultation with the Consultation Parties, Debtors will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net

- 11 -

proceeds that will be made available to the Debtors' bankruptcy estate upon a purported sale of the Assets (the "Winning Bidder") and shall designate the next highest or otherwise best Qualified Bid (the "Back-Up Bid") and the entity submitting the Back-Up Bid ("Back-Up Bidder"). Debtors will file a notice immediately after the Auction setting forth the identity of the Winning Bidder. The Buyer's Premium is additional consideration that the Winning Bidder will be required to pay the Debtors' estates, but will not be taken into account in determining the Winning Bidder.

(vii)    At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, Debtors shall be authorized to close on the Back-Up Bid without further order of the Court.

**Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases**

14.    Debtors may be parties to executory contracts or unexpired leases that may be assumed and assigned pursuant to Bankruptcy Code section 365. Such executory contracts and unexpired leases are valuable assets of the estate and are an important component of the overall package of the assets to be marketed for the Sale.

15.    The Sale Procedures require each Qualified Bidder to identify executory contracts and unexpired leases to be assumed and assigned by Debtors to the Winning Bidder in the event such Qualified Bidder is the Winning Bidder.

16.    Debtors request authority pursuant to Bankruptcy Code section 365 to assume and assign to the Winning Bidder certain executory contracts and unexpired leases ("Assumed and Assigned Agreements"). The form of notice of the proposed assumption and assignment of executory contracts and unexpired leases ("Assumption and Assignment Notice") is attached as **Exhibit C** to this Sale Motion. The proposed Sale Procedures Order, attached as **Exhibit D** to

this Sale Motion, adopts the following procedures for the assumption and assignment of

executory contracts and unexpired leases:

(a)    By no later than seven days after entry of the Sale Procedures Order, the Debtors will file a schedule ("Cure Schedule") which will be attached to the Assumption and Assignment Notice, identifying (i) the Assumed and Assigned Agreements, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults and other defaults under such agreement pursuant to section 365 of the Bankruptcy Code ("Cure Costs").

(b)    Upon the filing of the Cure Schedule, the Debtors will serve the Cure Schedule and the Assumption and Assignment Notice on each of the nondebtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Debtors are or may be seeking the assumption and assignment of the Assumed and Assigned Agreement and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale, (ii) the deadline for objecting ("Cure/Assignment Objection") to the amount of the proposed Cure Costs related to any executory contract or unexpired lease is **April 22, 2016 at 5:00 p.m. Eastern Time** ("Cure/Assignment Objection Deadline") and (iii) the deadline for objecting ("Adequate Assurance Objection") to the ability of the buyer to provide adequate assurance of future performance under any Assumed and Assigned Agreement is **April 22, 2016 at 5:00 p.m. Eastern Time** ("Adequate Assurance Objection Deadline" and collectively, the "Cure/Adequate Assurance Objection Deadlines").

(c)    Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on Debtors' counsel so that it is received by the applicable Cure/Adequate Assurance Objection Deadline.

(d)    If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Costs set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Costs required to be paid by or on behalf of the applicable Debtor in connection with the assumption and assignment of such agreement.  In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Adequate Assurance Objection Deadlines, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Debtors and the buyer

- 13 -

will be entitled to rely solely upon the Cure Cost set forth on the Cure Schedule, (ii) deemed to have consented to the assumption and assignment, and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the buyer that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumptions or assignment of the applicable Assumed and Assigned Agreement.

(e)     The Debtors or the Winning Bidder may amend the Cure Schedule to remove any Assumed and Assigned Agreement at any time before such Assumed and Assigned Agreement is actually assumed and assigned pursuant to an order of the Court.  The nondebtor party or parties to any such removed contract or lease will be notified of such exclusion by written notice mailed within one (1) business day after such amendment.

## Sale Hearing, Auction, and Objection Deadline

17.     Subject to the Court's availability, Debtors propose the following timetable in connection with the Auction and Sale Hearing:

(a)     <u>Notice of Auction and Sale</u>.  Within seven days after entry of Sale Procedures Order approving the Sale Procedures, Debtors will provide notification of the Sale Procedures to the following parties in the form and manner described below:

(i)     Debtors will serve the Sale Procedures Order and APA, by mail, postage prepaid on:

(1)     The United States Trustee;

(2)     All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

(3)     All entities known by the Debtors to have expressed a *bona fide* interest in acquiring the Assets;

(4)     Everstream GLC Holding Company, LLC;

(5)     The Unsecured Creditors' Committee (if any);

(6)     All entities known by the Debtors to have asserted a lien, claim, or encumbrance on or against any of the Assets, including CoBank;

- 14 -

(7)     All taxing applicable authorities; and

(8)     Governmental agencies regulating Debtors, including Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

(ii)     Debtors will serve a notice of the Sale Procedures Order and the Auction, by mail, postage prepaid, in the form attached as **Attachment A** to the Sale Procedures, on all known creditors of the Debtors; and

(iii)     Debtors will submit for publication to the Detroit Free Press or Detroit News a notice of the Sale Procedures Order and the Auction and invitation to bid, also in the form attached as **Attachment A** to the Sale Procedures.

(b)     <u>Auction</u>. In the event one or more Qualified Bids other than the Stalking Horse Bid is submitted as provided in the Sale Procedures, the Auction will be held on April 15, 2016, commencing at 10:00 a.m. Debtors will file a notice promptly after the auction setting forth the identity of the Winning Bidder. If no Qualified Bids are received other than the Stalking Horse Bid, the Buyer shall be the Winning Bidder.

(c)     <u>Objections to Sale of Assets.</u> An objection to the sale of the Assets to the Winning Bidder must be filed with the Court, and served on Debtors' counsel so that it is received on or before April 22, 2016 at 5:00 p.m. Eastern Time.

### BASIS FOR RELIEF REQUESTED

### The Proposed Sale is Authorized Under Bankruptcy Code § 363

18.     Section 363(b)(1) of the Bankruptcy Code empowers a debtor-in-possession, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

19.     A broad consensus of courts, including the Sixth Circuit and this District, hold that a debtor may sell property of the estate outside of the ordinary course of business where such use represents an exercise of the debtor's sound business judgment. *Stephen Industries,*

- 15 -

*Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("We adopt the Second Circuit's reasoning in *In re Lionel, supra*, and conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action."); *citing Committee of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Quality Stores, Inc.*, 272 B.r. 643, 647-48 (Bankr. W.D. Mich. 2002) ("[A] sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.") *quoting In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995) ("In this circuit, a bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action.")

20.      The proposed sale of the Assets to the Winning Bidder satisfies the applicable requirements. The Debtors are relying on their well-articulated business judgment in their decision to sell the Assets.  The Debtors lack the necessary capital to continue their operations and, therefore, have concluded in their business judgment that a competitive bidding process for their assets will provide the greatest return to their creditors. The Debtors have determined that they can obtain the highest and best value for their assets only by selling substantially all of their assets and their businesses as a going concern.

21.      In addition, the Sale Procedures will result in fair and reasonable consideration being realized for the Assets because they are designed to maximize the value of the Assets.  The Stalking Horse Bid submitted by Buyer pursuant to the APA establishes a "floor" purchase price for the Assets and will serve as a baseline bid that the Debtors will use to solicit other Qualified Bids from third parties. By testing the purchase price of the Stalking Horse Bid in the market, the

Sale Procedures and the Auction are designed to ensure that the Debtors receive fair and reasonable consideration for the Assets.

22.     Moreover, the APA and Sale Procedures are the result of extensive good faith, arms-length negotiations between the Debtors and Buyer.

23.     The Debtors seek permission to sell the Assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with such Liens attaching to the applicable proceeds.  Section 363(f) of the Bankruptcy Code provides that property may be sold free and clear of any interest in property if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

24.     The Debtors need only satisfy one of the noted conditions and believe that CoBank will consent to the proposed sale. Otherwise, section 363(f)(5) of the Bankruptcy Code allows a debtor to sell property free and clear of liens when a legal or equitable proceeding could compel the lienholder to accept less than full money satisfaction for its interest.  *In re James*, 203 B.R. 449, 453 (W.D. Mo. 1997); *In re Grand Slam USA, Inc.*, 178 B.R. 460, 463-64 (E.D. Mo. 1995).  Courts considering this issue have held that the "cram down" provision under the Bankruptcy Code constitutes such a "legal or equitable proceeding" and permits a sale under section 363(f)(5) of the Bankruptcy Code where a secured creditor may receive less than the

value of its claim.  *Grand Slam USA, Inc.*, 178 B.R. at 464; *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993); *In re Healthco Intern., Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994).  The Debtors propose that any valid Liens attach to the sale proceeds attributable to the Asset(s) being sold and encumbered by such Liens and in the same priority as such Liens.

25.    Finally, Buyer is not affiliated with, managed, or controlled by any of Debtors' owners. Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

## The Proposed Assumption and Assignment of Executory Contracts Complies with Bankruptcy Code Section 365

26.    To facilitate the sale of the Assets as outlined in this Motion, Debtors seek authority to assume and assign certain executory contracts and unexpired leases to the Winning Bidder to the extent required by the Winning Bid.

27.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign an executory contract or unexpired lease, subject to the approval of the bankruptcy court provided that any defaults under such executory contract or unexpired lease are cured and the assignee provides adequate assurance of future performance.

28.    A debtor's decision to assume or reject an executory contract or unexpired lease is examined under the business judgment standard.  *See, e.g.*, *In re Stable Mews Association, Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1983); *Software Customizer v. Bullet Jet Charter (In re Bullet Jet Charter)*, 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or]

rejection of the contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

29.     Debtors believe that the purchase price for the Assets will be maximized if Debtors agree to assume and assign to the Winning Bidder the Assumed and Assigned Agreements. Accordingly, Debtors' business rationale for seeking to assume and assign certain executory contracts is the same as their rationale for conducting the proposed Sale − Debtors believe that the sale of their Assets, including related valuable unexpired contract rights, will maximize the value of their estates for the benefit of their creditors.

30.     Debtors believe that all of the requirements under Bankruptcy Code section 365 for the assumption and assignment of the Assumed and Assigned Agreements will be satisfied by the procedures outlined above.  To the extent that no defaults exist under any of the Assumed and Assigned Agreements, such defaults will be cured by the payment of the Cure Amounts by the Winning Bidder.  Further, as required by the Sale Procedures, the financial wherewithal of each bidder will be evaluated before such bidder is allowed to participate in the Auction. Accordingly, Debtors believe that the Winning Bidder will be able to provide adequate assurance of future performance under each of the Assumed and Assigned Agreements.

### The Proposed Sale Procedures Are Appropriate Under the Circumstances

31.     The Sale Procedures are the result of good faith, arms-length negotiation between Debtors and Buyer.  All parties in interest are united in their aim to realize the highest possible value of the Assets through a sale.  It has long been recognized by bankruptcy courts that a competitive bidding process is the best way to realize the highest value that industry participants place on assets. *See, e.g.*, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr.

S.D.N.Y. 1997).  The Sale Procedures reflect an understanding of this principle by facilitating competitive bidding for the Assets.

32.    The Sale Procedures contain certain limitations on participants in the Auction, which are designed to maximize the efficiency of the Auction process.  By limiting participation in the Auction to Qualified Bidders, delineating requirements for being designated as a Qualified Bidder and establishing an overbid requirement, the Sale Procedures will discourage bidding by parties other than those with the financial capacity to purchase the Assets.  Such requirements are not onerous and will likely not discourage legitimate Auction participants from submitting bids.

33.    A debtor's business judgment is entitled to substantial deference with respect to the procedures used in selling assets of its estate.  *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992).  Here, the Sale Procedures create a process for fully competitive bidding among the parties most likely to be interested in purchasing the Assets and will maximize the value of Debtors' estates by providing certain protections for Debtors' administrative, priority, and unsecured creditors.

### The Termination Fee is Appropriate Under the Circumstances

34.    The Termination Fee was the product of arms-length negotiations between Debtors and Buyer, and the Termination Fee is fair and reasonable under the circumstances.  Buyer has incurred and will incur costs, expenses and risks associated with entering into the APA and submitting the Stalking Horse Bid.  These expenses are not limited to ordinary due diligence.  In this case, Buyer has incurred significant expenses associated with the preparation of sale documents, as well as bankruptcy pleadings necessary to consummate the sale.

35.     The requirements in the Sales Procedures that a Qualified Bidder submit a bid with a cash purchase price equal to $32,350,000 and agree to pay the Buyer's Premium provide the Debtors' estates with sufficient funds to pay the Termination Fee.

36.     Bankruptcy courts have generally approved termination fees under 11 U.S.C. § 105 in conjunction with a trustee or debtor-in-possession's authority under section 363(b) to sell property of the estate outside the ordinary course of business.  Courts recognize that termination fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code.  *See Integrated Resources*, 147 B.R. at 659-60.   The appropriate test of a termination fee is whether a "compelling and sound business justification" exists under section 363(b).  *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 603 (5th Cir. 2011); *accord In re JW Res., Inc.*, 536 B.R. 193, 195-96 (Bankr. E.D. Ky. 2015).  One of the key considerations in determining whether a termination fee or expense reimbursement should be allowed is whether it reasonably relates to the initial bidder's "risk, effort, and expenses . . . ." *Integrated Resources*, 147 B.R. at 662.

37.     Here, Debtors have supplied a compelling business justification for its judgment that the Termination Fee is appropriate under the circumstances.  Buyer has invested significant time and resources negotiating the Stalking Horse Bid with Debtors and preparing the sale-related documents and pleadings.  Buyer should not be penalized for its initiative and investment simply because Debtors are compelled to accept a bid that is more than Buyer's Stalking Horse Bid.

38.     In addition, Buyer has provided a benefit to the estate, and the Termination Fee is in the best interests of the estates. *M&M Holdings, LLC v. Unsecured Creditors Comm. (In re SpecialtyChem Prods. Corp.)*, 372 B.R. 434, 440 (E.D. Wis. 2007); *In re S.N.A. Nut Co.*, 186

- 21 -

B.R. 98, 104 (Bankr. N.D. Ill. 1995).  The Termination Fee is payable only on the conditions set forth in the APA.  If those conditions are satisfied, the Buyer will have provided significant benefit to Debtors' estates by initiating the Auction and helping cause another bidder to consummate a sale transaction with Debtors at a price substantially higher than the Purchase Price.  Accordingly, the Debtors have demonstrated a compelling business justification for the Termination Fee, and the Termination Fee qualifies an administrative expense pursuant to section 503(b) of the Bankruptcy Code.

### Reservation of Rights; Deadline Extension

39.     Debtors reserve the right modify the Sale Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation, extending the deadlines set forth in the Sale Procedures, modifying bidding increments, adjourning or canceling the Auction or Sale, all without further notice.

### Request for Modification of Stay Imposed by Rule 6004(h) and 6006(d)

40.     Debtors request that the stay imposed by Bankruptcy Rule 6004(h) and 6006(d) be modified such that any Sale Order entered by the Court shall be effective immediately upon entry.

### CONCLUSION

WHEREFORE, Debtors respectfully request (A) entry of the Sale Procedures Order, (B) entry of the Sale Order, attached as **Exhibit E** to this Sale Motion, containing a provision modifying the stay imposed by Bankruptcy Rule 6004(h) such that it is effective immediately upon entry; and (C) such other and further relief as the Court deems just and proper.


Dated: February 1, 2016

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By: /s/ Stephen S. LaPlante
       Timothy A. Fusco (P13768)
       Jonathan S. Green (P33140)
       Stephen S. LaPlante (P48063)
       Marc N. Swanson (P71149)
       150 West Jefferson, Suite 2500
       Detroit, MI 48226
       (313) 496-7997
       (313) 496-8478
       laplante@millercanfield.com

       *Proposed Attorneys to the Debtors and*
       *Debtors in Possession*

**Exhibits**

| | | |
|---|---|---|
| **Exhibit A** | -- | **APA** |
| **Exhibit B** | -- | **Sales Procedures** |
| **Exhibit C** | -- | **Assumption and Assignment Notice** |
| **Exhibit D** | -- | **Sale Procedures Order** |
| **Exhibit E** | -- | **Sale Order** |
| **Exhibit F** | -- | **Legal Description and Common Street Address for Real Property to be Sold** |

**Exhibit A    --    APA**

**Execution Version**

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("**Agreement**") is made and entered into as of January 29, 2016, by and among (i) Great Lakes Comnet, Inc. and Comlink, L.L.C. (each a "**Comnet Company**" and collectively, the "**Comnet Companies**") and  (ii) Everstream GLC Holding Company LLC (or its designee(s), the "**Buyer**").  Each of the Comnet Companies and the Buyer is a "**Party**" and collectively they are the "**Parties**" to this Agreement.  Capitalized terms used, but not otherwise defined herein, shall have the meanings set forth in **Section 11.7**.

## RECITALS

A.      The Comnet Companies presently conduct the Business.

B.      On January 25, 2016 ("**Petition Date**"), each of the Comnet Companies filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code ("**Bankruptcy Code**") and in accordance with the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") commencing a bankruptcy proceeding in the United States Bankruptcy Court for the Western District of Michigan (the "**Bankruptcy Court**"), which cases are being jointly administered under case no. 16-00290 (collectively, the "**Bankruptcy Case**").

C.      Each of the Comnet Companies desires to sell, convey, transfer, assign and deliver to the Buyer, and the Buyer desires to purchase, acquire and assume from each of the Comnet Companies, all of the Acquired Assets free and clear of all Liens (other than Permitted Liens) and Assumed Liabilities, which shall include all Assumed Contracts, all on the terms and conditions provided herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code.

D.      The Acquired Assets shall be purchased by the Buyer pursuant to the Sale Order approving such sale, free and clear of all Liens (other than Permitted Liens), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 6004 and 6006, which order will include the authorization for the assumption by the Comnet Companies and assignment to the Buyer of the Assumed Liabilities, including the Assumed Contracts thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with other applicable provisions of the Bankruptcy Code and the Bankruptcy Rules and the local rules for the Bankruptcy Court; and

E.      The board of directors (or similar governing body) of each Comnet Company has determined that it is advisable and in the best interests of such Comnet Company and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

## AGREEMENT

In consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF ASSETS

      1.1   <u>Acquired Assets</u>.  Upon the terms and subject to the conditions of this Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing and effective at the Closing Date, each of the Comnet Companies shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall purchase, receive and accept from each of the Comnet Companies, free and clear of all Liens (except for Permitted Liens), all of the Acquired Assets. "**Acquired Assets**" shall mean all of each of the Comnet Companies' right, title, and interest in the properties, assets and rights used or useful in connection with the Business (except for the Excluded Assets), wherever located, whether tangible or intangible, real, personal or mixed, as the same shall exist at the Closing, and whether or not any such properties, assets or rights have any value for accounting purposes.  The Acquired Assets shall include, but shall not be limited to, all of each Comnet Company's right, title and interest in and to the assets described in the following clauses (but shall specifically exclude the Excluded Assets):

      (a)   The real property described in **Schedule 1.1(a)** (the "**Owned Real Property**" and with the Leased Real Property, defined below, the "**Real Property**").

      (b)   All computers, computer equipment, computer hardware/software, servers, fiber optic lines, copiers, security systems, and all other equipment listed on **Schedule 1.1(b)** (collectively, the "**Equipment**"), which Equipment shall include, without limitation, all Equipment related to the Network.

      (c)   All assets and rights included in, necessary for the operation of, or currently used in connection with the Network, including without limitation, any Fiber Lease or other similar right.

      (d)   All telephone numbers registered to the Comnet Companies, including without limitation, those telephone numbers listed on **Schedule 1.1(d)**; provided however, that the Buyer acknowledges that the Comnet Companies will utilize numbers on **Schedule 1.1(d)** in the ordinary course of business prior to the Closing Date.

      (e)   All inventory owned by the Comnet Companies that shall be transferred as part of the sale transaction (the "**Inventory**").

      (f)   All Intellectual Property owned by the Comnet Companies and all rights to any Intellectual Property of any other person licensed to the Comnet Companies pursuant to any Assumed Contract.

      (g)   All Assumed Contracts and all rights of the Comnet Companies under the Assumed Contracts, including without limitation, any right to any uncollected accounts receivable or notes receivable (the "**Accounts Receivable**") related to or arising from any of the Assumed Contracts.

      (h)   All express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights

2

of set off against third parties relating to the Acquired Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assumed Contracts) or Assumed Liabilities, including without limitation, rights under vendors' and manufacturers' warranties, indemnities, and guaranties.

(i)    All deposit accounts with any bank or other financial institution and the respective account numbers for the purposes of maintaining these accounts post-Closing. (the "**Deposit Accounts**").  For the avoidance of doubt, these Deposit Accounts shall not include any cash, cash equivalents, financial assets, or other funds on deposit pre-Closing, and the aggregate amount of any cash, cash equivalents, financial assets, or other funds on deposit contained in the Deposit Accounts immediately prior to Closing shall be transferred to a newly-created bank account established by the Comnet Companies for purposes of the Closing (such bank account shall not constitute a Deposit Account hereunder).

(j)    To the extent transferrable under applicable Law or with the Consent of any third party, if necessary, which Consent has been obtained, all Licenses and Permits, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, all pending applications for any of the foregoing, and the rights to all data and records held by such permitting, licensing and certifying agencies.

(k)    All goodwill of the Business as a going concern and all other intangible properties of the Business.

(l)    All documents consisting of purchasing and sales records, accounting records, business plans, budgets, cost and pricing information, customer and vendor lists, wherever located related to the Business, other than those documents that are Excluded Assets.

(m)    All tangible assets of each of the Comnet Companies other than the assets set forth on **Schedule 1.1(l)**, including without limitation, the tangible assets located at any Real Property.

(n)    All personnel files for Transferred Employees except as required under Law; provided, however, that the Comnet Companies have the right to retain copies at their expense to the extent required by Law.

(o)    All prepaid expenses, except deferred Tax assets.

(p)    Any rights, claims or causes of action of the Comnet Companies, except for those identified as, related to, or arising under, Excluded Assets.

(q)    Those additional items referenced on **Schedule 1.1(q)**.

1.2    Excluded Assets.  Notwithstanding anything contained in **Section 1.1**, the Comnet Companies are not selling, conveying, transferring or assigning and the Buyer is not purchasing receiving or accepting, any of the assets, rights or properties set forth below (such assets being referred to as the "**Excluded Asset**s").  The Comnet Companies shall retain all right, title and interest to and in the Excluded Assets:

(a)    Any and all rights under all Contracts that are not Assumed Contracts.

(b)    Any (i) prepayments relating to retainers payable to professional advisors to the Comnet Companies, (ii) cash, cash equivalents, financial assets, or other funds on deposit, except uncollected Accounts Receivable related to any of the Assumed Contracts, (iii) cash or cash equivalents that consist of the Cash Purchase Price, as provided in **Section 2.1(a)**, and (iv) deferred Tax assets.

(c)    Any (i) confidential personnel and medical records pertaining to any Employee who is not hired by the Buyer; (ii) books and records that the Comnet Companies are required by Law to retain; provided, that the Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Acquired Assets, and (iii) minute books, stock and membership ledgers and stock and membership certificates of the Comnet Companies.

(d)    All rights under or pursuant to all warranties (express or implied), representations and guarantees made by third parties relating to any Excluded Assets.

(e)    Any claim, right or interest of the Comnet Companies in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date.

(f)    All claims that any of the Comnet Companies may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities.

(g)    All Employee Plans and assets related thereto, including the Comnet Companies' rights, title and interests in any (i) assets related to a defined benefit or defined contribution retirement plan, and (ii) assets related to non-qualified deferred compensation plan (except to the extent related to liabilities of such Employee Plans that are agreed to be assumed by the Buyer).

(h)    All Accounts Receivable, other than any accounts or notes related to or arising from any of the Assumed Contracts.

(i)    All stock or equity in Clinton County Telephone Company.

(j)    All property owned by Clinton County Telephone Company.

(k)    All stock or equity in Westphalia Telephone Company.

(l)    All property owned by Westphalia Telephone Company.

(m)    All stock or equity in Westphalia Broadband, Inc.

(n)    All property owned by Westphalia Broadband, Inc.

4

(o)    Laptop computers and cell phones for employees of the Comnet Companies that are not Transferred Employees and that are retained by the Comnet Companies to wind down the affairs of the Comnet Companies following the Closing. The Buyer may remove all proprietary programs and data from the laptop computers and cell phones.

(p)    All rights, Claims or causes of action of the Comnet Companies in the lawsuit captioned, *Great Lakes Comnet, Inc. and Westphalia Telephone Company, Plaintiffs, vs. AT&T Corp., Defendant*, Case No. 1:15-cv-216, pending in the United States District Court for the Western District of Michigan, Southern Division and the proceeds of such lawsuits.

(q)    All membership interests of the Comnet Companies and all equity securities owned or held by any members of the Comnet Companies.

(r)    Any avoidance actions and Claims and proceeds of such avoidance actions and Claims under Sections 510, 541, 544, 546, 547, 548, 549, 550, 551, 552 and 553 – 562 of the Bankruptcy Code and non-Bankruptcy law.

1.3    <u>Assumed Liabilities</u>. Upon the terms and subject to the conditions of this Agreement, at the Closing and effective at the Closing Date, the Comnet Companies shall assign to the Buyer and the Buyer shall assume from the Comnet Companies and shall perform and discharge in accordance with their respective terms, all of the Assumed Liabilities. The Buyer shall assume no liabilities of any of the Comnet Companies except as set forth in this **Section 1.3.** "**Assumed Liabilities**" shall mean all of the Comnet Companies' obligations for the liabilities set forth below:

(a)    All liabilities and obligations under the Assumed Contracts from and after the Closing (as specified on **Schedule 1.3(a)** (the "**Assumed Contracts**"), including without limitation, the Cure Costs;

(b)    All liabilities and obligations arising out of, or with respect to, (i) the operation of the Business and the Acquired Assets by the Buyer after the Closing or (ii) the employment of the Transferred Employees by the Buyer after the Closing; and

(c)    All liabilities and obligations for the security deposits, customer deposits or other deposits listed on **Schedule 1.3(c)** (which may be amended by Buyer any time prior to Closing), in each case, in the amount listed therein (such aggregate amount, the "**Deposit Amount**"), and provided that the Buyer shall receive a corresponding dollar-for-dollar credit against the Cash Purchase Price, as provided in **Section 2.1(a)**, otherwise payable by the Buyer hereunder for the total sum of the Deposit Amount as of the Closing Date.

1.4    <u>Excluded Liabilities</u>. Except as expressly set forth in **Section 1.3** of this Agreement, the Buyer shall not assume, and shall not be obligated to satisfy or perform, any liability or obligation of the Comnet Companies, whether known or unknown, whether arising before the Petition Date or after the Petition Date, whether absolute or contingent, whether liquidated or nonliquidated, whether due or to become due, and whether claims with respect thereto are asserted before or after the Closing Date. It is expressly understood and agreed that the Comnet Companies and the Buyer intend that Buyer shall not be considered to be a successor to the Comnet Companies by reason of any theory of law or equity and that the Buyer shall have

no liability except as expressly provided in **Section 1.3** of this Agreement.  Without in any way limiting the generality of the foregoing, "**Excluded Liabilities**" specifically includes:

(a)    All trade payables and non-trade payables, not specifically included in the Assumed Liabilities.

(b)    All liabilities arising out of Excluded Assets, including Contracts that are not Assumed Contracts.

(c)    Except as otherwise provided in this Agreement, all liabilities for Taxes due from, and owing by, each of the Comnet Companies relating to the Acquired Assets for any Tax periods (or portions thereof) ending on or before the Closing Date.

(d)    Any liability relating to any severance plans or any other employee retention or termination agreements, not specifically included in the Assumed Liabilities.

(e)    Any liability relating to or arising out of any employment action or practice in connection with the employment or termination of employment of any persons currently or formerly employed or seeking to be employed by the applicable Comnet Companies.

(f)    Any liability relating to the services performed by any professional in connection with the Bankruptcy Case or any liabilities or costs related to the administration of the Bankruptcy Case, including any liabilities or costs that arise under Section 503 or Section 507 of the Bankruptcy Code.

(g)    Any liability for Taxes, subject to Section 2.2.

(h)    All liability relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, Governmental Authorities, or otherwise) involving, against, or affecting any Acquired Asset, the Business, any Comnet Company, or any assets or properties of any Comnet Company, whether commenced, filed, initiated, or threatened before or after the Closing relating to facts, events, or circumstances arising or occurring before the Closing.

(i)    All liabilities arising under or relating to Environmental Health and Safety Requirements to the extent such liabilities existed or arose as of or prior to Closing Date.

(j)    All liabilities arising out of, or in any way related to, the decision of the Federal Communications Commission in the matter of In Re: AT&T Services, Inc. and AT&T Corporation v Great Lakes Comnet, Inc. and Westphalia Telephone Company, EB Docket No. 14-222, File No. EB-14-MD-013, now on appeal to the United States Court of Appeals for the District of Columbia, or any similar liabilities arising out of, or in any way related to, similar Claims by any other Person whether such Claims have been asserted in the past or may be asserted in the future, including without limitation Claims by the following Persons: Verizon Verizon Wireless, Verizon Communications Inc., Sprint Communications Company L.P., CenturyLink Communications, LLC f/k/a Qwest Communications Company, LLC, MCI Communications Services, Inc. d/b/a Verizon Business Services,    Qwest

Communications Company, LLC d/b/a CenturyLink QCC and Sprint Communications Company L.P.

          (k)     All cure amounts due with respect to any Contract, including the Assumed Contracts, other than the Cure Costs for the Assumed Contracts.

    1.5    <u>Instruments of Transfer</u>. The sale of the Acquired Assets and the assumption of the Assumed Liabilities as herein provided shall be effected at Closing by:

          (a)     one or more assignment and assumption agreements ("**Assignment and Assumption Agreements**") in the forms attached hereto as **Exhibit A**;

          (b)     one or more special warranty deeds with respect to Real Property ("**Deeds**") purchased pursuant to this Agreement in the forms attached hereto as **Exhibit B**;

          (c)     one of more bills of sale ("**Bills of Sale**") in the forms attached hereto as **Exhibit C**; and

          (d)     such other instruments of sale, transfer, conveyance and assignment as the Parties may agree.

    1.6    <u>Assumed and Rejected Leases and Contracts</u>.

          (a)     **Schedule 1.6(a)** sets forth a list of all executory Contracts and other Contracts (including all Fiber Leases and all leases with respect to Leased Real Property) to which, to the Comnet Companies' Knowledge, one or more of the Comnet Companies are a party and which the Buyer may deem included in the Assumed Contracts. The Comnet Companies shall take all actions reasonably required to assume and assign the Assumed Contracts to the Buyer (other than payment of Cure Costs, if so required), including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Assumed Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code and as otherwise acceptable in form and substance to the Buyer.

          (b)     At Closing, (x) the Comnet Companies shall, pursuant to the Sale Order and the Assignment and Assumption Agreements, assume and assign to the Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts, and (y) the Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among the various counterparties, the Buyer and the Comnet Companies, or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreements.

    1.7    <u>Payment of Taxes</u>. The Comnet Companies covenant to pay, any and all sales, use or other transfer Taxes payable by reason of the transfer and conveyance of the Acquired Assets hereunder. The Parties will prepare and deliver and if necessary file at or before Closing all

transfer Tax returns and other filings necessary to vest in the Buyer full right, title and interest in the Acquired Assets.

1.8  Third-Party Consents. Notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, (a) to the extent that the Comnet Companies' rights under any Assumed Contract or License or Permit constituting an Acquired Asset may not be assigned to the Buyer without the consent of another Person and (b) such consent has not been obtained, this Agreement shall not constitute an agreement to assign such Assumed Contract or License or Permit if an attempted assignment would constitute a breach thereof or be unlawful, and the Comnet Companies shall use their reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent is not obtained or if any attempted assignment would be ineffective or would impair the Buyer's rights under the Acquired Asset in question so that the Buyer would not in effect acquire the benefit of all such rights, the Comnet Companies, to the maximum extent permitted by Law, shall act after the Closing to obtain for the Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by Law, with the Buyer in any other reasonable arrangement designed to provide such benefits to the Buyer. Notwithstanding any provision in this Section 1.8 to the contrary, the Buyer shall not be deemed to have waived its rights under Section 7.01 or Section 9.1(b) unless and until the Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at the Closing.

## ARTICLE 2

## CONSIDERATION AND MANNER OF PAYMENT

2.1  Payment.

(a)  Consideration. The aggregate consideration (the "**Purchase Price**") for the Acquired Assets is an amount that shall be equal (subject to the adjustments set forth in this Section 2.1(a)) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Comnet Companies' bankruptcy estate ("**Estate Payment")**, minus the Excess Cure Credit, if any (the "**Cash Purchase Price**"). The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction. If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter. On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Comnet Companies utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**. Upon the execution of this Agreement, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed. **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of this Agreement. Moreover, if the Additional CoBank DIP Liability utilized by the Comnet Companies is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Comnet Companies; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

(b)    Purchase Price Deposit. Pursuant to the terms of an escrow agreement attached as **Exhibit D** (the "**Escrow Agreement**"), within seven (7) days of the date of this Agreement, the Buyer shall deposit with the escrow agent identified in the Escrow Agreement (the "**Escrow Agent**"), the sum of $3,210,000 (USD) (the "**Deposit**") by wire transfer of immediately available funds.  The Deposit shall be distributed in accordance with this Agreement, the Bidding Procedures Order and/or the Escrow Agreement, as applicable.  For all purposes hereunder, the Deposit shall be treated as an advance of the Cash Purchase Price that shall be refundable to the Buyer under certain conditions set forth in this Agreement.

2.2    Proration and Adjustments.  All ordinary course of business expenses incurred, will be prorated as of the Closing Date, such that the Buyer is responsible for amounts incurred on or after the Closing Date, and the Comnet Companies are responsible for amounts incurred prior to the Closing Date.

(a)    In connection with the transfer of the Acquired Assets purchased pursuant to this Agreement the public utility taxes imposed pursuant to 1905 PA 282, MCL 207.1 et seq., and, to the extent applicable, any taxes arising under the Michigan General Property Tax Act, 1893 PA 206, MCL 211.1 et seq., shall be prorated as of the Closing Date such that the Comnet Companies are responsible for that portion of the annual taxes payable in the 12 months immediately preceding, but not including, the Closing Date, from the preceding July 1 to, but not including, the day title passes and the Buyer is responsible for the remainder of the annual taxes, in the manner set forth on **Schedule 2.2(a)**.  In connection with the transfer of the personal property which is included in the Acquired Assets, the personal property Taxes shall be pro-rated as set forth on **Schedule 2.2(a)**.

(b)    In connection with the transfer of the Real Property purchased pursuant to this Agreement: (i) the Comnet Companies shall pay any applicable transfer taxes; (ii) the title insurance premiums for an owner's title insurance policy shall be paid by the Comnet Companies; and (iii) the recording fees, escrow fees, closing fees, or other similar Taxes payable in connection with the purchase shall be paid by the Comnet Companies.

(c)    The estimated net amounts of all such prorations shall be subtracted from the Cash Purchase Price, as provided in **Section 2.1(a)**, if the Buyer is entitled to a credit therefor or added to the Cash Purchase Price if the Comnet Companies are entitled to a credit therefor. The Buyer and the Comnet Companies shall use their Reasonable Efforts to calculate all prorations at or prior to Closing, and at or about Closing, the Buyer and the Comnet Companies shall take readings or other measurements of utilities.

(d)    Except as provided herein, including as set forth in **Section 2.2(a)**, in the case of any taxable period that includes (but does not end on) the Closing Date (a "**Straddle Period**"), (i) the amount of any Taxes based on or measured by income or receipts of the Acquired Assets for the pre-Closing portion of the Straddle Period (the "**Pre-Closing Tax Period**") shall be determined based on an interim closing of the books as of the close of business on the Closing Date, and (ii) the amount of other Taxes relating to the Acquired Assets for a Straddle Period that relates to the Pre-Closing Tax Period shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction the numerator of which is the

number of days in the Pre-Closing Tax Period and the denominator of which is the number of days in such Straddle Period.

2.3    <u>Allocation of Purchase Price</u>. The Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) among the Acquired Assets in accordance with Code Section 1060 and the Treasury Regulations thereunder (and any similar provision of state, local, or foreign law, as appropriate).  The Buyer shall deliver such allocation to the Comnet Companies within 90 days after the Closing Date.  The Buyer and each of the Comnet Companies and their Affiliates shall report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) consistent with such allocation prepared by the Buyer. Each of the Comnet Companies shall prepare, execute, file and deliver all such documents, forms and other information as the Buyer may reasonably request to prepare such allocation (at the Buyer's cost).  Neither the Buyer nor the Comnet Companies shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

**ARTICLE 3**

**REPRESENTATIONS AND WARRANTIES OF THE COMNET COMPANIES**

Each of the Comnet Companies hereby represents and warrants to the Buyer as of the date hereof and as of the Closing Date as follows:

3.1    <u>Organization and Qualification</u>. Great Lakes Comnet, Inc. is a corporation duly organized, validly existing and in good standing under the Laws of the state of Michigan. Comlink, L.L.C. is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Michigan. Each Comnet Company has all requisite power and authority to own, lease and operate its properties and to carry on its business (including the Business) as it is now being conducted, subject to the provisions of the Bankruptcy Code.  Each Comnet Company is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of the Business or the nature of its properties makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

3.2    <u>Title to Assets; Equipment</u>. The Comnet Companies have good and marketable title to the Acquired Assets.  Except for the Excluded Assets, the Acquired Assets include all property of each of the Comnet Companies, tangible and intangible, used or usable in connection with the Business satisfactory to conduct the Business as it is currently conducted. At the Closing, the Buyer, pursuant to the Sale Order, shall acquire good and marketable title in, and under all of such Acquired Assets, in each case free and clear of all Liens other than Permitted Liens, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code. To the Comnet Companies' Knowledge, all Acquired Assets are in good working condition and repair and sufficient for operation of the Business as presently conducted (normal maintenance, wear and tear excepted).

3.3     Execution and Delivery.  Subject to the Bankruptcy Court's approval and entry of the Sale Order, this Agreement constitutes, and upon execution of each of the of the Buyer Documents, such agreements shall constitute valid and binding obligations of the Comnet Companies, enforceable against the Comnet Companies in accordance with their respective terms.

3.4     Litigation. Except for the Bankruptcy Case or as set forth on **Schedule 3.4**, there are no material suits, actions, proceedings, investigations, suits, claims or orders (collectively, "**Legal Proceedings**") pending or, to the Comnet Companies' Knowledge, Threatened, against any of the Comnet Companies or any of the current or former officers, directors, managers or employees of any of the Comnet Companies in their respective capacity as an officer, director, manager or employee of any of the Comnet Companies, that would seek to prevent any of the transactions contemplated by this Agreement or that could result in the imposition of any liability on the Buyer or the Comnet Companies or in respect of the Acquired Assets or the Business.

3.5     Compliance with Applicable Laws. Subject to the Bankruptcy Code, orders of the Bankruptcy Court and the disputed allegations in the Legal Proceedings set forth on **Schedule 3.4**, the Comnet Companies have complied in all material respects with all Laws and orders of any Governmental Authority applicable to the operation of the Business or the Acquired Assets. Subject to the disputed allegations in the Legal Proceedings set forth on **Schedule 3.4**, the Comnet Companies have not received any notice from any Governmental Authority asserting a failure, or possible failure, to comply with any such applicable Laws or orders, the subject of which notice has not been resolved as required thereby or otherwise to the satisfaction of the party sending such notice. Subject to the disputed allegations in the Legal Proceedings set forth on **Schedule 3.4**, to the Comnet Companies' Knowledge, no material investigation or review by any Governmental Authority is pending or Threatened, against any of the Comnet Companies or any of their respective assets or properties, nor has any Governmental Authority indicated to any of the Comnet Companies an intention to conduct the same.

3.6     Environmental, Health and Safety Matters.  Except as set forth in **Schedule 3.6**:

(a)     (i) No Hazardous Materials are present on, at, in or under the Real Property, other than in compliance with Environmental, Health and Safety Requirements or as would not reasonably be expected to result in any lien on any such Real Property or any Material Adverse Effect on any of the Comnet Companies or the Business pursuant to any Environmental, Health and Safety Requirement, and (ii) to the Comnet Companies' Knowledge, no release, spill or discharge of any Hazardous Materials has occurred on, at, in or under the Real Property which would reasonably be expected to require reporting, investigation or remediation by the Comnet Companies or the Business pursuant to any Environmental, Health and Safety Requirement.

(b)     The Comnet Companies, the Real Property and the Business are, and to the Comnet Companies' Knowledge have been, in compliance with all Environmental, Health and Safety Requirements.

(c)     To the Comnet Companies' Knowledge, there are no existing liabilities, claims, investigations, notices of violation or notices of any liability with respect to

11

the Comnet Companies, the Business or the Real Property, nor are the Comnet Companies, the Business or the Real Property subject of any investigation or inquiry arising under Environmental, Health and Safety Requirements, including any investigatory, remedial or corrective obligation, the subject of which is unresolved.

3.7    Authorization; Enforceability. Subject to the entry of the Sale Order, the Comnet Companies have the respective requisite entity power and authority to execute and deliver this Agreement, and the Comnet Companies have the respective requisite entity power and authority to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Comnet Companies in connection with the consummation of the transactions contemplated by this Agreement (the "**Comnet Companies' Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement has been, and of the Comnet Companies' Documents will be at or prior to the Closing, and the consummation of the transactions contemplated hereby and thereby will be prior to the Closing, duly authorized by all respective requisite corporate action on the part of the Comnet Companies. This Agreement has been, and each of the Comnet Companies' Documents will be at or prior to the Closing, duly and validly executed and delivered by the Comnet Companies, and this Agreement constitutes and each of the Comnet Companies' Documents will constitute (in each case assuming the due authorization, execution and delivery by the other Parties hereto and thereto), upon such execution and delivery, legal, valid and binding obligations of the Comnet Companies, enforceable against the Comnet Companies in accordance with their respective terms and conditions.

3.8    No Consents. Except as set forth on **Schedule 3.8**, no Consent of, Licenses and Permits or exemption from, or declaration, filing or registration with, any Person or Governmental Authority is required to be made or obtained by the Comnet Companies in connection with the execution, delivery and performance of this Agreement by the Comnet Companies and the consummation of the transactions contemplated hereby.

3.9    Leased Property.

(a)    **Schedule 3.9(a)** contains a list of all leased Real Property (other than Fiber Leases) held or used for, or necessary to the operation of the Business (the "**Leased Real Property**"). The Comnet Companies have made available to the Buyer true and complete copies of all leases with respect to such Leased Real Property (individually, a "**Lease**" and collectively, the "**Leases**") to the Buyer.

(b)    **Schedule 3.9(b)** contains a true and complete listing of all fiber leases (including without limitation indefeasible rights of use, pole attachment agreements, rental agreements, local franchise agreements, service agreements, overlash agreements and conduit leases) of any Comnet Company (the "**Fiber Leases**"), identified by type, stating whether such Comnet Company is the lessor or lessee and setting forth the scheduled expiration date thereof. The Comnet Companies have made available to the Buyer true and complete copies of all Fiber Leases.    To the Comnet Companies' Knowledge, the respective Comnet Company, where applicable, holds a valid and existing leasehold interest under such Fiber Leases on the terms set forth therein.    To the Comnet Companies' Knowledge, the Comnet Companies' use of the

property subject to the Fiber Leases is in compliance in all material respects with all Laws and applicable contractual requirements.  To the Comnet Companies' Knowledge, no party to the Fiber Leases intends to terminate such Fiber Leases.

(c)    **Schedule 3.9(c)** sets forth all leases of personal property ("**Personal Property Leases**,") relating to personal property used by the Comnet Companies or to which any Comnet Company is a party or by which the properties or assets of any Comnet Company are bound, in each case relating to the Business.  To the Comnet Companies' Knowledge, the respective Comnet Company, where applicable, has a valid and enforceable leasehold interest under such Personal Property Leases under which it is a lessee.

3.10    Intellectual Property; Security.

(a)    **Schedule 3.10(a)(1)** sets forth an accurate and complete list of all Intellectual Property necessary to the Business as currently conducted; the Acquired Assets include all such Intellectual Property. None of the Comnet Companies has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Intellectual Property right of any other Person, except as set forth on **Schedule 3.10(a)(2)**. Except as set forth on **Schedule 3.10(a)(3)**, none of the Comnet Companies has received any written claim or written notice from any Person alleging infringement, misappropriation or any other violation of Intellectual Property rights, offering a license to Intellectual Property, or challenging the validity, enforceability, use or ownership of the Comnet Companies' Intellectual Property.  To the Comnet Companies' Knowledge, no Person has infringed, misappropriated or otherwise violated, or is infringing, misappropriating or otherwise violating any Intellectual Property of the Comnet Companies.  Except as set forth on **Schedule 3.10(a)(4)**, there are no pending or Threatened administrative or judicial proceedings or actions involving Intellectual Property of the Comnet Companies or the Comnet Companies' use of Intellectual Property rights.

(b)    Each Comnet Company has taken commercially reasonable precautions (including without limitation, log-in controls, user authentication and password controls, firewalls, software protecting against viruses and other malware, intrusion detection technology, and security patches) to preserve the availability, security and integrity of its computer systems and the data and information stored on its computer systems, and, except as set forth on **Schedule 3.10(b)**, no Comnet Company has experienced any breach of security or unauthorized access of its computer systems or the data or information stored on its computer systems.

3.11    Licenses and Permits.    The Comnet Companies are in compliance with the material terms of all material Licenses and Permits used by the Comnet Companies in the Business, and all such Licenses and Permits are valid and in full force and effect, and no proceeding is pending or, to the Comnet Companies' Knowledge, Threatened, the object of which is to revoke, limit or otherwise affect any such License or Permit.

3.12    Network.

(a)    **Schedule 3.12(a)** sets forth each application, award, contract, grant, and related agreement with respect to grants, including, but not limited to those entered into pursuant

13

to the Broadband Technology Opportunities Program ("**BTOP**") and any other such agreements or grants with a Governmental Authority (collectively, the "**Award Agreements**").

(b)      A true and complete Google Earth KMZ digital file clearly identifying each portion of the Comnet Companies' fiber network, including (i) the current (i.e. built) fiber network of each Comnet Company as of the date hereof and (ii) the planned fiber network of each Comnet Company currently in the process of being built or for which any Comnet Company has committed to build, is attached hereto as **Schedule 3.12(b)(1)**. Such current fiber network and planned fiber network is collectively referred to herein as the "**Network**". **Schedule 3.12(b)(2)** sets forth reasonable descriptions of the Network, including the following information: (x) differentiation, with specificity, between owned and leased fiber segments, (y) differentiation, with specificity, between "lit" and "dark" fiber, and (z) identification of strand count by segment of the Network.

(c)      Each Comnet Company has met in all material respects, and is in material compliance with, all requirements of the Award Agreements. Each Comnet Company has completed construction of the applicable portions of the Network pursuant to and as required by the Award Agreements.

3.13    Contracts. Except for such Contracts listed on **Schedule 3.13**, the Assumed Contracts include all Contracts material to the ownership and/or operation of the Business (including the Network). Complete and correct copies (including all material modifications and amendments) of all Contracts have been provided or made available to the Buyer, and each Assumed Contract is, or will be upon the payment of the Cure Costs, valid, binding and in full force and effect in accordance with its terms. Except as set forth on **Schedule 3.13**, there is no Contract not included in the Assumed Contacts that is material to or necessary for the ownership, management and operation of the Business (including the Network) as currently conducted, or the absence of which would reasonably be expected to result in a Material Adverse Effect. Except as set forth on **Schedule 3.4**, none of the Comnet Companies, or, to the Comnet Companies' Knowledge, the other parties thereto, (a) are in material breach of any Assumed Contract, (b) has commenced any Legal Proceeding against any of the parties to such Assumed Contract, or (c) given or received any written notice of any material breach, default or violation under any such Assumed Contract, except, in each case, (i) solely by virtue of the Comnet Companies' initiation of the Bankruptcy Case (including any resulting restriction on payment of pre-petition obligations) or (ii) in respect of any such material breach, default or violation thereunder, or any such Legal Proceeding in respect thereof, as will be cured or dismissed upon entry of the Sale Order and payment of the Cure Costs.

3.14    Customers and Suppliers. **Schedule 3.14** lists the names and addresses of the ten largest customers and ten largest suppliers of products and/or services for the Business (indicating approximate dollar value for each) during the fiscal year ended December 31, 2015. To the Comnet Companies' Knowledge, except as set forth on **Schedule 3.14**,  (a) no event, occurrence or fact has occurred or is likely to occur which threatens to adversely and materially affect the Comnet Companies' arrangements with such customers, suppliers and vendors; and (b) no event, occurrence, or fact has occurred or is likely to occur which would lead it to believe that any of such customers, suppliers or vendors will not continue to supply the current level and type

of materials, supplies, merchandise, services and other goods currently being provided to the Comnet Companies on similar terms and conditions.

3.15    <u>Absence of Certain Changes</u>.  Except for the commencement of the Bankruptcy Case or as set forth on **Schedule 3.15**, since the date of the Unaudited Financials, the Comnet Companies have conducted the Business only in the ordinary course of business and:

(a)    there has been no circumstance, state of facts or matters, change, event, occurrence, action or omission that, individually or in the aggregate, has, or would be reasonably likely to have, a Material Adverse Effect; and

(b)    the Comnet Companies have not taken any action that they are prohibited from taking after the date of this Agreement pursuant to **Section 5.1**.

3.16    <u>Insurance</u>.  **Schedule 3.16** sets forth all insurance policies under which each Comnet Company is insured, the name of the insurer of each policy, the type of policy provided by such insurer, the amount, scope and period covered thereby and a description of any material claims made thereunder. Such insurance policies are valid and in full force and effect and provide insurance in such amounts and against such risks as is sufficient to comply with applicable Law and which reflect coverages and policy terms that are customary and adequate for the industry in which the Comnet Companies operate. All premiums due to date under such policies have been paid, none of the Comnet Companies have received a notice of default thereunder or, with respect to any material claims made under such policies, a notice that any insurer has made any "reservation of rights" or refused to cover all or any portion of such claims. No Comnet Company has received any notice of any proposed material increase in the premiums payable for coverage, or proposed reduction in the scope (or discontinuation) of coverage, under any of such insurance policies. To the Comnet Companies' Knowledge, there exists no event, occurrence, condition or act (including the commencement of the Bankruptcy Case and the purchase of the Acquired Assets hereunder) that, with the giving of notice, the lapse of time or the happening of any other event or condition, could  entitle any insurer to terminate or cancel any such insurance policies.

3.17    <u>Financial Statements</u>.  The Comnet Companies have delivered to the Buyer the consolidated balance sheets of the affiliated group of Companies of which Great Lakes Comnet, Inc. is the common parent, which includes other companies other than the Comnet Companies (the "**GLC Group**"), as of, and consolidated statements of operations, stockholder's equity (deficit) and cash flows for, the fiscal years ended December 31, 2013 and 2014 (collectively, the "**Audited Financial Statements**"). The Audited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the GLC Group's past practices throughout the periods indicated.  The Comnet Companies have also delivered to the Buyer unaudited condensed consolidated balance sheets for the GLC Group as of November 30, 2015, and the condensed consolidated statements of operations and cash flows for the 11 month period then ending (collectively, the "**Unaudited Financial Statements**").  The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with the GLC Group's past practice except for the absence of footnotes and customary year-end adjustments (which, to the Comnet Companies' knowledge, are not expected to be material).  To the Comnet Companies' knowledge, the Audited Financial Statements and the Unaudited

Financial Statements (together the "**Financial Statements**") (a) are true, correct and complete in all material respects, (b) are in accordance in all material respects with the books and records of the GLC Group or the Comnet Companies, as the case may be, and (c) fairly present in all material respects the financial position of the GLC Group or the Comnet Companies, as the case may be, at the dates specified and the results of their operations for the period covered. The copies of the Financial Statements delivered to the Buyer are true, correct and complete copies. The Comnet Companies have not incurred any material indebtedness, obligations or other liabilities of any kind that would have been required to be reflected in, reserved against or otherwise described in the Financial Statements or the notes thereto in accordance with GAAP, other than liabilities incurred in the ordinary course of business since the date of the Unaudited Financials and Excluded Liabilities.

3.18   Taxes.

(a)   Except as set forth on **Schedule 3.18(a)**: (i) the Comnet Companies have timely filed all material Tax Returns required to be filed with the appropriate Governmental Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of the Comnet Companies); and (ii) all Taxes shown as due on such Tax Returns have been paid.

(b)   No Comnet Company is a foreign person within the meaning of Section 1445 of the Code.

(c)   No Comnet Company has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to the assessment of any Tax, or any deficiency with respect thereto.

(d)   To the Comnet Companies' Knowledge, each Comnet Company has properly withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any stockholder, member, owner, employee, creditor, independent contractor or other third party and has complied with all information reporting requirements in connection with such payments.

(e)   No Comnet Company (i) has ever been a member of an affiliated group of corporations within the meaning of Section 1504 of the Code, except an affiliate group of which Great Lakes Comnet, Inc. was the common parent or (ii) has any liability for Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign tax Law), as a transferee or successor, by contract or otherwise, except any liability for Taxes arising as a result of or in connection with a Comnet Company being a member of a consolidated, affiliated or unitary group for tax purposes of which Great Lakes Comnet, Inc. was the common parent.

3.19   Brokers and Finders.   Except for Media Venture Partners, Alix Partners, John Summersett, and Schreur Financial Advisory Services, LLC, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Comnet Companies in connection with the transactions contemplated by this Agreement, and the Buyer is not or will not become obligated to pay any fee or commission or like payment to any broker, finder or financial advisor

as a result of the consummation of the transactions contemplated by this Agreement based upon any arrangement made by or on behalf of Comnet Companies.

3.20    Employment and Benefit Matters.

(a)    All Employee Plans sponsored or contributed to by the Comnet Companies, covering employees of the Comnet Companies, or for which the Comnet Companies may have any liability are set forth on **Schedule 3.20(a),** including each Comnet Company's 401(k) plan. **Schedule 3.20(a)** identifies the plan sponsor for each such Employee Plan.  Except as provided on **Schedule 3.20(a)** and except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA, the Comnet Companies do not have any liability for severance, life, health, medical or other welfare benefits to former employees or beneficiaries or dependents thereof that shall affect the Buyer or the Assets.

(b)    The Comnet Companies do not have any employment agreements with any of its employees that are not terminable at will without material cost or expense at the election of Comnet Companies, except for those set forth on **Schedule 3.20(b).**

(c)    Within five (5) Business Days prior to the Closing Date, the Comnet Companies shall provide to Buyer **Schedule 3.20(c)**, which shall list all employees of the Comnet Companies.

(d)    All contributions, premiums and expenses to or in respect of each Employee Plan for any period through the Closing Date have been timely made or paid in full or, to the extent not required to be made or paid on or before the Closing Date, and a Schedule of such amounts shall be provided to Buyer within five (5) Business Days prior to the Closing Date.

3.21    Accounts Receivable and Assumed Liabilities.  All Accounts Receivable represent bona fide transactions and have arisen in the ordinary course of business.  All of the Assumed Liabilities represent bona fide transactions and have arisen in the ordinary course of business, taking into account the pendency of the Bankruptcy Case.

The representations and warranties of the Comnet Companies in this Agreement shall expire immediately and irrevocably upon, and not survive after, the Closing.  The Buyer expressly agrees that neither the Buyer nor any Person attempting to assert or maintain a claim through Buyer, may, after the Closing, bring any claims, or assert any rights with respect to, (i) any breaches of representations or warranties of this Agreement, or (ii) covenants of this Agreement, except in each case of actual fraud.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Comnet Companies as of the date of this Agreement and as of the Closing Date as follows:

4.1    Organization and Qualification.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of Delaware.

17

4.2     <u>Authorization; Enforceability</u>.    The Buyer has the requisite entity power and authority to execute and deliver this Agreement, and the Buyer has the requisite entity power and authority to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by the Buyer in connection with the consummation of the transactions contemplated by this Agreement (the "**Buyer Documents**"), to perform its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby.   The execution and delivery of this Agreement has been duly authorized by all requisite corporate action on the part of the Buyer.   The execution and delivery of the Buyer Documents will be at or prior to Closing, and the consummation of the transactions contemplated hereby and thereby will be prior to the Closing, duly authorized by all requisite corporate action on the part of the Buyer.   This Agreement, and each of the Buyer Documents, will be, at or prior to the Closing, duly and validly executed and delivered by the Buyer, and this Agreement constitutes and each of the Buyer Documents will constitute (in each case assuming the due authorization, execution and delivery by the other Parties hereto and thereto), upon such execution and delivery, legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at Law or in equity).

4.3     <u>No Consents</u>. Except as set forth on **Schedule 4.3,** no Consent of, Licenses and Permits or exemption from, or declaration, filing or registration with, any Person or Governmental Authority is required to be made or obtained by the Buyer in connection with the execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby.

4.4     <u>Litigation</u>. There are no Legal Proceedings pending, or to the Buyer's Knowledge, Threatened, against the Buyer, nor is the Buyer subject to any judgment, order or decree of any court or Governmental Authority that would seek to prevent any of the transactions contemplated by this Agreement.

4.5     <u>No Violation</u>. Subject to the receipt of the Consents and to the filing of notices as contemplated by **Section 4.3,** neither the execution and delivery of this Agreement or any of the Buyer Documents, nor the performance by it of the transactions contemplated hereby or thereby will (a) constitute a default under the Organizational Documents of the Buyer, or (b) to the Buyer's Knowledge, result in a default, give rise to any right of termination, cancellation or acceleration, or require any Consent under any of the terms, conditions or provisions of any material mortgage, loan, license, agreement, lease or other instrument or obligation to which the Buyer is a party, or (c) to the Buyer's Knowledge, violate any Laws applicable to the Buyer or by which any of its properties is bound other than, in the case of (b) or (c), a default, termination, cancellation or acceleration, violation, or absence of a Consent, that would not have a Material Adverse Effect.

4.6     <u>Brokers</u>. No broker, finder or agent is entitled to any brokerage fees, finder's fees or commissions in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

The representations and warranties of the Buyer in this **Article 4** shall expire upon, and not survive after, the Closing, and upon and after the Closing, the Comnet Companies may not bring any claims, or assert any rights with respect to, (i) any breaches of representations or warranties of this **Article 4**, or (ii) covenants of this Agreement to be performed prior to Closing, except in each case of fraud or intentional misrepresentation.

## ARTICLE 5

## COVENANTS OF THE COMNET COMPANIES

5.1    <u>Conduct of Business</u>.  Except as contemplated by this Agreement, as required by applicable Law, as set forth on **Schedule 5.1** or as otherwise consented to in writing by the Buyer (which such consent may not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing, each of the Comnet Companies covenants and agrees that it shall:

(a)    maintain the Acquired Assets within its control in the ordinary course of business and repair and continue normal maintenance with respect thereto, normal wear and tear excepted;

(b)    use its Reasonable Efforts to preserve the present business operations, organization and goodwill of the portion of the Business that it conducts;

(c)    use its Reasonable Efforts to collect all outstanding Accounts Receivable prior to the Closing.

(d)    use its Reasonable Efforts to preserve intact its relationships with third parties and to keep available the services of its present officers and key employees;

(e)    not amend, modify, terminate or grant any waiver under, any Assumed Contract, or enter into any agreement that Buyer would have been able to designate as an Assumed Contract had it been entered into prior to the date hereof, or incur any cure costs for Assumed Contracts that are in excess of the amounts included in the Cure Costs;

(f)    not sell, assign, transfer, lease or license the Company Intellectual Property or abandon or allow to lapse any rights in the Company Intellectual Property;

(g)    use its Reasonable Efforts to operate in all material respects in accordance with the budget attached hereto as **Schedule 5.1(g)** (the "**Pre-Closing Budget**"); and

(h)    take any action or omit to take any action that would cause the representations and warranties contained in **Article 3** to be untrue or incorrect in any material respect.

5.2    <u>Bankruptcy Sale Procedures</u>.

(a)    Within five (5) business days after the Petition Date, the Comnet Companies shall file with the Bankruptcy Court a motion in substantially the form of **Exhibit E**

19

hereto (the "**Sale Motion**") seeking, among other things, entry of (i) an order approving (A) the bidding protections set forth in the Sale Motion and (B) certain bidding procedures for alternative offers for the Acquired Assets, which proposed order shall be substantially in the form of **Exhibit F** hereto and in any event shall be in form and substance acceptable to the Buyer (the "**Bidding Procedures Order**"), and (ii) an order authorizing and approving (A) the execution, delivery and performance by the Comnet Companies of this Agreement, (B) the sale of the Acquired Assets to the Buyer on the terms set forth herein and free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), (C) the performance by the Comnet Companies of their respective obligations under this Agreement; (D) the Comnet Companies' assumption and assignment to the Buyer of the Assumed Contracts; and (E) a finding that the Buyer is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any of the Comnet Companies (including a grant to the Buyer of the protections of Section 363(m) of the Bankruptcy Code), which order shall be substantially in the form of **Exhibit G** hereto and in any event shall be in form and substance reasonably acceptable to the Buyer (the "**Sale Order**").

(b)      The Comnet Companies shall serve on the counterparties to the Assumed Contracts a notice specifically stating that the Comnet Companies are or may be seeking the assumption and assignment of such contracts and/or leases and shall notify such counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than three (3) days prior to the date on which the Sale Motion will be heard by the Bankruptcy Court.

(c)      This Agreement and the transactions contemplated hereby are subject to approval by the Bankruptcy Court and the Comnet Companies' right and ability to consider higher or better competing bids with respect to the Business and a material portion of the Acquired Assets pursuant to the Bidding Procedures Order (each a "**Competing Bid**"), including without limitation, by way of auction (the "**Auction**") as set forth in the Bidding Procedures Order.  Following completion of the Auction, if the Buyer is the Prevailing Bidder, the Comnet Companies shall not initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any sale or other disposition of the Acquired Assets.  In addition, unless otherwise directed by the Bankruptcy Court, the Comnet Companies shall not after completion of the Auction respond to or pursue any proposed Third Party Sale or perform any other acts related thereto.

(d)      If an Auction is conducted, and the Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "**Prevailing Bidder**"), the Buyer shall, if its bid is determined to be the next highest bid, serve as a back-up bidder (the "**Back-up Bidder**") and keep the Buyer's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 100 days after the date on which the Sale Motion is filed (the "**Outside Back-up Date**"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than June 22, 2016, or (ii) the date of closing of a Third Party Sale with the Prevailing Bidder.  Following the filing of the Sale Motion and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Third Party Sale as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder will be deemed to have the new prevailing bid, and the Comnet Companies will be authorized, without further order of the Bankruptcy

Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement with the Back-up Bidder. For the avoidance of doubt, among the factors that the Comnet Companies will consider in evaluating what constitutes the Prevailing Bidder and Back-up Bidder, are the net proceeds that will be made available to the Comnet Companies' bankruptcy estates upon a purported sale of the Acquired Assets. Such an evaluation shall take into account the payment of a Termination Fee to Buyer in determining the highest bid.

5.3    Efforts to Consummate.  The Comnet Companies shall use Reasonable Efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby. Without limiting the generality of the foregoing, the Comnet Companies shall use Reasonable Efforts to have the Bankruptcy Court (i) schedule a hearing on the Sale Motion, (ii) enter the Bidding Procedures Order as soon as practicable after the date hereof, and (iii) enter the Sale Order as and when contemplated by the Bidding Procedures Order. Furthermore, the Comnet Companies shall use their Reasonable Efforts to give, or cause to be given, all material notices, make all material required filings with, or applications to, Governmental Authorities and use Reasonable Efforts to obtain all material Consents of all third parties, including Governmental Authorities, necessary for the Parties to consummate the transactions contemplated hereby, in each case including with respect to any Award Agreement. In addition, the Comnet Companies agree to use Reasonable Efforts to (a) oppose, lift or rescind any injunction or restraining order or other order adversely affecting the ability of the Parties to consummate the transactions contemplated hereby, and (b) cause the conditions set forth in **Section 7.1** to be satisfied and to consummate the transactions contemplated hereby.

5.4    Assignment of Contracts.  The Comnet Companies shall use Reasonable Efforts to assume and assign to Buyer all of the Assumed Contacts on **Schedule 1.3(a)**. Subject to Bankruptcy Court approval, the parties hereby acknowledge and agree that such Schedule may be amended by Buyer in its sole discretion through the Closing Date. From the date of execution of this Agreement through the entry of the Sale Order, the Comnet Companies shall not reject any Contract unless otherwise agreed to in writing by Buyer (and the Comnet Companies shall agree to reject such contracts effective at the Closing relating to the Acquired Assets as requested by Buyer in connection with the transactions contemplated hereby). The Comnet Companies shall include in the Sale Order an authorization for each of the Comnet Companies, as applicable, to assume the Assumed Contracts and assign to the Buyer all Assumed Contracts. Notwithstanding anything in this Agreement to the contrary, in the event and to the extent that any of the Assumed Contracts cannot be assumed and assigned to Buyer under Section 365 of the Bankruptcy Code or otherwise, then this Agreement shall not constitute an agreement to assign any such particular Assumed Contract or any Claim or right or any benefit arising thereunder or resulting therefrom if the agreement to assign or attempt to assign, without the consent of a third party, would constitute a breach thereof, accelerate any obligations thereunder, permit the termination thereof or in any other way adversely affect the rights of Buyer or the Comnet Companies thereunder. Until such consent is obtained, or if an attempted assignment thereof would be ineffective or would affect the rights of the Comnet Company thereunder so that Buyer would not, in fact, receive all such rights, the Comnet Company shall provide, to the extent practicable, for Buyer the benefits of (upon the same terms

as in existence on the date hereof), and to permit Buyer to assume, insofar as expressly set forth herein, the stated liabilities under such particular Assumed Contract (upon the same terms as in existence on the date hereof), including enforcement at the request and expense and for the benefit of Buyer of any and all rights of the Comnet Company against a third party thereto arising out of the breach or cancellation thereof by such third party or otherwise. Any transfer or assignment to Buyer by the Comnet Company of any property or property rights or any contract or agreement that shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained.

  5.5 <u>Termination Fee</u>.

    (a) Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of this Agreement, (ii) this Agreement has not been terminated (other than in accordance with **Section 9.1(d)**, **(f)**, **(g)**, **(h)**, **(i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Acquired Assets in a single transaction or a series of transactions to one or more Persons (a "**Third Party**") other than the Buyer or an Affiliate of the Buyer (a "**Third Party Sale**"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "**Termination Fee**"). Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale. For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Comnet Companies or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale. For the avoidance of doubt, the termination of this Agreement pursuant to **Section 9.1(d)**, **(f)**, **(g)**, **(h)**, **(i)**, **or (j)** shall not prevent Buyer from recovering its Termination Fee. The provisions of this **Section 5.5(a)** shall be included in the Bidding Procedures.

    (b) Each of the Parties hereto acknowledges that the agreements contained in this **Section 5.5** are an integral part of the transactions contemplated by this Agreement and that the Termination Fee is not a penalty, but rather liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

  5.6 <u>Further Assurances</u>. The Comnet Companies shall execute and deliver such instruments, and take such other actions, as may reasonably be requested by Buyer, whether

prior to, at or after the Closing, to carry out the terms of this Agreement and consummate the transactions contemplated hereby.

5.7    <u>Press Releases and Public Disclosure</u>. Prior to the Closing, the Comnet Companies shall not, without the prior written consent of Buyer (which will not be unreasonably withheld, delayed or conditioned), or except as required by Law or ordered by the Bankruptcy Court, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement or any of the transactions contemplated hereby.

5.8    <u>Confidentiality and Non-Use</u>. After the Closing, the Comnet Companies shall, and shall cause each of their respective Affiliates to, maintain all Confidential Information in confidence and, except as required by Law or order of the Bankruptcy Court, not disclose any Confidential Information to any Person other than Buyer, and not use any Confidential Information for any purposes, whether for its own benefit or the benefit of any other Person.

5.9    <u>Access to Information</u>.  The Comnet Companies agree that, between the date of this Agreement and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with **Article 9**, the Buyer shall be entitled, through its officers, employees, legal counsel, accountants and other authorized representatives, agents and contractors ("**Representatives**"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, employees, accountants, auditors, counsel and operations of the Comnet Companies as the Buyer's Representatives may reasonably request.  Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances.  Each Comnet Company shall use Reasonable Efforts to cause its Representatives to reasonably cooperate with the Buyer and the Buyer's Representatives in connection with such investigations and examinations, and the Buyer shall, and use its Reasonable Efforts to cause its Representatives to, reasonably cooperate with the Comnet Companies and their respective Representatives, and shall use its Reasonable Efforts to minimize any disruption to the Business.

5.10    <u>Preservation of Records</u>.  The Comnet Companies (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and the Buyer agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for a period of six (6) months from the Closing Date and shall make such books and records available to the other Parties (and permit such other Party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such Party in connection with, among other things, any insurance claims by, legal proceedings or Tax audits against or governmental investigations of the Comnet Companies or the Buyer or in order to enable the Comnet Companies or the Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event the Comnet Companies, on the one hand, or the Buyer, on the other hand, wish to destroy such records during such three (3) month period, such Party shall first give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

5.11    Material Adverse Effect.  The Comnet Companies shall promptly inform the Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect or of the occurrence of any fact or circumstances that results in any breach, inaccuracy or violation of any representation or warranty contained in this Agreement or that would cause any such representations or warranties to not be true and correct either as of the date of this Agreement or as of the date of Closing.

5.12    Change of Name.  Promptly following the Closing, the Comnet Companies shall discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by any Comnet Company) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Comnet" or "Comlink" without the prior written consent of the Buyer.

## ARTICLE 6

## COVENANTS OF THE BUYER

6.1    Efforts to Consummate. The Buyer shall use Reasonable Efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable in compliance with applicable Laws on the part of the Buyer to consummate and make effective, as soon as reasonably practicable, the transactions contemplated hereby. Without limiting the generality of the foregoing, the Buyer shall cooperate with the Comnet Companies in its efforts to obtain entry of the Bidding Procedures Order and the Sale Order, including without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes of providing necessary assurances of performance by the Buyer under this Agreement and the Assumed Contracts. The Buyer shall use Reasonable Efforts to give all notices, make all material required filings with or applications to Governmental Authorities, and use Reasonable Efforts to cooperate with the Comnet Companies to obtain all material Consents of all third parties, including Governmental Authorities, necessary for the Parties to consummate the transactions contemplated hereby. In addition, the Buyer agrees to use Reasonable Efforts to (a) oppose, lift or rescind any injunction or restraining order or other order adversely affecting the ability of the Buyer to consummate the transactions contemplated hereby, and (b) to cause the conditions set forth in **Section 7.2** to be satisfied and to consummate the transactions contemplated herein. Notwithstanding the foregoing, nothing in this **Section 6.1** shall require the Buyer to (i) incur any out-of-pocket expense or cost related to the Assumed Contracts or the Acquired Assets, other than the Cure Costs, (ii) agree to any waiver or modification to any Assumed Contract, (iii) agree to any limitation on the conduct of the Business or the operation of the Acquired Assets from and after the Closing, or on the conduct of the Buyer's business or that of any of its Affiliates, or (iv) commence any Legal Proceeding against any Person.

6.2    Press Releases and Public Disclosure. Prior to the Closing, the Buyer shall not, without the prior written consent of the Comnet Companies (which will not be unreasonably withheld, delayed or conditioned), or except as required by Law or order of the Bankruptcy Court, issue any press release or otherwise make any public statement or other public disclosure regarding this Agreement or any of the transactions contemplated hereby, except to the extent

24

necessary in discussions by the Buyer with customers, dealers, lessees and suppliers of the Comnet Companies.

6.3     <u>Confidential Information</u>. The Buyer acknowledges that the Confidential Information (as defined in the Confidentiality Agreement) provided to it in connection with this Agreement and the consummation of the transactions contemplated hereby, is subject to the terms of the confidentiality agreement between the Buyer and Great Lakes Comnet and its affiliates dated October 23, 2015 (the "**Confidentiality Agreement**"), the terms of which are incorporated herein by reference.

6.4     <u>Further Assurances</u>. Subject to the limitations otherwise set forth in this Agreement, the Buyer agrees to execute and deliver such instruments, and take such other actions, as may reasonably be required, whether prior to or at the Closing, to carry out the terms of this Agreement and consummate the transactions contemplated hereby.

6.5     <u>Access to Accounting Records</u>. For the purpose of financial and Tax reporting, except as may be prohibited by Law, by the terms of any Contract and except for any information that would be protected from discovery or disclosure in a legal or regulatory action or proceeding due to any privilege recognized by Law, the Buyer shall, upon reasonable notice and request of the Comnet Companies, give representatives of the Comnet Companies reasonable access during normal business hours and under reasonable circumstances to all books of account, financial and accounting records and files comprising the Acquired Assets; <u>provided</u>, <u>however</u>, that the Comnet Companies will not unreasonably interfere with the business and operations of the Buyer.

## ARTICLE 7

## CONDITIONS PRECEDENT TO CLOSING

7.1     <u>Conditions Precedent to Obligations of Buyer</u>.  The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing at the option of the Buyer:

(a)     <u>Accuracy of Representations and Warranties; Performance of Covenants</u>.  The representations and warranties of the Comnet Companies contained in **Article 3** of this Agreement shall be true and correct in all material respects as of the date hereof and as of the Closing with the same force and effect as though made on and as of the Closing (other than (i) those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period, and (ii) those representations and warranties qualified by materiality, which shall be true and correct in all respects).  The Comnet Companies shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by the Comnet Companies on or prior to the Closing, including the obligation to complete the Schedules pursuant to **Section 11.10**.

(b) <u>No Legal Prohibition</u>. No statute, rule, regulation, ruling, consent, decree, judgment, injunction or order shall be enacted, promulgated, entered or enforced by any court or Governmental Authority, which would prohibit the consummation by such Party of the transactions contemplated hereby, and no Legal Proceedings (other than those related to the Sale Order) shall be pending or overtly threatened with respect to the transactions contemplated hereby or with respect to the Acquired Assets or the Business.

(c) <u>Bidding Procedures Order and Sale Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order. The Bankruptcy Court shall have also entered the Sale Order, which shall have authorized the Comnet Companies to convey to Buyer all of its right, title and interest in and to the Acquired Assets free and clear of all Liens (other than Permitted Liens), and the Bankruptcy Court shall have approved the assignment and assumption of the Assumed Contracts as contemplated hereby.

(d) <u>Assumed Contracts</u>. The certain Assumed Contracts are assigned to the Buyer as of the Closing Date pursuant to this Agreement, the Buyer Documents and the Sale Order, and the Buyer shall have satisfied the respective Cure Costs.

(e) <u>Consents and Approvals</u>. The Consents, Licenses and Permits, and regulatory approvals necessary for transfer and operation of the Business by the Buyer set forth in **Schedule 4.3** shall have been obtained and delivered to the Buyer, including, without limitation, Final Approval of an asset transfer of the Comnet Companies by the Federal Communications Commission and the Michigan Public Service Commission.

(f) <u>Lender Due Diligence</u>. CoBank and Webster Bank, National Association (and any other lenders syndicated by Webster Bank, National Association) shall have completed all due diligence, found the results of such due diligence satisfactory in connection with the extending of credit to the Buyer, and shall have provided Buyer with written notice of such completion and satisfaction upon the entry of the Bidding Procedures Order.

(g) <u>Material Adverse Effect</u>. No Material Adverse Effect shall have occurred on or before the Closing Date.

(h) <u>Closing Deliveries</u>. Buyer shall have received, or waived delivery of, the items to be delivered pursuant to **Section 8.2.**

(i) <u>Bidding Procedures</u>. The Comnet Companies shall have engaged in their best efforts to comply in all material respects with the sale process deadlines set forth in the Bidding Procedures Order.

(j) <u>No Termination Event Occurs in Debtor-in-Possession Financing Order</u>. Prior to the Closing Date, CoBank shall not have declared a Termination Event as defined in the Debtor-in-Possession Financing Order (the "**DIP Order**") and stopped providing funding to the Comnet Companies.

(k) <u>Pre-Closing Budget and Use of Proceeds</u>. The Comnet Companies shall have complied in all material respects with the Pre-Closing Budget and shall have utilized

available cash proceeds before accessing the debtor-in-possession financing that CoBank shall have made available under the terms of the DIP Order.

(l)    <u>Real Property Matters</u>.  The Buyer shall have received (i) such environmental site assessment reports or similar analyses as it shall reasonably require with respect to the Real Property and such reports shall be satisfactory to the Buyer in its reasonable discretion, and (ii) unconditional and binding commitments from a reputable insurance agency to issue title insurance policies with respect to the Owned Real Property in form and amount reasonably satisfactory to the Buyer.

(m)    <u>Buyer Satisfaction</u>.  The Buyer shall be satisfied, in its reasonable discretion, on or before the entry date of the Sale Procedures Order, with the results of, (i) the real estate title work completed on the Owned Real Property, and (ii) any diligence relating to compliance with Environmental, Health and Safety Requirements.

7.2    <u>Conditions Precedent to Obligations of the Comnet Companies</u>.  The obligations of the Comnet Companies under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all the following conditions, any one or more of which may be waived in writing at the option of the Comnet Companies:

(a)    <u>Accuracy of Representations and Warranties; Performance of Covenants</u>. The representations and warranties of the Buyer contained in **Article 4** of this Agreement shall be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing. The Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

(b)    <u>No Legal Prohibition</u>.  No statute, rule, regulation, ruling, consent, decree, judgment, injunction or order shall be enacted, promulgated, entered or enforced by any court or Governmental Authority, which would prohibit the consummation by such Party of the transactions contemplated hereby.

(c)    <u>Bidding Procedures Order and Sale Order</u>.  The Bankruptcy Court shall have entered the Bidding Procedures Order.  The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall authorize each of the Comnet Companies to convey to the Buyer all of the Comnet Companies' right, title and interest in and to the Acquired Assets free and clear of all Liens (except as otherwise specified herein), and the Bankruptcy Court shall have approved the assignment and assumption of the Assumed Contracts as contemplated herein.

(d)    <u>Assumed Contracts</u>.  The Bankruptcy Court shall have authorized the assumption and assignment of certain Assumed Contracts to the Buyer as of the Closing Date pursuant to the Sale Order, and the Buyer shall have paid the respective Cure Costs.

(e)    <u>Consents and Approvals</u>.  The Buyer shall have confirmed in writing that the Consents, Licenses and Permits, and regulatory approvals necessary for transfer to and operation of the Acquired Assets by the Buyer shall have been obtained, including without

limitation, Final Approval of an asset transfer of the Comnet Companies by the Federal Communications Commission and the Michigan Public Service Commission.

    (f)    <u>Closing Deliveries</u>.  The Comnet Companies shall have received, or waived delivery of, the items to be delivered pursuant to **Section 8.3**.

# ARTICLE 8

# CLOSING

8.1    <u>Time and Place</u>.  The closing of the transactions contemplated hereby ("**Closing**") shall take place remotely via electronic exchange of documents, on the date ("**Closing Date**") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in **Sections 7.1(d)** and **7.2(d)**, whichever is last to occur, absent written agreement of the Parties.

8.2    <u>Deliveries by the Comnet Companies</u>.  At the Closing, the Comnet Companies shall deliver or cause to be delivered to the Buyer:

    (a)    <u>Sale Order</u>.  A certified copy of the Sale Order.

    (b)    <u>Assignment and Assumption Agreements</u>.  Each of the Assignment and Assumption Agreements related to those Assumed Contracts that are being assumed and assigned on or prior to the Closing Date are duly executed by the Comnet Companies.

    (c)    <u>Deeds</u>.  Each Deed, duly executed by the applicable Comnet Company.

    (d)    <u>Payoff Letter</u>.  A payoff letter duly executed by CoBank confirming receipt of payment of amounts owed by the Comnet Companies.

    (e)    <u>Company Certificate</u>.  A certificate, dated as of the Closing Date and executed by an authorized officer of the Comnet Companies, certifying the satisfaction of the conditions specified in **Section 7.1(a)**.

    (f)    <u>Other Comnet Companies' Documents</u>.  Each of the Comnet Companies' Documents, duly executed by the Comnet Companies.

    (g)    <u>FIRPTA Certificate</u>. A certificate, duly executed by each Comnet Company, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Comnet Company is not a foreign person within the meaning of Section 1445(f)(3) of the Code.

    (h)    <u>Other Documents</u>.  Such other documents and instruments as the Buyer or its counsel shall deem reasonably necessary to consummate the transactions contemplated by this Agreement.

8.3    <u>Deliveries by the Buyer</u>.  The Buyer will deliver or cause to be delivered to the Comnet Companies:

28

(a)    <u>Cash Purchase Price</u>.  Payment of the balance of the Cash Purchase Price (less the Deposit), as provided in **Section 2.1(a)** by the Buyer, and the release of the Deposit to the Comnet Companies pursuant to the Bid Procedures Order and/or Escrow Agreement, as applicable.

(b)    <u>Assignment and Assumption Agreements</u>.  Each of the Assignment and Assumption Agreements related to those Assumed Contracts that are being assumed and assigned on or prior to the Closing Date are duly executed by the Buyer.

(c)    <u>Buyer Certificate</u>.  A certificate, dated as of the Closing Date and executed by an authorized officer of the Buyer, certifying to the satisfaction of the conditions specified in **Section 7.2(a)**.

(d)    <u>Other Buyer Documents</u>.  Each other Buyer Document, duly executed by the Buyer.

(e)    <u>Other Documents</u>.  Such other documents and instruments as the Comnet Companies or its counsel shall deem reasonably necessary to consummate the transactions contemplated hereby.

# ARTICLE 9

## TERMINATION

9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to Closing by:

(a)    the mutual written consent of the Comnet Companies and the Buyer.

(b)    by the Buyer upon notice to the Comnet Companies in writing, if any of the conditions in **Section 7.1** is or becomes impossible (other than through failure of the Buyer to comply with its obligations under this Agreement) and the Buyer has not waived in writing such condition on or before the Closing;

(c)    by the Comnet Companies upon notice to the Buyer in writing, if any of the conditions in **Section 7.2** is or becomes impossible (other than through failure of the Comnet Companies to comply with its obligations under this Agreement) and the Comnet Companies have not waived in writing such condition on or before the Closing;

(d)    by the Buyer upon notice to the Comnet Companies in writing, in the event of any material breach of this Agreement by the Comnet Companies, which breach remains uncured ten (10) days following written notice by the Buyer to the Comnet Companies of such breach;

(e)    by the Comnet Companies upon notice to the Buyer in writing, in the event of any material breach of this Agreement by the Buyer, which breach remains uncured ten (10) days following written notice by the Comnet Companies to the Buyer of such breach;

(f)    by either the Buyer or Comnet Companies upon notice to the other party in writing and subject to **Section 5.2**, in the event the Bankruptcy Court shall enter an order approving a Competing Bid;

(g)    by either the Buyer or the Comnet Companies upon notice to the other party in writing, if the Bankruptcy Court shall have issued an order, which has become final and non-appealable restricting or restraining in a material manner or enjoining or otherwise prohibiting or making illegal effectuation of the transactions contemplated by this Agreement;

(h)    by the Buyer, upon notice to the Comnet Companies in writing, in the event the Comnet Companies consummate a Third Party Sale or the Closing has not occurred by June 22, 2016;

(i)    by the Buyer upon notice to the Comnet Companies in writing, if (i) any Comnet Company seeks to have the Bankruptcy Court enter an order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by the Comnet Companies under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), (ii) an order is entered in the Bankruptcy Case or any of the bankruptcy cases commenced by the Comnet Companies dismissing or converting the applicable case under Chapter 7 of the Bankruptcy Code, or (iii) the Bankruptcy Court enters an order in the Bankruptcy Case or any of the bankruptcy cases that the Comnet Companies have filed that appoints a trustee, a responsible officer, or an examiner with enlarged power relating to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b) in any of the applicable bankruptcy cases, and such order is not reversed or vacated within fourteen (14) days after entry thereof; or

(j)    by the Buyer upon notice to the Comnet Companies in writing, if (i) the Bidding Procedures Order is not entered on or before March 11, 2016, (ii) the Bankruptcy Court has not entered the Sale Order on or prior to May 9, 2016, or (iii) the Sale Order shall have been stayed, vacated, modified or supplemented without the Buyer's prior written consent.

Each condition set forth in this **Section 9.1**, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in this **Section 9.1** is applicable, the applicable Party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

9.2    Effect of Termination.

(a)    In the event of termination of this Agreement pursuant to **Section 9.1**, all obligations under this Agreement (other than (i) the obligation, if any, of the Comnet Companies to pay Buyer the Termination Fee pursuant to **Section 5.5** and (ii) obligations with respect to the Deposit set forth herein (other than in Section **9.2(b)**)) shall terminate and shall be of no further force or effect, and such Deposit shall be forthwith returned to the Buyer or paid

to the Comnet Companies in accordance with the provisions set forth in **Section 9.2(b)**, in the Bidding Procedures Order and/or Escrow Agreement, as applicable.

(b)    In the event that this Agreement is terminated by the Comnet Companies pursuant to **Section 9.1(c)** or **Section 9.1(e)**, in each case, when all conditions set forth in **Section 7.1** and **Section 7.2** shall have otherwise been satisfied and the Closing has not otherwise occurred within the timeframes set forth in **Section 8.1**, the Deposit shall be immediately forfeited and released to the Comnet Companies, and the Buyer and the Comnet Companies acknowledge and agree that the forfeiture of the Deposit under such circumstance is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Comnet Companies in the circumstances in which such amount is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions. In the event that this Agreement is terminated by the Buyer pursuant to **Section 9.1(a), (b), (d), (f), (g), (h), (i) or (j)**, the Deposit shall be immediately released and paid to the Buyer.

(c)    In the event this Agreement may be terminated by the Comnet Companies and the Comnet Companies are entitled to the Deposit under **Section 9.2(b)**, the Comnet Companies' right to receive the Deposit shall be the sole and exclusive remedy of the Comnet Companies or any other Person with respect to this Agreement and the Buyer's obligations hereunder, and all other remedies (including equitable remedies) shall be deemed waived against Buyer or any of its Affiliates and none of Buyer or any of their respective Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated thereby.

(d)    In the event this Agreement may be terminated by the Buyer and the Buyer is entitled to the Deposit under **Section 9.2(b)**, the Buyer's right to receive the Deposit shall be the sole and exclusive remedy of the Buyer or any other Person (other than the Buyer's right, if any, to the Termination Fee under **Section 5.5** and the remedy of specific performance) with respect to this Agreement and the Comnet Companies' obligations hereunder, and all other remedies (other than the Buyer's right, if any, to the Termination Fee under **Section 5.5** and the remedy of specific performance) shall be deemed waived against the Comnet Companies or any of their Affiliates, and none of the Comnet Companies or any of their respective Affiliates shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated thereby.

(e)    The Comnet Companies' right to terminate this Agreement and its obligations hereunder shall be the sole and exclusive remedy of the Comnet Companies and their Affiliates against the lenders to the Buyer or any other Persons not party to this Agreement that have committed to provide or otherwise entered into agreements to finance the transactions contemplated by this Agreement (each such Person, a "**Debt Financing Source**") and any of their respective former, current, or future general or limited partners, stockholders, managers, members, directors, officers, Affiliates, employees, representatives or agents for any loss suffered as a result of any breach of any covenant or agreement in this Agreement or the failure of the transactions contemplated by this Agreement to be consummated.  For the avoidance of doubt, (1) in any circumstance in which the Comnet Companies are permitted to terminate this Agreement, none of the Debt Financing Sources shall have any liability or obligation relating to

31

or arising out of this Agreement or the transactions contemplated by this Agreement and (2) in any circumstance where the Buyer is not the Prevailing Bidder or the Agreement is terminated pursuant to **Section 9.1(a)**, the Deposit shall be promptly returned to the Buyer.

9.3    Extension; Waiver. At any time prior to Closing, (a) the Buyer may extend the time for the performance of any obligations of the Comnet Companies, (b) Comnet Companies may extend the time for the performance of any obligations of the Buyer, (c) the Buyer may waive any inaccuracies in the representations and warranties of the Comnet Companies contained in this Agreement, (d) the Comnet Companies may waive any inaccuracies in the representations and warranties of the Buyer contained in this Agreement, (e) unless prohibited by applicable Laws, the Buyer may waive compliance by the Comnet Companies with any of the covenants or conditions contained in this Agreement, and (f) unless prohibited by applicable Laws, the Comnet Companies may waive compliance by the Buyer with any of the covenants or conditions contained in this Agreement. Any agreement on the part of any Party to any extension or waiver will be valid only if set forth in an instrument in writing signed by such Party. The failure of any Party to assert any of its rights under this Agreement or otherwise will not constitute a waiver of such rights.

## ARTICLE 10

## OTHER COVENANTS OF THE PARTIES

10.1    Employment.

(a)    The Comnet Companies shall terminate and the Buyer shall offer employment effective as of the Closing to such employees, if any, who are specifically identified on **Schedule 10.1(a)** on terms and conditions determined by the Buyer in its discretion. Notwithstanding any other term of this Agreement to the contrary, Buyer shall deliver to the Comnet Companies a completed **Schedule 10.1(a)** seven (7) days prior to the Closing, which shall be completed in the sole discretion of Buyer.  Such Persons who accept the Buyer's offer of employment shall be referred to as the "**Transferred Employees**." To facilitate the Buyer's obligations under this **Section 10.1**, upon request, each of the Comnet Companies, as applicable, shall provide the Buyer within a reasonable period prior to the Closing a true and correct list of all Employees, including with respect to any inactive Employee, the reason for such inactive status and, if applicable, the anticipated date of return to active employment. With respect to the Transferred Employees, after the Closing Date, (i) the Buyer shall be responsible for all liabilities, obligations and commitments relating to all wages, salaries, bonuses, vacation, sick leave and other forms of compensation and related expenses, workers' compensation claims, and employee benefit liabilities under any and all plans, programs and arrangements maintained or contributed to by the Buyer and its Affiliates for the benefit of the Transferred Employees, if and to the extent incurred or accrued after the Closing Date, and (ii) the applicable Comnet Companies shall be responsible for all liabilities, obligations and commitments relating to all wages, salaries, bonuses, sick leave and other forms of compensation and related expenses, and workers' compensation claims and for any and all employee benefits incurred under any and all current or former Employee Plans/Agreements maintained or contributed to by the applicable Comnet Companies, whether incurred or accrued on or before the Closing Date. The applicable Comnet Companies shall maintain COBRA continuation coverage under any Employee

Plan/Agreement that is a group health plan for any "qualified beneficiary" (as defined in Section 4980B(g)(1) and Section 607(3) of ERISA) who elects such coverage and pays the required premiums for such coverage. Except as otherwise specifically set forth herein, the Comnet Companies shall have no responsibility whatsoever for any liabilities or obligations that relate in any way to such Transferred Employee's employment with the Buyer or termination by the Buyer.

(b)      The provisions of this **Section 10.1** are for the sole benefit of the Parties to this Agreement only and shall not be construed to grant any rights, as a third party beneficiary or otherwise, to any person who is not a party to this Agreement, nor shall any provision of this Agreement be deemed to be the adoption of, or an amendment to, any employee benefit plan, as that term is defined in Section 3(3) of ERISA, or otherwise to limit the right of the Buyer or the Comnet Companies to amend, modify or terminate any such employee benefit plan. In addition, nothing contained herein shall be construed to (i) prohibit any amendments to or termination of any employee benefit plans or (ii) prohibit the termination or change in terms of employment of any Employee (including any Transferred Employee) as permitted under applicable law. Nothing herein, expressed or implied, shall confer upon any Employee (including any Transferred Employee) any rights or remedies (including without limitation, any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of any provision of this Agreement.

## ARTICLE 11

## MISCELLANEOUS

11.1    <u>Notices, Consents, etc</u>.  Any notices, consents or other communications required to be sent or given hereunder by any of the Parties shall in every case be in writing and shall be deemed properly served if and when (a) delivered by hand, (b) transmitted by facsimile or email with confirmation of transmission or receipt, or (c) delivered by Federal Express or other express overnight delivery service, or registered or certified mail, return receipt requested, to the Parties at the addresses as set forth below or at such other addresses as may be furnished in writing:

(a)      If to the Comnet Companies:

Great Lakes Comnet, Inc. & Comlink, L.L.C.
Attn:  John Summersett & Gordon Schreur
1515 Turf Lane, Suite 100
East Lansing, MI 48823
Email:          jsummersett@comlink.net
Email:          Gordon@schreurcpa.com

With a copy (which shall not constitute notice) to:

Timothy A. Fusco and Stephen S. LaPlante
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500

33

Detroit, MI 48226
Facsimile:    (313) 496-8451
Email:    Laplante@millercanfield.com
Email:    fusco@millercanfield.com

(b)    If to the Buyer:

Everstream Solutions, LLC
800 W St Clair Avenue
Cleveland, Ohio 44113
Attn: Brett Lindsey
Facsimile:    216-394-0596
Email:    blindsey@everstream.net

With copies (which shall not constitute notice) to:

Thompson Hine LLP
3900 Key Center
127 Public Square
Cleveland, Ohio 44114-1291
Attention:    Scott B. Lepene and Jonathon H. Vinocur
Facsimile:    216-566-5800
Email:    Scott.Lepene@ThompsonHine.com and
    Jonathon.Vinocur@ThompsonHine.com

and

Choate, Hall & Stewart, LLP
Two International Place
Boston, MA 02110
Attention: Brian P. Lenihan and John F. Ventola
Facsimile:    617-248-4000
Email:    blenihan@choate.com and
    jventola@choate.com

Date of service of such notice shall be (x) the date such notice is delivered by hand, (y) the earlier of the date on which receipt is confirmed or one business day following the delivery by facsimile, by email, or by express overnight delivery service, or (z) three days after the date of mailing if sent by certified or registered mail.

11.2    <u>Severability</u>. Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any

34

provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

11.3    <u>Successors; Assignment</u>. This Agreement will be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and permitted assigns, but will not be assignable or delegable by the Buyer prior to Closing without the prior written consent of the Comnet Companies. Notwithstanding the foregoing, the Buyer shall be permitted to assign, in whole or in part, its right to purchase the Acquired Assets, or to transfer this Agreement to its lenders or to one or more affiliates of, or one or more entities controlled by, the Buyer.

11.4    <u>Counterparts; Facsimile or Electronic Signatures</u>. This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement, any and all agreements and instruments executed and delivered in accordance herewith, along with any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

11.5    <u>Expenses</u>.  Except as otherwise set forth in this Agreement, each of the Parties hereto shall pay its own fees, costs and expenses, including attorney's fees, incurred in connection with the negotiation, preparation, execution and delivery of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.  Except as otherwise provided in this Agreement, all transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement shall be paid by the Comnet Companies at Closing, and the Comnet Companies shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable Law, the Parties will, and will cause their respective Affiliates to, join in the execution of any such Tax Returns and other documentation.

11.6    <u>Table of Contents and Headings</u>.  The table of contents and section headings of this Agreement are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Agreement.

11.7    <u>Definitions</u>.  As used in this Agreement,

"**Accounts Receivable**" shall have the meaning ascribed to it in **Section 1.1(g)**.

"**Acquired Assets**" shall have the meaning ascribed to it in **Section 1.1**.

"**Additional CoBank DIP Liability**" shall mean debtor-in-possession financing made available by CoBank in an amount that shall not exceed $5,000,000.

35

"**Affiliate**" shall have the meaning given for that term in Rule 405 under the Securities Act of 1933, as amended, and shall include each past and present Affiliate of a Person and the members of such Affiliate's immediate family and any trust, the beneficiaries of which are such individuals or relatives.

"**Agreement**" shall have the meaning ascribed to it in the Introduction.

"**Assignment and Assumption Agreements**" shall have the meaning ascribed to it in **Section 1.5(a)**.

"**Assumed Contracts**" shall have the meaning ascribed to it in **Section 1.3(a)**.

"**Assumed Liabilities**" shall have the meaning ascribed to it in **Section 1.3**.

"**Auction**" shall have the meaning ascribed to it in **Section 5.2(c)**.

"**Audited Financial Statements**" shall have the meaning ascribed to it in **Section 3.13**.

"**Award Agreements**" shall have the meaning ascribed to it in **Section 3.12(a)**.

"**Back-up Bidder**" shall have the meaning ascribed to it in **Section 5.2(d)**.

"**Bankruptcy Case**" shall have the meaning ascribed to it in the Recitals.

"**Bankruptcy Code**" shall have the meaning ascribed to it in the Recitals.

"**Bankruptcy Court**" shall have the meaning ascribed to it in the Recitals.

"**Bankruptcy Rules**" shall have the meaning ascribed to it in the Recitals.

"**Bidding Procedures Order**" shall have the meaning ascribed to it in **Section 5.2(a)**.

"**Bills of Sale**" shall have the meaning ascribed to it in **Section 1.5(c)**.

"**BTOP**" shall have the meaning ascribed to it in **Section 3.12(a)**.

"**Business**" shall mean all aspects of each of the Comnet Companies relating to the Network, all telecommunications services and operations for enterprise and carrier customers conducted by either of the Comnet Companies, and all other business conducted by either of the Comnet Companies in furtherance thereof.

"**Buyer**" shall have the meaning ascribed to it in the Introduction.

"**Buyer Documents**" shall have the meaning ascribed to it in **Section 4.2**, and shall include without limitation: the Assignment and Assumption Agreements, Bills of Sale and Deeds.

"**Buyer's Knowledge**" means the knowledge, assuming reasonable internal inquiry, of the executive officers of the Buyer.

36

"**Claims**" shall have the meaning ascribed to it in Section 101 of the Bankruptcy Code.

"**Cash Purchase Price**" shall have the meaning ascribed to it in **Section 2.1(a)**.

"**Closing**" shall have the meaning ascribed to it in **Section 8.1**.

"**Closing Date**" shall have the meaning ascribed to it in **Section 8.1**.

"**CoBank**" means CoBank, ACB.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Comnet Companies**" and "**Comnet Company**" shall have the meaning ascribed to them in the Introduction.

"**Comnet Companies' Documents**" shall have the meaning ascribed to it in **Section 3.7**.

"**Comnet Companies' Intellectual Property**" shall mean all Intellectual Property rights of each of the Comnet Companies.

"**Comnet Companies' Knowledge**" shall mean the actual knowledge of the individuals listed on **Schedule 11.7A,** assuming reasonable internal inquiry.

"**Competing Bid**" shall have the meaning ascribed to it in **Section 5.2(c)**.

"**Confidentiality Agreement**" shall have the meaning ascribed to it in **Section 6.3**.

"**Consent**" means any approval, consent, ratification, waiver, or other authorization.

"**Contract**" means any written or oral agreement, note, mortgage, indenture, lease, deed of trust, license, plan, instrument or other contract, including without limitation, to any purchase orders or releases thereunder.

"**Cure Costs**" means all cure amounts, as determined by the Bankruptcy Court through the entry of a final, non-appealable order with respect to the Assumed Contracts, up to an aggregate amount not to exceed $2,000,000 (USD).  The Buyer will be responsible for and pay all Cure Costs in excess of $2,000,000, subject to the provisions of **Section 2.1(a)** of this Agreement.

"**Debt Financing Source**" shall have the meaning ascribed to it in **Section 11.12**.

"**Deeds**" shall have the meaning ascribed to it in **Section 1.5(b)**.

"**Deposit**" shall have the meaning ascribed to it in **Section 2.1(b)**.

"**Deposit Account**" shall have the meaning ascribed to it in Section **1.1(i)**.

"**Deposit Amount**" shall have the meaning ascribed to it in **Section 1.3(c)**.

37

"**DIP Order**" shall mean that certain debtor-in-possession loan facility between CoBank and the Comnet Companies.

"**Employee**" means all individuals, actively at work as of the date hereof, or who otherwise will have re-hire or reinstatement rights with any of the Comnet Companies under applicable Law, who are employed by any of the Comnet Companies in connection with the Business, together with hourly "at will" employees who are hired by the any of Comnet Companies in respect of the Business after the date hereof.

"**Employee Plans/Agreements**" means all plans, programs, Contracts providing benefits to any current or former employee, director or independent contractor who performs or performed services primarily for the benefit of the Business, or beneficiary or dependent thereof, sponsored or maintained by any of the Comnet Companies or any ERISA Affiliate, to which any of the Comnet Companies or any ERISA Affiliate has contributed, contributes or is obligated to contribute, or under which the Comnet Companies or any ERISA Affiliate had or has any liability, including any pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute," severance, vacation, sick leave, fringe or welfare benefits, any employment or consulting Contracts, "golden parachutes," collective bargaining agreements, "employee benefit plans" (as defined in Section 3(3) of ERISA), employee manuals, and written or binding oral statements of policies, practices or understandings relating to employment.

"**Environmental, Health and Safety Requirements**" means all federal, state, provincial and local statutes, codes, regulations, rules, ordinances, Permits and Licenses, and any other Laws relating to the protection, preservation or conservation of the environment and to public or worker health and safety, as amended or reauthorized through the Closing Date.

"**Equipment**" shall have the meaning ascribed to it in **Section 1.1(b)**.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that is a member of a controlled group of corporations (as defined in Section 414(b) of the Code) of which any of the Comnet Companies is a member, an unincorporated trade or business under common control with the Comnet Companies (as determined under Section 414(c) of the Code), or a member of an "affiliated service group" (within the meaning of Section 414(m) of the Code) of which any of the Comnet Companies are a member.

"**Escrow Agent**" shall have the meaning ascribed to it in **Section 2.1(b)**.

"**Escrow Agreement**" shall have the meaning ascribed to it in **Section 2.1(b)**.

"**Excess Cure Credit**" means that in the event that the pre-petition Cure Costs for the Assumed Contracts exceed $2,000,000, the aggregate amount by which the actual pre-petition Cure Costs associated with the Assumed Contracts exceed $2,000,000.

"**Excluded Assets**" shall have the meaning ascribed to it in **Section 1.2**.

38

"**Excluded Liabilities**" shall have the meaning ascribed to it in **Section 1.4**.

"**Fiber Leases**" shall have the meaning ascribed to it in **Section 3.9(b)**.

"**Final Approval**" shall mean that (a) either (1) pursuant to 47 C.F.R. Sections 1.102 and 1.103, a forty (40)-day period shall have elapsed from the date of the FCC consent or (2) the Buyer shall have provided written notice to the Comnet Companies of the Buyer's waiver of such period and (b) (1) no request for stay has been filed, and no action with respect thereto is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it has passed, (2) no appeal, petition for rehearing or reconsideration or application for review of the action is pending before the FCC and the time for filing any such action has passed, (3) no reconsideration on the FCC's own motion is pending or in effect and the time for such reconsideration has passed and (4) no appeal or petition for review to a court, or request for stay by a court, of the FCC's action is pending or in effect, and, if any deadline for filing any such appeal or request is designated by statute or rule, such deadline has passed.

"**Financial Statements**" shall have the meaning ascribed to it in **Section 3.13**.

"**GAAP**" means generally accepted accounting principles, consistently applied, in the United States.

"**Governmental Authority**" shall mean any federal, state, provincial, local or foreign government, or any subdivision, agency or authority of any thereof having jurisdiction over any of the Comnet Companies, the Buyer or the transactions contemplated by this Agreement, as applicable.

"**Hazardous Materials**" means (i) hazardous substances or hazardous wastes, as defined under Environmental, Health and Safety Requirements; (ii) petroleum, including without limitation, crude oil or any fraction thereof which is liquid at standard conditions of temperature and pressure; (iii) any radioactive material, including without limitation, any source, special nuclear, or by-product material; (iv) asbestos in any form or condition; (v) polychlorinated biphenyls; and (vi) any other material, substance or waste to which liability or standards of conduct may be imposed under any Environmental, Health and Safety Requirement.

"**Intellectual Property**" of any Person means all intellectual property, confidential information, and proprietary information of such Person, including, but not limited to, (a) patents and patent applications (including all reissues, continuations, continuations-in-part, revisions, extensions and reexaminations thereof) and patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (b) trademarks, service marks, trade dress, trade names, Internet domain names, assumed names and corporate names, together with the goodwill of the business associated with and symbolized by such trademarks, service marks, trade dress, trade names and corporate names, in each case whether or not registered; (c) published and unpublished works of authorship, whether copyrightable or not, including all statutory and common law copyrights associated therewith, including without limitation compositions, artwork and graphic design, manuscripts, and drawings; (d) all registrations, applications, extensions and renewals for any of the terms listed in clauses (b) and (c); (e) trade secrets and other proprietary information, including without limitation

39

formulae, know-how, research and development information, processes and business methods, specifications, test reports, manuals, and financial, business, sales and marketing proposals, research, data, and plans; (f) websites; (g) all computer programs, including operating systems, applications, routines, interfaces, all algorithms, whether in source code or object code, and electronic files or data stored on any computer, technical and computer data, databases, and documentation; (h) lists of customers and potential customers (including any lists of electronic mail addresses of customers and potential customers), lists of suppliers and service providers, pricing and cost information and records; promotional materials and related information; and (i) other intellectual property, confidential information and proprietary rights, in each case in any medium, including digital, and in any jurisdiction, together with all causes of action, judgment, settlements, claims and demands of any nature related thereto, including the right to prosecute any past infringements or other violations thereof.

"**Inventory**" shall have the meaning ascribed to it in **Section 1.1(e)**.

"**Law**" means each provision of any federal, state, local or foreign law, statute, ordinance, order, code, rule or regulation, promulgated or issued by any Governmental Authority.

"**Leased Real Property**" shall have the meaning ascribed to it in **Section 3.9(a)**.

"**Legal Proceedings**" shall have the meaning ascribed to it in **Section 3.2**.

"**Licenses and Permits**" means any licenses, permits, certificates, notifications, exemptions, classifications, registrations, franchises, approvals, orders or similar authorizations, or any waivers of the foregoing, issued by any Governmental Authority or private accrediting agency related to the Business.

"**Liens**" means any mortgage, pledge, hypothecation, right of others, Claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever, other than restrictions on the offer and sale of securities under applicable securities Laws.

"**Material Adverse Effect**" means any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other change, effect, event, occurrence, state of facts or development, is materially adverse to the financial condition, results of operations or prospects of the Business taken as a whole; provided, however, that no adverse change, event, development, or effect arising from or relating to changes in GAAP shall be taken into account in determining whether there has been or will be, a Material Adverse Effect.

"**Network**" shall have the meaning ascribed to it in **Section 3.12(b)**.

"**Organizational Documents**" means (a) with respect to a limited liability company, the certificate or articles of organization and operating agreement; (b) with respect to any corporation, the certificate or articles of incorporation and bylaws; (c) with respect to any other

40

entity, any charter or similar document adopted or filed in connection with the creation, formation or organization of such entity; and (d) any amendment to any of the foregoing.

"**Outside Back-up Date**" shall have the meaning ascribed to it in **Section 5.2(d)**.

"**Owned Real Property**" shall have the meaning ascribed to it in **Section 1.1(a)**.

"**Party**" and "**Parties**" shall have the meanings ascribed to them in the Introduction.

"**Permitted Liens**" means (a) Liens for Taxes not yet due and payable, (b) statutory Liens of landlords for amounts not yet due and payable, (c) Liens of carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for amounts not yet due and payable, (d) Liens attaching to inventory held by consignees in the ordinary course of business, (e) Liens that will be terminated at or upon Closing, and (f) the federal interest, if any, of the National Telecommunications Information Administration, U.S. Department of Commerce under NTIA/BTOP Grant Award #NTIOBIX5570099 (to Bloomingdale Communications, Inc. in which Comnet is a sub-recipient) and #NTIOBIX5570114 (to Merit Network, Inc. in which Comnet is a sub-recipient).

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated association, corporation, limited liability company, entity or government (whether federal, state, county, city or otherwise, including without limitation, any instrumentality, division, agency or department thereof).

"**Personal Property Leases**" shall have the meaning ascribed to it in **Section 3.9(c)**.

"**Petition Date**" shall have the meaning ascribed to it in the Recitals.

"**Pre-Closing Budget**" shall have the meaning ascribed to it in **Section 5.1(g)**.

"**Pre-Closing Tax Period**" shall have the meaning ascribed to it in **Section 2.2(d)**.

"**Prevailing Bidder**" shall have the meaning ascribed to it in **Section 5.2(d)**.

"**Purchase Price**" shall have the meaning ascribed to it in **Section 1.1(a)(a)**.

"**Real Property**" shall have the meaning ascribed to it in **Section 1.1(a)**.

"**Reasonable Efforts**" shall mean the good faith efforts that a reasonably prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as reasonably expeditiously and economically as possible.

"**Representative**" shall have the meaning ascribed to it in **Section 5.9**.

"**Sale Motion**" shall have the meaning ascribed to it in **Section 5.2(a)**.

"**Sale Order**" shall have the meaning ascribed to it in **Section 5.2(a)**.

"**Straddle Period**" shall have the meaning ascribed to it in **Section 2.2(d)**.

"**Tax or Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, fuel, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Termination Fee**" shall have the meaning ascribed to it as set forth in **Section 5.5(a)**.

"**Third Party**" shall have the meaning ascribed to it in **Section 5.5(a)**.

"**Third Party Sale**" shall have the meaning ascribed to it in **Section 5.5(a)**.

"**Threatened**" means a claim, proceeding, dispute, action or other matter with respect to which any demand or statement has been made in writing or any notice of commencement of an action or suit has been given in writing.

"**Transferred Employees**" shall have the meaning ascribed to it in **Section 10.1**.

"**Unaudited Financial Statements**" shall have the meaning ascribed to it in **Section 3.13**.

11.8    Entire Agreement. This Agreement, the recitals hereto, the Schedules and the Exhibits attached hereto, along with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the transactions contemplated hereby, supersede all prior discussions, understandings, agreements and representations and shall not be modified or affected by any offer, proposal, statement or representation, oral or written, made by or for any Party in connection with the negotiation of the terms hereof. This Agreement may be modified only by subsequent instruments signed by the Parties hereto.  Notwithstanding anything to the contrary contained herein, neither this **Section 11.8** nor **Sections 6.1**, **9.2**, **11.3**, **11.9**, or **11.12** (and any other provision of this Agreement to the extent an amendment, supplement, waiver or other modification of such provision would modify the substance of such Sections) may be amended, supplemented, modified or waived in a manner that is adverse to the interests of the Debt Financing Sources (as defined below) in any respect without the written consent of such lenders.

11.9    Third Parties. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties to this Agreement, any rights or remedies under or by reason of this Agreement; provided, however, that the lenders to the Buyer shall be express third party beneficiaries of **Sections 6.1**, **9.2**, **11.3**, **11.12**, **11.14**, and this **Section 11.9** and such Sections shall inure to the benefit of such lenders to the Buyer.

11.10    Disclosure Generally. All Schedules attached hereto are incorporated herein and expressly made a part of this Agreement as though completely set forth herein. All references to

this Agreement herein or in any of the Schedules hereto shall be deemed to refer to this entire Agreement, including all such Schedules; provided, however, that information furnished in any particular Schedule shall be deemed to be included in another Schedule if a specific cross-reference is contained therein. The Schedules to this Agreement (other than those relating to **Article 3** and **Article 5** which shall be complete as of the date hereof) shall be agreed upon in writing by the parties no later than the Auction or, if no Auction occurs, by April 15, 2016; provided; however, that any change to **Schedule 1.3(a)** or **Schedule 1.6(a)** shall not cause a breach of, or inaccuracy in, the representations and warranties of the Comnet Companies set forth in **Section 3.13**.

11.11    Interpretive Matters. Unless the context otherwise requires, (a) all references to articles, sections, schedules or exhibits are to Articles, Sections, Schedules or Exhibits in this Agreement, (b) each accounting term not otherwise defined in this Agreement has the meaning assigned to it in accordance with GAAP, (c) words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, feminine or neuter gender shall include the masculine, feminine and neuter, and (d) the term "including" shall mean by way of example and not by way of limitation. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

11.12    Choice of Law; Jurisdiction. This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Michigan (without regard to its conflicts of laws principles), the Bankruptcy Code, and other applicable Federal law. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) in any action or proceeding arising out of, or relating to, this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby, and any matters and transactions related thereto shall be deemed to have arisen in the State of Michigan. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceeding may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith. Each Party agrees that service of summons and complaint or any other process that might be served in any action or proceeding may be made on such Party by sending or delivering a copy of the process to the Party to be served at the address of the Party and in the manner provided for the giving of notices in **Section 11.1**. Nothing in this **Section 11.12**, however, shall affect the right of any Party to serve legal process in any other manner permitted by law.  Notwithstanding anything in this **Section 11.12** to the contrary, each of the Comnet Companies agrees that it will not bring or support any Legal Proceeding (whether at law, in equity, in contract, in tort or otherwise) against the lenders to the Buyer or any other Persons not party to this Agreement that have committed to provide or otherwise entered into agreements to finance the transactions contemplated by this Agreement (each such Person, a "**Debt Financing Source**") in any way relating to this Agreement or any of the transactions contemplated by this Agreement, including any dispute arising out of or relating in any way to the any commitment

letter entered into by any Debt Financing Source or the performance thereof. The provisions of this **Section 11.12** shall be enforceable by each Debt Financing Source, its Affiliates and their respective successors and permitted assigns.

11.13   Specific Performance; Time is of the Essence. Except as otherwise expressly set forth in this Agreement, the Parties agree that if any provision of this Agreement is not performed in accordance with its terms or is otherwise breached, irreparable harm would occur, no adequate remedy at law would exist, and damages would be difficult to determine, and the Party or Parties not in breach shall be entitled to the remedy of specific performance in addition to any other remedies that may be available at law or in equity by reason of such breach. Time is of the essence with respect to each and every provision of this Agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** the Parties have executed this Agreement on the date first written above:

**BUYER:**

**Everstream GLC Holding Company LLC**

By: _____

Name: _Brett Lindsey_____

Title: _President & CEO_____

**COMNET COMPANIES:**

**Great Lakes Comnet, Inc.**

By: _____

Name: _____

Title: _____

**Comlink, L.L.C**

By: _____

Name: _____

Title: _____

7154418

Execution Version

**IN WITNESS WHEREOF,** the Parties have executed this Agreement on the date first written above:

**BUYER:**

**Everstream GLC Holding Company LLC**

By:_____

Name:_____

Title:_____

**COMNET COMPANIES:**

**Great Lakes Comnet, Inc.**

By:_____

Name: JOHN SUMMERSETT

Title: CEO

**Comlink, L.L.C**

By:_____

Name: JOHN SUMMERSETT

Title: GENERAL MANAGER

7154418

**Exhibits and Schedules**

**<u>EXHIBITS</u>:**

| | | |
|---|---|---|
| Exhibit A | - | Assignment and Assumption Agreements |
| Exhibit B | - | Deeds |
| Exhibit C | - | Bills of Sale |
| Exhibit D | - | Escrow Agreement |
| Exhibit E | - | Sale Motion |
| Exhibit F | - | Bidding Procedures Order |
| Exhibit G | - | Sale Order |

**<u>SCHEDULES</u>:**

| | | |
|---|---|---|
| Schedule 1.1(a) | - | Owned Real Property |
| Schedule 1.1(b) | - | Equipment |
| Schedule 1.1(d) | - | Telephone Numbers |
| Schedule 1.1(l) | - | Tangible Assets |
| Schedule 1.1(q) | - | Other Acquired Assets |
| Schedule 1.2(o) | - | Excluded Equipment |
| Schedule 1.3(a) | - | Assumed Contracts |
| Schedule 1.3(c) | - | Deposit Amount |
| Schedule 1.6(a) | - | Executory Contracts and Unexpired Leases |
| Schedule 2.1(a)(i) | - | Wiring Information |
| Schedule 2.1(a)(ii) | - | Rejected Contracts |
| Schedule 2.2(b) | - | Proration of Taxes |
| Schedule 3.4 | - | Litigation |
| Schedule 3.6 | - | Environmental, Health and Safety Matters |
| Schedule 3.8 | - | Consents of the Comnet Companies |
| Schedule 3.9(a) | - | Leased Real Property |

Schedule 3.9(b)          -          Fiber Leases

Schedule 3.9(c)          -          Personal Property Leases

Schedule 3.10(a)(1)      -          Intellectual Property

Schedule 3.10(a)(2)      -          Infringed Intellectual Property

Schedule 3.10(a)(3)      -          Notice Alleging Infringement

Schedule 3.10(a)(4)      -          Intellectual Property Proceedings

Schedule 3.10(b)         -          Security

Schedule 3.12(a)         -          Award Agreements

Schedule 3.12(b)(1)      -          Network Map

Schedule 3.12(b)(2)      -          Network Description

Schedule 3.13            -          Contracts

Schedule 3.14            -          Customers and Suppliers

Schedule 3.15            -          Material Adverse Change

Schedule 3.16            -          Insurance

Schedule 3.18(a)         -          Taxes

Schedule 3.20(a)         -          Employee Plans

Schedule 3.20(b)         -          Employee Agreements

Schedule 3.20(c)         -          List of Employees

Schedule 4.3             -          Consents of the Buyer

Schedule 5.1             -          Conduct of Business

Schedule 5.1(g)          -          Pre-Closing Budget

Schedule 10.1(a)         -          Transferred Employees

Schedule 11.7A           -          Knowledge

**Exhibit A**

**Assignment and Assumption Agreements**

See attached.

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement ("**Assignment**") is made and entered into as of _____, 2016, by and among (i) Great Lakes Comnet, Inc., a Michigan corporation, and Comlink, L.L.C., a Michigan limited liability company (each, a "**Assignor**" and collectively, the "**Assignors**"), and (ii) Everstream GLC Holding Company LLC, a Delaware limited liability company (the "**Assignee**").  Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Purchase Agreement.

## RECITALS

A.    The Assignors and the Assignee are parties to that certain Purchase and Sale Agreement dated as of January 29, 2016 (the "**Purchase Agreement**").

B.    Pursuant to the Purchase Agreement, (i) the Assignors have agreed to sell, transfer, assign, convey and deliver to the Assignee, and the Assignee has agreed to purchase and acquire from the Assignors, all of the Assignors' right, title and interest in and to the Acquired Assets and (ii) the Assignors have agreed to assign to the Assignee, and the Assignee has agreed to assume from the Assignors, all of the Assumed Liabilities, in each case, on the terms and subject to the conditions more fully described in the Purchase Agreement.

C.    The United States Bankruptcy Court for the Western District of Michigan has entered a final, unstayed, non-appealable order approving the Purchase Agreement and the transactions contemplated therein, and authorizing the Comnet Companies to consummate the Purchase Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    <u>Assignment and Assumption</u>.  Upon the terms and subject to the conditions of the Purchase Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing and effective as of the date hereof, (a) each of the Assignors hereby sells, conveys, transfers, assigns and delivers to the Assignee, and the Assignee hereby receives and accepts from the Assignors, free and clear of all Liens (except for Permitted Liens), all of the Acquired Assets and (b) Assignee hereby assumes all of the Assumed Liabilities.

2.    <u>Terms of Purchase Agreement</u>.  This Assignment is expressly made subject to the terms and provisions of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Assignment and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

3.    <u>Successors ; Assignment</u>.  This Assignment will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns.

4.      Headings; Interpretation.  The section headings of this Assignment are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Assignment.  The Parties have participated jointly in the negotiation and drafting of this Assignment. In the event an ambiguity or question of intent arises, this Assignment shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Assignment.

5.      Counterparts.  This Assignment may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Assignment, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

6.      Choice of Law.  This Assignment shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Michigan (without regard to its conflicts of laws principles), the Bankruptcy Code, and other applicable Federal law.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

**ASSIGNORS:**

**Great Lakes Comnet, Inc.**

By:_____

Name:_____

Title:_____

**Comlink, L.L.C**


By:_____

Name:_____

Title:_____


**ASSIGNEE:**

**Everstream GLC Holding Company LLC**

By:_____

Name:_____

Title:_____

# TRADEMARK ASSIGNMENT

This Trademark Assignment ("**Trademark Assignment**") is made and entered into as of _____, 2016, by and between Great Lakes Comnet, Inc., a Michigan corporation, and Comlink, L.L.C., a Michigan limited liability company (each, a "**Assignor**" and collectively, the "**Assignors**"), and (ii) Everstream GLC Holding Company LLC, a Delaware limited liability company (the "**Assignee**"). Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Purchase Agreement.

# RECITALS

A.    The Assignors and the Assignee are parties to that certain Purchase and Sale Agreement dated as of January 29, 2016 (the "**Purchase Agreement**").

B.    Pursuant to the Purchase Agreement, the Assignors have agreed to sell, transfer, assign, convey and deliver to the Assignee, and the Assignee has agreed to purchase and acquire from the Assignors, all of the Assignors' right, title and interest in and to the Acquired Assets, including the United States trademark registrations set forth on **Schedule A** or that otherwise constitute the Acquired Assets and the goodwill associated with all of the foregoing (collectively, the "**Trademarks**"), on the terms and subject to the conditions more fully described in the Purchase Agreement.

# AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Assignment of Trademarks.  Upon the terms and subject to the conditions of the Purchase Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing and effective as of the date hereof, each of the Assignors hereby irrevocably sells, transfers, assigns, conveys and delivers to Assignee all of such Assignor's right, title and interest in and to the Trademarks together with all of the goodwill of the business relating to the products and/or services on which the marks are used and for which they are registered, and all registrations, applications therefor and renewals and extensions of the foregoing in the United States that are or may be secured under the laws of the United States, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, together with all income, royalties or payments due or payable as of the date hereof or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Trademarks, with the right to sue for and collect the same for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns or other legal representatives.  Each of the Assignors hereby authorizes and requests the United States Commissioner of Patents and Trademarks and any other similar government authority to record Assignee as the assignee and owner of the Trademarks and issue any and all registrations thereon to Assignee, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of Assignee and its successors, assigns or other legal representatives.

2.    <u>Terms of Purchase Agreement</u>.  This Trademark Assignment is expressly made subject to the terms and provisions of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Trademark Assignment and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

3.    <u>Successors ; Assignment</u>.  This Trademark Assignment will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns.

4.    <u>Headings; Interpretation</u>.  The section headings of this Trademark Assignment are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Trademark Assignment.  The Parties have participated jointly in the negotiation and drafting of this Trademark Assignment. In the event an ambiguity or question of intent arises, this Trademark Assignment shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Trademark Assignment.

5.    <u>Counterparts</u>.  This Trademark Assignment may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Trademark Assignment, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

6.    <u>Choice of Law</u>.  This Trademark Assignment shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Michigan (without regard to its conflicts of laws principles), the Bankruptcy Code, and other applicable Federal law.

**[Signature Page Follows]**

2

      **IN WITNESS WHEREOF**, the parties have executed this Trademark Assignment as of the date first written above.

## ASSIGNORS:

**Great Lakes Comnet, Inc.**

By:_____

Name:_____

Title:_____

**Comlink, L.L.C**


By:_____

Name:_____

Title:_____


## ASSIGNEE:

**Everstream GLC Holding Company LLC**

By:_____

Name:_____

Title:_____

**Schedule A**

**Trademarks**

| Trademark | Serial/Reg. No. | Ownership of Record | Security Interest |
|---|---|---|---|
| EMPOWERING CONNECTIONS | 4654380 | Great Lakes Comnet, Inc. | None recorded |
| COMLINK SIMPLIFYING A COMPLEX WORLD | 4608636 | Great Lakes Comnet, Inc. | None recorded |
| SIMPLIFYING A COMPLEX WORLD | 4521734 | Great Lakes Comnet, Inc. | None recorded |
| VARCLOUD, Classes 39 and 42 | 4553470 | Great Lakes Comnet, Inc. | None recorded |
| VARCLOUD, Class 38 | 4472802 | Great Lakes Comnet, Inc. | None recorded |
| MEDISPHERE and Design, Classes 38, 39 and 42 | 4462649 | Great Lakes Comnet, Inc. | None recorded |
| MEDISPHERE (word), Classes 38 and 39 | 4446519 | Great Lakes Comnet, Inc. | None recorded |
| DATASPHERE, Class 42 | 4175719 | Great Lakes Comnet, Inc. | None recorded |
| COMLINK | 4175231 | Great Lakes Comnet, Inc. | None recorded |
| THINKING BEYOND THE CLOUD | 4063454 | Great Lakes Comnet, Inc. | None recorded |
| DATASPHERE, Classes 38 and 39 | 4129404 | Great Lakes Comnet, Inc. | None recorded |

**Exhibit B**

**Deeds**

See attached.

**THIS INSTRUMENT PREPARED BY AND
RETURN TO**
[_____]
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made this [__] day of [_____], 2016
between [_____], a [_____] [limited liability company]
[corporation], whose address is [_____] (hereinafter called the "Grantor"), and
[_____], a [_____] [limited liability company] [corporation], whose
address is [_____] (hereinafter called the "Grantee").

## WITNESSETH:

That the Grantor, for and in consideration of the sum of [_____] Dollars ($[_____]) and
other good and valuable consideration, to it in hand paid, the receipt whereof is hereby
acknowledged, by these presents does grant, bargain, sell, alien, remise, release, convey and
confirm unto the Grantee, its successors and assigns forever, all of that certain parcel of land
lying and being in County of [_____], State of [_____], as more particularly
described in Exhibit A, attached hereto and incorporated herein by reference.

TOGETHER WITH all the tenements, hereditaments, and appurtenances thereto
belonging or in anywise appertaining.

SUBJECT TO real estate taxes for 20[__] and all subsequent years, and the following
easements, restrictions, and reservations of record set forth on Exhibit B attached hereto.

TO HAVE AND TO HOLD the above described premises, with the appurtenances, unto
that said Grantee, it successors and assigns, in fee simple forever.

AND the Grantor does hereby specially warrant the title to said land subject to the
matters referenced to above and will defend the same against lawful claims of all persons
claiming by, through or under the Grantor, but not otherwise.

IN WITNESS WHEREOF, the Grantor has caused these presents to be duly executed in its name and by those thereunto duly authorized, the day and year first above written.

Witnesses:

[_____]
a [_____] limited liability company

Name: [_____]
Print Name: [_____]

By: [_____]
Print Name: [_____]
Title: [_____]

Name: [_____]
Print Name: [_____]

STATE OF [_____]
COUNTY OF [_____]

The foregoing instrument was acknowledged before me this [__] day of [_____], 2016 by [_____], as [_____] of [_____], a [_____] [limited liability company] [corporation], on behalf of the company.  He is personally known to me or produced [_____] as identification.

[_____]
NOTARY PUBIC
Name: [_____]
My Commission Expires:

**EXHIBIT A**
**LEGAL DESCRIPTION:**

**<u>EXHIBIT B</u>**

**Exhibit C**

**Bills of Sale**

See attached.

## BILL OF SALE

This Bill of Sale ("**Bill of Sale**") is made and entered into as of _____, 2016, by Great Lakes Comnet, Inc., a Michigan corporation, and Comlink, L.L.C., a Michigan limited liability company (each, a "**Comnet Company**" and collectively, the "**Comnet Companies**"), in favor of Everstream GLC Holding Company LLC, a Delaware limited liability company (the "**Buyer**"). Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Purchase Agreement.

## RECITALS

A.    The Buyer and the Comnet Companies are parties to that certain Purchase and Sale Agreement dated as of January 29, 2016 (the "**Purchase Agreement**").

B.    Pursuant to the Purchase Agreement, the Comnet Companies have agreed to sell, transfer, assign, convey and deliver to the Buyer, and the Buyer has agreed to purchase and acquire from the Comnet Companies, all of the Comnet Companies' right, title and interest in and to the Acquired Assets on the terms and subject to the conditions more fully described in the Purchase Agreement.

C.    The United States Bankruptcy Court for the Western District of Michigan has entered a final, unstayed, non-appealable order approving the Purchase Agreement and the transactions contemplated therein, and authorizing the Comnet Companies to consummate the Purchase Agreement.

## AGREEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Comnet Companies hereby agree as follows:

1.    <u>Sale of Acquired Assets</u>.  Upon the terms and subject to the conditions of the Purchase Agreement, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, at the Closing and effective as of the date hereof, each of the Comnet Companies hereby sells, conveys, transfers, assigns and delivers to the Buyer, free and clear of all Liens (except for Permitted Liens), all of the Acquired Assets.

2.    <u>Terms of Purchase Agreement</u>.  This Bill of Sale is expressly made subject to the terms and provisions of the Purchase Agreement.  In the event of a conflict between the terms and provisions of this Bill of Sale and the terms and provisions of the Purchase Agreement, the terms and provisions of the Purchase Agreement shall govern and control.

3.    <u>Successors ; Assignment</u>.  This Bill of Sale will be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns.

4.    <u>Headings; Interpretation</u>.  The section headings of this Bill of Sale are included for reference purposes only and shall not affect the construction or interpretation of any of the provisions of this Bill of Sale.  The Parties have participated jointly in the negotiation and

drafting of this Bill of Sale. In the event an ambiguity or question of intent arises, this Bill of Sale shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Bill of Sale.

5.     Counterparts.   This Bill of Sale may be executed simultaneously in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Bill of Sale, to the extent signed and delivered by means of a facsimile machine or other means of electronic transmission, shall be treated in all manner and respects and for all purposes as an original signature, agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

6.     Choice of Law.  This Bill of Sale shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Michigan (without regard to its conflicts of laws principles), the Bankruptcy Code, and other applicable Federal law.

**[Signature Page Follows]**

11949355.2
25975764.2\130050-00009

       **IN WITNESS WHEREOF,** the Comnet Companies have executed this Bill of Sale as of the date first written above.

**COMNET COMPANIES:**

**Great Lakes Comnet, Inc.**

By:_____

Name:_____

Title:_____

**Comlink, L.L.C**

By:_____

Name:_____

Title:_____

**Exhibit D**

**Escrow Agreement**

See attached.

# ESCROW AGREEMENT

**THIS ESCROW AGREEMENT**, dated as of February _, 2016 ("Escrow Agreement"), is by and among Everstream GLC Holding Company LLC, a Delaware limited liability company ("Purchaser");  Great Lakes Comnet, Inc., a Michigan corporation and Comlink, L.L.C., a Michigan limited liability company (collectively, "Seller"); and U.S. BANK NATIONAL ASSOCIATION, a national banking association, as escrow agent hereunder ("Escrow Agent").

## BACKGROUND

A.  Purchaser and Seller have entered into a Purchase and Sale Agreement (the "Underlying Agreement"), dated as of January 29, 2016, pursuant to which Purchaser is agreeing to purchase certain assets of Seller.  The Underlying Agreement provides that, within seven (7) days of the date of the Underlying Agreement, the Purchaser shall deposit with the Escrow Agent the sum of $3,210,000 (USD) by wire transfer of immediately available funds.

B.  Escrow Agent has agreed to accept, hold, and disburse the funds deposited with it and the earnings thereon in accordance with the terms of this Escrow Agreement.

C.  Purchaser and Seller have appointed the Representatives (as defined below) to represent them for all purposes in connection with the funds to be deposited with Escrow Agent and this Escrow Agreement.

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.      Definitions.  The following terms shall have the following meanings when used herein:

"Bankruptcy Court Order" shall mean a final, unstayed, non-appealable order of the United States Bankruptcy Court for the Western District of Michigan directing or stipulating that the Escrowed Funds be delivered to any person or entity, which order is delivered to Escrow Agent accompanied by a Joint Written Direction given to effectuate such order and confirming that such order is a final, unstayed and  non-appealable order of the United States Bankruptcy Court for the Western District of Michigan. Escrow Agent shall be entitled to conclusively rely upon any such confirmation and instruction and shall have no responsibility to review the order to which such confirmation and instruction refers.

"Escrow Funds" shall mean the funds deposited with Escrow Agent pursuant to Section 3 of this Agreement, together with any interest and other income thereon.

"Indemnified Party" shall have the meaning set forth in Section 11.

"Joint Written Direction" shall mean a written direction executed by the Representatives and directing Escrow Agent to disburse all or a portion of the Escrow Funds or to take or refrain from taking any other action pursuant to this Escrow Agreement.

"Purchaser Representative" shall mean the person(s) so designated on Schedule B hereto or any other person designated in a writing signed by Purchaser and delivered to Escrow Agent and the Seller Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

"Representatives" shall mean the Purchaser Representative and the Seller Representative.

1

"Seller Representative" shall mean the person(s) so designated on Schedule B hereto or any other person designated in a writing signed by Seller and delivered to Escrow Agent and the Purchaser Representative in accordance with the notice provisions of this Escrow Agreement, to act as its representative under this Escrow Agreement.

2.    Appointment of and Acceptance by Escrow Agent.  Purchaser and Seller hereby appoint Escrow Agent to serve as escrow agent hereunder.  Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 3 below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

3.    Deposit of Escrow Funds.  No later than seven (7) days after the entry by Purchaser and Seller into the Underlying Agreement, and simultaneously with the execution and delivery of this Escrow Agreement, Purchaser, on behalf of the Seller, will transfer the Escrow Funds in the amount of $3,210,000 (THREE MILLION TWO HUNDRED AND TEN THOUSAND DOLLARS), by wire transfer of immediately available funds, to an account designated by Escrow Agent. The Escrow Funds shall be held in an non-interest bearing cash deposit account.

4.    Disbursements of Escrow Funds.

a.    Upon Consummation of Underlying Agreement.  The Purchaser and Seller shall deliver a Joint Written Direction (containing complete payment instructions, including wiring instructions or an address to which a check shall be sent) to the Escrow Agent at least one business day prior to the "Closing" as defined in the Underlying Agreement and the Escrow Agent will disburse the Escrow Funds in accordance with such instructions.

b.    Upon Joint Written Direction or Bankruptcy Court Order.  If the event in Section 4(a) is not satisfied, Escrow Agent shall disburse Escrow Funds at any time and from time to time, only upon receipt of, and in accordance with, either (1) a Joint Written Direction or (2) a Bankruptcy Court Order. Such Joint Written Direction or Bankruptcy Court Order, as the case may be, shall contain complete payment instructions, including wiring instructions or an address to which a check shall be sent.

c.    Identifying Information. Prior to any disbursement, Escrow Agent shall have received reasonable identifying information regarding the recipient such that Escrow Agent may comply with its regulatory obligations and reasonable business practices, including without limitation a completed United States Internal Revenue Service ("IRS") Form W-9 or original IRS Form W-8, as applicable.  All disbursements of funds from the Escrow Funds shall be subject to the fees and claims of Escrow Agent and the Indemnified Parties pursuant to Section 11 and Section 12 below.

5.    Suspension of Performance; Disbursement into Court.  If, at any time, (i) there shall exist any dispute between Purchaser, Seller or the Representatives with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) the Representatives have not, within 10 calendar days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 8 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

a.    suspend the performance of any of its obligations under this Escrow Agreement (including without limitation any disbursement obligations) other than to hold and keep safe the funds until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed.

b.    petition (by means of an interpleader action or any other appropriate method) the United States Bankruptcy Court for the Western District of Michigan for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into the court, for holding and

2

disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Purchaser, Seller or the Representatives, their respective owners, shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

6.      <u>Reserved</u>.

7.      <u>Reserved</u>.

8.      <u>Resignation or Removal of Escrow Agent</u>.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving ten (10) days prior written notice to the Purchaser and Seller specifying a date when such resignation shall take effect and, after the effective date of such resignation notice, notwithstanding any other provision of this Agreement, Escrow Agent's sole obligation will be to hold the Escrow Funds pending appointment of a successor Escrow Agent.  Similarly, Escrow Agent may be removed at any time by Purchaser and Seller giving at least thirty (30) days' prior written notice to Escrow Agent specifying the date when such removal shall take effect.  Purchaser and Seller jointly shall appoint a successor Escrow Agent hereunder prior to the effective date of such resignation or removal.  If the Purchaser and Seller fail to appoint a successor Escrow Agent within such time, the Escrow Agent shall have the right to petition the United States Bankruptcy Court for the Western District of Michigan to appoint a successor Escrow Agent, and all costs and expenses (including without limitation attorneys' fees) related to such petition shall be paid jointly and severally by Purchaser and Seller.  The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.  After any retiring Escrow Agent's resignation or removal, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement.

9.      <u>Binding Effect; Successors</u>.  This Escrow Agreement shall be binding upon the respective parties hereto and their heirs, executors, successors or assigns.  If the Escrow Agent consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business (including the escrow contemplated by this Escrow Agreement) to another corporation, the successor or transferee corporation without any further act shall be the successor Escrow Agent.

10.     <u>Liability of Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied.  The Escrow Agent has no fiduciary or discretionary duties of any kind. The Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement, including without limitation any other agreement between any or all of the parties hereto or any other persons even though reference thereto may be made herein.  The Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that the Escrow Agent's gross negligence or willful misconduct was the sole cause of any loss to the Purchaser or Seller.  Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement.  Escrow Agent shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein.  Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.  In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages or penalties (including, but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such damages or penalty and

3

10.10.13

25973812.2\130050-00009

regardless of the form of action. Escrow Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control, including without limitation acts of God, strikes, lockouts, riots, acts of war or terror, epidemics, governmental regulations, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Underlying Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the advice of such counsel. Purchaser and Seller, jointly and severally, shall promptly pay, upon demand, the reasonable fees and expenses of such counsel. Purchaser and Seller agree to perform or procure the performance of all further acts and things, and execute and deliver such further documents, as may be required by law or as Escrow Agent may reasonably request in connection with its duties hereunder.

The Escrow Agent is authorized, in its sole discretion, to comply with final orders issued or process entered by any court with respect to the Escrow Funds, without determination by the Escrow Agent of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order, or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, the Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if the Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

     11.     <u>Indemnification of Escrow Agent</u>. From and at all times after the date of this Escrow Agreement, Purchaser and Seller, jointly and severally, shall, to the fullest extent permitted by law, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "<u>Indemnified Parties</u>") against any and all actions, claims (whether or not valid), losses, damages, liabilities, penalties, costs and expenses of any kind or nature (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation Purchaser, Seller and the Representatives, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance in connection with this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; provided, however, that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Purchaser and Seller further agree, jointly and severally, to indemnify each Indemnified Party for all costs, including without limitation reasonable attorney's fees, incurred by such Indemnified Party in connection with the enforcement of Purchaser's and Seller's indemnification obligations hereunder. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Purchaser and Seller jointly and severally.   The obligations of Purchaser and Seller under this Section 11 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

The parties agree that neither the payment by Purchaser or Seller of any claim by Escrow Agent for indemnification hereunder nor the disbursement of any amounts to Escrow Agent from the Escrow Funds in respect of a claim by Escrow Agent for indemnification shall impair, limit, modify, or affect, as between Purchaser and Seller, the respective rights and obligations of Purchaser and Seller under the Underlying Agreement.

4

10.10.13

12.    <u>Compensation of Escrow Agent</u>

(a)    <u>Fees and Expenses</u>.  Purchaser and Seller agree, jointly and severally, to compensate Escrow Agent on demand for its services hereunder in accordance with Schedule A attached hereto.  Without limiting the joint and several nature of their obligations to Escrow Agent, the Purchaser and Seller agree between themselves that each will be responsible for one-half of Escrow Agent's compensation. The obligations of Purchaser and Seller under this Section 12 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

(b)    <u>Disbursements from Escrow Funds to Pay Escrow Agent</u>.  Escrow Agent is authorized to, and may disburse to itself from the Escrow Funds, from time to time, the amount of any compensation and reimbursement of out-of-pocket expenses due and payable hereunder (including any amount to which Escrow Agent or any Indemnified Party is entitled to seek indemnification hereunder).  Escrow Agent shall notify Purchaser and Seller of any disbursement from the Escrow Funds to itself or any Indemnified Party in respect of any compensation or reimbursement hereunder and shall furnish Purchaser and Seller copies of related invoices and other statements.

(c)    <u>Security and Offset</u>.  Seller, Purchaser and the Representatives hereby grant to Escrow Agent and the Indemnified Parties a security interest in, lien upon and right of offset against the Escrow Funds with respect to any compensation or reimbursement due any of them hereunder (including any claim for indemnification hereunder).  If for any reason the Escrow Funds are insufficient to cover such compensation and reimbursement, Purchaser and Seller shall promptly pay such amounts to Escrow Agent or any Indemnified Party upon receipt of an itemized invoice.

13.    <u>Representations and Warranties</u>.  Purchaser and Seller each respectively make the following representations and warranties to Escrow Agent:

(a)    it has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder; and this Escrow Agreement has been duly approved by all necessary action and constitutes its valid and binding agreement enforceable in accordance with its terms; and

(b)    each of the applicable persons designated on Schedule B attached hereto have been duly appointed to act as authorized representatives hereunder and individually have full power and authority to execute and deliver any Joint Written Direction, to amend, modify or waive any provision of this Escrow Agreement and to take any and all other actions as authorized representatives under this Escrow Agreement, all without further consent or direction from, or notice to, it or any other party, provided that any change in designation of such authorized representatives shall be provided by written notice delivered to each party to this Escrow Agreement.

14.    <u>Identifying Information</u>.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, the Escrow Agent requires documentation to verify its formation and existence as a legal entity. The Escrow Agent may ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.  The parties acknowledge that a portion of the identifying information set forth herein is being requested by the Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"), and each agrees to provide any additional information requested by the Escrow Agent in connection with the Act or any other legislation or regulation to which Escrow Agent is subject, in a timely manner.

15.    <u>Consent to Jurisdiction and Venue</u>.  In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree to the personal jurisdiction by and venue in the state and federal courts in the State of Michigan and waive any objection to such jurisdiction or venue. The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

5

16.    Notices.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered (i) by personal delivery, or (ii) by national overnight courier service, or (iii) by certified or registered mail, return receipt requested, or (iv) via facsimile transmission, with confirmed receipt or (v) via email by way of a PDF attachment thereto of an executed document.  Notice shall be effective upon receipt except for notice via email, which shall be effective only when the recipient, by return email or notice delivered by other method provided for in this Section 16, acknowledges having received that email (with an automatic "read receipt" or similar notice not constituting an acknowledgement of an email receipt for purposes of this Section 16.)  Such notices shall be sent to the applicable party or parties at the address specified below:

If to Purchaser or Purchaser Representative at:

> Everstream GLC Holding Company LLC
> 800 W St Clair Avenue
> Cleveland, Ohio 44113
> Attn: Brett Lindsey
> Facsimile:        216-394-0596
> E-mail:            blindsey@everstream.net

> With copies (which shall not constitute notice) to:

> Thompson Hine LLP
> 3900 Key Center
> 127 Public Square
> Cleveland, Ohio 44114-1291
> Attention:        Scott B. Lepene and Jonathon H. Vinocur
> Facsimile:        216-566-5800
> E-mail:            Scott.Lepene@ThompsonHine.com and
> Jonathon.Vinocur@ThompsonHine.com

> and

> Choate, Hall & Stewart, LLP
> Two International Place
> Boston, MA 02110
> Attention: Brian P. Lenihan and John F. Ventola
> Facsimile:        617-248-4000
> E-mail:            blenihan@choate.com and
>                      jventola@choate.com

If to Seller or Seller Representative at:

> Great Lakes Comnet, Inc. & Comlink L.L.C.
> Attn: John Summersett
> 1515 Turf Lane, Ste. 100
> East Lansing, MI 48823
> Facsimile:  (517) 324-8900
> E-mail:  jsummersett@comlink.net

> With a copy (which shall not constitute notice) to:
> Great Lakes Comnet, Inc. & Comlink L.L.C.
> Attn:  Gordon Schreur
> 1515 Turf Lane, Ste. 100
> East Lansing, MI 48823
> Facsimile:  (517) 324-8900
> E-mail:  gordon@schreurcpa.com

> and

6

10.10.13
25973812.2\130050-00009

Timothy A. Fusco and Stephen S. LaPlante
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
Facsimile:     (313) 496-8451
E-mail:        laplante@millercanfield.com
               fusco@millercanfield.com

If to the Escrow Agent at:     U.S. Bank National Association, as Escrow Agent
ATTN:  Global Corporate Trust Services
Address:        1350 Euclid Avenue, 11th Floor
                Cleveland, Ohio 44115
Telephone:      216-623-5987
Facsimile:      216-623-9202
E-mail:         david.schlabach@usbank.com

and to (which shall not constitute notice):

U.S. Bank National Association
ATTN:           Denise Gullickson, Trust Finance Management
Mail Code:      EP-MN-WS3T
                60 Livingston Ave
                St. Paul, MN 55107
Telephone:      651-466-6224
Facsimile:      866-691-4161
E-mail:         denise.gullickson1@usbank.com

or to such other address as each party may designate for itself by like notice and unless otherwise provided herein shall be deemed to have been given on the date received.

17.    Optional Security Procedures.  In the event funds transfer instructions, address changes or change in contact information are given (other than in writing at the time of execution of this Escrow Agreement), whether in writing, by facsimile or otherwise, the Escrow Agent is authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to the person or persons designated on Schedule B hereto, and the Escrow Agent may rely upon the confirmation of anyone purporting to be the person or persons so designated.  The persons and telephone numbers for call-backs may be changed only in writing actually received and acknowledged by Escrow Agent and shall be effective only after Escrow Agent has a reasonable opportunity to act on such changes. If the Escrow Agent is unable to contact any of the designated representatives identified in Schedule B, the Escrow Agent is hereby authorized but shall be under no duty to seek confirmation of such instructions by telephone call-back to any one or more of Purchaser or Seller's executive officers ("Executive Officers"), as the case may be, which shall include the titles of Chief Executive Officer, President and Vice President, as the Escrow Agent may select. Such Executive Officer shall deliver to the Escrow Agent a fully executed incumbency certificate, and the Escrow Agent may rely upon the confirmation of anyone purporting to be any such officer. Purchaser and Seller agree that the Escrow Agent may at its option record any telephone calls made pursuant to this Section. The Escrow Agent in any funds transfer may rely solely upon any account numbers or similar identifying numbers provided by Purchaser or Seller s to identify (a) the beneficiary, (b) the beneficiary's bank, or (c) an intermediary bank.  The Escrow Agent may apply any of the Escrow Funds for any payment order it executes using any such identifying number, even when its use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated. Purchaser and Seller acknowledge that these optional security procedures are commercially reasonable.

18.    Amendment, Waiver and Assignment.  None of the terms or conditions of this Escrow Agreement may be changed, waived, modified, discharged, terminated or varied in any manner whatsoever unless in writing duly signed by each party to this Escrow Agreement. No course of conduct shall constitute a waiver of any of the

7

terms and conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion. Except as provided in Section 9 hereof, this Escrow Agreement may not be assigned by any party without the written consent of the other parties.

19. <u>Severability</u>. To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

20. <u>Governing Law</u>. This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of Michigan without giving effect to the conflict of laws principles thereof.

21. <u>Entire Agreement, No Third Party Beneficiaries</u>. This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds. Nothing in this Escrow Agreement, express or implied, is intended to or shall confer upon any other person any right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

22. <u>Execution in Counterparts, Facsimiles</u>. This Escrow Agreement and any Joint Written Direction may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction. The delivery of copies of this Escrow Agreement and any Joint Written Instruction and their respective signature pages by PDF or facsimile transmission shall constitute effective execution and delivery as to the parties and may be used in lieu of originals for all purposes.

23. <u>Termination</u>. This Escrow Agreement shall terminate upon the distribution of all the Escrow Funds pursuant to any applicable provision of this Escrow Agreement, and Escrow Agent shall thereafter have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

24. <u>Dealings</u>. The Escrow Agent and any stockholder, director, officer or employee of the Escrow Agent may buy, sell, and deal in any of the securities of the Purchaser or Seller and become pecuniarily interested in any transaction in which the Purchaser or Seller may be interested, and contract and lend money to the Purchaser or Seller and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement. Nothing herein shall preclude the Escrow Agent from acting in any other capacity for the Purchaser or Seller or for any other entity.

25. <u>Brokerage Confirmation Waiver</u>. Purchaser and Seller acknowledge that to the extent regulations of the Comptroller of the Currency or other applicable regulatory entity grant either the right to receive brokerage confirmations for certain security transactions as they occur, Purchaser and Seller specifically waive receipt of such confirmations to the extent permitted by law. The Escrow Agent will furnish the Purchaser and Seller periodic cash transaction statements that include detail for all investment transactions made by the Escrow Agent.

26. <u>Tax Reporting</u>. Escrow Agent shall have no responsibility for the tax consequences of this Agreement and Purchaser and Seller shall consult with independent counsel concerning any and all tax matters. Purchaser and Seller shall provide Escrow Agent Form W-9 and an original Form W-8, as applicable, for each payee, together with any other documentation and information requested by Escrow Agent in connection with Escrow Agent's reporting obligations under applicable IRS regulations. If such tax documentation is not so provided, Escrow Agent shall withhold taxes as required by the IRS. Seller and Purchaser have determined that any interest or income on Escrow Funds shall be reported on an accrual basis and deemed to be for the account of Seller. Purchaser and Seller shall prepare and file all required tax filings with the IRS and any other applicable taxing authority; provided that the parties further agree that:

(a) <u>Escrow Agent IRS Reporting</u>. Purchaser shall provide the Escrow Agent with all information requested by the Escrow Agent in connection with the preparation of all applicable Form 1099 and Form 1042-S documents with respect to all distributions as well as in the performance of Escrow Agent's reporting obligations

8

under the Foreign Account Tax Compliance Act and Foreign Investment in Real Property Tax Act or other applicable law or regulation.

(b)    Withholding Requests and Indemnification.  Purchaser and Seller jointly and severally agree to (i) assume all obligations imposed now or hereafter by any applicable tax law or regulation with respect to payments or performance under this Agreement, (ii) request the Escrow Agent in writing with respect to withholding and other taxes, assessments or other governmental charges, and advise Escrow Agent in writing with respect to any certifications and governmental reporting that may be required under any applicable laws or regulations, and (iii) indemnify and hold the Escrow Agent harmless pursuant to Section 11 hereof from any liability or obligation on account of taxes, assessments, additions for late payment, interest, penalties, expenses and other governmental charges that may be assessed or asserted against Escrow Agent.

(c)    Imputed Interest.  To the extent that IRS imputed interest regulations apply, Purchaser and Seller shall so inform Escrow Agent, provide Escrow Agent with all imputed interest calculations and direct Escrow Agent to disburse imputed interest amounts as Purchaser and Seller deem appropriate. Escrow Agent shall rely solely on such provided calculations and information and shall have no responsibility for the accuracy or completeness of any such calculations or information.

27.    WAIVER OF TRIAL BY JURY.      EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT OR (2) IN ANY WAY IN CONNECTION WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY SUCH PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES TO THIS AGREEMENT, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES HERETO HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT EACH HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A CONSENT BY ALL PARTIES TO A TRIAL BY THE COURT.

28.    Publicity.  No party will (a) use any other party's proprietary indicia, trademarks, service marks, trade names, logos, symbols, or brand names, or (b) otherwise refer to or identify any other party in advertising, publicity releases, or promotional or marketing publications, or correspondence to third parties without, in each case, securing the prior written consent of such other party.

[Signature Page Follows]

9

10.10.13
25973812.2\130050-00009

**IN WITNESS WHEREOF**, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

**EVERSTREAM GLC HOLDING COMPANY LLC**

BY: _____
NAME: _____
TITLE: _____

**GREAT LAKES COMNET, INC.**

BY: _____
NAME: _____
TITLE: _____

**COMLINK, L.L.C.**

By: _____
Name: _____
Title: _____

**U.S. BANK NATIONAL ASSOCIATION**
**as Escrow Agent**

By: _____
Name: _____
Title: _____

**SCHEDULE A**

**Schedule of Fees for Services as Escrow Agent**

**Escrow Fee** ........................................................................................................... **$3,000.00**

The Escrow Fee includes the review of documents, initial set-up of the account(s), and other reasonably required services up to and including the closing. The fee also includes performance of routine duties of Escrow Agent associated with the management of the account.

This is a one-time fee payable at closing.

## SCHEDULE B

Each of the following person(s) is a **Purchaser Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Purchaser's behalf (only one signature required):

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No. |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations:

[_____]                                      _____
Name                                                         Telephone Number

Each of the following person(s) is a **Seller Representative** authorized to execute documents and direct Escrow Agent as to all matters, including fund transfers, address changes and contact information changes, on Seller's behalf (only one signature required):

| | | |
|---|---|---|
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No |
| _____ | _____ | _____ |
| Name | Specimen signature | Telephone No |

*(Note: if only one person is identified above, please add the following language:)*
The following person not listed above is authorized for call-back confirmations

[_____]                                      _____
Name                                                         Telephone Number

SCHEDULE C

**Payment Instructions**

**Payment Instructions for Disbursements to Purchaser:**

| Payment Instructions, including:<br>• Receiving bank name<br>• Receiving bank ABA number<br>• Beneficiary account number<br>• Beneficiary account name<br>• Beneficiary street address (PO Box is not acceptable) | Reference/Comment |
|---|---|
|  |  |

**Payment Instructions for Disbursements to Seller:**

| Payment Instructions, including:<br>• Receiving bank name<br>• Receiving bank ABA number<br>• Beneficiary account number<br>• Beneficiary account name<br>• Beneficiary street address (PO Box is not acceptable) | Reference/Comment |
|---|---|
|  |  |

**Exhibit E**

**Sale Motion**

See attached.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In re:                                                                 Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                     Case No. 16-00290 (JTG)
                                                                       (Jointly Administered)

                                          Debtors.

_____/                       Honorable John T. Gregg

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) ESTABLISHING SALE PROCEDURES, (II) SCHEDULING AN AUCTION AND A SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (III) SETTING CERTAIN DATES AND DEADLINES IN CONNECTION THEREWITH, (IV) APPROVING THE FORM OF THE PURCHASE AND SALE AGREEMENT, INCLUDING THE TERMINATION FEE, AND (V) GRANTING RELATED RELIEF; AND (B) AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO 11 U.S.C. § 365, AND (III) GRANTING RELATED RELIEF**

Great Lakes Comnet, Inc. and Comlink L.L.C. (collectively, the "Debtors"), by and through their undersigned counsel, file this motion the ("Sale Motion"), pursuant to §§ 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of (a) an order (the "Sale Procedures Order") (i) establishing sale procedures, (ii) scheduling an auction and a sale hearing in connection with the sale of substantially all of Debtors' assets pursuant to 11 U.S.C. §§ 105, 363 and 365, (iii) setting certain dates and deadlines in connection therewith, (iv) approving the form of the Purchase and Sale Agreement,

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

including the Termination Fee,[2] and (v) granting related relief; and (b) an order (the "Sale Order") (i) authorizing the sale of substantially all of Debtors' assets free and clear of liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §§ 105, 363 and 365, (ii) approving the assumption and assignment of certain executory contracts and unexpired leases pursuant to 11 U.S.C. § 365, and (iii) granting related relief.

In this Motion, Debtors seek, among other things, approval of bidding and sale procedures to be followed by the sale ("Sale") of substantially all of Debtors' assets ("Assets") to Everstream GLC Holding Company LLC or an affiliate thereof ("Buyer"), subject to Debtors' receipt of a higher or, in the exercise of the Debtors' business judgment, better bid (taking into account both price and other factors, including execution risk, that Debtors determine to be appropriate) at the Auction. Debtors have determined that an auction sale of substantially all assets (as proposed herein) is in the best interests of their estates because it will maximize the value of the estates. In support of this Motion, Debtors state as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2).

4.      The bases for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014.

---

[2] All capitalized terms not defined herein shall have the meanings ascribed to them in the Sale Procedures.

- 2 -

## BACKGROUND

5.    On January 25, 2016, the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

6.    Debtors continue to operate their businesses and manage their affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### Form of Proposed Sale

7.    Debtors have agreed to sell and Buyer has agreed to purchase the Assets through a Sale outside of the ordinary course of business under section 363 of the Bankruptcy Code. Debtors and Buyer have entered into a Purchase and Sale Agreement ("APA") memorializing their agreement.  The APA is attached to this Sale Motion as **Exhibit A**.

8.    Following entry of the Sale Procedures Order requested herein, Debtors will market the Assets in accordance with the Sale Procedures attached as **Exhibit B** to this Sale Motion ("Sale Procedures") with the purpose of obtaining a higher or better offer, in the Debtors' business judgment, than the offer submitted by Buyer.

### RELIEF REQUESTED

### Approval of the Proposed Sale of the Assets to Buyer and Form of Purchase and Sale Agreement

9.    Debtors have agreed to sell the Assets to Buyer and Buyer has agreed to buy the Assets, subject to the terms and conditions of the APA ("Stalking Horse Bid").  As set forth in the APA, the Buyer, as stalking horse bidder, may be outbid or Debtors may otherwise receive a better bid by another Qualified Bidder submitting a sufficiently higher or better Qualified Bid for the Assets.  The bidder submitting the highest or best Qualified Bid for the Assets, as determined by the Debtors in the exercise of their business judgment, will be designated as the "Winning Bidder."  Among the factors that the Debtors will consider in determining the Winning Bidder

- 3 -

are the net proceeds that will be made available to the Debtors' bankruptcy estates upon a sale of the Assets.

10.     The following is a summary of the primary terms contained in the APA. This summary is not intended to be a comprehensive discussion of all of the provisions of the APA and is qualified in all respects by the terms of the APA itself. In the event of a discrepancy between the following summary and the terms of the APA, the APA will control.

(a)     <u>Purchased Assets.</u> The Assets to be sold will consist of substantially all of Debtors' assets.

(b)     <u>Stalking Horse Bid</u>. The aggregate consideration (the "<u>Purchase Price</u>") for the Assets is an amount that shall be equal (subject to the adjustments set forth in Section 2.1(a) of the APA) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Debtors' bankruptcy estate ("<u>Estate Payment</u>**")**, minus the Excess Cure Credit, if any (the "<u>Cash Purchase Price</u>"). The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction. If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter. On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Debtors utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**. Upon the execution of the APA, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed. **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of the APA. Moreover, if the Additional CoBank DIP Liability utilized by the Debtors is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Debtors; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

(c)     <u>Deposit Amount</u>. Pursuant to the terms of an escrow agreement attached to the APA as **Exhibit D** (the "<u>Escrow Agreement</u>"), within seven (7) days of the date of the APA, the Buyer shall deposit with the escrow agent identified in the Escrow Agreement (the "<u>Escrow Agent</u>"), the sum of $3,210,000 (USD) (the "<u>Deposit</u>") by wire transfer of immediately available funds. The Deposit shall be distributed in accordance with the APA, the Bidding Procedures Order and/or the Escrow Agreement, as applicable. For all purposes under the APA, the Deposit shall be treated

- 4 -

as an advance of the Cash Purchase Price that shall be refundable to the Buyer under certain conditions set forth in the APA.

(d)     <u>Termination Fee</u>.  Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA, (ii) the APA has not been terminated (other than in accordance with **Section 9.1(d), (f), (g), (h), (i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more Persons (a "<u>Third Party</u>") other than the Buyer or an Affiliate of the Buyer (a "<u>Third Party Sale</u>"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "<u>Termination Fee</u>").  Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale.  For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Debtors or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale.  For the avoidance of doubt, the termination of the APA pursuant to **Section 9.1(d), (f), (g), (h), (i) or (j)** shall not prevent Buyer from recovering its Termination Fee.

(e)     <u>Assumed and Rejected Leases and Contracts</u>.

(1)     The Debtors shall take all actions reasonably required to assume and assign the Assumed Contracts to the Buyer (other than payment of Cure Costs, if so required), including taking all actions reasonably required to facilitate any negotiations with the counterparties to such Assumed Contracts and to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to the Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code and as otherwise acceptable in form and substance to the Buyer.

- 5 -

(2)     At Closing, (x) the Debtors shall, pursuant to the Sale Order and the Assignment and Assumption Agreements, assume and assign to the Buyer (the consideration for which is included in the Purchase Price) each of the Assumed Contracts, and (y) the Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among the various counterparties, the Buyer and the Debtors, or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreements.

(f)     Assignment of Bid.  Pursuant to Section 11.3 of the APA, the APA will be binding upon, and inure to the benefit of, the Parties thereto and their respective successors and permitted assigns, but will not be assignable or delegable by the Buyer prior to Closing without the prior written consent of the Debtors. Notwithstanding the foregoing, the Buyer shall be permitted to assign, in whole or in part, its right to purchase the Assets, or to transfer the APA to its lenders or to one or more affiliates of, or one or more entities controlled by, the Buyer.

(g)     Conditions to Closing. The obligation of Buyer to close the Sale is conditioned upon the matters described in Sections 7.1 of the APA, which include, but are not limited to, (i) entry of the Sale Order as a Final Order, (ii) the accuracy of the representations and warranties of Debtors contained in the APA, (iii) the execution and delivery of the closing documents, and (iv) the performance by Debtors of their obligations under the APA.

(h)     Closing Date.  The closing of the transactions contemplated by the APA ("Closing") shall take place remotely via electronic exchange of documents, on the date ("Closing Date") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in Sections 7.1(e) and 7.2(e), whichever is last to occur, absent written agreement of the Parties.

(i)     Sale Free and Clear.  All of Debtors' right, title, and interest in and to the Assets will be sold to Buyer pursuant to the Sale Order "AS IS AND WHERE IS", free and clear of all liens, claims, encumbrances, and interests of any kind or nature (except Permitted Liens), with any such liens, claims, encumbrances and interests attaching to the Sale Proceeds according to their pre-Closing Date priority.

- 6 -

11.    The proposed Sale Order includes the following findings and provisions, among others: (a) that the Winning Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; and (b) that the sale price for the Assets was not controlled by a collusive agreement among potential bidders within the meaning of section 363(n) of the Bankruptcy Code.

### Approval of Proposed Sale Procedures

12.    Debtors propose to offer the Assets for sale as a whole with Debtors' businesses being sold as a going concern. Any Qualified Bidder shall bid on all of the Assets together.  If no Qualified Bid other than Buyer's Stalking Horse Bid is received for the Assets, Debtors shall move the Court to approve the Stalking Horse Bid as the highest or otherwise best bid for the Assets.  The Sale Procedures contemplate an auction process whereby only bidders having submitted a Qualified Bid are eligible to participate.  The bid submitted by Buyer pursuant to the APA establishes a baseline bid for the Assets, which Debtors will use to solicit Qualified Bids from other bidders.  The highest or otherwise best Qualified Bid submitted prior to the Auction will serve as the opening bid at the Auction.

13.    The following is a summary of the primary terms of the Sale Procedures.  This summary is not intended to be a complete discussion of all of the provisions of the Sale Procedures and is qualified in all respects by the terms of the Sale Procedures.  For a complete recital of all of the terms and conditions of the Sale Procedures, parties are encouraged to consult the Sale Procedures.

(a)    Assets.  The assets to be sold are substantially all of the assets of the Debtors.

(b)    Due Diligence.  Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from Debtors. Interested parties must execute a form nondisclosure agreement acceptable to Debtors ("NDA") before any due diligence materials will be provided.  Parties that

- 7 -

have previously executed an NDA do not need to execute a new NDA. All due diligence requests should be directed to Jason Hill, Media Venture Partners, 990 Washington Street, Suite 200, Dedham, MA 02026; phone: 617.345.7316; email: jhill@mediaventurepartners.com. Debtors will comply with other reasonable due diligence requests made by such interested parties, and all due diligence shall be completed by the Auction.

(c)     Qualified Bidders.

(i)     Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(ii)     A "Qualified Bidder" is any entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures and includes Buyer.

(iii)     A "Qualified Bid" is a written offer to purchase the Assets that complies with the following requirements:

(1)     Deadline to Submit Qualified Bids: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received by Debtors' counsel no later than 5:00 p.m. prevailing Eastern Time on April 8, 2016 (the "Qualified Bid Deadline").

(2)     Where to Submit Bids:  Bids must be submitted by electronic mail to Counsel for Debtor and Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

Counsel for Debtors
Timothy A. Fusco & Stephen S. LaPlante
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
fusco@millercanfield.com
laplante@millercanfield.com

Office of the United States Trustee
c/o Michelle Wilson
The Ledyard Building, 2nd Floor
125 Ottawa, NW, Suite 202R
Grand Rapids, MI 49503
Michelle.m.wilson@usdoj.gov

- 8 -

(3)    <u>Content of Qualified Bids</u>:  The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("<u>Bid Package</u>"):

a.    An unconditional cash offer for substantially all of the Debtors' assets.

b.    An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors.

c.    Propose a cash purchase price that is not less than $32,350,000.

d.    Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("<u>Buyer's Premium</u>"), in order to compensate the Debtors for the Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer.

e.    A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (c) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

f.    A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (c) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder.

g.    A disclosure of the identity of each person or entity that will be bidding for the Assets.

h.    A binding and irrevocable offer.

- 9 -

i. The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties")(provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction.

j. A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

k. A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid.

l. The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

(d) Designation of Qualified Bids.

(i) On or before April 13, 2016, at 5:00 p.m. prevailing Eastern Time and after consultation with the Consultation Parties, Debtors will in their sole discretion designate those submitted bids, if any, that are Qualified Bids. After consultation with the Consultation Parties, Debtors may, in their sole discretion, determine, at the Auction, that a previously Qualified Bidder has altered its bid in a way that causes it no longer to be a Qualified Bidder.

(ii) If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, Debtors will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

(e)    Auction.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, the Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

(i)    Only representatives of Debtors, the Committee, the United States Trustee, Buyer, CoBank and any Qualified Bidder will be entitled to attend the Auction.

(ii)    Debtors may announce at the Auction additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances (*e.g.*, regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

(iii)    After consultation with the Consultation Parties, Debtors shall designate in their sole discretion at the start of the Auction the Qualified Bid determined by the Debtors in the exercise of their business judgment to be the highest and best bid as the initial bid for the Assets ("Initial Qualified Bid").

(iv)    The first overbid above the Initial Qualified Bid and each subsequent overbid must be in the form of cash consideration and must be determined by Debtors to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).  Each Qualified Bid, including the Initial Qualified Bid, made by a Qualified Bidder (other than Buyer) must agree to pay, in addition to its Qualified Bid, the Buyer's Premium should its Qualified Bid become the Winning Bid.

(v)    After each round of bidding and consultation with the Consultation Parties, Debtors will announce the identity of the Qualified Bidder deemed by Debtors at that point to have made the highest or otherwise best offer for the Assets.

(vi)    Promptly after the conclusion of the Auction and after consultation with the Consultation Parties, Debtors will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net

- 11 -

proceeds that will be made available to the Debtors' bankruptcy estate upon a purported sale of the Assets (the "Winning Bidder") and shall designate the next highest or otherwise best Qualified Bid (the "Back-Up Bid") and the entity submitting the Back-Up Bid ("Back-Up Bidder"). Debtors will file a notice immediately after the Auction setting forth the identity of the Winning Bidder. The Buyer's Premium is additional consideration that the Winning Bidder will be required to pay the Debtors' estates, but will not be taken into account in determining the Winning Bidder.

(vii)  At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, Debtors shall be authorized to close on the Back-Up Bid without further order of the Court.

**Approval of Assumption and Assignment of Executory Contracts and Unexpired Leases**

14.    Debtors may be parties to executory contracts or unexpired leases that may be assumed and assigned pursuant to Bankruptcy Code section 365.  Such executory contracts and unexpired leases are valuable assets of the estate and are an important component of the overall package of the assets to be marketed for the Sale.

15.    The Sale Procedures require each Qualified Bidder to identify executory contracts and unexpired leases to be assumed and assigned by Debtors to the Winning Bidder in the event such Qualified Bidder is the Winning Bidder.

16.    Debtors request authority pursuant to Bankruptcy Code section 365 to assume and assign to the Winning Bidder certain executory contracts and unexpired leases ("Assumed and Assigned Agreements").  The form of notice of the proposed assumption and assignment of executory contracts and unexpired leases ("Assumption and Assignment Notice") is attached as **Exhibit C** to this Sale Motion.  The proposed Sale Procedures Order, attached as **Exhibit D** to

- 12 -

this Sale Motion, adopts the following procedures for the assumption and assignment of

executory contracts and unexpired leases:

(a)     By no later than seven days after entry of the Sale Procedures Order, the Debtors will file a schedule ("Cure Schedule") which will be attached to the Assumption and Assignment Notice, identifying (i) the Assumed and Assigned Agreements, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults and other defaults under such agreement pursuant to section 365 of the Bankruptcy Code ("Cure Costs").

(b)     Upon the filing of the Cure Schedule, the Debtors will serve the Cure Schedule and the Assumption and Assignment Notice on each of the nondebtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Debtors are or may be seeking the assumption and assignment of the Assumed and Assigned Agreement and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale, (ii) the deadline for objecting ("Cure/Assignment Objection") to the amount of the proposed Cure Costs related to any executory contract or unexpired lease is **April 22, 2016 at 5:00 p.m. Eastern Time** ("Cure/Assignment Objection Deadline") and (iii) the deadline for objecting ("Adequate Assurance Objection") to the ability of the buyer to provide adequate assurance of future performance under any Assumed and Assigned Agreement is **April 22, 2016 at 5:00 p.m. Eastern Time** ("Adequate Assurance Objection Deadline" and collectively, the "Cure/Adequate Assurance Objection Deadlines").

(c)     Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on Debtors' counsel so that it is received by the applicable Cure/Adequate Assurance Objection Deadline.

(d)     If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Costs set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Costs required to be paid by or on behalf of the applicable Debtor in connection with the assumption and assignment of such agreement.  In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Adequate Assurance Objection Deadlines, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Debtors and the buyer

- 13 -

will be entitled to rely solely upon the Cure Cost set forth on the Cure Schedule, (ii) deemed to have consented to the assumption and assignment, and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the buyer that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumptions or assignment of the applicable Assumed and Assigned Agreement.

(e)     The Debtors or the Winning Bidder may amend the Cure Schedule to remove any Assumed and Assigned Agreement at any time before such Assumed and Assigned Agreement is actually assumed and assigned pursuant to an order of the Court. The nondebtor party or parties to any such removed contract or lease will be notified of such exclusion by written notice mailed within one (1) business day after such amendment.

### Sale Hearing, Auction, and Objection Deadline

17.     Subject to the Court's availability, Debtors propose the following timetable in connection with the Auction and Sale Hearing:

(a)     <u>Notice of Auction and Sale</u>.  Within seven days after entry of Sale Procedures Order approving the Sale Procedures, Debtors will provide notification of the Sale Procedures to the following parties in the form and manner described below:

(i)     Debtors will serve the Sale Procedures Order and APA, by mail, postage prepaid on:

(1)     The United States Trustee;

(2)     All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

(3)     All entities known by the Debtors to have expressed a *bona fide* interest in acquiring the Assets;

(4)     Everstream GLC Holding Company, LLC;

(5)     The Unsecured Creditors' Committee (if any);

(6)     All entities known by the Debtors to have asserted a lien, claim, or encumbrance on or against any of the Assets, including CoBank;

- 14 -

(7)    All taxing applicable authorities; and

(8)    Governmental agencies regulating Debtors, including Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

(ii)    Debtors will serve a notice of the Sale Procedures Order and the Auction, by mail, postage prepaid, in the form attached as **Attachment A** to the Sale Procedures, on all known creditors of the Debtors; and

(iii)    Debtors will submit for publication to the Detroit Free Press or Detroit News a notice of the Sale Procedures Order and the Auction and invitation to bid, also in the form attached as **Attachment A** to the Sale Procedures.

(b)    <u>Auction</u>. In the event one or more Qualified Bids other than the Stalking Horse Bid is submitted as provided in the Sale Procedures, the Auction will be held on April 15, 2016, commencing at 10:00 a.m. Debtors will file a notice promptly after the auction setting forth the identity of the Winning Bidder. If no Qualified Bids are received other than the Stalking Horse Bid, the Buyer shall be the Winning Bidder.

(c)    <u>Objections to Sale of Assets.</u> An objection to the sale of the Assets to the Winning Bidder must be filed with the Court, and served on Debtors' counsel so that it is received on or before April 22, 2016 at 5:00 p.m. Eastern Time.

## BASIS FOR RELIEF REQUESTED

### The Proposed Sale is Authorized Under Bankruptcy Code § 363

18.    Section 363(b)(1) of the Bankruptcy Code empowers a debtor-in-possession, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1).

19.    A broad consensus of courts, including the Sixth Circuit and this District, hold that a debtor may sell property of the estate outside of the ordinary course of business where such use represents an exercise of the debtor's sound business judgment. *Stephen Industries,*

- 15 -

*Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("We adopt the Second Circuit's reasoning in *In re Lionel, supra*, and conclude that a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action."); *citing Committee of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Quality Stores, Inc.*, 272 B.r. 643, 647-48 (Bankr. W.D. Mich. 2002) ("[A] sale of assets is appropriate if all provisions of § 363 are followed, the bid is fair, and the sale is in the best interests of the estate and its creditors.") *quoting In re Embrace Systems Corp.*, 178 B.R. 112, 124 (Bankr. W.D. Mich. 1995) ("In this circuit, a bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under Section 363(b)(1) when a sound business purpose dictates such action.")

20.    The proposed sale of the Assets to the Winning Bidder satisfies the applicable requirements. The Debtors are relying on their well-articulated business judgment in their decision to sell the Assets.  The Debtors lack the necessary capital to continue their operations and, therefore, have concluded in their business judgment that a competitive bidding process for their assets will provide the greatest return to their creditors. The Debtors have determined that they can obtain the highest and best value for their assets only by selling substantially all of their assets and their businesses as a going concern.

21.    In addition, the Sale Procedures will result in fair and reasonable consideration being realized for the Assets because they are designed to maximize the value of the Assets.  The Stalking Horse Bid submitted by Buyer pursuant to the APA establishes a "floor" purchase price for the Assets and will serve as a baseline bid that the Debtors will use to solicit other Qualified Bids from third parties. By testing the purchase price of the Stalking Horse Bid in the market, the

Sale Procedures and the Auction are designed to ensure that the Debtors receive fair and reasonable consideration for the Assets.

22.     Moreover, the APA and Sale Procedures are the result of extensive good faith, arms-length negotiations between the Debtors and Buyer.

23.     The Debtors seek permission to sell the Assets free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with such Liens attaching to the applicable proceeds.  Section 363(f) of the Bankruptcy Code provides that property may be sold free and clear of any interest in property if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

24.     The Debtors need only satisfy one of the noted conditions and believe that CoBank will consent to the proposed sale. Otherwise, section 363(f)(5) of the Bankruptcy Code allows a debtor to sell property free and clear of liens when a legal or equitable proceeding could compel the lienholder to accept less than full money satisfaction for its interest.  *In re James*, 203 B.R. 449, 453 (W.D. Mo. 1997); *In re Grand Slam USA, Inc.*, 178 B.R. 460, 463-64 (E.D. Mo. 1995).  Courts considering this issue have held that the "cram down" provision under the Bankruptcy Code constitutes such a "legal or equitable proceeding" and permits a sale under section 363(f)(5) of the Bankruptcy Code where a secured creditor may receive less than the

- 17 -

value of its claim.  *Grand Slam USA, Inc.*, 178 B.R. at 464; *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 829 (N.D. Ill. 1993); *In re Healthco Intern., Inc.*, 174 B.R. 174, 176 (Bankr. D. Mass. 1994).  The Debtors propose that any valid Liens attach to the sale proceeds attributable to the Asset(s) being sold and encumbered by such Liens and in the same priority as such Liens.

25.    Finally, Buyer is not affiliated with, managed, or controlled by any of Debtors' owners. Buyer is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

### The Proposed Assumption and Assignment of Executory Contracts Complies with Bankruptcy Code Section 365

26.    To facilitate the sale of the Assets as outlined in this Motion, Debtors seek authority to assume and assign certain executory contracts and unexpired leases to the Winning Bidder to the extent required by the Winning Bid.

27.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign an executory contract or unexpired lease, subject to the approval of the bankruptcy court provided that any defaults under such executory contract or unexpired lease are cured and the assignee provides adequate assurance of future performance.

28.    A debtor's decision to assume or reject an executory contract or unexpired lease is examined under the business judgment standard.  *See*, *e.g.*, *In re Stable Mews Association, Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1983); *Software Customizer v. Bullet Jet Charter (In re Bullet Jet Charter)*, 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995).  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or]

- 18 -

rejection of the contract will benefit the estate." *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

29.     Debtors believe that the purchase price for the Assets will be maximized if Debtors agree to assume and assign to the Winning Bidder the Assumed and Assigned Agreements. Accordingly, Debtors' business rationale for seeking to assume and assign certain executory contracts is the same as their rationale for conducting the proposed Sale − Debtors believe that the sale of their Assets, including related valuable unexpired contract rights, will maximize the value of their estates for the benefit of their creditors.

30.     Debtors believe that all of the requirements under Bankruptcy Code section 365 for the assumption and assignment of the Assumed and Assigned Agreements will be satisfied by the procedures outlined above.  To the extent that no defaults exist under any of the Assumed and Assigned Agreements, such defaults will be cured by the payment of the Cure Amounts by the Winning Bidder.  Further, as required by the Sale Procedures, the financial wherewithal of each bidder will be evaluated before such bidder is allowed to participate in the Auction. Accordingly, Debtors believe that the Winning Bidder will be able to provide adequate assurance of future performance under each of the Assumed and Assigned Agreements.

### The Proposed Sale Procedures Are Appropriate Under the Circumstances

31.     The Sale Procedures are the result of good faith, arms-length negotiation between Debtors and Buyer.  All parties in interest are united in their aim to realize the highest possible value of the Assets through a sale.  It has long been recognized by bankruptcy courts that a competitive bidding process is the best way to realize the highest value that industry participants place on assets. *See, e.g.*, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 551 (Bankr.

S.D.N.Y. 1997).  The Sale Procedures reflect an understanding of this principle by facilitating competitive bidding for the Assets.

32.    The Sale Procedures contain certain limitations on participants in the Auction, which are designed to maximize the efficiency of the Auction process.  By limiting participation in the Auction to Qualified Bidders, delineating requirements for being designated as a Qualified Bidder and establishing an overbid requirement, the Sale Procedures will discourage bidding by parties other than those with the financial capacity to purchase the Assets.  Such requirements are not onerous and will likely not discourage legitimate Auction participants from submitting bids.

33.    A debtor's business judgment is entitled to substantial deference with respect to the procedures used in selling assets of its estate.  *See In re Integrated Resources, Inc.*, 147 B.R. 650, 656-57 (S.D.N.Y. 1992).  Here, the Sale Procedures create a process for fully competitive bidding among the parties most likely to be interested in purchasing the Assets and will maximize the value of Debtors' estates by providing certain protections for Debtors' administrative, priority, and unsecured creditors.

## The Termination Fee is Appropriate Under the Circumstances

34.    The Termination Fee was the product of arms-length negotiations between Debtors and Buyer, and the Termination Fee is fair and reasonable under the circumstances.  Buyer has incurred and will incur costs, expenses and risks associated with entering into the APA and submitting the Stalking Horse Bid.  These expenses are not limited to ordinary due diligence.  In this case, Buyer has incurred significant expenses associated with the preparation of sale documents, as well as bankruptcy pleadings necessary to consummate the sale.

- 20 -

35.     The requirements in the Sales Procedures that a Qualified Bidder submit a bid with a cash purchase price equal to $32,350,000 and agree to pay the Buyer's Premium provide the Debtors' estates with sufficient funds to pay the Termination Fee.

36.     Bankruptcy courts have generally approved termination fees under 11 U.S.C. § 105 in conjunction with a trustee or debtor-in-possession's authority under section 363(b) to sell property of the estate outside the ordinary course of business.  Courts recognize that termination fees are often a key component to significant sales conducted under section 363 of the Bankruptcy Code.  *See Integrated Resources*, 147 B.R. at 659-60.   The appropriate test of a termination fee is whether a "compelling and sound business justification" exists under section 363(b).  *ASARCO, Inc. v. Elliot Mgmt. (In re ASARCO, LLC)*, 650 F.3d 593, 603 (5th Cir. 2011); *accord In re JW Res., Inc.*, 536 B.R. 193, 195-96 (Bankr. E.D. Ky. 2015).  One of the key considerations in determining whether a termination fee or expense reimbursement should be allowed is whether it reasonably relates to the initial bidder's "risk, effort, and expenses . . . ." *Integrated Resources*, 147 B.R. at 662.

37.     Here, Debtors have supplied a compelling business justification for its judgment that the Termination Fee is appropriate under the circumstances.  Buyer has invested significant time and resources negotiating the Stalking Horse Bid with Debtors and preparing the sale-related documents and pleadings.  Buyer should not be penalized for its initiative and investment simply because Debtors are compelled to accept a bid that is more than Buyer's Stalking Horse Bid.

38.     In addition, Buyer has provided a benefit to the estate, and the Termination Fee is in the best interests of the estates. *M&M Holdings, LLC v. Unsecured Creditors Comm. (In re SpecialtyChem Prods. Corp.)*, 372 B.R. 434, 440 (E.D. Wis. 2007); *In re S.N.A. Nut Co.*, 186

- 21 -

B.R. 98, 104 (Bankr. N.D. Ill. 1995). The Termination Fee is payable only on the conditions set forth in the APA. If those conditions are satisfied, the Buyer will have provided significant benefit to Debtors' estates by initiating the Auction and helping cause another bidder to consummate a sale transaction with Debtors at a price substantially higher than the Purchase Price. Accordingly, the Debtors have demonstrated a compelling business justification for the Termination Fee, and the Termination Fee qualifies an administrative expense pursuant to section 503(b) of the Bankruptcy Code.

### Reservation of Rights; Deadline Extension

39.    Debtors reserve the right modify the Sale Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets, including, without limitation, extending the deadlines set forth in the Sale Procedures, modifying bidding increments, adjourning or canceling the Auction or Sale, all without further notice.

### Request for Modification of Stay Imposed by Rule 6004(h) and 6006(d)

40.    Debtors request that the stay imposed by Bankruptcy Rule 6004(h) and 6006(d) be modified such that any Sale Order entered by the Court shall be effective immediately upon entry.

### CONCLUSION

WHEREFORE, Debtors respectfully request (A) entry of the Sale Procedures Order, (B) entry of the Sale Order, attached as **Exhibit E** to this Sale Motion, containing a provision modifying the stay imposed by Bankruptcy Rule 6004(h) such that it is effective immediately upon entry; and (C) such other and further relief as the Court deems just and proper.

Dated: February 1, 2016

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By:  /s/ Stephen S. LaPlante
       Timothy A. Fusco (P13768)
       Jonathan S. Green (P33140)
       Stephen S. LaPlante (P48063)
       Marc N. Swanson (P71149)
       150 West Jefferson, Suite 2500
       Detroit, MI  48226
       (313) 496-7997
       (313) 496-8478
       laplante@millercanfield.com

       *Proposed Attorneys to the Debtors and
       Debtors in Possession*

**Exhibits**

**Exhibit A**    **--**        **APA**

**Exhibit B**    **--**        **Sales Procedures**

**Exhibit C**    **--**        **Assumption and Assignment Notice**

**Exhibit D**    **--**        **Sale Procedures Order**

**Exhibit E**    **--**        **Sale Order**

**Exhibit F**    **--**        **Legal Description and Common Street Address for Real Property to be Sold**

**Exhibit F**

**Bidding Procedures Order**

See attached.

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:                                                    Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                       Case No. 16-00290 (JTG)
                                                          (Jointly Administered)

                          Debtors.
_____/                  Honorable John T. Gregg

**ORDER (I) ESTABLISHING SALE PROCEDURES, (II) SCHEDULING AN AUCTION AND A SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (III) SETTING CERTAIN DATES AND DEADLINES IN CONNECTION THEREWITH, (IV) APPROVING THE FORM OF THE PURCHASE AND SALE AGREEMENT, INCLUDING THE TERMINATION FEE, AND (V) GRANTING RELATED RELIEF**

This matter having come before the Court on Debtors' Motion for the entry of an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related Relief ("Sale Motion")[2], which seeks entry of, among other things, this order ("Sale Procedures Order"); proper notice of the Sale Motion having been provided to all parties entitled thereto as required by applicable law, and no other or further notice being required; objections, if any, to the entry of this Sales Procedure Order having been withdrawn, resolved, or overruled; the Court finding that (a) it has jurisdiction to enter this Sale Procedures Order pursuant to 28 U.S.C. § 1334; and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

[2] All capitalized terms used in this Sale Procedures Order but not defined herein shall have the meanings ascribed to them in the Sale Motion.

to the Court that the relief granted by the Sale Procedures Order is in the best interest of Debtors, their estates, and their creditors; the Court being otherwise fully advised on the premises;

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Sale Motion is GRANTED, solely to the extent that it requests entry of this Sale Procedures Order and as provided herein. All objections to the entry of this Sale Procedures Order not settled, withdrawn, or otherwise resolved are overruled.

2.      The APA is approved, duly executed, and binding, and Debtors and Buyer are authorized to perform as required thereunder, subject to the Sale Procedures and the Sale Order.

3.      The Debtors are authorized to pay to the Buyer an amount equal to $1,500,000, plus an expense reimbursement for the reasonable fees, including professional fees of the Buyer, of up to $500,000 (the "Termination Fee") pursuant to the Sale Procedures and the terms set forth in the APA.  The Termination Fee is hereby approved based on the substantial value the Stalking Horse Bid created for the bankruptcy estates and the exercise of the Debtors' appropriate business judgment.

4.      Objections, if any, to the remaining relief requested in the Sale Motion and the entry of the Proposed Sale Order must: (a) be in writing; (b) conform to any applicable requirements of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local rules of procedure of this Court; (c) set forth the name of the objecting party and the nature of any claims or interests held by such party against or in Debtors' estate or property; (d) state with particularity the legal and factual bases for the objection and the specific grounds therefore; and (e) be filed with the Clerk of the Court, and served on Debtors' counsel so as to be received, on or before **April 22, 2016 at 5:00 p.m., prevailing Eastern Time**.

5.      Any person or entity that fails to make an objection as in paragraph 4 above shall be forever barred from asserting any objection to the entry of the Sale Order.

6.      A hearing ("Sale Hearing") to consider the remaining relief requested in the Sale Motion and the entry of the proposed Sale Order shall be held on April 2__, 2016 at ___:____ __.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Division Ave. N., Room 200, Grand Rapids, MI 49503

7.      The Sale Procedures attached hereto as **Exhibit A** are incorporated herein, are hereby approved, and shall apply to the sale of the Assets.

8.      The proposed assumption and assignment notice ("Assumption and Assignment Notice"), substantially in the form attached as **Exhibit B**, is hereby approved and deemed sufficient for all purposes, and no further notice shall be required.

9.      The following procedures are hereby approved and shall apply to the assumption and assignment by Debtors of certain executory contracts and unexpired leases (the "Assumed and Assigned Agreements"):

(a)     By no later than seven (7) days after entry of the Sale Procedures Order, the Debtors will file a schedule ("Cure Schedule") which will be attached to the Assumption and Assignment Notice, identifying (i) the Assumed and Assigned Agreements, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults and other defaults under such agreement pursuant to section 365 of the Bankruptcy Code ("Cure Costs").

(b)     Upon the filing of the Cure Schedule, the Debtors will serve the Cure Schedule and the Assumption and Assignment Notice on each of the non-debtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Debtors are or may be seeking the assumption and assignment of the Assumed and Assigned Agreement and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale, (ii) that the deadline for objecting ("Cure/Assignment Objection") to the amount of the proposed Cure Costs related to any executory contract

or unexpired lease is **April 22, 2016 at 5:00 p.m. prevailing Eastern Time** ("Cure/Assignment Objection Deadline") and (iii) that the deadline for objecting ("Adequate Assurance Objection") to the ability of the buyer to provide adequate assurance of future performance under any Assumed and Assigned Agreement is **April 22, 2016, at 5:00 p.m. prevailing Eastern Time** ("Adequate Assurance Objection Deadline" and collectively, the "Cure/Adequate Assurance Objection Deadlines").

(c)     Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on Debtors' counsel so that it is received by the applicable Cure/Adequate Assurance Objection Deadline.

(d)     If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Costs set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by or on behalf of the applicable Debtor in connection with the assumption and assignment of such agreement.  In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Adequate Assurance Objection Deadlines, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Debtors and the buyer will be entitled to rely solely upon the Cure Cost set forth on the Cure Schedule; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the buyer that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumption or assignment of the applicable Assumed and Assigned Agreement.

(e)     The Debtors or the Winning Bidder may amend the Cure Schedule to remove any Assumed and Assigned Agreement at any time before such Assumed and Assigned Agreement is actually assumed and assigned pursuant to an order of the Court.  The nondebtor party or parties to any such removed contract or lease will be notified of such exclusion by written notice mailed within one (1) business day after such amendment.

10.     The presence of an Assumed and Assigned Agreement on the Cure Schedule

does not constitute an admission that such Assumed and Assigned Agreement is an executory

contract or unexpired lease or that the Assumed and Assigned Agreement will be assumed, assigned or both.

     11.    The Court retains jurisdiction to hear and determine all matters arising from or relating to the implementation and/or interpretation of this Order.

**Exhibit A – Sale Procedures**

## Sale Procedures

***In re Great Lakes Comnet Inc.*, (Bankr. W.D. Mich. Case No. 16-00290)**
***In re Comlink, L.L.C.*, (Bankr. W.D. Mich. Case No. 16-00292)**

1.  <u>Assets</u>.

    (a)  Great Lakes Comnet Inc. and Comlink, L.L.C. (collectively, the "<u>Debtors</u>") have determined that they can obtain the highest and best value for their assets by selling their businesses as going concerns. Debtors have entered into a Purchase and Sale Agreement ("<u>APA</u>")[1] with, and accepted an initial bid ("<u>Stalking Horse Bid</u>") from, Everstream GLC Holding Company LLC (or its designee(s), the "<u>Buyer</u>") for their assets. The assets to be sold ("<u>Assets</u>") consist of substantially all of the assets of the Debtors, including, but not limited to, Debtors' right, title and interest to the following:

        (1)  The real property described in **Schedule 1.1(a)** (the "<u>Owned Real Property</u>" and with the Leased Real Property, defined below, the "<u>Real Property</u>").

        (2)  All computers, computer equipment, computer hardware/software, servers, fiber optic lines, copiers, security systems, and all other equipment listed on **Schedule 1.1(b)** (collectively, the "<u>Equipment</u>"), which Equipment shall include, without limitation, all Equipment related to the Network.

        (3)  All assets and rights included in, necessary for the operation of, or currently used in connection with the Network, including without limitation, any Fiber Lease or other similar right.

        (4)  All telephone numbers registered to the Debtors, including without limitation, those telephone numbers listed on **Schedule 1.1(d)**; provided however, that the Buyer acknowledges that the Debtors will utilize numbers on **Schedule 1.1(d)** in the ordinary course of business prior to the Closing Date.

        (5)  All inventory owned by the Debtors that shall be transferred as part of the sale transaction (the "<u>Inventory</u>").

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the APA. The Schedules referenced herein are appended to the APA.

(6)     All Intellectual Property owned by the Debtors and all rights to any Intellectual Property of any other person licensed to the Debtors pursuant to any Assumed Contract.

(7)     All Assumed Contracts and all rights of the Debtors under the Assumed Contracts, including without limitation, any right to any uncollected accounts receivable or notes receivable (the "<u>Accounts Receivable</u>") related to or arising from any of the Assumed Contracts.

(8)     All express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assumed Contracts) or Assumed Liabilities, including without limitation, rights under vendors' and manufacturers' warranties, indemnities, and guaranties.

(9)     All deposit accounts with any bank or other financial institution and the respective account numbers for the purposes of maintaining these accounts post-Closing.  (the "<u>Deposit Accounts</u>").  For the avoidance of doubt, these Deposit Accounts shall not include any cash, cash equivalents, financial assets, or other funds on deposit pre-Closing, and the aggregate amount of any cash, cash equivalents, financial assets, or other funds on deposit contained in the Deposit Accounts immediately prior to Closing shall be transferred to a newly-created bank account established by the Debtors for purposes of the Closing (such bank account shall not constitute a Deposit Account).

(10)    To the extent transferrable under applicable Law or with the Consent of any third party, if necessary, which Consent has been obtained, all Licenses and Permits, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, all pending applications for any of the foregoing, and the rights to all data and records held by such permitting, licensing and certifying agencies.

(11)    All goodwill of the Business as a going concern and all other intangible properties of the Business.

(12)    All documents consisting of purchasing and sales records, accounting records, business plans, budgets, cost and

pricing information, customer and vendor lists, wherever located related to the Business, other than those documents that are Excluded Assets.

(13) All tangible assets of each of the Debtors other than the assets set forth on **Schedule 1.1(m)**, including without limitation, the tangible assets located at any Real Property.

(14) All personnel files for Transferred Employees except as required under Law; provided, however, that the Debtors have the right to retain copies at their expense to the extent required by Law.

(15) All prepaid expenses, except deferred Tax assets.

(16) Any rights, claims or causes of action of the Debtors, except for those identified as, related to, or arising under, Excluded Assets.

(17) Those additional items referenced on **Schedule 1.1(q)**.

(b) The Assets shall not include the following ("Excluded Assets"):

(1) Any and all rights under all Contracts that are not Assumed Contracts.

(2) Any (i) prepayments relating to retainers payable to professional advisors to the Debtors, (ii) cash, cash equivalents, financial assets, or other funds on deposit, except uncollected Accounts Receivable related to any of the Assumed Contracts, (iii) cash or cash equivalents that consist of the Cash Purchase Price, as provided in **Section 2.1(a)**, and (iv) deferred Tax assets.

(3) Any (i) confidential personnel and medical records pertaining to any Employee who is not hired by the Buyer; (ii) books and records that the Debtors are required by Law to retain; provided, that the Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets, and (iii) minute books, stock and membership ledgers and stock and membership certificates of the Debtors.

(4) All rights under or pursuant to all warranties (express or implied), representations and guarantees made by third parties relating to any Excluded Assets.

- 3 -

(5)    Any claim, right or interest of the Debtors in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date.

(6)    All claims that any of the Debtors may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities.

(7)    All Employee Plans and assets related thereto, including the Debtors' rights, title and interests in any (i) assets related to a defined benefit or defined contribution retirement plan, and (ii) assets related to non-qualified deferred compensation plan (except to the extent related to liabilities of such Employee Plans that are agreed to be assumed by the Buyer).

(8)    All Accounts Receivable, other than any accounts or notes related to or arising from any of the Assumed Contracts.

(9)    All stock or equity in Clinton County Telephone Company.

(10)    All property owned by Clinton County Telephone Company.

(11)    All stock or equity in Westphalia Telephone Company.

(12)    All property owned by Westphalia Telephone Company.

(13)    All stock or equity in Westphalia Broadband, Inc.

(14)    All property owned by Westphalia Broadband, Inc.

(15)    Laptop computers and cell phones for employees of the Debtors that are not Transferred Employees and that are retained by the Debtors to wind down the affairs of the Debtors following the Closing. The Buyer may remove all proprietary programs and data from the laptop computers and cell phones.

(16)    All rights, Claims or causes of action of the Debtors in the lawsuit captioned, *Great Lakes Comnet, Inc. and Westphalia Telephone Company, Plaintiffs, vs. AT&T Corp., Defendant*, Case No. 1:15-cv-216, pending in the United States District Court for the Western District of Michigan, Southern Division and the proceeds of such lawsuits.

(17)    All membership interests of the Debtors and all equity securities owned or held by any members of the Debtors.

(18)    Any avoidance actions and Claims and proceeds of such avoidance actions and Claims under Sections 510, 541, 544, 546, 547, 548, 549, 550, 551, 552 and 553 – 562 of the Bankruptcy Code and non-Bankruptcy law.

2.    <u>Notice of Auction and Sale</u>.  Within seven days after entry of an order (the "<u>Sale Procedures Order</u>") approving these Sale Procedures, Debtors will provide notification approving the Sale Procedures to the following parties ("<u>Notice Parties</u>") in the form and manner described below:

(a)    Debtors will serve the Sale Procedures Order and APA, by mail, postage prepaid on:

(i)    The United States Trustee;

(ii)    All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

(iii)    All entities known by the Debtors to have expressed a *bona fide* interest in acquiring the Assets;

(iv)    Buyer;

(v)    The Unsecured Creditors' Committee (if any);

(vi)    All entities known by the Debtors to have asserted a lien, claim, or encumbrance on or against any of the Assets, including CoBank, ACB ("<u>CoBank</u>");

(vii)    All applicable taxing authorities; and

(viii)    Governmental agencies regulating Debtors, including Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

(b)    Debtors will serve a notice of the Sale Procedures Order and the Auction, by mail, postage prepaid, in the form of **Attachment A**, on all known creditors of the Debtors; and

- 5 -

(c)     Debtors will submit for publication in the Detroit Free Press or Detroit News a notice of the Sale Procedures Order and the Auction and invitation to bid, also in the form of **Attachment A**.

3.      Due Diligence.    Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from Debtors. Interested parties must execute a form nondisclosure agreement acceptable to Debtors ("NDA") before any due diligence materials will be provided.  Parties that have previously executed an NDA do not need to execute a new NDA.  All due diligence requests should be directed to Jason Hill, Media Venture Partners, 990 Washington Street, Suite 200, Dedham, MA 02026; phone: 617.345.7316; email: jhill@mediaventurepartners.com. Debtors will comply with other reasonable due diligence requests made by such interested parties, and all due diligence shall be completed by the Auction.

4.      Stalking Horse Bid.

(a)     The aggregate consideration (the "Purchase Price") for the Assets is an amount that shall be equal (subject to the adjustments set forth in Section 2.1(a) of the APA) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Debtors' bankruptcy estate ("Estate Payment**"**), minus the Excess Cure Credit, if any (the "Cash Purchase Price").  The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction.  If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter.  On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Debtors utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**.  Upon the execution of the APA, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed.  **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of the APA.  Moreover, if the Additional CoBank DIP Liability utilized by the Debtors is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Debtors; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

(b)     Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA, (ii) the APA has not been terminated (other than in accordance with **Section 9.1(d), (f), (g), (h), (i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more Persons (a "Third Party") other than the Buyer

or an Affiliate of the Buyer (a "Third Party Sale"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "Termination Fee").    Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale.  For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Debtors or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale.  For the avoidance of doubt, the termination of the APA pursuant to **Section 9.1(d), (f), (g), (h), (i) or (j)** shall not prevent Buyer from recovering its Termination Fee.

5.    Qualified Bidders.

(a)    Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(b)    A "Qualified Bidder" is any entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures and includes Buyer.

(c)    A "Qualified Bid" is a written offer to purchase the Assets that complies with the following requirements:

(i)    Deadline to Submit Qualified Bids: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received by Debtors' counsel no later than 5:00 p.m. prevailing Eastern Time on April 8, 2016 (the "Qualified Bid Deadline").

(ii)    Where to Submit Bids:  Bids must be submitted by electronic mail to Counsel for Debtor and Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

Counsel for Debtors
Timothy A. Fusco & Stephen S. LaPlante

- 7 -

> Miller, Canfield, Paddock and Stone, PLC
> 150 West Jefferson, Suite 2500
> Detroit, MI 48226
> fusco@millercanfield.com
> laplante@millercanfield.com
>
> Office of the United States Trustee
> c/o Michelle Wilson
> The Ledyard Building, 2nd Floor
> 125 Ottawa, NW, Suite 202R
> Grand Rapids, MI 49503
> Michelle.m.wilson@usdoj.gov

(iii)  <u>Content of Qualified Bids</u>:  The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("<u>Bid Package</u>"):

   (1)  An unconditional cash offer for substantially all of the Debtors' assets.

   (2)  An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors.

   (3)  Propose a cash purchase price that is not less than $32,350,000.

   (4)  Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("<u>Buyer's Premium</u>"), in order to compensate the Debtors for the Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer.

   (5)  A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (3) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

   (6)  A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or

executory contracts that are to be assumed and assigned to the potential Qualified Bidder. In addition to the cash purchase requirement identified in (3) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder.

(7)    A disclosure of the identity of each person or entity that will be bidding for the Assets.

(8)    A binding and irrevocable offer.

(9)    The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction.

(10)   A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

(11)   A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid.

(12)   The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

The Debtors will provide to the Consultation Parties copies of each Bid Package received from a proposed Qualified Bidder, as described in Section 7 of these Sale Procedures. After consultation with the Consultation Parties, the Debtors in their sole discretion will determine if a proposed Qualified Bidder is, in fact, a Qualified Bidder.

6.    "As Is, Where Is"; No Reliance by Bidders. All entities seeking to be designated as Qualified Bidders shall be conclusively presumed to represent, warrant, and acknowledge as follows:

- 9 -

(a)     The Assets shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Debtors, their agents, or the bankruptcy estates, other than as contained in the APA or the asset purchase agreement submitted by the Qualified Bidder.

(b)     All of Debtors' right, title, and interest in and to the Assets pursuant to the terms of the Sale Order shall be sold free and clear of all liens, claims, encumbrances, interests, restrictions, and other encumbrances of any kind or nature thereon to the full extent authorized under Bankruptcy Code §§ 363(f) and 365, with the same to attach to the net proceeds of the sale of the Assets according to their priority.

(c)     Each Qualified Bidder understands and is bound by the terms of these Sale Procedures, and any order approving these Sale Procedures.

(d)     Each Qualified Bidder has had an opportunity to conduct reasonable due diligence, if requested, and it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or Assets in making its bid and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the accuracy or completeness of any information provided in connection with the Assets, the Sale Procedures Order, or the Auction, except as expressly stated in the Sale Procedures Order or in an executed asset purchase agreement.

(e)     Each Qualified Bidder has not colluded with any party with respect to its bid and has submitted its bid in good faith and not by any means forbidden by law. Nothing herein shall be construed to prohibit joint bids, however.

(f)     Each Qualified Bidder acknowledges and understands that approval of a sale, assignment and transfer of the Assets will require the prior approval of Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

7.     <u>Designation of Qualified Bids</u>.

(a)     On or before April 13, 2016, at 5:00 p.m. prevailing Eastern Time and after consultation with the Consultation Parties, Debtors will in their sole discretion designate those submitted bids, if any, that are Qualified Bids. After consultation with the Consultation Parties, Debtors may, in their sole discretion, determine, at the Auction, that a previously Qualified Bidder

has altered its bid in a way that causes it no longer to be a Qualified Bidder.

    (b)    If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, Debtors will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

    8.    <u>Auction</u>.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, the Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("<u>Auction</u>").

    (a)    Only representatives of Debtors, the Committee, the United States Trustee, Buyer, CoBank and any Qualified Bidder will be entitled to attend the Auction.

    (b)    Debtors may announce at the Auction additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances (*e.g.*, regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

    (c)    After consultation with the Consultation Parties, Debtors shall designate in their sole discretion at the start of the Auction the Qualified Bid determined by the Debtors in the exercise of their business judgment to be the highest and best bid as the initial bid for the Assets ("<u>Initial Qualified Bid</u>").

    (d)    The first overbid above the Initial Qualified Bid and each subsequent overbid must be in the form of cash consideration and must be determined by Debtors to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).  Each Qualified Bid, including the Initial Qualified Bid, made by a Qualified Bidder (other than Buyer) must agree to pay, in addition to its Qualified Bid, the Buyer's Premium should its Qualified Bid become the Winning Bid.

    (e)    After each round of bidding and consultation with the Consultation Parties, Debtors will announce the identity of the Qualified Bidder deemed by Debtors at that point to have made the highest or otherwise best offer for the Assets.

    (f)    Promptly after the conclusion of the Auction and after consultation with the Consultation Parties, Debtors will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not

- 11 -

limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net proceeds that will be made available to the Debtors' bankruptcy estate upon a purported sale of the Assets (the "Winning Bidder") and shall designate the next highest or otherwise best Qualified Bid (the "Back-Up Bid") and the entity submitting the Back-Up Bid ("Back-Up Bidder"). Debtors will file a notice immediately after the Auction setting forth the identity of the Winning Bidder. The Buyer's Premium is additional consideration that the Winning Bidder will be required to pay the Debtors' estates, but will not be taken into account in determining the Winning Bidder.

(g)     At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, Debtors shall be authorized to close on the Back-Up Bid without further order of the Court.

9.     Presentation of Winning Bidder and Back-Up Bid; Acceptance of Qualified Bid Only Upon Court Approval. A hearing shall occur as soon as practicable after the Auction given the schedule of the Court, at which hearing Debtors shall seek entry of an order approving the sale of the Assets to the Winning Bidder ("Sale Order") and that is effective immediately upon entry, notwithstanding Bankruptcy Rule 6004(h). The Sale Order shall provide that, if the transaction with the Winning Bidder for sale of the Assets fails to close because of a breach or failure to perform on the part of the Winning Bidder, Debtors may consummate a sale of the Assets pursuant to the Back-Up Bid without further order of the Court. If an Auction is conducted, and the Buyer is not the Winning Bidder, the Buyer shall, if its bid is determined to be the next highest bid, serve as the Back-Up Bidder and keep the Buyer's bid to consummate the transactions contemplated by the APA on the terms and conditions set forth in the APA open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 100 days after the date on which the Sale Motion is filed (the "Buyer Outside Back-up Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than June 22, 2016, or (ii) the date of closing of a Third Party Sale with the Winning Bidder. The Back-Up Bid of a Back-Up Bidder other than Buyer shall remain open and irrevocable until August 1, 2016 ("Non-Buyer Outside Back-Up Date"). A Qualified Bid, including any Winning Bid or Back-Up Bid, shall be deemed accepted by Debtors only when that Qualified Bid has been approved by the Court.

10.     Treatment of Deposits.

(a)     Any Qualified Bidder that submitted a Deposit and that is not designated at the Auction as having submitted the Winning Bid or the Back-Up Bid shall have its Deposit returned no later than two (2) business days after the designation of the Winning Bid.

- 12 -

(b)      If Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(c)      If a Qualified Bidder other than Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Non-Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(d)      Notwithstanding anything to the contrary in any agreement between a Qualified Bidder and Debtors or any other entity, if such Qualified Bidder fails to consummate a transaction approved pursuant to the Sale Order because of a breach or failure to perform on the part of such Qualified Bidder, such Qualified Bidder shall not be entitled to the return of its Deposit. Such Deposit shall be deemed property of Debtors' estates, such Deposit shall be retained by Debtors' estates in partial satisfaction of any damages due to Debtors' estates as a result of such Qualified Bidder's failure to consummate the transaction, and such Deposit shall be deemed to be proceeds of the Sale. Debtors retain any and all rights to recover damages in excess of the Deposit from such Qualified Bidder.

11.    <u>Closing</u>.  The closing of the transactions contemplated by the APA ("<u>Closing</u>") shall take place remotely via electronic exchange of documents, on the date ("<u>Closing Date</u>") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in **Sections 7.1(e)** and **7.2(e)**, whichever is last to occur, absent written agreement of the Parties.

12.    <u>Sale Hearing</u>.  A hearing ("<u>Sale Hearing</u>") to consider entry of the Sale Order will be held before the Court on a date to be set at the hearing on the entry of the Sale Procedures Order.

**Attachment A – Notice**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:                                                          Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                            Case No. 16-00290 (JTG)
                                                               (Jointly Administered)

                          Debtors.
                                                               Honorable John T. Gregg
_____/

### NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on February 1, 2016, the Debtors filed their motion ("Sale Motion") for entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (a) approving the Sale Procedures (as defined below) in connection with the sale ("Sale") of substantially all of the Debtors' assets ("Assets"); (b) authorizing and scheduling an auction, if other bids are received ("Auction"), in connection with the Sale; (c) approving a termination fee and certain other protections to the Debtors' current stalking horse bidder, Everstream GLC Holding Company LLC ("Buyer"), under the Debtors' stalking horse purchase and sale agreement ("APA"); (d) approving cure procedures relating to the assumption and assignment of certain executory contracts and unexpired leases ("Assumed and Assigned Agreements") in connection with the Sale; (e) approving the form and manner of notices; (f) setting a hearing ("Sale Hearing") to take place after the Auction (if an Auction is necessary), to approve the Sale and the assumption and assignment of the Assumed and Assigned Agreements.  By Order dated [ ], 2016, the Bankruptcy Court entered an order ("Sale Procedures Order") approving the sale procedures as described therein ("Sale Procedures"). Copies of the Sale Procedures Order, the Sale Procedures and the APA are available free of charge at http://www.kccllc.net/glc.

Any party that wishes to take part in the process and submit a bid for the Assets must comply with the Sale Procedures, including without limitation the following procedures.  Only "Qualified Bidders" may participate in the bidding and Auction process.  A "Qualified Bidder" is a potential bidder that has, no later than the bid deadline of 5:00 p.m Eastern Time on April 8, 2016, at 5:00 p.m. prevailing Eastern Time ("Qualified Bid Deadline"), submitted a "Qualified Bid" by electronic mail to (a) counsel to the Debtors, Timothy A. Fusco & Stephen S. LaPlante, Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, MI 48226, fusco@millercanfield.com, laplante@millercanfield.com, and (b) the Office of the United States Trustee c/o Michelle Wilson, The Ledyard Building, 2nd Floor, 125 Ottawa, NW, Suite 202R, Grand Rapids, MI 49503 michelle.m.wilson@usdoj.gov.

Subject to any other requirements established by the Court, an offer to purchase will only constitute a Qualified Bid if it contains the following items: (i) An unconditional cash offer for substantially all of the Debtors' assets; (ii) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; (iii) Propose a cash purchase price that is not less than $32,350,000; (iv) Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("Buyer's Premium"), in order to compensate the Debtors for the

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer; (v) A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (iii) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document; (vi) A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder. A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder. In addition to the cash purchase requirement identified in (iii) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder; (vii) A disclosure of the identity of each person or entity that will be bidding for the Assets; (viii) A binding and irrevocable offer; (ix) The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank, ACB and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction; (x) A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so; (xi) A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid; and (xii) The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

In the event the Debtors receive a Qualified Bid in addition to the APA, the Debtors will, unless otherwise ordered by the Court, conduct the Auction with respect to the Assets. The Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Sale Procedures Order and the Sale Procedures. Such objections must be filed with the Bankruptcy Court, and served on Debtors' counsel so as to be received, on or before April 22, 2016 at 5:00 p.m., prevailing Eastern Time. The Sale Hearing shall be held on April ___, 2016, at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Division Ave. N., Room 200, Grand Rapids, MI 49503, at which time the Court will resolve any such objections. If any party fails to timely file and serve an objection in accordance with the Sale Procedures Order, the Bankruptcy Court may disregard such objection. The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or the Debtors' assumption and assignment of the Assumed and Assigned agreements or the consummation of the Sale and the performance of the APA.

By: /s/ Marc N. Swanson
　　　Marc N. Swanson (P71149)
　　　Miller, Canfield, Paddock and Stone, PLC
　　　150 W. Jefferson, Suite 2500
　　　Detroit, MI 48226
　　　Phone: 313.496.7591; Fax: 313.496.8451
　　　Email: swansonm@millercanfield.com
　　　*Proposed Attorneys to the Debtors and Debtors in Possession*

**Exhibit B – Assumption and Assignment Notice**

# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:                                                          Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                            Case No. 16-00290 (JTG)
                                                                (Jointly Administered)

                           Debtors.

_____/                               Honorable John T. Gregg

       **You are receiving this notice because you may be a party to a contract or lease with Great Lakes Comnet, Inc. or Comlink, L.L.C.  Please read this notice carefully as your rights may be affected by the transactions described herein.**

       **PLEASE TAKE NOTICE** that on January 25, 2016, Great Lakes Comnet, Inc. and Comlink, L.L.C. (collectively, the "Debtors") commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

       **PLEASE TAKE FURTHER NOTICE** that on February 1, 2016, Debtors filed their Motion for Entry of (A) an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee and (V) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105, 363 and 365, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases pursuant to 11 U.S.C. § 365, and (III) Granting Related Relief ("Sale Motion").

       **PLEASE TAKE FURTHER NOTICE** that on [ ], the United State Bankruptcy Court for the Western District of Michigan  ("Bankruptcy Court") entered an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related Relief [Doc. No. __] ("Sale Procedures Order").[2]  Among other things, the Sale Procedures Order: (a) established certain procedures ("Sale Procedures") for the sale ("Sale") of the Debtors' assets pursuant to an auction ("Auction") and (b) scheduled the time and place for the Auction.  The hearing on

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Sale Procedures Order.

- 1 -

whether to approve the Sale will take place on April __, 2016 at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Divison Ave N., Room 200, Grand Rapids, MI 49503 ("Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, the Debtors may potentially assume and assign to the Winning Bidder one or more of those executory contracts and unexpired leases listed on Annex 1 attached hereto (collectively, the "Assumed and Assigned Agreements" and each, a "Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that the Debtors have indicated on Annex 1 attached hereto the cure amounts the Debtors believe must be paid to cure all pre-petition defaults and pay all amounts accrued under the Assigned Agreements (in each instance, the "Cure Amount").

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the assumption by the Debtors and assignment/transfer to the Winning Bidder of any Assigned Agreement, including the validity and amount of the Cure Amount as determined by the Debtors, or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Assigned Agreement for such contract or lease to be assumed and assigned, must file an objection ("Cure/Assignment Objection") that (a) is in writing (b) sets forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) is filed with the Clerk of the Bankruptcy Court, and served on the Debtors' counsel so that it is received, on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time** ("Cure/Assignment Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the ability of the Winning Bidder to provide adequate assurance of future performance of an Assigned Agreement must file an objection with the Clerk of Bankruptcy Court on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time.**

**PLEASE TAKE FURTHER NOTICE** that unless a Cure/Assignment Objection or Adequate Assurance Objection is filed and served before the applicable objection deadline, all parties shall (a) be forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to the Assigned Agreements, and the Debtors and the Winning Bidder shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to the assumption and assignment; (c) be forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assigned Agreements.

**PLEASE TAKE FURTHER NOTICE** that all unresolved Cure/Assignment Objections and Adequate Assurance Objections will be heard at the Sale Hearing or such other date as to be determined by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on Annex 1 and otherwise do not object to the Debtors' assumption and assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Assigned Agreements is subject to the approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of any document on the list of Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Winning Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, or that your executory contract or unexpired lease will be assumed and/or assigned, and all rights with respect thereto are expressly preserved.

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Stephen S. LaPlante
     Timothy A. Fusco (P13768)
     Jonathan S. Green (P33140)
     Stephen S. LaPlante (P48063)
     Marc N. Swanson (P71149)
     150 West Jefferson, Suite 2500
     Detroit, MI  48226
     (313) 496-7997
     (313) 496-8478
     laplante@millercanfield.com

     *Proposed Attorneys to the Debtors and*
     *Debtors in Possession*

- 3 -

**Annex 1**

**Exhibit G**

**Sale Order**

See attached.

## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                                    Chapter 11

GREAT LAKES COMNET, INC., *et.al* [1]                       Case No. 16-16-00290 (jtg)

                                                          (Jointly Administered)

                              Debtor.                     Honorable John T. Gregg

_____/

### ORDER APPROVING SALE OF ASSETS PURSUANT TO 11 U.S.C. § 363

This matter having come before the Court on the Motion of Great Lakes Comnet, Inc.

and Comlink, L.L.C. as debtors in possession (collectively, the "Debtors") for the entry of an

order (i) authorizing the sale of substantially all of Debtors' assets free and clear of liens, claims,

encumbrances and interests pursuant to 11 U.S.C. §§ 105, 363, and 365 (ii) approving the

assumption and assignment of certain executory contracts pursuant to 11 U.S.C. § 365, and (iii)

granting related relief [Doc. No. ___] ("Sale Motion"),[2] which seeks entry of, *inter alia*, this

order ("Sale Order") authorizing the sale ("Sale") of substantially all of Debtors' assets free and

clear of liens, claims, encumbrances and interests pursuant to sections 105, 363 and 365 of title

11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to Buyer, or to such other

entity as may submit a higher or otherwise better Qualified Bid (as defined in the Sale

Procedures); the Court having entered on [ ] its Order (I) Establishing Sale Procedures, (II)

Scheduling an Auction and a Sale Hearing in Connection With the Sale of Substantially All of

---

[1] The Debtors in these Bankruptcy Cases are Great Lakes Comnet, Inc., case no. 16-00290, and
Comlink, L.L.C., case no. 16-0092. On January 27, 2016, the Court entered an Order Directing
the Joint Administration of Their Bankruptcy Cases [Dkt. No. 50].

[2] All capitalized terms not defined in this Order shall have the meanings ascribed to them in the
Sale Motion.

25830806.3\130050-00009

Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363, and 365 (III) Setting Certain Dates and

Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale

Agreement, Including the Termination Fee, and (V) Granting Related Relief [Doc. No. ___]

("Sale Procedures Order"); the Court finding, as more fully set forth below, that (i) proper notice

of (a) the deadlines and methods for asserting objections to the Sale Motion and the entry of this

Order, (b) the [ ] hearing on the Sale Motion ("Sale Hearing"), and (c) the entry of this Order has

been provided to all parties entitled thereto as required by applicable law and by the Sale

Procedures Order, and no other or further notice of any such matters is required, and (ii) the

appearances of all interested parties and all responses and objections, if any, to the Sale Motion

and to the entry of this Sale Order have been duly noted in the record of the Sale Hearing and

such objections or responses have been withdrawn, overruled, or otherwise resolved; the Court

having considered the (i) Sale Motion and the legal and factual bases set forth in support of the

Sale Motion; (ii) form of this Sale Order submitted to the Court; (iii) objections or other

responses made to the Sale Motion and the entry of this Sale Order; and (iv) entire record of the

Sale Hearing, including any evidence submitted at or prior to the Sale Hearing; the Court finding

that the relief sought by the Sale Motion and contained in this Sale Order is in the best interest of

Debtors, their estates, and their creditors; the Court being otherwise fully advised in the

premises, and after due deliberation and sufficient cause appearing therefor,

### THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES THAT:

A.    This Court has jurisdiction to approve the Sale pursuant to 28 U.S.C. §§ 157 and

1334.  Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

- 2 -

B.      Approval of the Sale is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).  The bases for the relief granted herein are Bankruptcy Code §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.      As evidenced by declarations filed with the Court and representations of counsel at the Sale Hearing and the hearing related to the Sale Procedures Order, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the entry of the Sale Procedures Order and the dates and deadlines set forth therein, including the procedures required for the submission of Qualified Bids for the Assets and for participation by interested bidders at an auction of the Assets (the "Auction"); (ii) the Sale Motion; (iii) the entry of this Sale Order; and (iv) the transaction contemplated under the APA, including the Sale has been provided to (a) the Office of the United States Trustee; (b) Buyer; (c) the Unsecured Creditors Committee; (d) all parties known to Debtors who assert a security interest in or lien on the Assets, or assert a claim against or interest in the Assets, including CoBank, ACB; (e) all of Debtors' creditors, including without limitation any taxing authorities, and contract counterparties; (f) entities, or their counsel, not described above, who have filed a notice of appearance through the Court's CM/ECF System; and (g) Governmental agencies regulating Debtors.  Any expediting of the relevant deadlines for responses and notice of hearing is appropriate and supported by cause under the circumstances and such notice has been adequate and no further notice is required.

D.      In addition to the actual notice described above, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding, (i) the Sale Motion; (ii) the entry of this Sale Order; and (iii) the transaction contemplated under the APA, including the Sale, has been published in the Detroit Free Press and the Detroit News, in

- 3 -

the form of Attachment A to the Sales Procedure Order, and that such notice is sufficient and reasonably calculated to apprise unknown creditors and other parties in interest of the matters reflected in the notice, and no further notice is required or appropriate.

  E.  The foregoing notice in Findings of Fact C and D constitute good and sufficient notice of, and a reasonable opportunity to object or be heard regarding the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Auction, and the entry of this Order under Bankruptcy Code §§ 105, 363, and 365, and Bankruptcy Rules 2002, 6004, 6006, and 9014.

  F.  The Purchase Price (as defined in the APA) offered by Buyer, under the terms and conditions set forth in the APA:  (i) represents the highest or otherwise best offer obtained for the Assets; (ii) is fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Assets, (iii) would not have been made by Buyer absent the protections afforded to Buyer by the Bankruptcy Code and this Order, (iv) will provide a better recovery for Debtors' creditors than would be provided by any other practical available alternative, and (v) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  A sale of the Assets other than one free and clear of all prepetition and postpetition liens (including, without limitation, any "lien" as defined in Bankruptcy Code § 101(37)), claims (including, without limitation, any "claim" as defined in Bankruptcy Code § 101(5)), encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests (collectively, "Interests") would impact materially and adversely on Debtors' bankruptcy estates, would yield substantially less value for Debtors' estates, and would provide less certainty than the available alternatives.  Buyer would not agree to purchase the Assets if the Assets could not

- 4 -

be transferred to Buyer free and clear of all Interests, except for Permitted Liens (as defined in the APA) and Assumed Liabilities (as defined in the APA).

G.      Subject to the terms and conditions of the APA and entry of this Sale Order, the transfer of the Assets to Buyer pursuant to the Sale will be a legal, valid, and effective transfer of the Assets and will, upon the occurrence of the Closing in accordance with the terms of this Sale Order, vest in Buyer all right, title and interest of the Debtors in the Assets free and clear of any and all Interests, including, without limitation, mechanics,' materialmen's and other consensual and non-consensual liens and statutory liens, security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in Bankruptcy Code § 101(5) or "lien" as defined in Bankruptcy Code § 101(37)), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, contracts, offsets, recoupment, rights of recovery, judgments, orders and decrees of any Court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, licenses, options, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, taxes or similar charges and other liabilities (including without limitation fuel taxes and surcharges and similar amounts), causes of action and claims, or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including without limitation to the generality of the foregoing restrictions or conditions on or to the transfer, assignment, or renewal of licenses, permits, registrations, and authorizations or approvals of or with respect to governmental units and instrumentalities), in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

- 5 -

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise.  The APA, as approved herein, was duly executed and authorized.

H.      Except as provided for in the APA or this Sale Order, all such Interests shall be discharged as to the Assets, with such Interests attaching to the proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.

I.      Entry into the APA and consummation of the transactions contemplated thereby and hereby as required by the terms set forth in the Sale Procedures Order constitute the exercise of sound business judgment, and such acts are in the best interests of Debtors, their estates, and all parties in interest.  The Court finds that Debtors have articulated good and sufficient business reasons justifying the Sale under Bankruptcy Code § 363(b).  Such business reasons include, but are not limited to, the following:  (i) the APA constitutes the highest or otherwise best offer for the Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets; and (iii) any alternative likely would not have yielded as favorable an economic result.

J.      Each person or entity with an Interest in the Assets to be transferred on the Closing Date (i) has consented to, or is deemed to have consented to, the Sale free and clear of such Interest, (ii) could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest, or (iii) holds an interest that is a lien that is worth less than the

- 6 -

amount of the purchase price to be paid by Buyer under the APA, and, therefore, in each case, one or more of the standards set forth in Bankruptcy Code § 363(f) has been satisfied as to all such Interests. Those holders of Interests who did not object, or who withdrew their objections, to the Sale Motion are deemed to have consented to entry of this Sale Order pursuant to Bankruptcy Code § 363(f)(2). Therefore, approval of the APA and consummation of the Sale at this time free and clear of Interests is appropriate pursuant to Bankruptcy Code § 363(f).

K.     Buyer is not holding itself out to the public as a continuation of Debtors. The transaction contemplated by the APA does not amount to a consolidation, merger, or de facto merger of Buyer and Debtors or Debtors' estates, there is not substantial continuity between Buyer and Debtors, there is no continuity of enterprise between Buyer and Debtors, Buyer is not a mere continuation of Debtors or their estates, and Buyer does not constitute a successor to Debtors or their estates.

L.     Upon the Closing, Buyer shall be deemed to have assumed only the Assumed Liabilities under the APA. Except with respect to the Assumed Liabilities, the Closing and the consummation of the transactions contemplated by the APA shall not, by reason of such Closing and transactions, subject Buyer to any liability whatsoever for claims with respect to the operation of the business of Debtors before the Closing Date. Except for the Assumed Liabilities, Buyer's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing, to the extent allowed by applicable law. Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Agreements to Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assumed and Assigned Agreements is in the best interests of Debtors, their

- 7 -

estates, and their creditors. The Assumed and Assigned Agreements being assigned to Buyer are an integral part of the Assets being purchased by Buyer and, accordingly, such assumption and assignment of the Assumed and Assigned Agreements is reasonable, enhances the value of Debtors' estate, and does not constitute unfair discrimination. Each and every provision of the Assumed and Assigned Agreements or applicable non-bankruptcy law that purports to prohibit, restrict, or condition assignment of any of the Assumed and Assigned Agreements has been satisfied or is unenforceable under Bankruptcy Code § 365.

M.      At the Closing under the APA, or as soon as practicable thereafter, and subject to the terms of the APA, Buyer shall (i) cure, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed and Assigned Agreements, within the meaning of Bankruptcy Code § 365(b)(1)(A), and (ii) provide compensation or adequate assurance of compensation to any party of any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(B). Other than the payment of the Cure Amounts (including by way of setoffs or recoupments), neither Buyer nor the Debtors shall have any further obligations to non-debtor parties to the Assumed and Assigned Agreements. Buyer has provided adequate assurance of future performance of and under the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(C). Upon assumption and assignment to Buyer, the Assumed and Assigned Agreements shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and Debtors shall have no liability for any breach of any Assumed and Assigned Agreement occurring after assignment of the Assumed and Assigned Agreement pursuant to Bankruptcy Code § 365(k) and this Sale Order.

N.      Buyer and Debtors negotiated the APA and the transaction contemplated by the APA from arms' length bargaining positions, without collusion, and in good faith within the meaning of Bankruptcy Code §§ 363(m) and (n).  As a result, Debtors and Buyer are entitled to the protections of Bankruptcy Code § 363(m) with respect to the Sale.

O.      Neither Buyer, Debtors, nor any other person or entity has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code § 363(n).

P.      Buyer will be acting in good faith pursuant to Bankruptcy Code § 363(m) in closing the transaction contemplated by the APA and this Sale Order at any time on or after the entry of this Sale Order.

Q.      Subject to the terms of the APA, the transfer of the Assets to Buyer will not subject Buyer to any liability whatsoever prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability to the extent allowed by applicable law.

R.      The Sale of the Assets must be approved and consummated promptly to preserve the value of the Assets.  Therefore, time is of the essence in consummating the Sale, and Debtors and Buyer intend to close the Sale as soon as reasonably possible.

S.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

T.     The transfer of the Assets to Buyer will be a legal, valid, and effective transfer of assets, and will vest Buyer with all right, title, and interest of Debtors in and to the Assets free and clear of all Interests, except as provided for in the APA.

U.     The terms of the APA are fair and reasonable in all respects.

V.     The transactions contemplated by the Motion and the Sale, as approved and implemented by this Sale Order, are in compliance with and satisfy all applicable provisions of the Bankruptcy Code, the local and Federal Rules of Bankruptcy Procedure, and any other applicable law relating to the Sale including, without limitation, Bankruptcy Code §§ 363(b), (e) and (f) and section 365.

W.     The transactions contemplated by the Motion and the Sale, as approved and implemented by this Order, are in compliance with and satisfy all applicable provisions of the Bankruptcy Code, the local and Federal Rules of Bankruptcy Procedure, and any other applicable law relating to the Sale including without limitation Bankruptcy Code §§ 363(b), (e), and (f) and 365.

**For all of the foregoing reasons and after due deliberation, the Court hereby ORDERS, ADJUDGES AND DECREES THAT:**

1.     The Sale Motion is GRANTED with respect to the Assets, and the Sale of the Assets, the APA, and the transaction contemplated in the APA are hereby approved and authorized in all respects in accordance with and pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 365.

2.     Objections, if any, to the Sale Motion or to the relief granted herein that have not been withdrawn, waived, settled, or otherwise resolved and all reservations of rights included in such objections, are overruled on the merits.

- 10 -

3.      Pursuant to Bankruptcy Code § 363(b), the Court approves in all respects the Sale of the Assets to Buyer free and clear of all Interests (except those permitted by the APA), with such Interests attaching to the Sale Proceeds in the order of their priority, and the transaction contemplated by the APA is approved in all respects.  Debtors are authorized to sell the Assets to Buyer upon the terms and subject to the conditions set forth in the APA, with, subject to the terms of this Sale Order, such modifications as may be agreed to by Buyer and Debtors.

4.      The APA, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is approved.  Debtors and Buyer are both authorized to take all actions and execute all documents and instruments that Debtors or Buyer reasonably deem necessary or appropriate to implement and effectuate the transactions contemplated by the APA, including without limitation, to execute all documents and further agreements necessary or appropriate to implement and effectuate the APA and this Sale Order.

5.      Pursuant to Bankruptcy Code §§ 363(b) and (f) and subject to the terms of the APA, upon the Closing under the APA, the transfer of the Assets to Buyer will be a legal, valid and effective transfer and shall vest Buyer with all right, title and interest of Debtors in and to the Assets, free and clear of all Interests, including, without limitation, security interests of whatever kind or nature, mortgages, pledges, deeds of trust, hypothecations, assignments, preferences, debts, charges, suits, licenses, options, rights-of-recovery, judgment, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), licenses, covenants, indentures, instruments, leases, options, contracts, agreements, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor product, tax, labor, ERISA, CERCLA, environmental, alter-ego and other liabilities, causes of action, known or unknown, contract rights, and claims, in each case to the fullest extent of the law, of any kind or

- 11 -

nature, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, statutory or non-statutory, matured or unmatured, legal or equitable, with all such Interests in and upon the Assets to be unconditionally released, discharged and terminated to the extent allowed by applicable law.

6.      On the Closing Date and upon payment of the Purchase Price, this Sale Order will be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in such Assets to Buyer.

7.      Except as set forth in the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Interests of any kind or nature whatsoever against or in Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, Debtors, the Assets, or the transfer of the Assets to Buyer, are forever barred, estopped, and permanently enjoined from asserting against Buyer, its successors and/or assigns, its property, or the Assets, such person's or entity's Interest.

8.      On the Closing Date of the Sale, Debtors and their creditors, vendors and contract counterparties are authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or otherwise exist.

9.      The Sale of the Assets to Buyer under the APA constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of all applicable jurisdictions, including, but not limited to, the laws of the State of Michigan.  The transfer of the Assets by Debtors to Buyer is a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent of any entity.

10.     Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under Bankruptcy Code § 363(m) and any other applicable bankruptcy and non-bankruptcy law.  Buyer acted in good faith at the Sale Hearing and will be acting in good faith within the meaning of Bankruptcy Code § 363(m) in closing the transactions contemplated by the APA.

11.     Neither Buyer's purchase of the Assets nor Buyer's subsequent operation of the business previously operated by Debtors shall cause Buyer to be, or to be deemed to be:  (a) a successor-in-interest in any respect to Debtors or Debtors' businesses under or within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor or environmental law, rule or regulation or under any products liability law or doctrine with respect to Debtor's liability under such law, rules, regulations or doctrines; or (b) a joint employer, co-employer or successor employer with Debtors.  Consummation of the APA and the transactions contemplated therein and thereby do not affect a *de facto* merger or consolidation of the Debtors and Buyer or result in the continuation of the Debtors' businesses under Buyer's control.  Buyer is not the alter ago of, a successor in interest to, or a continuation of the Debtors.

12.     This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the APA, the Sale Procedures Order, and this Sale Order, including all amendments to the APA and each of these orders and any waivers and consents thereunder, and further to hear

- 13 -

and determine each of the agreements executed in connection therewith or herewith, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Buyer free and clear of Interests, or compel the performance of other obligations owed by Debtors or Buyer, (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Sale Order, and (d) protect Buyer against (i) claims made related to any of the Excluded Assets (as defined in the APA), (ii) any claims of successor liability related to the Assets, or (iii) any claims of Interests asserted against Buyer or the Assets, of any kind or nature whatsoever, *provided however*, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the APA, the Sale Procedures Order, or this Sale Order, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to any such matter.

13.    The transactions contemplated under the Sale are undertaken by Buyer in good faith, as that term is used in Bankruptcy Code § 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Assets shall not affect the validity of the Sale and other transactions contemplated and authorized by this Sale Order, unless such authorization is duly stayed pending such appeal prior to the Closing.

14.    The provisions of this Sale Order are non-severable and mutually dependent.  The failure to include specifically any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the

APA and all of its provisions, payments, and transactions be authorized and approved in their entirety.

15.    On the Closing Date and payment of the Purchase Price, this Sale Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to Buyer.  Each and every federal, state and local governmental agency, department or entity is directed to accept the filing of any and all documents and instruments necessary and appropriate to implement, effectuate or consummate the transactions contemplated by the APA and this Sale Order.

16.    Debtors and each other person having duties or responsibilities under the APA, any agreements related thereto, or this Sale Order, and their respective members, directors, officers, agents, representatives and attorneys, are authorized to execute and deliver any and all instruments, including all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units, as may be required to effectuate the APA and this Sale Order.  For the avoidance of doubt, all persons and entities (i) holding liens or encumbrances, (ii) that have filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing claims, or (iii) otherwise asserting claims against the Assets shall, and hereby are directed to, execute and deliver to Debtors or its designated representatives(s) any and all documents necessary (or requested by Debtors or Buyer) to effectuate the transfer of the Assets to Buyer free and clear of any and all liens and encumbrances.

17.    The requirements of Bankruptcy Code §§ 365(b)(1) and 365(f)(2) are deemed satisfied with respect to the Assumed and Assigned Agreements.  Debtors are authorized, in

- 15 -

accordance with Bankruptcy Code §§ 105(a), 363, and 365, to (i) assume and assign to Buyer the Assumed and Assigned Agreement, free and clear of all Interests, and (ii) execute and deliver to Buyer such assignment documents as may be necessary to confirm such assignment and transfer. Buyer has provided adequate assurance of future performance under the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(C).

18.     The Assumed and Assigned Agreements shall be transferred and assigned to Buyer, and, following the Closing, shall remain valid and binding and in full force and effect for the benefit of Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed and Assigned Agreement (including those of the type described in Bankruptcy Code §§ 365(b)(2), (e)(1) and (f)(1)) that prohibits, restricts, or conditions such assignment or transfer.  Pursuant to Bankruptcy Code § 365(k), Debtors shall be relieved from any liability with respect to any breach of any Assumed and Assigned Agreement after assignment of such Assumed and Assigned Agreement to Buyer.  All other requirements and conditions under Bankruptcy Code §§ 363 and 365 for the assumption by Debtors and assignment to Buyer of each Assumed and Assigned Agreement have been satisfied and, upon Closing and payment of the Purchase Price, Buyer shall be fully and irrevocably vested in all right, title and interest in each Assumed and Assigned Agreement.

19.     Upon assignment of the Assumed and Assigned Agreements to Buyer, no non-debtor party to any Assumed and Assigned Agreement shall be permitted to declare a default by Buyer under such Assumed and Assigned Agreement or otherwise take action against Buyer on account of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under such Assumed and Assigned Agreement, including any failure to pay any amounts to cure defaults thereunder in excess of the Cure Costs.  The Court hereby determines that the Cure

- 16 -

Costs established pursuant to the Sale Procedures Order, or as otherwise agreed by the non-debtor parties to the Assumed and Assigned Agreements, constitute all of the cure amounts that are required to be paid under Bankruptcy Code § 365(b)(1) in connection with the assumption and assignment of the Assumed and Assigned Agreements.

20.    Each non-debtor party to an Assumed and Assigned Agreement is forever barred, permanently estopped, and permanently enjoined from asserting against Debtors or Buyer, or the property of either, any default existing as of the date of the Sale Hearing.

21.    Upon the assignment of the Assumed and Assigned Agreements to Buyer, Buyer shall be deemed, as of the Closing, to be in compliance with all terms and provisions of the Assumed and Assigned Agreements.  Except for the right to payment of the Cure Cost pursuant to Bankruptcy Code §§ 105(a), 363, and 365 (including through satisfaction by setoff or recoupment), all parties to the Assumed and Assigned Agreements are forever barred and enjoined from raising or asserting against Debtors or Buyer any assignment fee, default, breach, or claim for pecuniary loss, or condition to assignment, arising under or related to the Assumed and Assigned Agreements existing as of the Closing or arising by reason of the Closing.  Any party that may have had the right to consent to an assignment, for purpose of Bankruptcy Code § 365(e)(2)(A)(ii) or otherwise, is deemed to grant such consent if it failed to object to the assumption and assignment.

22.    The rights of Buyer under the APA may be assigned only to the extent permitted in the APA.

23.    The APA and any related agreements may be modified, amended, or supplemented by agreement of Debtors, CoBank, ACB, and Buyer without further action of the Court; provided that any such modification, amendment, or supplement is not in the good faith

- 17 -

belief of the Debtors, CoBank, ACB and the Buyer material and substantially conforms to and effectuates the APA.

24.     This Order (a) shall be effective as a determination that, except as provided in the APA, on the Closing Date and payment of the Purchase Price, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, according to the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets. Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. Buyer and Debtors are hereby authorized to take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph.

25.     At the Closing, the Buyer shall pay to the Debtors the Purchase Price (as defined in the APA and in the manner described therein) in immediately available funds.   At the Closing, each holder of an Interest in the Assets is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests against or in the Assets, if any, as such Interests may have been recorded or may otherwise exist. If any person or

entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests against or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests that the person or entity has with respect to the Assets or otherwise, Debtors and/or Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets upon the Closing of the Sale in accordance with the terms of this Sale Order and the APA.  The foregoing notwithstanding, subject to the terms of the APA, the provisions of this Sale Order authorizing the sale and assignment of the Assets free and clear of the Interests shall be self-executing, and notwithstanding the failure of Buyer, the Debtors, or any other party to execute, file, or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof or of the APA, all Interests on the Assets shall be deemed divested, released and terminated.  As of the Closing, Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release and termination of all Interests in the Assets of any kind or nature, and no further action shall be necessary to evidence such release and termination.

26.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of Debtors, their successors and assigns, their estate, and their creditors, Buyer and its respective affiliates, successors and assigns, and any affected parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s) under

- 19 -

any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

27.     The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

28.     To the extent applicable, the automatic stay pursuant to Bankruptcy Code § 362 is hereby lifted with respect to Debtors and the Assets to the extent necessary, without further order of the Court (a) to allow Buyer to give Debtors any notice provided for in the APA, and (b) to allow Buyer to take any and all actions permitted by the APA.

29.     To the extent a counterparty to an Assumed and Assigned Agreement failed to timely object to any Cure Cost with respect to such Assumed and Assigned Agreement, such Cure Cost shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Costs at any time, and such Cure Costs, when paid, shall completely revive any Assumed and Assigned Agreement to which it relates.

30.     The Sale shall not be subject to any bulk sales laws.

31.     Debtors, Buyer, and each other person having duties or responsibilities under the APA or this Sale Order, and their respective agents, representatives, and attorneys, are authorized to carry out all of the provisions of the APA, to issue, execute, deliver, file and record, as appropriate, the APA, and any related agreements, and to take any action contemplated by the APA or this Sale Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement,

- 20 -

effectuate and consummate the APA and this Sale Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court.  Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the APA and this Sale Order and the transactions contemplated thereby and hereby.

32.    The stay imposed by Bankruptcy Rule 6004(h) and 6006(d) is modified such that the provisions of this Sale Order shall be effective immediately after entry.

**Exhibit B    --    Sales Procedures**

## Sale Procedures

***In re Great Lakes Comnet Inc.*, (Bankr. W.D. Mich. Case No. 16-00290)**
***In re Comlink, L.L.C.*, (Bankr. W.D. Mich. Case No. 16-00292)**

1.    Assets.

(a)    Great Lakes Comnet Inc. and Comlink, L.L.C. (collectively, the "Debtors") have determined that they can obtain the highest and best value for their assets by selling their businesses as going concerns. Debtors have entered into a Purchase and Sale Agreement ("APA")[1] with, and accepted an initial bid ("Stalking Horse Bid") from, Everstream GLC Holding Company LLC (or its designee(s), the "Buyer") for their assets. The assets to be sold ("Assets") consist of substantially all of the assets of the Debtors, including, but not limited to, Debtors' right, title and interest to the following:

(1)    The real property described in **Schedule 1.1(a)** (the "Owned Real Property" and with the Leased Real Property, defined below, the "Real Property").

(2)    All computers, computer equipment, computer hardware/software, servers, fiber optic lines, copiers, security systems, and all other equipment listed on **Schedule 1.1(b)** (collectively, the "Equipment"), which Equipment shall include, without limitation, all Equipment related to the Network.

(3)    All assets and rights included in, necessary for the operation of, or currently used in connection with the Network, including without limitation, any Fiber Lease or other similar right.

(4)    All telephone numbers registered to the Debtors, including without limitation, those telephone numbers listed on **Schedule 1.1(d)**; provided however, that the Buyer acknowledges that the Debtors will utilize numbers on **Schedule 1.1(d)** in the ordinary course of business prior to the Closing Date.

(5)    All inventory owned by the Debtors that shall be transferred as part of the sale transaction (the "Inventory").

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the APA. The Schedules referenced herein are appended to the APA.

(6)     All Intellectual Property owned by the Debtors and all rights to any Intellectual Property of any other person licensed to the Debtors pursuant to any Assumed Contract.

(7)     All Assumed Contracts and all rights of the Debtors under the Assumed Contracts, including without limitation, any right to any uncollected accounts receivable or notes receivable (the "<u>Accounts Receivable</u>") related to or arising from any of the Assumed Contracts.

(8)     All express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assumed Contracts) or Assumed Liabilities, including without limitation, rights under vendors' and manufacturers' warranties, indemnities, and guaranties.

(9)     All deposit accounts with any bank or other financial institution and the respective account numbers for the purposes of maintaining these accounts post-Closing. (the "<u>Deposit Accounts</u>").  For the avoidance of doubt, these Deposit Accounts shall not include any cash, cash equivalents, financial assets, or other funds on deposit pre-Closing, and the aggregate amount of any cash, cash equivalents, financial assets, or other funds on deposit contained in the Deposit Accounts immediately prior to Closing shall be transferred to a newly-created bank account established by the Debtors for purposes of the Closing (such bank account shall not constitute a Deposit Account).

(10)    To the extent transferrable under applicable Law or with the Consent of any third party, if necessary, which Consent has been obtained, all Licenses and Permits, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, all pending applications for any of the foregoing, and the rights to all data and records held by such permitting, licensing and certifying agencies.

(11)    All goodwill of the Business as a going concern and all other intangible properties of the Business.

(12)    All documents consisting of purchasing and sales records, accounting records, business plans, budgets, cost and

- 2 -

pricing information, customer and vendor lists, wherever located related to the Business, other than those documents that are Excluded Assets.

(13) All tangible assets of each of the Debtors other than the assets set forth on **Schedule 1.1(m)**, including without limitation, the tangible assets located at any Real Property.

(14) All personnel files for Transferred Employees except as required under Law; provided, however, that the Debtors have the right to retain copies at their expense to the extent required by Law.

(15) All prepaid expenses, except deferred Tax assets.

(16) Any rights, claims or causes of action of the Debtors, except for those identified as, related to, or arising under, Excluded Assets.

(17) Those additional items referenced on **Schedule 1.1(q)**.

(b) The Assets shall not include the following ("Excluded Assets"):

(1) Any and all rights under all Contracts that are not Assumed Contracts.

(2) Any (i) prepayments relating to retainers payable to professional advisors to the Debtors, (ii) cash, cash equivalents, financial assets, or other funds on deposit, except uncollected Accounts Receivable related to any of the Assumed Contracts, (iii) cash or cash equivalents that consist of the Cash Purchase Price, as provided in **Section 2.1(a)**, and (iv) deferred Tax assets.

(3) Any (i) confidential personnel and medical records pertaining to any Employee who is not hired by the Buyer; (ii) books and records that the Debtors are required by Law to retain; provided, that the Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets, and (iii) minute books, stock and membership ledgers and stock and membership certificates of the Debtors.

(4) All rights under or pursuant to all warranties (express or implied), representations and guarantees made by third parties relating to any Excluded Assets.

- 3 -

(5)    Any claim, right or interest of the Debtors in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date.

(6)    All claims that any of the Debtors may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities.

(7)    All Employee Plans and assets related thereto, including the Debtors' rights, title and interests in any (i) assets related to a defined benefit or defined contribution retirement plan, and (ii) assets related to non-qualified deferred compensation plan (except to the extent related to liabilities of such Employee Plans that are agreed to be assumed by the Buyer).

(8)    All Accounts Receivable, other than any accounts or notes related to or arising from any of the Assumed Contracts.

(9)    All stock or equity in Clinton County Telephone Company.

(10)   All property owned by Clinton County Telephone Company.

(11)   All stock or equity in Westphalia Telephone Company.

(12)   All property owned by Westphalia Telephone Company.

(13)   All stock or equity in Westphalia Broadband, Inc.

(14)   All property owned by Westphalia Broadband, Inc.

(15)   Laptop computers and cell phones for employees of the Debtors that are not Transferred Employees and that are retained by the Debtors to wind down the affairs of the Debtors following the Closing. The Buyer may remove all proprietary programs and data from the laptop computers and cell phones.

(16)   All rights, Claims or causes of action of the Debtors in the lawsuit captioned, *Great Lakes Comnet, Inc. and Westphalia Telephone Company, Plaintiffs, vs. AT&T Corp., Defendant*, Case No. 1:15-cv-216, pending in the United States District Court for the Western District of Michigan, Southern Division and the proceeds of such lawsuits.

- 4 -

(17)   All membership interests of the Debtors and all equity securities owned or held by any members of the Debtors.

(18)   Any avoidance actions and Claims and proceeds of such avoidance actions and Claims under Sections 510, 541, 544, 546, 547, 548, 549, 550, 551, 552 and 553 – 562 of the Bankruptcy Code and non-Bankruptcy law.

2.   <u>Notice of Auction and Sale</u>.  Within seven days after entry of an order (the "<u>Sale Procedures Order</u>") approving these Sale Procedures, Debtors will provide notification approving the Sale Procedures to the following parties ("<u>Notice Parties</u>") in the form and manner described below:

(a)   Debtors will serve the Sale Procedures Order and APA, by mail, postage prepaid on:

(i)   The United States Trustee;

(ii)   All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

(iii)   All entities known by the Debtors to have expressed a *bona fide* interest in acquiring the Assets;

(iv)   Buyer;

(v)   The Unsecured Creditors' Committee (if any);

(vi)   All entities known by the Debtors to have asserted a lien, claim, or encumbrance on or against any of the Assets, including CoBank, ACB ("<u>CoBank</u>");

(vii)   All applicable taxing authorities; and

(viii)   Governmental agencies regulating Debtors, including Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

(b)   Debtors will serve a notice of the Sale Procedures Order and the Auction, by mail, postage prepaid, in the form of **Attachment A**, on all known creditors of the Debtors; and

- 5 -

(c)   Debtors will submit for publication in the Detroit Free Press or Detroit News a notice of the Sale Procedures Order and the Auction and invitation to bid, also in the form of **Attachment A**.

3.    <u>Due Diligence</u>.   Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from Debtors. Interested parties must execute a form nondisclosure agreement acceptable to Debtors ("<u>NDA</u>") before any due diligence materials will be provided.  Parties that have previously executed an NDA do not need to execute a new NDA. All due diligence requests should be directed to Jason Hill, Media Venture Partners, 990 Washington Street, Suite 200, Dedham, MA 02026; phone: 617.345.7316; email: jhill@mediaventurepartners.com. Debtors will comply with other reasonable due diligence requests made by such interested parties, and all due diligence shall be completed by the Auction.

4.    <u>Stalking Horse Bid</u>.

(a)   The aggregate consideration (the "<u>Purchase Price</u>") for the Assets is an amount that shall be equal (subject to the adjustments set forth in Section 2.1(a) of the APA) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Debtors' bankruptcy estate ("<u>Estate Payment</u>**"**), minus the Excess Cure Credit, if any (the "<u>Cash Purchase Price</u>").  The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction.  If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter. On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Debtors utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**.  Upon the execution of the APA, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed.  **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of the APA.  Moreover, if the Additional CoBank DIP Liability utilized by the Debtors is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Debtors; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

(b)   Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA, (ii) the APA has not been terminated (other than in accordance with **Section 9.1(d), (f), (g), (h), (i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more Persons (a "<u>Third Party</u>") other than the Buyer

- 6 -

or an Affiliate of the Buyer (a "Third Party Sale"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "Termination Fee").    Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale.  For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Debtors or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale.  For the avoidance of doubt, the termination of the APA pursuant to **Section 9.1(d), (f), (g), (h), (i) or (j)** shall not prevent Buyer from recovering its Termination Fee.

5.    Qualified Bidders.

(a)    Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(b)    A "Qualified Bidder" is any entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures and includes Buyer.

(c)    A "Qualified Bid" is a written offer to purchase the Assets that complies with the following requirements:

(i)    Deadline to Submit Qualified Bids: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received by Debtors' counsel no later than 5:00 p.m. prevailing Eastern Time on April 8, 2016 (the "Qualified Bid Deadline").

(ii)    Where to Submit Bids:  Bids must be submitted by electronic mail to Counsel for Debtor and Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

Counsel for Debtors
Timothy A. Fusco & Stephen S. LaPlante

- 7 -

Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
fusco@millercanfield.com
laplante@millercanfield.com

Office of the United States Trustee
c/o Michelle Wilson
The Ledyard Building, 2nd Floor
125 Ottawa, NW, Suite 202R
Grand Rapids, MI 49503
Michelle.m.wilson@usdoj.gov

(iii)    Content of Qualified Bids:  The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("Bid Package"):

(1)    An unconditional cash offer for substantially all of the Debtors' assets.

(2)    An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors.

(3)    Propose a cash purchase price that is not less than $32,350,000.

(4)    Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("Buyer's Premium"), in order to compensate the Debtors for the Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer.

(5)    A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (3) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

(6)    A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or

- 8 -

executory contracts that are to be assumed and assigned to the potential Qualified Bidder. In addition to the cash purchase requirement identified in (3) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder.

(7)     A disclosure of the identity of each person or entity that will be bidding for the Assets.

(8)     A binding and irrevocable offer.

(9)     The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction.

(10)    A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

(11)    A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid.

(12)    The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

The Debtors will provide to the Consultation Parties copies of each Bid Package received from a proposed Qualified Bidder, as described in Section 7 of these Sale Procedures. After consultation with the Consultation Parties, the Debtors in their sole discretion will determine if a proposed Qualified Bidder is, in fact, a Qualified Bidder.

6.    "As Is, Where Is"; No Reliance by Bidders. All entities seeking to be designated as Qualified Bidders shall be conclusively presumed to represent, warrant, and acknowledge as follows:

- 9 -

(a)     The Assets shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Debtors, their agents, or the bankruptcy estates, other than as contained in the APA or the asset purchase agreement submitted by the Qualified Bidder.

(b)     All of Debtors' right, title, and interest in and to the Assets pursuant to the terms of the Sale Order shall be sold free and clear of all liens, claims, encumbrances, interests, restrictions, and other encumbrances of any kind or nature thereon to the full extent authorized under Bankruptcy Code §§ 363(f) and 365, with the same to attach to the net proceeds of the sale of the Assets according to their priority.

(c)     Each Qualified Bidder understands and is bound by the terms of these Sale Procedures, and any order approving these Sale Procedures.

(d)     Each Qualified Bidder has had an opportunity to conduct reasonable due diligence, if requested, and it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or Assets in making its bid and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the accuracy or completeness of any information provided in connection with the Assets, the Sale Procedures Order, or the Auction, except as expressly stated in the Sale Procedures Order or in an executed asset purchase agreement.

(e)     Each Qualified Bidder has not colluded with any party with respect to its bid and has submitted its bid in good faith and not by any means forbidden by law. Nothing herein shall be construed to prohibit joint bids, however.

(f)     Each Qualified Bidder acknowledges and understands that approval of a sale, assignment and transfer of the Assets will require the prior approval of Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

7.     <u>Designation of Qualified Bids</u>.

(a)     On or before April 13, 2016, at 5:00 p.m. prevailing Eastern Time and after consultation with the Consultation Parties, Debtors will in their sole discretion designate those submitted bids, if any, that are Qualified Bids. After consultation with the Consultation Parties, Debtors may, in their sole discretion, determine, at the Auction, that a previously Qualified Bidder

has altered its bid in a way that causes it no longer to be a Qualified Bidder.

(b)    If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, Debtors will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

8.    <u>Auction</u>.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, the Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("<u>Auction</u>").

(a)    Only representatives of Debtors, the Committee, the United States Trustee, Buyer, CoBank and any Qualified Bidder will be entitled to attend the Auction.

(b)    Debtors may announce at the Auction additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances (*e.g.*, regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

(c)    After consultation with the Consultation Parties, Debtors shall designate in their sole discretion at the start of the Auction the Qualified Bid determined by the Debtors in the exercise of their business judgment to be the highest and best bid as the initial bid for the Assets ("<u>Initial Qualified Bid</u>").

(d)    The first overbid above the Initial Qualified Bid and each subsequent overbid must be in the form of cash consideration and must be determined by Debtors to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).  Each Qualified Bid, including the Initial Qualified Bid, made by a Qualified Bidder (other than Buyer) must agree to pay, in addition to its Qualified Bid, the Buyer's Premium should its Qualified Bid become the Winning Bid.

(e)    After each round of bidding and consultation with the Consultation Parties, Debtors will announce the identity of the Qualified Bidder deemed by Debtors at that point to have made the highest or otherwise best offer for the Assets.

(f)    Promptly after the conclusion of the Auction and after consultation with the Consultation Parties, Debtors will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not

- 11 -

limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net proceeds that will be made available to the Debtors' bankruptcy estate upon a purported sale of the Assets (the "Winning Bidder") and shall designate the next highest or otherwise best Qualified Bid (the "Back-Up Bid") and the entity submitting the Back-Up Bid ("Back-Up Bidder"). Debtors will file a notice immediately after the Auction setting forth the identity of the Winning Bidder.  The Buyer's Premium is additional consideration that the Winning Bidder will be required to pay the Debtors' estates, but will not be taken into account in determining the Winning Bidder.

(g)     At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, Debtors shall be authorized to close on the Back-Up Bid without further order of the Court.

9.     Presentation of Winning Bidder and Back-Up Bid; Acceptance of Qualified Bid Only Upon Court Approval. A hearing shall occur as soon as practicable after the Auction given the schedule of the Court, at which hearing Debtors shall seek entry of an order approving the sale of the Assets to the Winning Bidder ("Sale Order") and that is effective immediately upon entry, notwithstanding Bankruptcy Rule 6004(h). The Sale Order shall provide that, if the transaction with the Winning Bidder for sale of the Assets fails to close because of a breach or failure to perform on the part of the Winning Bidder, Debtors may consummate a sale of the Assets pursuant to the Back-Up Bid without further order of the Court.  If an Auction is conducted, and the Buyer is not the Winning Bidder,  the Buyer shall, if its bid is determined to be the next highest bid, serve as the Back-Up Bidder and keep the Buyer's bid to consummate the transactions contemplated by the APA on the terms and conditions set forth in the APA open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 100 days after the date on which the Sale Motion is filed (the "Buyer Outside Back-up Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than June 22, 2016, or (ii) the date of closing of a Third Party Sale with the Winning Bidder.  The Back-Up Bid of a Back-Up Bidder other than Buyer shall remain open and irrevocable until August 1, 2016 ("Non-Buyer Outside Back-Up Date").   A Qualified Bid, including any Winning Bid or Back-Up Bid, shall be deemed accepted by Debtors only when that Qualified Bid has been approved by the Court.

10.     Treatment of Deposits.

(a)     Any Qualified Bidder that submitted a Deposit and that is not designated at the Auction as having submitted the Winning Bid or the Back-Up Bid shall have its Deposit returned no later than two (2) business days after the designation of the Winning Bid.

- 12 -

(b)      If Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(c)      If a Qualified Bidder other than Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Non-Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(d)      Notwithstanding anything to the contrary in any agreement between a Qualified Bidder and Debtors or any other entity, if such Qualified Bidder fails to consummate a transaction approved pursuant to the Sale Order because of a breach or failure to perform on the part of such Qualified Bidder, such Qualified Bidder shall not be entitled to the return of its Deposit. Such Deposit shall be deemed property of Debtors' estates, such Deposit shall be retained by Debtors' estates in partial satisfaction of any damages due to Debtors' estates as a result of such Qualified Bidder's failure to consummate the transaction, and such Deposit shall be deemed to be proceeds of the Sale. Debtors retain any and all rights to recover damages in excess of the Deposit from such Qualified Bidder.

11.    <u>Closing</u>.  The closing of the transactions contemplated by the APA ("<u>Closing</u>") shall take place remotely via electronic exchange of documents, on the date ("<u>Closing Date</u>") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in **Sections 7.1(e)** and **7.2(e)**, whichever is last to occur, absent written agreement of the Parties.

12.    <u>Sale Hearing</u>.  A hearing ("<u>Sale Hearing</u>") to consider entry of the Sale Order will be held before the Court on a date to be set at the hearing on the entry of the Sale Procedures Order.

**Attachment A – Notice**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re: | Chapter 11 |
| GREAT LAKES COMNET, INC. *et al.*[1] | Case No. 16-00290 (JTG) |
| | (Jointly Administered) |
| Debtors. | |
| _____/ | Honorable John T. Gregg |

### NOTICE OF AUCTION AND SALE

**PLEASE TAKE NOTICE** that on February 1, 2016, the Debtors filed their motion ("Sale Motion") for entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (a) approving the Sale Procedures (as defined below) in connection with the sale ("Sale") of substantially all of the Debtors' assets ("Assets"); (b) authorizing and scheduling an auction, if other bids are received ("Auction"), in connection with the Sale; (c) approving a termination fee and certain other protections to the Debtors' current stalking horse bidder, Everstream GLC Holding Company LLC ("Buyer"), under the Debtors' stalking horse purchase and sale agreement ("APA"); (d) approving cure procedures relating to the assumption and assignment of certain executory contracts and unexpired leases ("Assumed and Assigned Agreements") in connection with the Sale; (e) approving the form and manner of notices; (f) setting a hearing ("Sale Hearing") to take place after the Auction (if an Auction is necessary), to approve the Sale and the assumption and assignment of the Assumed and Assigned Agreements. By Order dated [ ], 2016, the Bankruptcy Court entered an order ("Sale Procedures Order") approving the sale procedures as described therein ("Sale Procedures"). Copies of the Sale Procedures Order, the Sale Procedures and the APA are available free of charge at http://www.kccllc.net/glc.

Any party that wishes to take part in the process and submit a bid for the Assets must comply with the Sale Procedures, including without limitation the following procedures. Only "Qualified Bidders" may participate in the bidding and Auction process. A "Qualified Bidder" is a potential bidder that has, no later than the bid deadline of 5:00 p.m Eastern Time on April 8, 2016, at 5:00 p.m. prevailing Eastern Time ("Qualified Bid Deadline"), submitted a "Qualified Bid" by electronic mail to (a) counsel to the Debtors, Timothy A. Fusco & Stephen S. LaPlante, Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, MI 48226, fusco@millercanfield.com, laplante@millercanfield.com, and (b) the Office of the United States Trustee c/o Michelle Wilson, The Ledyard Building, 2nd Floor, 125 Ottawa, NW, Suite 202R, Grand Rapids, MI 49503 michelle.m.wilson@usdoj.gov.

Subject to any other requirements established by the Court, an offer to purchase will only constitute a Qualified Bid if it contains the following items: (i) An unconditional cash offer for substantially all of the Debtors' assets; (ii) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; (iii) Propose a cash purchase price that is not less than $32,350,000; (iv) Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("Buyer's Premium"), in order to compensate the Debtors for the

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer; (v) A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (iii) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA.  Any changes to the APA shall be marked against the APA in a separate document; (vi) A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (iii) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder; (vii) A disclosure of the identity of each person or entity that will be bidding for the Assets; (viii) A binding and irrevocable offer; (ix) The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank, ACB and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction; (x) A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so; (xi) A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid; and (xii) The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

In the event the Debtors receive a Qualified Bid in addition to the APA, the Debtors will, unless otherwise ordered by the Court, conduct the Auction with respect to the Assets.  The Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Sale Procedures Order and the Sale Procedures.  Such objections must be filed with the Bankruptcy Court, and served on Debtors' counsel so as to be received, on or before April 22, 2016 at 5:00 p.m., prevailing Eastern Time.  The Sale Hearing shall be held on April ___, 2016, at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Division Ave. N., Room 200, Grand Rapids, MI 49503, at which time the Court will resolve any such objections.  If any party fails to timely file and serve an objection in accordance with the Sale Procedures Order, the Bankruptcy Court may disregard such objection.  The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or the Debtors' assumption and assignment of the Assumed and Assigned agreements or the consummation of the Sale and the performance of the APA.

By: /s/ Marc N. Swanson
       Marc N. Swanson (P71149)
       Miller, Canfield, Paddock and Stone, PLC
       150 W. Jefferson, Suite 2500
       Detroit, MI 48226
       Phone: 313.496.7591; Fax: 313.496.8451
       Email: swansonm@millercanfield.com
*Proposed Attorneys to the Debtors and Debtors in Possession*

**Exhibit C    --    Assumption and Assignment Notice**

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN

In re:                                                Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                  Case No. 16-00290 (JTG)
                                                      (Jointly Administered)

                          Debtors.

_____/                 Honorable John T. Gregg

     **You are receiving this notice because you may be a party to a contract or lease with Great Lakes Comnet, Inc. or Comlink, L.L.C.  Please read this notice carefully as your rights may be affected by the transactions described herein.**

     **PLEASE TAKE NOTICE** that on January 25, 2016, Great Lakes Comnet, Inc. and Comlink, L.L.C. (collectively, the "Debtors") commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

     **PLEASE TAKE FURTHER NOTICE** that on February 1, 2016, Debtors filed their Motion for Entry of (A) an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee and (V) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105, 363 and 365, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases pursuant to 11 U.S.C. § 365, and (III) Granting Related Relief ("Sale Motion").

     **PLEASE TAKE FURTHER NOTICE** that on [ ], the United State Bankruptcy Court for the Western District of Michigan  ("Bankruptcy Court") entered an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related Relief [Doc. No. __] ("Sale Procedures Order").[2]  Among other things, the Sale Procedures Order: (a) established certain procedures ("Sale Procedures") for the sale ("Sale") of the Debtors' assets pursuant to an auction ("Auction") and (b) scheduled the time and place for the Auction.  The hearing on

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Sale Procedures Order.

25711065.2/130050-00009

whether to approve the Sale will take place on April __, 2016 at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Divison Ave N., Room 200, Grand Rapids, MI 49503 ("Sale Hearing").

PLEASE TAKE FURTHER NOTICE that pursuant to the Sale Procedures Order, the Debtors may potentially assume and assign to the Winning Bidder one or more of those executory contracts and unexpired leases listed on Annex 1 attached hereto (collectively, the "Assumed and Assigned Agreements" and each, a "Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that the Debtors have indicated on Annex 1 attached hereto the cure amounts the Debtors believe must be paid to cure all pre-petition defaults and pay all amounts accrued under the Assigned Agreements (in each instance, the "Cure Amount").

PLEASE TAKE FURTHER NOTICE that any party seeking to object to the assumption by the Debtors and assignment/transfer to the Winning Bidder of any Assigned Agreement, including the validity and amount of the Cure Amount as determined by the Debtors, or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Assigned Agreement for such contract or lease to be assumed and assigned, must file an objection ("Cure/Assignment Objection") that (a) is in writing (b) sets forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) is filed with the Clerk of the Bankruptcy Court, and served on the Debtors' counsel so that it is received, on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time** ("Cure/Assignment Objection Deadline").

PLEASE TAKE FURTHER NOTICE that any party seeking to object to the ability of the Winning Bidder to provide adequate assurance of future performance of an Assigned Agreement must file an objection with the Clerk of Bankruptcy Court on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time.**

PLEASE TAKE FURTHER NOTICE that unless a Cure/Assignment Objection or Adequate Assurance Objection is filed and served before the applicable objection deadline, all parties shall (a) be forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to the Assigned Agreements, and the Debtors and the Winning Bidder shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to the assumption and assignment; (c) be forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assigned Agreements.

PLEASE TAKE FURTHER NOTICE that all unresolved Cure/Assignment Objections and Adequate Assurance Objections will be heard at the Sale Hearing or such other date as to be determined by the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on Annex 1 and otherwise do not object to the Debtors' assumption and assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Assigned Agreements is subject to the approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of any document on the list of Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Winning Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, or that your executory contract or unexpired lease will be assumed and/or assigned, and all rights with respect thereto are expressly preserved.

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By:  /s/ Stephen S. LaPlante
      Timothy A. Fusco (P13768)
      Jonathan S. Green (P33140)
      Stephen S. LaPlante (P48063)
      Marc N. Swanson (P71149)
      150 West Jefferson, Suite 2500
      Detroit, MI  48226
      (313) 496-7997
      (313) 496-8478
      laplante@millercanfield.com

      *Proposed Attorneys to the Debtors and*
      *Debtors in Possession*

- 3 -

**<u>Annex 1</u>**

**Exhibit D** -- **Sale Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In re:                                                    Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                      Case No. 16-00290 (JTG)
                                                          (Jointly Administered)

                        Debtors.

_____/                   Honorable John T. Gregg

**ORDER (I) ESTABLISHING SALE PROCEDURES, (II) SCHEDULING AN AUCTION
AND A SALE HEARING IN CONNECTION WITH THE SALE OF SUBSTANTIALLY
ALL OF DEBTORS' ASSETS PURSUANT TO 11 U.S.C. §§ 105, 363 AND 365, (III)
SETTING CERTAIN DATES AND DEADLINES IN CONNECTION THEREWITH, (IV)
APPROVING THE FORM OF THE PURCHASE AND SALE AGREEMENT,
INCLUDING THE TERMINATION FEE, AND (V) GRANTING RELATED RELIEF**

This matter having come before the Court on Debtors' Motion for the entry of an Order

(I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection

with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and

365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the

Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting

Related Relief ("Sale Motion")[2], which seeks entry of, among other things, this order ("Sale

Procedures Order"); proper notice of the Sale Motion having been provided to all parties entitled

thereto as required by applicable law, and no other or further notice being required; objections, if

any, to the entry of this Sales Procedure Order having been withdrawn, resolved, or overruled;

the Court finding that (a) it has jurisdiction to enter this Sale Procedures Order pursuant to 28

U.S.C. § 1334; and (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

[2] All capitalized terms used in this Sale Procedures Order but not defined herein shall have the meanings ascribed to them in the Sale Motion.

to the Court that the relief granted by the Sale Procedures Order is in the best interest of Debtors, their estates, and their creditors; the Court being otherwise fully advised on the premises;

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Sale Motion is GRANTED, solely to the extent that it requests entry of this Sale Procedures Order and as provided herein. All objections to the entry of this Sale Procedures Order not settled, withdrawn, or otherwise resolved are overruled.

2.      The APA is approved, duly executed, and binding, and Debtors and Buyer are authorized to perform as required thereunder, subject to the Sale Procedures and the Sale Order.

3.      The Debtors are authorized to pay to the Buyer an amount equal to $1,500,000, plus an expense reimbursement for the reasonable fees, including professional fees of the Buyer, of up to $500,000 (the "Termination Fee") pursuant to the Sale Procedures and the terms set forth in the APA.  The Termination Fee is hereby approved based on the substantial value the Stalking Horse Bid created for the bankruptcy estates and the exercise of the Debtors' appropriate business judgment.

4.      Objections, if any, to the remaining relief requested in the Sale Motion and the entry of the Proposed Sale Order must: (a) be in writing; (b) conform to any applicable requirements of the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local rules of procedure of this Court; (c) set forth the name of the objecting party and the nature of any claims or interests held by such party against or in Debtors' estate or property; (d) state with particularity the legal and factual bases for the objection and the specific grounds therefore; and (e) be filed with the Clerk of the Court, and served on Debtors' counsel so as to be received, on or before **April 22, 2016 at** 5**:00 p.m., prevailing Eastern Time**.

5.      Any person or entity that fails to make an objection as in paragraph 4 above shall be forever barred from asserting any objection to the entry of the Sale Order.

6.      A hearing ("Sale Hearing") to consider the remaining relief requested in the Sale Motion and the entry of the proposed Sale Order shall be held on April 2__, 2016 at ___:____ __.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Division Ave. N., Room 200, Grand Rapids, MI 49503

7.      The Sale Procedures attached hereto as **Exhibit A** are incorporated herein, are hereby approved, and shall apply to the sale of the Assets.

8.      The proposed assumption and assignment notice ("Assumption and Assignment Notice"), substantially in the form attached as **Exhibit B**, is hereby approved and deemed sufficient for all purposes, and no further notice shall be required.

9.      The following procedures are hereby approved and shall apply to the assumption and assignment by Debtors of certain executory contracts and unexpired leases (the "Assumed and Assigned Agreements"):

(a)     By no later than seven (7) days after entry of the Sale Procedures Order, the Debtors will file a schedule ("Cure Schedule") which will be attached to the Assumption and Assignment Notice, identifying (i) the Assumed and Assigned Agreements, potentially to be assumed and assigned to a buyer in the event of a Sale and (ii) the amount, if any, the Debtors believe is necessary to cure all monetary defaults and other defaults under such agreement pursuant to section 365 of the Bankruptcy Code ("Cure Costs").

(b)     Upon the filing of the Cure Schedule, the Debtors will serve the Cure Schedule and the Assumption and Assignment Notice on each of the non-debtor counterparties listed on the Cure Schedule by first class mail. The Assumption and Assignment Notice will state that the Debtors are or may be seeking the assumption and assignment of the Assumed and Assigned Agreement and include (i) a description of each executory contract and unexpired lease that may be assumed and assigned in connection with the Sale, (ii) that the deadline for objecting ("Cure/Assignment Objection") to the amount of the proposed Cure Costs related to any executory contract

or unexpired lease is **April 22, 2016 at 5:00 p.m. prevailing Eastern Time** ("Cure/Assignment Objection Deadline") and (iii) that the deadline for objecting ("Adequate Assurance Objection") to the ability of the buyer to provide adequate assurance of future performance under any Assumed and Assigned Agreement is **April 22, 2016, at 5:00 p.m. prevailing Eastern Time** ("Adequate Assurance Objection Deadline" and collectively, the "Cure/Adequate Assurance Objection Deadlines").

(c)     Each Cure/Assignment Objection and/or Adequate Assurance Objection must be filed with the Bankruptcy Court and served on Debtors' counsel so that it is received by the applicable Cure/Adequate Assurance Objection Deadline.

(d)     If no objections are received with respect to any Assumed and Assigned Agreement, then the Cure Costs set forth in the Cure Schedule for such agreement will be binding upon the nondebtor counterparty to such agreement for all purposes and will constitute a final determination of the Cure Cost required to be paid by or on behalf of the applicable Debtor in connection with the assumption and assignment of such agreement. In addition, all counterparties to the Assumed and Assigned Agreements who fail to file an objection before the Cure/Adequate Assurance Objection Deadlines, as applicable, will be (i) forever barred from objecting to the Cure Costs or adequate assurance of future performance with respect to the Assumed and Assigned Agreements, and the Debtors and the buyer will be entitled to rely solely upon the Cure Cost set forth on the Cure Schedule; (ii) deemed to have consented to the assumption and assignment; and (iii) forever barred and estopped from asserting or claiming against the applicable Debtor(s) or the buyer that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied or that there is any other objection or defense to the assumption or assignment of the applicable Assumed and Assigned Agreement.

(e)     The Debtors or the Winning Bidder may amend the Cure Schedule to remove any Assumed and Assigned Agreement at any time before such Assumed and Assigned Agreement is actually assumed and assigned pursuant to an order of the Court. The nondebtor party or parties to any such removed contract or lease will be notified of such exclusion by written notice mailed within one (1) business day after such amendment.

10.     The presence of an Assumed and Assigned Agreement on the Cure Schedule

does not constitute an admission that such Assumed and Assigned Agreement is an executory

contract or unexpired lease or that the Assumed and Assigned Agreement will be assumed, assigned or both.

  11.  The Court retains jurisdiction to hear and determine all matters arising from or relating to the implementation and/or interpretation of this Order.

**Exhibit A – Sale Procedures**

# Sale Procedures

**_In re Great Lakes Comnet Inc._, (Bankr. W.D. Mich. Case No. 16-00290)**
**_In re Comlink, L.L.C._, (Bankr. W.D. Mich. Case No. 16-00292)**

1.  Assets.

    (a)  Great Lakes Comnet Inc. and Comlink, L.L.C. (collectively, the "Debtors") have determined that they can obtain the highest and best value for their assets by selling their businesses as going concerns.  Debtors have entered into a Purchase and Sale Agreement ("APA")[1] with, and accepted an initial bid ("Stalking Horse Bid") from, Everstream GLC Holding Company LLC (or its designee(s), the "Buyer") for their assets.  The assets to be sold ("Assets") consist of substantially all of the assets of the Debtors, including, but not limited to, Debtors' right, title and interest to the following:

        (1)  The real property described in **Schedule 1.1(a)** (the "Owned Real Property" and with the Leased Real Property, defined below, the "Real Property").

        (2)  All computers, computer equipment, computer hardware/software, servers, fiber optic lines, copiers, security systems, and all other equipment listed on **Schedule 1.1(b)** (collectively, the "Equipment"), which Equipment shall include, without limitation, all Equipment related to the Network.

        (3)  All assets and rights included in, necessary for the operation of, or currently used in connection with the Network, including without limitation, any Fiber Lease or other similar right.

        (4)  All telephone numbers registered to the Debtors, including without limitation, those telephone numbers listed on **Schedule 1.1(d)**; provided however, that the Buyer acknowledges that the Debtors will utilize numbers on **Schedule 1.1(d)** in the ordinary course of business prior to the Closing Date.

        (5)  All inventory owned by the Debtors that shall be transferred as part of the sale transaction (the "Inventory").

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the APA. The Schedules referenced herein are appended to the APA.

(6)    All Intellectual Property owned by the Debtors and all rights to any Intellectual Property of any other person licensed to the Debtors pursuant to any Assumed Contract.

(7)    All Assumed Contracts and all rights of the Debtors under the Assumed Contracts, including without limitation, any right to any uncollected accounts receivable or notes receivable (the "<u>Accounts Receivable</u>") related to or arising from any of the Assumed Contracts.

(8)    All express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assumed Contracts) or Assumed Liabilities, including without limitation, rights under vendors' and manufacturers' warranties, indemnities, and guaranties.

(9)    All deposit accounts with any bank or other financial institution and the respective account numbers for the purposes of maintaining these accounts post-Closing. (the "<u>Deposit Accounts</u>"). For the avoidance of doubt, these Deposit Accounts shall not include any cash, cash equivalents, financial assets, or other funds on deposit pre-Closing, and the aggregate amount of any cash, cash equivalents, financial assets, or other funds on deposit contained in the Deposit Accounts immediately prior to Closing shall be transferred to a newly-created bank account established by the Debtors for purposes of the Closing (such bank account shall not constitute a Deposit Account).

(10)    To the extent transferrable under applicable Law or with the Consent of any third party, if necessary, which Consent has been obtained, all Licenses and Permits, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, all pending applications for any of the foregoing, and the rights to all data and records held by such permitting, licensing and certifying agencies.

(11)    All goodwill of the Business as a going concern and all other intangible properties of the Business.

(12)    All documents consisting of purchasing and sales records, accounting records, business plans, budgets, cost and

- 2 -

pricing information, customer and vendor lists, wherever located related to the Business, other than those documents that are Excluded Assets.

(13)    All tangible assets of each of the Debtors other than the assets set forth on **Schedule 1.1(m)**, including without limitation, the tangible assets located at any Real Property.

(14)    All personnel files for Transferred Employees except as required under Law; <u>provided</u>, <u>however</u>, that the Debtors have the right to retain copies at their expense to the extent required by Law.

(15)    All prepaid expenses, except deferred Tax assets.

(16)    Any rights, claims or causes of action of the Debtors, except for those identified as, related to, or arising under, Excluded Assets.

(17)    Those additional items referenced on **Schedule 1.1(q)**.

(b)    The Assets shall not include the following ("<u>Excluded Assets</u>"):

(1)    Any and all rights under all Contracts that are not Assumed Contracts.

(2)    Any (i) prepayments relating to retainers payable to professional advisors to the Debtors, (ii) cash, cash equivalents, financial assets, or other funds on deposit, except uncollected Accounts Receivable related to any of the Assumed Contracts, (iii) cash or cash equivalents that consist of the Cash Purchase Price, as provided in **Section 2.1(a)**, and (iv) deferred Tax assets.

(3)    Any (i) confidential personnel and medical records pertaining to any Employee who is not hired by the Buyer; (ii) books and records that the Debtors are required by Law to retain; provided, that the Buyer shall have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets, and (iii) minute books, stock and membership ledgers and stock and membership certificates of the Debtors.

(4)    All rights under or pursuant to all warranties (express or implied), representations and guarantees made by third parties relating to any Excluded Assets.

(5)     Any claim, right or interest of the Debtors in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) ending on or before the Closing Date.

(6)     All claims that any of the Debtors may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities.

(7)     All Employee Plans and assets related thereto, including the Debtors' rights, title and interests in any (i) assets related to a defined benefit or defined contribution retirement plan, and (ii) assets related to non-qualified deferred compensation plan (except to the extent related to liabilities of such Employee Plans that are agreed to be assumed by the Buyer).

(8)     All Accounts Receivable, other than any accounts or notes related to or arising from any of the Assumed Contracts.

(9)     All stock or equity in Clinton County Telephone Company.

(10)    All property owned by Clinton County Telephone Company.

(11)    All stock or equity in Westphalia Telephone Company.

(12)    All property owned by Westphalia Telephone Company.

(13)    All stock or equity in Westphalia Broadband, Inc.

(14)    All property owned by Westphalia Broadband, Inc.

(15)    Laptop computers and cell phones for employees of the Debtors that are not Transferred Employees and that are retained by the Debtors to wind down the affairs of the Debtors following the Closing. The Buyer may remove all proprietary programs and data from the laptop computers and cell phones.

(16)    All rights, Claims or causes of action of the Debtors in the lawsuit captioned, *Great Lakes Comnet, Inc. and Westphalia Telephone Company, Plaintiffs, vs. AT&T Corp., Defendant*, Case No. 1:15-cv-216, pending in the United States District Court for the Western District of Michigan, Southern Division and the proceeds of such lawsuits.

(17)    All membership interests of the Debtors and all equity securities owned or held by any members of the Debtors.

(18)    Any avoidance actions and Claims and proceeds of such avoidance actions and Claims under Sections 510, 541, 544, 546, 547, 548, 549, 550, 551, 552 and 553 – 562 of the Bankruptcy Code and non-Bankruptcy law.

2.    Notice of Auction and Sale.  Within seven days after entry of an order (the "Sale Procedures Order") approving these Sale Procedures, Debtors will provide notification of the Sale Procedures to the following parties ("Notice Parties") in the form and manner described below:

(a)    Debtors will serve the Sale Procedures Order and APA, by mail, postage prepaid on:

(i)    The United States Trustee;

(ii)    All parties that have requested notice in this case pursuant to Bankruptcy Rule 2002;

(iii)    All entities known by the Debtors to have expressed a *bona fide* interest in acquiring the Assets;

(iv)    Buyer;

(v)    The Unsecured Creditors' Committee (if any);

(vi)    All entities known by the Debtors to have asserted a lien, claim, or encumbrance on or against any of the Assets, including CoBank, ACB ("CoBank");

(vii)    All applicable taxing authorities; and

(viii)    Governmental agencies regulating Debtors, including Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

(b)    Debtors will serve a notice of the Sale Procedures Order and the Auction, by mail, postage prepaid, in the form of **Attachment A**, on all known creditors of the Debtors; and

      (c)     Debtors will submit for publication in the Detroit Free Press or Detroit News a notice of the Sale Procedures Order and the Auction and invitation to bid, also in the form of **Attachment A**.

    3.    <u>Due Diligence</u>.  Parties interested in purchasing the Assets may obtain due diligence materials regarding the Assets from Debtors. Interested parties must execute a form nondisclosure agreement acceptable to Debtors ("<u>NDA</u>") before any due diligence materials will be provided.  Parties that have previously executed an NDA do not need to execute a new NDA. All due diligence requests should be directed to Jason Hill, Media Venture Partners, 990 Washington Street, Suite 200, Dedham, MA 02026; phone: 617.345.7316; email: jhill@mediaventurepartners.com. Debtors will comply with other reasonable due diligence requests made by such interested parties, and all due diligence shall be completed by the Auction.

    4.    <u>Stalking Horse Bid</u>.

      (a)     The aggregate consideration (the "<u>Purchase Price</u>") for the Assets is an amount that shall be equal (subject to the adjustments set forth in Section 2.1(a) of the APA) to but not to exceed $32,100,000 (USD) of which no less than $500,000 shall be paid to the Debtors' bankruptcy estate ("<u>Estate Payment</u>**"**), minus the Excess Cure Credit, if any (the "<u>Cash Purchase Price</u>").  The Excess Cure Credit shall be calculated and fixed prior to the date of the Auction.  If no Auction occurs, the Excess Cure Credit shall be calculated and fixed by April 15, 2016, and not recalculated thereafter. On the Closing Date, the Buyer shall wire immediately available funds in an amount equal to the Cash Purchase Price (minus the Deposit, as defined in **Section 2.1(b)**, and minus the Deposit Amount) to the Debtors utilizing the wire instructions set forth on **Schedule 2.1(a)(i)**.  Upon the execution of the APA, if Buyer has already determined that it will not assume certain liabilities, Buyer will not obtain the benefit of the Excess Cure Credit to the extent any of these liabilities are subsequently assumed.  **Schedule 2.1(a)(ii)** contains a list of the Contracts, which Buyer has determined it will not assume, as of the date of the APA.  Moreover, if the Additional CoBank DIP Liability utilized by the Debtors is less than $5,000,000, the Purchase Price will be reduced by the difference between $5,000,000 and the actual amount of the debtor-in-possession financing utilized by the Debtors; provided, however, neither the potential reduction in this sentence, any proration or adjustment, nor the Excess Cure Credit shall in any way reduce the Estate Payment.

      (b)     Subject to the approval of the Bankruptcy Court, if (i) the Buyer is not in material breach of any provision of the APA, (ii) the APA has not been terminated (other than in accordance with **Section 9.1(d), (f), (g), (h), (i) or (j)**), and (iii) a sale pursuant to section 363 of the Bankruptcy Code or pursuant to a confirmed plan of reorganization or otherwise of all or substantially all of the Assets in a single transaction or a series of transactions to one or more Persons (a "<u>Third Party</u>") other than the Buyer

or an Affiliate of the Buyer (a "Third Party Sale"), whether at an Auction, pursuant to a plan of reorganization or otherwise, is consummated, then the Buyer shall be entitled to receive, without further order of the Bankruptcy Court, from the proceeds of the consummated Third Party Sale, an amount in cash equal to the sum of (i) $1,500,000 (USD), plus (ii) the amount of the reasonable, documented fees and expenses paid by the Buyer with respect to the transactions contemplated hereby, including attorneys' fees and expenses and those of other advisors and consultants in an amount not to exceed the sum of $500,000 (USD) (the "Termination Fee").  Such Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer from the proceeds of the applicable Third Party Sale, with such payment to be made on or before the fifth (5th) Business Day following the consummation of such Third Party Sale.  For the avoidance of doubt, any sale or restructuring transaction or otherwise where control of one or more of the Debtors or all or a substantial portion of its assets is allocated to or for the benefit of secured or unsecured creditors on account of their Claims (including without limitation pursuant to a credit bid pursuant Section 363(k) of the Bankruptcy Code) shall be deemed to be a Third Party Sale.  For the avoidance of doubt, the termination of the APA pursuant to **Section 9.1(d), (f), (g), (h), (i) or (j)** shall not prevent Buyer from recovering its Termination Fee.

5.      Qualified Bidders.

(a)     Additional bidders must be Qualified Bidders (as defined below) to participate at the Auction (as defined below).

(b)     A "Qualified Bidder" is any entity that submits a Qualified Bid (as defined below) in accordance with these Sale Procedures and includes Buyer.

(c)     A "Qualified Bid" is a written offer to purchase the Assets that complies with the following requirements:

(i)     Deadline to Submit Qualified Bids: Any person or entity that wishes to submit a Qualified Bid must submit its bid so that it is actually received by Debtors' counsel no later than 5:00 p.m. prevailing Eastern Time on April 8, 2016 (the "Qualified Bid Deadline").

(ii)    Where to Submit Bids:  Bids must be submitted by electronic mail to Counsel for Debtor and Office of the United States Trustee and must include an address, telephone number and electronic mail address at which the entity submitting the bid may be contacted:

Counsel for Debtors
Timothy A. Fusco & Stephen S. LaPlante

Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, MI 48226
fusco@millercanfield.com
laplante@millercanfield.com

Office of the United States Trustee
c/o Michelle Wilson
The Ledyard Building, 2nd Floor
125 Ottawa, NW, Suite 202R
Grand Rapids, MI 49503
Michelle.m.wilson@usdoj.gov

(iii)   Content of Qualified Bids:  The Stalking Horse Bid is deemed to be a Qualified Bid submitted by a Qualified Bidder. All other Qualified Bids must include the following items ("Bid Package"):

(1)   An unconditional cash offer for substantially all of the Debtors' assets.

(2)   An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors.

(3)   Propose a cash purchase price that is not less than $32,350,000.

(4)   Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("Buyer's Premium"), in order to compensate the Debtors for the Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer.

(5)   A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (3) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA. Any changes to the APA shall be marked against the APA in a separate document.

(6)   A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder. A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or

- 8 -

executory contracts that are to be assumed and assigned to the potential Qualified Bidder. In addition to the cash purchase requirement identified in (3) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder.

(7)    A disclosure of the identity of each person or entity that will be bidding for the Assets.

(8)    A binding and irrevocable offer.

(9)    The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction.

(10)    A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so.

(11)    A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid.

(12)    The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

The Debtors will provide to the Consultation Parties copies of each Bid Package received from a proposed Qualified Bidder, as described in Section 7 of these Sale Procedures. After consultation with the Consultation Parties, the Debtors in their sole discretion will determine if a proposed Qualified Bidder is, in fact, a Qualified Bidder.

      6.    "As Is, Where Is"; No Reliance by Bidders. All entities seeking to be designated as Qualified Bidders shall be conclusively presumed to represent, warrant, and acknowledge as follows:

- 9 -

(a)     The Assets shall be sold on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by Debtors, their agents, or the bankruptcy estates, other than as contained in the APA or the asset purchase agreement submitted by the Qualified Bidder.

(b)     All of Debtors' right, title, and interest in and to the Assets pursuant to the terms of the Sale Order shall be sold free and clear of all liens, claims, encumbrances, interests, restrictions, and other encumbrances of any kind or nature thereon to the full extent authorized under Bankruptcy Code §§ 363(f) and 365, with the same to attach to the net proceeds of the sale of the Assets according to their priority.

(c)     Each Qualified Bidder understands and is bound by the terms of these Sale Procedures, and any order approving these Sale Procedures.

(d)     Each Qualified Bidder has had an opportunity to conduct reasonable due diligence, if requested, and it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or Assets in making its bid and has not relied upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Assets or the accuracy or completeness of any information provided in connection with the Assets, the Sale Procedures Order, or the Auction, except as expressly stated in the Sale Procedures Order or in an executed asset purchase agreement.

(e)     Each Qualified Bidder has not colluded with any party with respect to its bid and has submitted its bid in good faith and not by any means forbidden by law. Nothing herein shall be construed to prohibit joint bids, however.

(f)     Each Qualified Bidder acknowledges and understands that approval of a sale, assignment and transfer of the Assets will require the prior approval of Federal Communications Commission, Michigan Public Service Commission, National Telecommunications and Information Administration, Indiana Utility Regulatory Commission, Public Utilities Commission of Ohio, Illinois Commerce Commission, Public Service Commission of Wisconsin, and Minnesota Public Utilities Commission.

7.     <u>Designation of Qualified Bids</u>.

(a)     On or before April 13, 2016, at 5:00 p.m. prevailing Eastern Time and after consultation with the Consultation Parties, Debtors will in their sole discretion designate those submitted bids, if any, that are Qualified Bids. After consultation with the Consultation Parties, Debtors may, in their sole discretion, determine, at the Auction, that a previously Qualified Bidder

has altered its bid in a way that causes it no longer to be a Qualified Bidder.

    (b)    If no Qualified Bids, other than the Stalking Horse Bid, are received by the Qualified Bid Deadline, Debtors will seek Bankruptcy Court approval of a sale of the Assets to Buyer pursuant to the APA.

8.    <u>Auction</u>.  If one or more Qualified Bids is received (in addition to the Stalking Horse Bid) by the Qualified Bid Deadline, the Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

    (a)    Only representatives of Debtors, the Committee, the United States Trustee, Buyer, CoBank and any Qualified Bidder will be entitled to attend the Auction.

    (b)    Debtors may announce at the Auction additional procedural, non-material substantive rules for bidding and other procedures that are reasonable under the circumstances (*e.g.*, regarding the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with the provisions of the Sale Procedures Order, any order of the Court entered in connection herewith, the APA, or the Bankruptcy Code.

    (c)    After consultation with the Consultation Parties, Debtors shall designate in their sole discretion at the start of the Auction the Qualified Bid determined by the Debtors in the exercise of their business judgment to be the highest and best bid as the initial bid for the Assets ("Initial Qualified Bid").

    (d)    The first overbid above the Initial Qualified Bid and each subsequent overbid must be in the form of cash consideration and must be determined by Debtors to be equal in value to the sum of $100,000.00 above the immediately preceding Initial Qualified Bid or subsequent overbid (if applicable).  Each Qualified Bid, including the Initial Qualified Bid, made by a Qualified Bidder (other than Buyer) must agree to pay, in addition to its Qualified Bid, the Buyer's Premium should its Qualified Bid become the Winning Bid.

    (e)    After each round of bidding and consultation with the Consultation Parties, Debtors will announce the identity of the Qualified Bidder deemed by Debtors at that point to have made the highest or otherwise best offer for the Assets.

    (f)    Promptly after the conclusion of the Auction and after consultation with the Consultation Parties, Debtors will designate the highest or best Qualified Bid (taking into account all relevant factors, including, but not

- 11 -

limited to, cash consideration, the terms and conditions of the proposed agreement, the aggregate value offered by the Qualified Bidder, the speed and certainty of consummation of a sale of the Assets to such Qualified Bidder), and the net proceeds that will be made available to the Debtors' bankruptcy estate upon a purported sale of the Assets (the "Winning Bidder") and shall designate the next highest or otherwise best Qualified Bid (the "Back-Up Bid") and the entity submitting the Back-Up Bid ("Back-Up Bidder"). Debtors will file a notice immediately after the Auction setting forth the identity of the Winning Bidder. The Buyer's Premium is additional consideration that the Winning Bidder will be required to pay the Debtors' estates, but will not be taken into account in determining the Winning Bidder.

(g)    At the conclusion of the Auction, the party making the highest or otherwise best bid for the Assets shall be designated the Winning Bidder and the party submitting the second highest or otherwise best bid shall be designated the Back-Up Bidder. If the Winning Bid is approved by the Court and the Winning Bidder fails to close, Debtors shall be authorized to close on the Back-Up Bid without further order of the Court.

9.    Presentation of Winning Bidder and Back-Up Bid; Acceptance of Qualified Bid Only Upon Court Approval. A hearing shall occur as soon as practicable after the Auction given the schedule of the Court, at which hearing Debtors shall seek entry of an order approving the sale of the Assets to the Winning Bidder ("Sale Order") and that is effective immediately upon entry, notwithstanding Bankruptcy Rule 6004(h). The Sale Order shall provide that, if the transaction with the Winning Bidder for sale of the Assets fails to close because of a breach or failure to perform on the part of the Winning Bidder, Debtors may consummate a sale of the Assets pursuant to the Back-Up Bid without further order of the Court. If an Auction is conducted, and the Buyer is not the Winning Bidder, the Buyer shall, if its bid is determined to be the next highest bid, serve as the Back-Up Bidder and keep the Buyer's bid to consummate the transactions contemplated by the APA on the terms and conditions set forth in the APA open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is 100 days after the date on which the Sale Motion is filed (the "Buyer Outside Back-up Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than June 22, 2016, or (ii) the date of closing of a Third Party Sale with the Winning Bidder. The Back-Up Bid of a Back-Up Bidder other than Buyer shall remain open and irrevocable until August 1, 2016 ("Non-Buyer Outside Back-Up Date"). A Qualified Bid, including any Winning Bid or Back-Up Bid, shall be deemed accepted by Debtors only when that Qualified Bid has been approved by the Court.

10.    Treatment of Deposits.

(a)    Any Qualified Bidder that submitted a Deposit and that is not designated at the Auction as having submitted the Winning Bid or the Back-Up Bid shall have its Deposit returned no later than two (2) business days after the designation of the Winning Bid.

- 12 -

(b)     If Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(c)     If a Qualified Bidder other than Buyer is the Back-Up Bidder, its deposit shall be returned to it within two (2) business days after the Non-Buyer Outside Back-Up Date, unless its Back-Up Bid becomes the Winning Bid.

(d)     Notwithstanding anything to the contrary in any agreement between a Qualified Bidder and Debtors or any other entity, if such Qualified Bidder fails to consummate a transaction approved pursuant to the Sale Order because of a breach or failure to perform on the part of such Qualified Bidder, such Qualified Bidder shall not be entitled to the return of its Deposit. Such Deposit shall be deemed property of Debtors' estates, such Deposit shall be retained by Debtors' estates in partial satisfaction of any damages due to Debtors' estates as a result of such Qualified Bidder's failure to consummate the transaction, and such Deposit shall be deemed to be proceeds of the Sale. Debtors retain any and all rights to recover damages in excess of the Deposit from such Qualified Bidder.

11.     Closing.   The closing of the transactions contemplated by the APA ("Closing") shall take place remotely via electronic exchange of documents, on the date ("Closing Date") that is mutually agreed to by the Parties but in no event shall be later than 15 days after the entry of the Sale Order, or seven (7) days after receipt of the approvals described in **Sections 7.1(e)** and **7.2(e)**, whichever is last to occur, absent written agreement of the Parties.

12.     Sale Hearing.   A hearing ("Sale Hearing") to consider entry of the Sale Order will be held before the Court on a date to be set at the hearing on the entry of the Sale Procedures Order.

**Attachment A – Notice**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF MICHIGAN**

In re:                                                                              Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                          Case No. 16-00290 (JTG)
                                                                          (Jointly Administered)


                                  Debtors.
_____/                      Honorable John T. Gregg

<u>NOTICE OF AUCTION AND SALE</u>

**PLEASE TAKE NOTICE** that on February 1, 2016, the Debtors filed their motion ("Sale Motion") for entry of orders pursuant to sections 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. ("Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"): (a) approving the Sale Procedures (as defined below) in connection with the sale ("Sale") of substantially all of the Debtors' assets ("Assets"); (b) authorizing and scheduling an auction, if other bids are received ("Auction"), in connection with the Sale; (c) approving a termination fee and certain other protections to the Debtors' current stalking horse bidder, Everstream GLC Holding Company LLC ("Buyer"), under the Debtors' stalking horse purchase and sale agreement ("APA"); (d) approving cure procedures relating to the assumption and assignment of certain executory contracts and unexpired leases ("Assumed and Assigned Agreements") in connection with the Sale; (e) approving the form and manner of notices; (f) setting a hearing ("Sale Hearing") to take place after the Auction (if an Auction is necessary), to approve the Sale and the assumption and assignment of the Assumed and Assigned Agreements. By Order dated [ ], 2016, the Bankruptcy Court entered an order ("Sale Procedures Order") approving the sale procedures as described therein ("Sale Procedures"). Copies of the Sale Procedures Order, the Sale Procedures and the APA are available free of charge at http://www.kccllc.net/glc.

Any party that wishes to take part in the process and submit a bid for the Assets must comply with the Sale Procedures, including without limitation the following procedures. Only "Qualified Bidders" may participate in the bidding and Auction process. A "Qualified Bidder" is a potential bidder that has, no later than the bid deadline of 5:00 p.m Eastern Time on April 8, 2016, at 5:00 p.m. prevailing Eastern Time ("Qualified Bid Deadline"), submitted a "Qualified Bid" by electronic mail to (a) counsel to the Debtors, Timothy A. Fusco & Stephen S. LaPlante, Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, MI 48226, fusco@millercanfield.com, laplante@millercanfield.com, and (b) the Office of the United States Trustee c/o Michelle Wilson, The Ledyard Building, 2nd Floor, 125 Ottawa, NW, Suite 202R, Grand Rapids, MI 49503 michelle.m.wilson@usdoj.gov.

Subject to any other requirements established by the Court, an offer to purchase will only constitute a Qualified Bid if it contains the following items: (i) An unconditional cash offer for substantially all of the Debtors' assets; (ii) An executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors; (iii) Propose a cash purchase price that is not less than $32,350,000; (iv) Its written agreement that in the event its Qualified Bid is the Winning Bid, the Qualified Bidder will pay, in addition to the cash purchase price reflected in the Winning Bid, a buyer's premium in the amount of $2 million ("Buyer's Premium"), in order to compensate the Debtors for the

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

Termination Fee they are required to pay in certain circumstances to Buyer under the APA if the Winning Bid is not submitted by Buyer; (v) A signed asset purchase agreement that contains, with the exception of the cash purchase price in paragraph (iii) above (and the Buyer's Premium), terms substantially similar to the terms and conditions contained in the APA.  Any changes to the APA shall be marked against the APA in a separate document; (vi) A designation of the executory contracts and unexpired leases that such Qualified Bidder desires to be assumed and assigned to such Qualified Bidder.  A potential Qualified Bidder will make a good faith showing of future performance with respect to any unexpired leases or executory contracts that are to be assumed and assigned to the potential Qualified Bidder.  In addition to the cash purchase requirement identified in (iii) above (and the Buyer's Premium), all cure costs will be paid by the Qualified Bidder; (vii) A disclosure of the identity of each person or entity that will be bidding for the Assets; (viii) A binding and irrevocable offer; (ix) The audited (if in existence) or unaudited financial statements and/or other written evidence of a financing commitment or other evidence satisfactory to the Debtors, in consultation with CoBank, ACB and the Official Committee of Unsecured Creditors ("Committee", and together with CoBank, the "Consultation Parties") (provided, however, that in the event CoBank elects to credit bid, it will no longer be a Consultation Party) of the financial ability to consummate the proposed transaction; (x) A board resolution or written evidence of some type that demonstrates to the reasonable satisfaction of the Debtors that the bidder has obtained all corporate or other authority necessary for it to close and fund the proposed transaction and that the person or persons authorized to bid at the Auction on behalf of such entity is authorized to do so; (xi) A deposit in cash or other immediately available funds ("Deposit") to be wired into a bank account to be designated by Debtors, which Deposit is actually received on or before the Qualified Bid Deadline and in the amount of not less than 10% of the cash purchase price component of the Qualified Bid; and (xii) The bid must not contain any contingencies except as provided in the APA, and may not include any financial or due diligence contingencies.

In the event the Debtors receive a Qualified Bid in addition to the APA, the Debtors will, unless otherwise ordered by the Court, conduct the Auction with respect to the Assets.  The Auction will be conducted at the offices of Miller, Canfield, Paddock and Stone, PLC, 150 West Jefferson, Suite 2500, Detroit, Michigan, 48226, or such other place as may be designated by the Debtors, on April 15, 2016, commencing at 10:00 a.m. prevailing Eastern Time ("Auction").

If you seek to object to the sale of the Assets or any portion thereof, you must comply with the terms for making such objections as set forth in the Sale Procedures Order and the Sale Procedures.  Such objections must be filed with the Bankruptcy Court, and served on Debtors' counsel so as to be received, on or before April 22, 2016 at 5:00 p.m., prevailing Eastern Time.  The Sale Hearing shall be held on April ___, 2016, at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Division Ave. N., Room 200, Grand Rapids, MI 49503, at which time the Court will resolve any such objections.  If any party fails to timely file and serve an objection in accordance with the Sale Procedures Order, the Bankruptcy Court may disregard such objection.  The failure of any person to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale or the Debtors' assumption and assignment of the Assumed and Assigned agreements or the consummation of the Sale and the performance of the APA.

By:  /s/ Marc N. Swanson

Marc N. Swanson (P71149)
Miller, Canfield, Paddock and Stone, PLC
150 W. Jefferson, Suite 2500
Detroit, MI 48226
Phone: 313.496.7591; Fax: 313.496.8451
Email: swansonm@millercanfield.com
*Proposed Attorneys to the Debtors and Debtors in Possession*

**Exhibit B – Assumption and Assignment Notice**

# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF MICHIGAN

In re:                                                    Chapter 11

GREAT LAKES COMNET, INC. *et al.*[1]                       Case No. 16-00290 (JTG)
                                                          (Jointly Administered)

                                   Debtors.

_____/                        Honorable John T. Gregg

   **You are receiving this notice because you may be a party to a contract or lease with Great Lakes Comnet, Inc. or Comlink, L.L.C.  Please read this notice carefully as your rights may be affected by the transactions described herein.**

   **PLEASE TAKE NOTICE** that on January 25, 2016, Great Lakes Comnet, Inc. and Comlink, L.L.C. (collectively, the "Debtors") commenced these cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

   **PLEASE TAKE FURTHER NOTICE** that on February 1, 2016, Debtors filed their Motion for Entry of (A) an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee and (V) Granting Related Relief; and (B) an Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Interests Pursuant to 11 U.S.C. §§ 105, 363 and 365, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases pursuant to 11 U.S.C. § 365, and (III) Granting Related Relief ("Sale Motion").

   **PLEASE TAKE FURTHER NOTICE** that on [ ], the United State Bankruptcy Court for the Western District of Michigan  ("Bankruptcy Court") entered an Order (I) Establishing Sale Procedures, (II) Scheduling an Auction and a Sale Hearing in Connection with the Sale of Substantially all of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363 and 365, (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, including the Termination Fee, and (V) Granting Related Relief [Doc. No. __] ("Sale Procedures Order").[2]  Among other things, the Sale Procedures Order: (a) established certain procedures ("Sale Procedures") for the sale ("Sale") of the Debtors' assets pursuant to an auction ("Auction") and (b) scheduled the time and place for the Auction.  The hearing on

---

[1] The Debtors are Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C (Case No. 16-00292)

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Sale Procedures Order.

whether to approve the Sale will take place on April __, 2016 at __:__ _.m. in the Courtroom of the Honorable John T. Gregg, United States Bankruptcy Court for the Western District of Michigan, 1 Divison Ave N., Room 200, Grand Rapids, MI 49503 ("Sale Hearing").

      **PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Procedures Order, the Debtors may potentially assume and assign to the Winning Bidder one or more of those executory contracts and unexpired leases listed on Annex 1 attached hereto (collectively, the "Assumed and Assigned Agreements" and each, a "Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors have indicated on Annex 1 attached hereto the cure amounts the Debtors believe must be paid to cure all pre-petition defaults and pay all amounts accrued under the Assigned Agreements (in each instance, the "Cure Amount").

      **PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the assumption by the Debtors and assignment/transfer to the Winning Bidder of any Assigned Agreement, including the validity and amount of the Cure Amount as determined by the Debtors, or otherwise assert that any other amounts, defaults, conditions or pecuniary losses must be cured or satisfied under any of the Assigned Agreement for such contract or lease to be assumed and assigned, must file an objection ("Cure/Assignment Objection") that (a) is in writing (b) sets forth the specific monetary amount the objector asserts to be due, and the specific types of the alleged defaults, pecuniary losses, accrued amounts and conditions to assignment and the support therefor, (c) is filed with the Clerk of the Bankruptcy Court, and served on the Debtors' counsel so that it is received, on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time** ("Cure/Assignment Objection Deadline").

      **PLEASE TAKE FURTHER NOTICE** that any party seeking to object to the ability of the Winning Bidder to provide adequate assurance of future performance of an Assigned Agreement must file an objection with the Clerk of Bankruptcy Court on or before **April 22, 2016 at 5:00 p.m. prevailing Eastern Time.**

      **PLEASE TAKE FURTHER NOTICE** that unless a Cure/Assignment Objection or Adequate Assurance Objection is filed and served before the applicable objection deadline, all parties shall (a) be forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to the Assigned Agreements, and the Debtors and the Winning Bidder shall be entitled to rely solely upon the Cure Amount; (b) be deemed to have consented to the assumption and assignment; (c) be forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be satisfied under such Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assigned Agreements.

      **PLEASE TAKE FURTHER NOTICE** that all unresolved Cure/Assignment Objections and Adequate Assurance Objections will be heard at the Sale Hearing or such other date as to be determined by the Bankruptcy Court.

- 2 -

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on Annex 1 and otherwise do not object to the Debtors' assumption and assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Assigned Agreements is subject to the approval of the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that the inclusion of any document on the list of Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Winning Bidder that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, or that your executory contract or unexpired lease will be assumed and/or assigned, and all rights with respect thereto are expressly preserved.

Respectfully Submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ Stephen S. LaPlante
     Timothy A. Fusco (P13768)
     Jonathan S. Green (P33140)
     Stephen S. LaPlante (P48063)
     Marc N. Swanson (P71149)
     150 West Jefferson, Suite 2500
     Detroit, MI  48226
     (313) 496-7997
     (313) 496-8478
     laplante@millercanfield.com

     *Proposed Attorneys to the Debtors and*
     *Debtors in Possession*

- 3 -

25711065.2\130050-00009

**<u>Annex 1</u>**

**Exhibit E    --    Sale Order**

**UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:                                                Chapter 11

GREAT LAKES COMNET, INC., *et.al* [1]            Case No. 16-16-00290 (jtg)

                                                      (Jointly Administered)

                            Debtor.                   Honorable John T. Gregg

_____/

**ORDER APPROVING SALE OF ASSETS PURSUANT TO 11 U.S.C. § 363**

    This matter having come before the Court on the Motion of Great Lakes Comnet, Inc.

and Comlink, L.L.C. as debtors in possession (collectively, the "Debtors") for the entry of an

order (i) authorizing the sale of substantially all of Debtors' assets free and clear of liens, claims,

encumbrances and interests pursuant to 11 U.S.C. §§ 105, 363, and 365 (ii) approving the

assumption and assignment of certain executory contracts pursuant to 11 U.S.C. § 365, and (iii)

granting related relief [Doc. No. ___] ("Sale Motion"),[2] which seeks entry of, *inter alia*, this

order ("Sale Order") authorizing the sale ("Sale") of substantially all of Debtors' assets free and

clear of liens, claims, encumbrances and interests pursuant to sections 105, 363 and 365 of title

11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to Buyer, or to such other

entity as may submit a higher or otherwise better Qualified Bid (as defined in the Sale

Procedures); the Court having entered on [ ] its Order (I) Establishing Sale Procedures, (II)

Scheduling an Auction and a Sale Hearing in Connection With the Sale of Substantially All of

_____

[1] The Debtors in these Bankruptcy Cases are Great Lakes Comnet, Inc., case no. 16-00290, and
Comlink, L.L.C., case no. 16-0092.  On January 27, 2016, the Court entered an Order Directing
the Joint Administration of Their Bankruptcy Cases [Dkt. No. 50].

[2] All capitalized terms not defined in this Order shall have the meanings ascribed to them in the
Sale Motion.

Debtors' Assets Pursuant to 11 U.S.C. §§ 105, 363, and 365 (III) Setting Certain Dates and Deadlines in Connection Therewith, (IV) Approving the Form of the Purchase and Sale Agreement, Including the Termination Fee, and (V) Granting Related Relief [Doc. No. ___] ("Sale Procedures Order"); the Court finding, as more fully set forth below, that (i) proper notice of (a) the deadlines and methods for asserting objections to the Sale Motion and the entry of this Order, (b) the [ ] hearing on the Sale Motion ("Sale Hearing"), and (c) the entry of this Order has been provided to all parties entitled thereto as required by applicable law and by the Sale Procedures Order, and no other or further notice of any such matters is required, and (ii) the appearances of all interested parties and all responses and objections, if any, to the Sale Motion and to the entry of this Sale Order have been duly noted in the record of the Sale Hearing and such objections or responses have been withdrawn, overruled, or otherwise resolved; the Court having considered the (i) Sale Motion and the legal and factual bases set forth in support of the Sale Motion; (ii) form of this Sale Order submitted to the Court; (iii) objections or other responses made to the Sale Motion and the entry of this Sale Order; and (iv) entire record of the Sale Hearing, including any evidence submitted at or prior to the Sale Hearing; the Court finding that the relief sought by the Sale Motion and contained in this Sale Order is in the best interest of Debtors, their estates, and their creditors; the Court being otherwise fully advised in the premises, and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS, DETERMINES AND CONCLUDES THAT:**

A.      This Court has jurisdiction to approve the Sale pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Approval of the Sale is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).  The bases for the relief granted herein are Bankruptcy Code §§ 105, 363, and 365 and Bankruptcy Rules 2002, 6004, 6006, and 9014.

C.      As evidenced by declarations filed with the Court and representations of counsel at the Sale Hearing and the hearing related to the Sale Procedures Order, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise to be heard regarding, (i) the entry of the Sale Procedures Order and the dates and deadlines set forth therein, including the procedures required for the submission of Qualified Bids for the Assets and for participation by interested bidders at an auction of the Assets (the "Auction"); (ii) the Sale Motion; (iii) the entry of this Sale Order; and (iv) the transaction contemplated under the APA, including the Sale has been provided to (a) the Office of the United States Trustee; (b) Buyer; (c) the Unsecured Creditors Committee; (d) all parties known to Debtors who assert a security interest in or lien on the Assets, or assert a claim against or interest in the Assets, including CoBank, ACB; (e) all of Debtors' creditors, including without limitation any taxing authorities, and contract counterparties; (f) entities, or their counsel, not described above, who have filed a notice of appearance through the Court's CM/ECF System; and (g) Governmental agencies regulating Debtors.  Any expediting of the relevant deadlines for responses and notice of hearing is appropriate and supported by cause under the circumstances and such notice has been adequate and no further notice is required.

D.      In addition to the actual notice described above, proper, timely, adequate, and sufficient notice of, and a reasonable opportunity to object or otherwise be heard regarding, (i) the Sale Motion; (ii) the entry of this Sale Order; and (iii) the transaction contemplated under the APA, including the Sale, has been published in the Detroit Free Press and the Detroit News, in

- 3 -

the form of Attachment A to the Sales Procedure Order, and that such notice is sufficient and reasonably calculated to apprise unknown creditors and other parties in interest of the matters reflected in the notice, and no further notice is required or appropriate.

E.      The foregoing notice in Findings of Fact C and D constitute good and sufficient notice of, and a reasonable opportunity to object or be heard regarding the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Auction, and the entry of this Order under Bankruptcy Code §§ 105, 363, and 365, and Bankruptcy Rules 2002, 6004, 6006, and 9014.

F.      The Purchase Price (as defined in the APA) offered by Buyer, under the terms and conditions set forth in the APA:  (i) represents the highest or otherwise best offer obtained for the Assets; (ii) is fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Assets, (iii) would not have been made by Buyer absent the protections afforded to Buyer by the Bankruptcy Code and this Order, (iv) will provide a better recovery for Debtors' creditors than would be provided by any other practical available alternative, and (v) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  A sale of the Assets other than one free and clear of all prepetition and postpetition liens (including, without limitation, any "lien" as defined in Bankruptcy Code § 101(37)), claims (including, without limitation, any "claim" as defined in Bankruptcy Code § 101(5)), encumbrances, defenses (including, without limitation, rights of setoff and recoupment) and interests (collectively, "Interests") would impact materially and adversely on Debtors' bankruptcy estates, would yield substantially less value for Debtors' estates, and would provide less certainty than the available alternatives.  Buyer would not agree to purchase the Assets if the Assets could not

- 4 -

be transferred to Buyer free and clear of all Interests, except for Permitted Liens (as defined in the APA) and Assumed Liabilities (as defined in the APA).

G.        Subject to the terms and conditions of the APA and entry of this Sale Order, the transfer of the Assets to Buyer pursuant to the Sale will be a legal, valid, and effective transfer of the Assets and will, upon the occurrence of the Closing in accordance with the terms of this Sale Order, vest in Buyer all right, title and interest of the Debtors in the Assets free and clear of any and all Interests, including, without limitation, mechanics,' materialmen's and other consensual and non-consensual liens and statutory liens, security interests, encumbrances and claims (including, but not limited to, any "claim" as defined in Bankruptcy Code § 101(5) or "lien" as defined in Bankruptcy Code § 101(37)), reclamation claims, mortgages, deeds of trust, pledges, covenants, restrictions, hypothecations, charges, indentures, loan agreements, instruments, contracts, leases, licenses, options, rights of first refusal, contracts, offsets, recoupment, rights of recovery, judgments, orders and decrees of any Court or foreign or domestic governmental entity, claims for reimbursement, contribution, indemnity or exoneration, assignment, preferences, debts, charges, suits, licenses, options, rights of recovery, interests, products liability, alter-ego, environmental, successor liability, taxes or similar charges and other liabilities (including without limitation fuel taxes and surcharges and similar amounts), causes of action and claims, or other encumbrances or restrictions on or conditions to transfer or assignment of any kind (including without limitation to the generality of the foregoing restrictions or conditions on or to the transfer, assignment, or renewal of licenses, permits, registrations, and authorizations or approvals of or with respect to governmental units and instrumentalities), in each case whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or

- 5 -

unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, or known or unknown, whether arising prior to, on, or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise.  The APA, as approved herein, was duly executed and authorized.

H.     Except as provided for in the APA or this Sale Order, all such Interests shall be discharged as to the Assets, with such Interests attaching to the proceeds of the Sale (the "Sale Proceeds") in the order of their priority, with the same validity, force and effect which they now have as against the Assets and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.

I.     Entry into the APA and consummation of the transactions contemplated thereby and hereby as required by the terms set forth in the Sale Procedures Order constitute the exercise of sound business judgment, and such acts are in the best interests of Debtors, their estates, and all parties in interest.  The Court finds that Debtors have articulated good and sufficient business reasons justifying the Sale under Bankruptcy Code § 363(b).  Such business reasons include, but are not limited to, the following:  (i) the APA constitutes the highest or otherwise best offer for the Assets; (ii) the APA and the closing thereon will present the best opportunity to realize the value of the Assets on a going concern basis and avoid decline and devaluation of the Assets; and (iii) any alternative likely would not have yielded as favorable an economic result.

J.     Each person or entity with an Interest in the Assets to be transferred on the Closing Date (i) has consented to, or is deemed to have consented to, the Sale free and clear of such Interest, (ii) could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest, or (iii) holds an interest that is a lien that is worth less than the

- 6 -

amount of the purchase price to be paid by Buyer under the APA, and, therefore, in each case, one or more of the standards set forth in Bankruptcy Code § 363(f) has been satisfied as to all such Interests.  Those holders of Interests who did not object, or who withdrew their objections, to the Sale Motion are deemed to have consented to entry of this Sale Order pursuant to Bankruptcy Code § 363(f)(2).  Therefore, approval of the APA and consummation of the Sale at this time free and clear of Interests is appropriate pursuant to Bankruptcy Code § 363(f).

K.    Buyer is not holding itself out to the public as a continuation of Debtors.  The transaction contemplated by the APA does not amount to a consolidation, merger, or de facto merger of Buyer and Debtors or Debtors' estates, there is not substantial continuity between Buyer and Debtors, there is no continuity of enterprise between Buyer and Debtors, Buyer is not a mere continuation of Debtors or their estates, and Buyer does not constitute a successor to Debtors or their estates.

L.    Upon the Closing, Buyer shall be deemed to have assumed only the Assumed Liabilities under the APA.  Except with respect to the Assumed Liabilities, the Closing and the consummation of the transactions contemplated by the APA shall not, by reason of such Closing and transactions, subject Buyer to any liability whatsoever for claims with respect to the operation of the business of Debtors before the Closing Date.  Except for the Assumed Liabilities, Buyer's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing, to the extent allowed by applicable law.  Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Agreements to Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assumed and Assigned Agreements is in the best interests of Debtors, their

- 7 -

estates, and their creditors. The Assumed and Assigned Agreements being assigned to Buyer are an integral part of the Assets being purchased by Buyer and, accordingly, such assumption and assignment of the Assumed and Assigned Agreements is reasonable, enhances the value of Debtors' estate, and does not constitute unfair discrimination. Each and every provision of the Assumed and Assigned Agreements or applicable non-bankruptcy law that purports to prohibit, restrict, or condition assignment of any of the Assumed and Assigned Agreements has been satisfied or is unenforceable under Bankruptcy Code § 365.

M.      At the Closing under the APA, or as soon as practicable thereafter, and subject to the terms of the APA, Buyer shall (i) cure, or have provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed and Assigned Agreements, within the meaning of Bankruptcy Code § 365(b)(1)(A), and (ii) provide compensation or adequate assurance of compensation to any party of any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(B). Other than the payment of the Cure Amounts (including by way of setoffs or recoupments), neither Buyer nor the Debtors shall have any further obligations to non-debtor parties to the Assumed and Assigned Agreements. Buyer has provided adequate assurance of future performance of and under the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(C). Upon assumption and assignment to Buyer, the Assumed and Assigned Agreements shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Sale Order, and Debtors shall have no liability for any breach of any Assumed and Assigned Agreement occurring after assignment of the Assumed and Assigned Agreement pursuant to Bankruptcy Code § 365(k) and this Sale Order.

N.      Buyer and Debtors negotiated the APA and the transaction contemplated by the APA from arms' length bargaining positions, without collusion, and in good faith within the meaning of Bankruptcy Code §§ 363(m) and (n).  As a result, Debtors and Buyer are entitled to the protections of Bankruptcy Code § 363(m) with respect to the Sale.

O.      Neither Buyer, Debtors, nor any other person or entity has engaged in any conduct that would cause or permit the APA to be avoided under Bankruptcy Code § 363(n).

P.      Buyer will be acting in good faith pursuant to Bankruptcy Code § 363(m) in closing the transaction contemplated by the APA and this Sale Order at any time on or after the entry of this Sale Order.

Q.      Subject to the terms of the APA, the transfer of the Assets to Buyer will not subject Buyer to any liability whatsoever prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of antitrust, successor or transferee liability to the extent allowed by applicable law.

R.      The Sale of the Assets must be approved and consummated promptly to preserve the value of the Assets.  Therefore, time is of the essence in consummating the Sale, and Debtors and Buyer intend to close the Sale as soon as reasonably possible.

S.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.

T.    The transfer of the Assets to Buyer will be a legal, valid, and effective transfer of assets, and will vest Buyer with all right, title, and interest of Debtors in and to the Assets free and clear of all Interests, except as provided for in the APA.

U.    The terms of the APA are fair and reasonable in all respects.

V.    The transactions contemplated by the Motion and the Sale, as approved and implemented by this Sale Order, are in compliance with and satisfy all applicable provisions of the Bankruptcy Code, the local and Federal Rules of Bankruptcy Procedure, and any other applicable law relating to the Sale including, without limitation, Bankruptcy Code §§ 363(b), (e) and (f) and section 365.

W.    The transactions contemplated by the Motion and the Sale, as approved and implemented by this Order, are in compliance with and satisfy all applicable provisions of the Bankruptcy Code, the local and Federal Rules of Bankruptcy Procedure, and any other applicable law relating to the Sale including without limitation Bankruptcy Code §§ 363(b), (e), and (f) and 365.

**For all of the foregoing reasons and after due deliberation, the Court hereby ORDERS, ADJUDGES AND DECREES THAT:**

1.    The Sale Motion is GRANTED with respect to the Assets, and the Sale of the Assets, the APA, and the transaction contemplated in the APA are hereby approved and authorized in all respects in accordance with and pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and 365.

2.    Objections, if any, to the Sale Motion or to the relief granted herein that have not been withdrawn, waived, settled, or otherwise resolved and all reservations of rights included in such objections, are overruled on the merits.

- 10 -

3.      Pursuant to Bankruptcy Code § 363(b), the Court approves in all respects the Sale

of the Assets to Buyer free and clear of all Interests (except those permitted by the APA), with

such Interests attaching to the Sale Proceeds in the order of their priority, and the transaction

contemplated by the APA is approved in all respects.  Debtors are authorized to sell the Assets to

Buyer upon the terms and subject to the conditions set forth in the APA, with, subject to the

terms of this Sale Order, such modifications as may be agreed to by Buyer and Debtors.

4.      The APA, including any amendments, supplements and modifications thereto, and

all of the terms and conditions therein, is approved.  Debtors and Buyer are both authorized to

take all actions and execute all documents and instruments that Debtors or Buyer reasonably

deem necessary or appropriate to implement and effectuate the transactions contemplated by the

APA, including without limitation, to execute all documents and further agreements necessary or

appropriate to implement and effectuate the APA and this Sale Order.

5.      Pursuant to Bankruptcy Code §§ 363(b) and (f) and subject to the terms of the

APA, upon the Closing under the APA, the transfer of the Assets to Buyer will be a legal, valid

and effective transfer and shall vest Buyer with all right, title and interest of Debtors in and to the

Assets, free and clear of all Interests, including, without limitation, security interests of whatever

kind or nature, mortgages, pledges, deeds of trust, hypothecations, assignments, preferences,

debts, charges, suits, licenses, options, rights-of-recovery, judgment, orders and decrees of any

court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes),

licenses, covenants, indentures, instruments, leases, options, contracts, agreements, off-sets,

claims for reimbursement, contribution, indemnity or exoneration, successor product, tax, labor,

ERISA, CERCLA, environmental, alter-ego and other liabilities, causes of action, known or

unknown, contract rights, and claims, in each case to the fullest extent of the law, of any kind or

- 11 -

nature, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, statutory or non-statutory, matured or unmatured, legal or equitable, with all such Interests in and upon the Assets to be unconditionally released, discharged and terminated to the extent allowed by applicable law.

6.      On the Closing Date and upon payment of the Purchase Price, this Sale Order will be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in such Assets to Buyer.

7.      Except as set forth in the APA or this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade and other creditors, holding Interests of any kind or nature whatsoever against or in Debtors or the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, Debtors, the Assets, or the transfer of the Assets to Buyer, are forever barred, estopped, and permanently enjoined from asserting against Buyer, its successors and/or assigns, its property, or the Assets, such person's or entity's Interest.

8.      On the Closing Date of the Sale, Debtors and their creditors, vendors and contract counterparties are authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Assets, if any, as such Interests may have been recorded or otherwise exist.

9.      The Sale of the Assets to Buyer under the APA constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of all applicable jurisdictions, including, but not limited to, the laws of the State of Michigan.  The transfer of the Assets by Debtors to Buyer is a legal, valid and effective transfer of the Assets notwithstanding any requirement for approval or consent of any entity.

10.      Buyer is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under Bankruptcy Code § 363(m) and any other applicable bankruptcy and non-bankruptcy law.  Buyer acted in good faith at the Sale Hearing and will be acting in good faith within the meaning of Bankruptcy Code § 363(m) in closing the transactions contemplated by the APA.

11.      Neither Buyer's purchase of the Assets nor Buyer's subsequent operation of the business previously operated by Debtors shall cause Buyer to be, or to be deemed to be:  (a) a successor-in-interest in any respect to Debtors or Debtors' businesses under or within the meaning of any federal, state or local revenue, pension, ERISA, tax, labor or environmental law, rule or regulation or under any products liability law or doctrine with respect to Debtor's liability under such law, rules, regulations or doctrines; or (b) a joint employer, co-employer or successor employer with Debtors.  Consummation of the APA and the transactions contemplated therein and thereby do not affect a *de facto* merger or consolidation of the Debtors and Buyer or result in the continuation of the Debtors' businesses under Buyer's control.  Buyer is not the alter ago of, a successor in interest to, or a continuation of the Debtors.

12.      This Court shall retain exclusive jurisdiction to interpret and enforce the provisions of the APA, the Sale Procedures Order, and this Sale Order, including all amendments to the APA and each of these orders and any waivers and consents thereunder, and further to hear

- 13 -

and determine each of the agreements executed in connection therewith or herewith, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to Buyer free and clear of Interests, or compel the performance of other obligations owed by Debtors or Buyer, (b) resolve any disputes arising under or related to the APA, except as otherwise provided therein, (c) interpret, implement, and enforce the provisions of this Sale Order, and (d) protect Buyer against (i) claims made related to any of the Excluded Assets (as defined in the APA), (ii) any claims of successor liability related to the Assets, or (iii) any claims of Interests asserted against Buyer or the Assets, of any kind or nature whatsoever, *provided however*, that, in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the APA, the Sale Procedures Order, or this Sale Order, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to any such matter.

13.     The transactions contemplated under the Sale are undertaken by Buyer in good faith, as that term is used in Bankruptcy Code § 363(m), and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of any Assets shall not affect the validity of the Sale and other transactions contemplated and authorized by this Sale Order, unless such authorization is duly stayed pending such appeal prior to the Closing.

14.     The provisions of this Sale Order are non-severable and mutually dependent.  The failure to include specifically any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the

APA and all of its provisions, payments, and transactions be authorized and approved in their entirety.

15.     On the Closing Date and payment of the Purchase Price, this Sale Order shall be construed as, and shall constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Assets or a bill of sale transferring good and marketable title in the Assets to Buyer.  Each and every federal, state and local governmental agency, department or entity is directed to accept the filing of any and all documents and instruments necessary and appropriate to implement, effectuate or consummate the transactions contemplated by the APA and this Sale Order.

16.     Debtors and each other person having duties or responsibilities under the APA, any agreements related thereto, or this Sale Order, and their respective members, directors, officers, agents, representatives and attorneys, are authorized to execute and deliver any and all instruments, including all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units, as may be required to effectuate the APA and this Sale Order.  For the avoidance of doubt, all persons and entities (i) holding liens or encumbrances, (ii) that have filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing claims, or (iii) otherwise asserting claims against the Assets shall, and hereby are directed to, execute and deliver to Debtors or its designated representatives(s) any and all documents necessary (or requested by Debtors or Buyer) to effectuate the transfer of the Assets to Buyer free and clear of any and all liens and encumbrances.

17.     The requirements of Bankruptcy Code §§ 365(b)(1) and 365(f)(2) are deemed satisfied with respect to the Assumed and Assigned Agreements.  Debtors are authorized, in

- 15 -

accordance with Bankruptcy Code §§ 105(a), 363, and 365, to (i) assume and assign to Buyer the Assumed and Assigned Agreement, free and clear of all Interests, and (ii) execute and deliver to Buyer such assignment documents as may be necessary to confirm such assignment and transfer. Buyer has provided adequate assurance of future performance under the Assumed and Assigned Agreements within the meaning of Bankruptcy Code § 365(b)(1)(C).

18.     The Assumed and Assigned Agreements shall be transferred and assigned to Buyer, and, following the Closing, shall remain valid and binding and in full force and effect for the benefit of Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed and Assigned Agreement (including those of the type described in Bankruptcy Code §§ 365(b)(2), (e)(1) and (f)(1)) that prohibits, restricts, or conditions such assignment or transfer.  Pursuant to Bankruptcy Code § 365(k), Debtors shall be relieved from any liability with respect to any breach of any Assumed and Assigned Agreement after assignment of such Assumed and Assigned Agreement to Buyer.  All other requirements and conditions under Bankruptcy Code §§ 363 and 365 for the assumption by Debtors and assignment to Buyer of each Assumed and Assigned Agreement have been satisfied and, upon Closing and payment of the Purchase Price, Buyer shall be fully and irrevocably vested in all right, title and interest in each Assumed and Assigned Agreement.

19.     Upon assignment of the Assumed and Assigned Agreements to Buyer, no non-debtor party to any Assumed and Assigned Agreement shall be permitted to declare a default by Buyer under such Assumed and Assigned Agreement or otherwise take action against Buyer on account of Debtors' financial condition, bankruptcy, or failure to perform any of their obligations under such Assumed and Assigned Agreement, including any failure to pay any amounts to cure defaults thereunder in excess of the Cure Costs.  The Court hereby determines that the Cure

Costs established pursuant to the Sale Procedures Order, or as otherwise agreed by the non-debtor parties to the Assumed and Assigned Agreements, constitute all of the cure amounts that are required to be paid under Bankruptcy Code § 365(b)(1) in connection with the assumption and assignment of the Assumed and Assigned Agreements.

20.     Each non-debtor party to an Assumed and Assigned Agreement is forever barred, permanently estopped, and permanently enjoined from asserting against Debtors or Buyer, or the property of either, any default existing as of the date of the Sale Hearing.

21.     Upon the assignment of the Assumed and Assigned Agreements to Buyer, Buyer shall be deemed, as of the Closing, to be in compliance with all terms and provisions of the Assumed and Assigned Agreements.  Except for the right to payment of the Cure Cost pursuant to Bankruptcy Code §§ 105(a), 363, and 365 (including through satisfaction by setoff or recoupment), all parties to the Assumed and Assigned Agreements are forever barred and enjoined from raising or asserting against Debtors or Buyer any assignment fee, default, breach, or claim for pecuniary loss, or condition to assignment, arising under or related to the Assumed and Assigned Agreements existing as of the Closing or arising by reason of the Closing.  Any party that may have had the right to consent to an assignment, for purpose of Bankruptcy Code § 365(e)(2)(A)(ii) or otherwise, is deemed to grant such consent if it failed to object to the assumption and assignment.

22.     The rights of Buyer under the APA may be assigned only to the extent permitted in the APA.

23.     The APA and any related agreements may be modified, amended, or supplemented by agreement of Debtors, CoBank, ACB, and Buyer without further action of the Court; provided that any such modification, amendment, or supplement is not in the good faith

- 17 -

belief of the Debtors, CoBank, ACB and the Buyer material and substantially conforms to and effectuates the APA.

24.     This Order (a) shall be effective as a determination that, except as provided in the APA, on the Closing Date and payment of the Purchase Price, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, according to the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.  Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.  Buyer and Debtors are hereby authorized to take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph.

25.     At the Closing, the Buyer shall pay to the Debtors the Purchase Price (as defined in the APA and in the manner described therein) in immediately available funds.   At the Closing, each holder of an Interest in the Assets is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests against or in the Assets, if any, as such Interests may have been recorded or may otherwise exist.  If any person or

- 18 -

entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing Interests against or in the Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests that the person or entity has with respect to the Assets or otherwise, Debtors and/or Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets upon the Closing of the Sale in accordance with the terms of this Sale Order and the APA.  The foregoing notwithstanding, subject to the terms of the APA, the provisions of this Sale Order authorizing the sale and assignment of the Assets free and clear of the Interests shall be self-executing, and notwithstanding the failure of Buyer, the Debtors, or any other party to execute, file, or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof or of the APA, all Interests on the Assets shall be deemed divested, released and terminated.  As of the Closing, Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release and termination of all Interests in the Assets of any kind or nature, and no further action shall be necessary to evidence such release and termination.

26.     The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of Debtors, their successors and assigns, their estate, and their creditors, Buyer and its respective affiliates, successors and assigns, and any affected parties including, but not limited to, all persons asserting Interests in the Assets to be sold to Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee(s) under

any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

27.     The failure specifically to include any particular provisions of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

28.     To the extent applicable, the automatic stay pursuant to Bankruptcy Code § 362 is hereby lifted with respect to Debtors and the Assets to the extent necessary, without further order of the Court (a) to allow Buyer to give Debtors any notice provided for in the APA, and (b) to allow Buyer to take any and all actions permitted by the APA.

29.     To the extent a counterparty to an Assumed and Assigned Agreement failed to timely object to any Cure Cost with respect to such Assumed and Assigned Agreement, such Cure Cost shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Costs at any time, and such Cure Costs, when paid, shall completely revive any Assumed and Assigned Agreement to which it relates.

30.     The Sale shall not be subject to any bulk sales laws.

31.     Debtors, Buyer, and each other person having duties or responsibilities under the APA or this Sale Order, and their respective agents, representatives, and attorneys, are authorized to carry out all of the provisions of the APA, to issue, execute, deliver, file and record, as appropriate, the APA, and any related agreements, and to take any action contemplated by the APA or this Sale Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement,

- 20 -

effectuate and consummate the APA and this Sale Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the APA and this Sale Order and the transactions contemplated thereby and hereby.

32.     The stay imposed by Bankruptcy Rule 6004(h) and 6006(d) is modified such that the provisions of this Sale Order shall be effective immediately after entry.

**Exhibit F      --      Legal Description and Common Street Address for Real Property to be Sold**

Street Address: 1515 Turf Ln, East Lansing

Unit 3, MAYNARD PROFESSIONAL CENTRE CONDOMINIUM, according to the Master Deed recorded in Document No. 5071944, Clinton County Records and in Liber 3145, Page 422, Ingham County Records and amendments thereto, and designated as Clinton County Condominium Subdivision Plan No. 46 and Ingham County Subdivision Plan No. 197, together with rights in general common elements and limited common elements as set forth in above Master Deed, and as described in Act 59 of the Public Acts of 1978, as amended.

PARCEL ID: Clinton County - 19-20-50-35-401-003, Ingham County - 33-20-01-02-226-017
Parcel ID:

Street Address: 1781 Holloway Dr., Holt

That part of the Northeast 1/4 and the Southeast 1/4 of Section 24, T3N, R2W, Delhi Township, Ingham County, Michigan, described as: Commencing at the North 1/4 corner of Section 24; thence South 00° 18' 06" East, 1665.65 feet along the North-South 1/4 line of Section 24; thence North 89° 52' 11" East, 178.12 feet along the South line of proposed Holloway Drive and its Westerly extension being parallel with the North line of Section 24 to the Point of Beginning of the following described parcel; thence along the Southerly and Westerly right of way line of proposed Holloway Drive the following three courses: 1) North 89° 52' 11" East, 493.52 feet parallel with the North line of Section 24; 2) Southeasterly, 1348.23 feet along a curve to the right having a radius of 860.00 feet, an internal angle of 89° 49' 23", and a chord bearing South 45° 13' 07" East, 1214.34 feet; 3) South 00° 18' 26" East, 494.05 feet; thence Northwesterly, 32.99 feet along a curve to the right having a radius of 29.90 feet, an internal angle of 63° 12' 37", and a chord bearing North 77° 12' 41" West, 31.34 feet; thence North 45° 36' 22" West, 1762.42 feet; thence North 38°45' 46" West, 101.51 feet; thence Northwesterly, 31.00 feet along a curve to the right having a radius of 29.90 feet, an internal angle of 59° 23' 49" and a chord bearing North 09° 03' 55" West, 29.63 feet to the Point of Beginning.

Parcel ID: 33-25-05-24-200-010