UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

In re:                                              Case No. GL 16-00290-jtg
                                                    (Jointly Administered)
GREAT LAKES COMNET, INC., *et al.*,[1]

                                                    Chapter 11

                      Debtors.
_____/           Hon. John T. Gregg

## MEMORANDUM DECISION REGARDING
## MOTION FOR DETERMINATION OF CLAIM

APPEARANCES:  Jonathan S. Green, Esq., MILLER, CANFIELD, PADDOCK AND STONE, P.L.C., Detroit, Michigan and Seth Van Aalten, Esq., COOLEY LLP, New York, New York, for Peter Kravitz, Liquidation Trustee of the GLC Liquidation Trust; Timothy P. Palmer, Esq., BUCHANAN INGERSOLL & ROONEY P.C., Pittsburgh, Pennsylvania, for CoBank, ACB; Michelle M. Wilson, Esq., UNITED STATES TRUSTEE, Grand Rapids, Michigan.

This matter comes before the court on a motion filed by CoBank, ACB ("CoBank") seeking a determination that it holds a secured claim or, to the extent insufficient collateral exists to satisfy its secured claim in full, a superpriority administrative expense (the "Motion").  Peter Kravitz, the liquidation trustee of the GLC Liquidation Trust (the "Liquidation Trustee"), and Daniel M. McDermott, the United States Trustee for Region 9 (the "UST"), object to the relief requested because the settlement agreement incorporated into a sale order entered by the court (the "Sale Order") limits CoBank's remaining claim to "an allowed unsecured deficiency claim."  The parties have requested that the court decide a threshold issue – whether the Sale Order unambiguously determined CoBank's remaining claim to be an allowed general unsecured claim.

---

[1]      The debtors are:  Great Lakes Comnet, Inc. (Case No. 16-00290) and Comlink, L.L.C. (Case No. 16-00292-jtg).

## JURISDICTION

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157. The court has expressly retained jurisdiction to determine this post-confirmation dispute, which has a close nexus to previous orders entered by this court, including the Sale Order. *Thickstun Bros. Equip. Co., Inc. v. Encompass Servs. Corp. (In re Thickstun Bros. Equip. Co., Inc.)*, 344 B.R. 515, 521 (B.A.P. 6th Cir. 2006) (citation omitted); *see also Harper v. The Oversight Comm. (In re Conco, Inc.)*, 855 F.3d 703, 711 (6th Cir. 2017). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B), (K), (N) and (O).

## BACKGROUND

Great Lakes Comnet, Inc. and Comlink L.L.C., the debtors in these jointly administered cases (collectively, the "Debtors"), were in the business of providing telecommunication and data services to various third-party carriers. Prior to the petition date, CoBank made certain loans to and/or for the benefit of the Debtors. In exchange, CoBank was granted first priority security interests and mortgage liens in substantially all of the Debtors' personal and real property.

On January 25, 2016, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[2] As of the petition date, the Debtors were indebted to CoBank in the amount of approximately $25 million. As part of their first day motions, the Debtors filed a motion seeking authority to obtain post-petition financing from CoBank and use its cash collateral [Dkt. No. 17][3] (the "DIP Motion"). In an objection to the DIP Motion [Dkt. No. 39], the UST raised several concerns, including the potential for administrative insolvency, an issue that would persist throughout the sale process. At the hearing, the court granted the DIP Motion on an interim basis

---

[2]   The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*. Specific sections of the Bankruptcy Code are referenced as "section ___."

[3]   All references to "[Dkt. No. __]" are to docket entry numbers in Case No. 16-00290.

[Dkt. No. 61] after the UST's objections were resolved and the Debtors represented that they would apprise parties in interest if administrative insolvency became an issue. (*See* Status Rep., Dkt. No. 380, at ¶ 6.)

Several parties, including the UST, filed objections to the entry of an order approving the DIP Motion on a final basis. In his objection [Dkt. No. 151] and at the final hearing, the UST reiterated his concerns with respect to the potential for administratively insolvent estates. The court overruled the objection and entered a final order granting the DIP Motion [Dkt. No. 218] (the "Final DIP Order"), but cautioned that administrative insolvency might need to be addressed at some point in the future.

Pursuant to the terms of the Final DIP Order, the Debtors were authorized to borrow up to the principal amount of $5.5 million from CoBank and use its cash collateral. CoBank, as post-petition lender, was granted, among other things, a priming lien and a superpriority administrative expense under section 364(c)(1) to ensure repayment of the post-petition loans. As prepetition lender, CoBank was granted adequate protection in the form of replacement liens and an administrative expense with priority under section 507(b) in order to protect against the diminution in the value of the collateral subject to CoBank's prepetition liens.[4]

Less than one week after the petition date, the Debtors filed a motion to establish bidding procedures and sell substantially all of their assets to a stalking horse bidder, subject to higher and better bids [Dkt. No. 72] (the "Sale Motion"). In an objection to the proposed bidding procedures [Dkt. No. 167], the UST again expressed concerns regarding administrative insolvency because of the amount of the proposed break up fee, among other things. After the court granted the bidding procedures portion of the Sale Motion [Dkt. No. 235], the Debtors continued to market their assets

---

[4]     According to the Debtors, the Debtors and CoBank were careful to distinguish between CoBank's rights as a prepetition lender, and separately as a post-petition lender. (Final DIP Hr'g Tr. 52, 80-82, Mar. 3, 2016.)

to potential purchasers.  Despite the Debtors' efforts, no other bids materialized and the Debtors informed parties in interest and the court that they intended to seek approval of a sale to the stalking horse bidder at the hearing scheduled for May 10, 2017 [Dkt. No. 363].

The weeks leading up to the sale hearing were challenging for the Debtors and their estates to say the least.  On May 5, 2016, the Debtors filed a status report disclosing that the Debtors "do not believe they have sufficient cash or credit to get to a closing of the Sale without creating, or substantially increasing the likelihood of, administratively insolvent estates."  (Status Rep. at ¶ 3.) The Debtors further explained that the sale was unlikely to be consummated for approximately three weeks (and possibly longer) after the sale hearing due to various governmental approvals and consents that were prerequisites to the closing.  As such, the Debtors stated that they were attempting to negotiate additional financing from CoBank, who might ultimately be the only beneficiary of the sale.  Finally, the Debtors requested that the court schedule a status conference to discuss the issue of administrative insolvency.

Concerned with some of the statements made in the status report, CoBank filed a response [Dkt. No. 387] wherein it emphasized that the Debtors' post-petition financial condition was strong, but for the professional fees which far exceeded those permitted under the budget in the Final DIP Order.  CoBank also stated that although it would continue to honor its obligations to extend post-petition financing, it should not be required to fund professional fees beyond those set forth in the budget and the agreed upon carve out in the Final DIP Order.

Also in response to the status report, the UST filed a motion to convert the Debtors' cases to Chapter 7 or dismiss them altogether because of the substantial and continuing losses to the Debtors' estates [Dkt. No. 382].  The UST, like CoBank, noted the significant amount of professional fees that the Debtors' estates had incurred in the three months since the petition date.

According to the UST's projections, the Debtors' estates would be administratively insolvent by mid-June 2016, if not before.  The UST also filed an objection to the proposed sale [Dkt. No. 364], again emphasizing that the Debtors' estates would likely be rendered administratively insolvent, resulting in no distribution whatsoever to unsecured creditors.

The court held a status conference on May 9, 2016 regarding the Debtors' report, but declined to take any action at that time.  Instead, on May 10, 2016 and immediately preceding the hearing on the Sale Motion, the court required the major stakeholders, their professionals and the UST to address the issue of administrative insolvency through mediation [Dkt. No. 394].  The parties emerged from mediation late in the day after having reached a resolution that was designed to alleviate concerns regarding administrative insolvency and provide the foundation by which to wind-down the Debtor's estates.  The court ultimately approved the Sale Motion, subject to various settlements placed on the record which would thereafter be incorporated into a proposed sale order.

Eight days after the sale hearing, the parties submitted and the court entered the Sale Order [Dkt. No. 405].  Section 39 of the Sale Order, specifically defined therein as the "Settlement Agreement," memorializes the resolution by and among the Debtors, CoBank (as pre and post-petition lender), the Official Committee of Unsecured Creditors (the "Committee") and the UST.

Among other things, the Settlement Agreement provides that:

> After Prepetition Senior Lender receives the net Sale Proceeds pursuant to section 39(v) above, Prepetition Senior Lender will hold an allowed unsecured deficiency claim in connection with the payment of its Prepetition Debt.  The Prepetition Senior Lender will file a proof of claim for such unsecured deficiency claim on or before any applicable claims bar date established by the Bar Date Motion (defined below).  However, [Prepetition] Senior Lender agrees to waive the first $80,000 of distributions it would otherwise receive on account of such unsecured deficiency claim, thereby increasing distributions to the remaining holders of allowed non-priority unsecured claims.

(Sale Order at § 39(ix).)

The Settlement Agreement implements the following formula to calculate the amount of the net sale proceeds to be paid to CoBank at closing:

> [CoBank] will be paid the net Sale Proceeds at Closing on account of the Postpetition Loans and Prepetition Debt less, and after first deducting, the sum of (a) the Additional Carve-Out; (b) the Estate Payment (defined in the APA); (c) the Utility Escrow; (d) the Alleged Prior Secured Claims Holdback; and (e) $2 million for the payment of Cure Costs from the Sale Proceeds, plus the amount of any Excess Cure Credit (defined in the APA). In the event that the actual Cure Costs are less than $2 million after all of the objections identified in paragraph 2(a) through (h) of the Sale Order have been litigated to conclusion or otherwise resolved, the difference, less amounts incurred in litigating or otherwise resolving those objections, will be paid to Prepetition Senior Lender (to the extent the Prepetition Debt remains outstanding). Furthermore, in the event of any dispute regarding the computation of "net Sale Proceeds" that is not resolved before Closing, the dispute will be resolved by the Court before and as a condition of Closing (or the disputed amount will be held by the Debtors in a separate segregated escrow account pending resolution of the dispute by the Court).

(Sale Order at § 39(v).) The Settlement Agreement also contains additional consideration for the resolution reached among the Debtors, CoBank, the Committee and the UST, including releases in favor of CoBank, an additional carve out, limits on administrative expenses of professionals, and funds allocated exclusively to general unsecured creditors upon confirmation of any plan of liquidation. (Sale Order at §§ 39(ii)-(iv), (vi)-(viii), (x).)

On June 1, 2016, the sale closed. One day later, CoBank was paid over $29 million after application of the formula set forth in subsection 39(v).[5] On July 1, 2016, CoBank filed a proof of claim [Claim No. 82], which was subsequently amended [Claim No. 141]. In its proof of claim and amended proof of claim, CoBank did not assert an "unsecured deficiency claim" in accordance with subsection 39(ix) of the Sale Order. Instead, CoBank asserted that it holds a secured claim

---

[5]    CoBank acknowledged at the hearing on the Motion that with the exception of the construction lien escrow (which remains in dispute between CoBank and the construction lien claimant), the Debtors have remitted all of the net sales proceeds. (Mot. Hr'g Tr. 25, Apr. 28, 2017.) CoBank further acknowledged that the Debtors have satisfied in full their obligations to CoBank for post-petition financing. (*Id.* at 27.)

in the amount of $1,976,835.84, as amended.  CoBank also filed an "unsecured" proof of claim [Claim No. 99] on July 15, 2016 for an "unliquidated" amount.

On January 13, 2017, the Debtors and the Committee proposed a joint plan of liquidation [Dkt. No. 671] (the "Plan").  Five days before the confirmation hearing on the Plan, CoBank filed its Motion [Dkt. No. 725], as well as a limited objection [Dkt. No. 724] to the Plan.  CoBank objected to any distribution under the Plan absent prior satisfaction of CoBank's alleged secured claim or superpriority administrative expense.  At the confirmation hearing on March 28, 2017, the Debtors, the Committee, CoBank and the UST resolved CoBank's objection by establishing an escrow of $2 million for the benefit of CoBank if it ultimately prevails on the Motion. (*See* Conf. Order at ¶ 32.)  Without any pending objections, the Plan was confirmed [Dkt. No. 737].[6]

At the conclusion of the confirmation hearing, the court held a status conference regarding the Motion during which the Debtors, CoBank, the Committee and the UST requested that the court decide whether section 39(ix) of the Sale Order unambiguously determined CoBank's remaining claim to be a general unsecured claim.[7]  Thereafter, the court entered a scheduling order regarding this threshold issue [Dkt. No. 735].

After the parties filed additional briefing [Dkt. Nos. 741, 744, 747, 752], the court held a hearing regarding the Motion on April 28, 2017.  At the conclusion of the hearing, the court took the matter under advisement.

---

[6]    The Plan became effective on April 1, 2017 [Dkt. No. 742]. On the effective date of the Plan, all of the Debtors' rights were transferred to the GLC Liquidation Trust.  (Conf. Order at ¶¶ 13-14.)

[7]    Because all parties have consented to adjudication of this dispute in a contested matter under Fed. R. Bankr. P. 9014, an adversary proceeding to determine the extent and validity of CoBank's alleged lien under Fed. R. Bankr. P. 7001 is unnecessary.  *See*, *e.g.*, *In re Klein*, 486 B.R. 853, 857 (Bankr. E.D. Mich. 2012); *see also Tully Constr. Co., Inc. v. Cannonsburg Envtl. Assocs., Ltd. (In re Cannonsburg Envtl. Assocs., Ltd.)*, 72 F.3d 1260, 1264-65 (6th Cir. 1996).

**DISCUSSION**

Because the Settlement Agreement incorporated into the Sale Order is an agreed order similar to a consent decree, it is considered to be a binding contract among the parties. *See Sault Ste. Marie Tribe of Chippewa Indians v. Granholm*, 475 F.3d 805, 811 (6th Cir. 2007). The court is therefore required to apply general principles of contract interpretation under Michigan law to determine its meaning. *Id*. (citing *McIntosh v. Groomes*, 227 Mich. 215, 198 N.W. 954, 955 (Mich. 1924)); *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995); *see In re Conco, Inc.*, 855 F.3d at 711 (citation omitted) (applicable state law governs contract interpretations).[8] The parties' intent should be determined by first examining the plain language of the order for "clear manifestations of intent." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 654 (6th Cir. 1996) (quotation omitted); *see Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543-44 (6th Cir. 2007) (citing *St. Clair Med., P.C. v. Borgiel*, 270 Mich. App. 260, 715 N.W. 2d 914, 918 (Mich. Ct. App. 2006)).

"If at all possible, each provision 'should be construed consistently with the entire document and the relative positions and purposes of the parties . . . [because] [t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.'" *Ohio Farmers Ins. Co. v. Hughes-Bechtol, Inc. (In re Hughes Bechtol, Inc.)*, 225 F.3d 659, 2000 WL 1091509, at *8 (6th Cir. July 27, 2000) (unpublished) (citation and quotation omitted). The court may interpret the order in light of its own understanding of the history of the case and the intention of the parties when they presented the agreed order. *Id.* (bankruptcy court properly interpreted agreed cash collateral order by relying on context of bankruptcy case); *see also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)

---

[8]      CoBank and the Liquidating Trustee agree that Michigan law should be applied to this dispute. (Resp. at ¶¶ 17, 19; Reply at ¶ 2.)

(bankruptcy courts have inherent authority to interpret their own orders); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998) (court approving consent decree is in best position to interpret it).

A contract, including an agreed order, is ambiguous where it is susceptible to more than one reasonable interpretation. *Certified Restoration*, 511 F.3d at 545. Only where there is more than one reasonable interpretation may the court admit extrinsic evidence to clarify the parties' intent. *Granholm*, 475 F.3d at 812 (citing *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 702 N.W.2d 106, 113 (Mich. 2005)). Where a contract is unambiguous, however, "extrinsic evidence is inadmissible because no outside evidence can better evince the intent of the parties than the writing itself." *Id*.

In its Motion, CoBank argues that although the Sale Order provides CoBank with a general unsecured claim, the Sale Order in no way precludes it from also holding a secured claim under section 506 or a superpriority administrative expense under section 364(c)(1).[9] According to CoBank, it holds two claims: (i) a general unsecured claim with respect to the assets acquired by the purchaser, and (ii) a secured claim or superpriority administrative expense with respect to the non-acquired assets.

Focusing on the express language in subsection 39(ix), the Liquidation Trustee disagrees with CoBank's interpretation.[10] The Liquidation Trustee argues that because the sole condition precedent in the Settlement Agreement - payment of the net sale proceeds to CoBank - has been

---

[9]    Relying on paragraph 9 of the Final DIP Order, CoBank asserts a superpriority administrative expense under section 364(c)(1) for the diminution in value of its prepetition collateral. (Mot. at ¶ 8.) However, paragraph 9 of the Final DIP Order grants a superpriority administrative expense only with respect to the "Postpetition Loans." The court is somewhat puzzled by CoBank's request for relief under section 364(c)(1) if, as CoBank acknowledges, the Debtors repaid the post-petition loans in full at the closing. *See* 11 U.S.C. § 364(c)(1) (superpriority for post-petition loans and extensions of credit). Ultimately, it does not matter for the reasons discussed herein.

[10]    Similar to the Liquidation Trustee, the UST argues in his short objection that the Sale Order is unambiguous, was explicitly agreed to by CoBank, and was the result of a strenuous mediation.

satisfied, subsection 39(ix) of the Sale Order unambiguously determined the status of CoBank's remaining claim.  The Liquidation Trustee further argues that the phrase "in connection with the Prepetition Debt" modifies the term "unsecured deficiency claim," meaning that upon satisfaction of the condition precedent, CoBank is entitled to nothing more than a general unsecured claim for its prepetition debt.

After carefully considering the parties' arguments, the court finds CoBank's interpretation to be unduly complicated and inconsistent with the plain meaning of subsection 39(ix), the other provisions of the Settlement Agreement, and the proceedings in this case to date.  Instead, the court agrees with the simple and straightforward interpretation advanced by the Liquidation Trustee. As the Liquidation Trustee highlights, the first sentence of subsection 39(ix) begins with a phrase establishing a condition precedent. The phrase provides that CoBank shall "hold an allowed unsecured deficiency claim," but only if CoBank first receives the net sale proceeds pursuant to the formula set forth in subsection 39(v).  At the hearing on the Motion, CoBank acknowledged that it had received the net sale proceeds as contemplated by subsection 39(v). *See supra* note 5. It is therefore undisputed that the condition precedent in the Settlement Agreement was satisfied.

The court next considers the meaning of the term "unsecured deficiency claim," which is what CoBank is deemed to hold after the condition precedent has been satisfied.[11]  Although the term is not defined in the Settlement Agreement, elsewhere in the Sale Order, or in the Bankruptcy Code, its meaning is clear when examined in connection with the remainder of the sentence. Subsection 39(ix) states that any "unsecured deficiency claim" relates to the "payment of its Prepetition Debt."  As the Liquidation Trustee notes, the term "Prepetition Debt" is defined by the Final DIP Order, and incorporated by reference into the Sale Order, to mean:

---

[11]     The parties do not disagree as to the definition of a deficiency claim, which is a claim a secured creditor holds when the amount of its secured loan exceeds the value of its collateral.  (Resp. at ¶ 25; Reply at ¶¶ 13, 18.)

> As of the Petition Date, the aggregate amount of approximately $25,165,732.05 was due and owing in respect of principal, accrued and unpaid interest, and fees, costs and other charges owed under the Prepetition Financing Documents (together with any other fees and expenses incurred in connection with the Prepetition Financing Documents, and all other obligations of the Debtors thereunder, the "Prepetition Debt").

(Sale Order at § 39(i); Final DIP Order at § D.)  By its very definition, "Prepetition Debt" includes any and all amounts that the Debtors owe to CoBank for their prepetition obligations.   *See* 11 U.S.C. § 101(12).  The term "Prepetition Debt" thus captures *any* claim that CoBank holds relating to the prepetition obligations of the Debtors.  *See* 11 U.S.C. § 101(5).  Such prepetition claim, as clearly stated in subsection 39(ix), can be nothing but an "unsecured deficiency claim."[12]  CoBank disputes the Liquidation Trustee's interpretation by raising several arguments, none of which are persuasive.

### A.      CoBank Agreed to Release Its Liens on All Assets

CoBank first argues that although the Settlement Agreement refers to its claim as an "unsecured deficiency claim," the Settlement Agreement is limited in scope by the remainder of the Sale Order.  CoBank contends that the Sale Order released the liens it held on the assets acquired by the purchaser, but did not release the liens it held on non-acquired assets.  CoBank's interpretation is that the Sale Order only affected CoBank's secured claim with respect to the assets sold, and in no way impacted CoBank's secured claim with respect to the non-acquired assets.

In support, CoBank notes the lack of any language in the Sale Order that (i) released CoBank's liens on non-acquired assets, (ii) released CoBank's secured claims, (iii) granted the Debtors a general release, (iv) recognized that the settlement was made in full and final satisfaction

---

[12]      Because the Debtors satisfied all of their obligations to CoBank with respect to the post-petition loans, CoBank's remaining claim can only relate to the "Prepetition Debt."  *See supra* note 5.

of CoBank's secured claims, or (v) stated CoBank's "remaining" claim is unsecured.  In other words, CoBank relies on the silence of the Sale Order to reinforce its status as a secured creditor.

However, as noted by the Liquidation Trustee, neither the Settlement Agreement nor any other provision in the Sale Order bifurcate CoBank's claim between a deficiency claim for acquired assets and a deficiency claim for non-acquired assets.  Nowhere in the Sale Order is there a distinction between acquired assets and non-acquired assets that would allow the court to conclude, or even infer, that CoBank holds an allowed unsecured deficiency claim only with respect to the acquired assets.  Instead, subsection 39(ix) unequivocally states that CoBank's claim for the prepetition debt owed by the Debtors is to be relegated to the status of a general unsecured creditor.

Moreover, if, as CoBank asserts, it retained a lien on the non-acquired assets, there would be no benefit to the Debtors' estates from CoBank's agreement to waive the first $80,000 of distributions it would otherwise receive on account of its "unsecured deficiency claim." (*See* Sale Order at § 39(ix).)  Similarly, it is difficult to understand why CoBank would be required to file an unsecured deficiency proof of claim if its remaining claim is secured by the non-acquired assets.  CoBank's argument renders the consideration it purportedly gave to the Debtors' estates as part of the Settlement Agreement superfluous.  *See Dematic Corp. v. UAW*, 635 F.Supp.2d 662, 673 (W.D. Mich. 2009) (citations omitted) (contract should be construed to give force and effect to all provisions, rendering none nugatory).  For this reason, CoBank's interpretation does not comport with the remainder of the Settlement Agreement.

CoBank also argues that the phrase "in connection with the payment of its Prepetition Debt" is somehow limited to the acquired assets.  Yet any such qualifier (*e.g.*, other than any claim secured by the non-acquired assets) is conspicuously absent from subsection 39(ix) or any other

provision of the Settlement Agreement.  As a general principle of contract interpretation, the court cannot modify a contract by inserting language that is simply not there.  *See Stenger v. Freeman*, 2015 WL 5579463, at *3 (E.D. Mich. Sept. 23, 2015) (citation omitted) (parties' failure to insert language in contract confirms conclusion that language chosen admitted only one interpretation). In order to adopt CoBank's interpretation, this court would be forced to improperly modify the terms of the settlement.

CoBank's argument regarding the lack of specific release language in the Sale Order is equally unavailing.  Section 26 of the Sale Order expressly required CoBank's liens on the assets to be released to ensure that the purchaser received the benefit of its bargain under the asset purchase agreement – a sale free and clear of liens, claims and other encumbrances.  The Settlement Agreement likewise captures the benefit of the bargain by and among the Debtors, CoBank, the Committee and the UST.  The Settlement Agreement makes it clear that CoBank's remaining claim regarding its prepetition debt (the only outstanding debt after repayment of the post-petition loan in full) would be nothing more than a general unsecured claim.

CoBank cites to an analogous decision from this court for the proposition that the Settlement Agreement falls short of releasing CoBank's liens on the non-acquired assets.  *See In re Holly's, Inc*., 190 B.R. 297, 302 (Bankr. W.D. Mich. 1995).  According to CoBank, *Holly's* requires an agreement to specifically state that the claim "is not a secured claim" in order for the claim to be deprived of its secured status.  CoBank's discussion of *Holly's* is incomplete, however. A careful reading of *Holly's* reveals that the court found a stipulation similar to the Settlement Agreement in this case to be clear and unambiguous with respect to reclassification of claims.

In *Holly's*, the secured creditor and the debtor agreed in a stipulation approved by the court that the secured creditor's claims would be deemed unsecured priority claims.  *Id*. at 301.  By

implication and in the absence of any specific release language, the *Holly's* court concluded that the creditor's claims were no longer secured. *Id.* at 302. Although the stipulation in *Holly's* stated that the claim was "not a secured claim," the phrase "unsecured deficiency claim" in the Settlement Agreement performs the same function. Moreover, the stipulation at issue in *Holly's*, like the Settlement Agreement in this case, never expressly released the creditor's lien, as CoBank argues is necessary. *Id.* at 301. As such, *Holly's* actually supports the Liquidation Trustee's contention that CoBank agreed that its remaining claim for all of the prepetition debt would be wholly unsecured and without priority.

### B.   The Settlement Agreement Was a Global Resolution

CoBank next argues that the Settlement Agreement was never intended to be a "global" settlement extending to all matters between the parties. In its reply brief, CoBank states:

> While the Settlement can be fairly characterized as a "global" settlement of the Sale Motion, it cannot be deemed a "global" settlement of ***all*** matters between the parties because there is absolutely no evidence that the parties intended to accomplish that. It was, for all purposes, a "partial" settlement.

(Reply Br. at ¶ 9 (emphasis in original).)

The court rejects CoBank's argument that the Settlement Agreement was limited to matters related to the sale, thereby limiting the release of CoBank's lien to the acquired assets. The terms of the Settlement Agreement itself confirm that it was intended to be a comprehensive resolution of all matters with significant benefits flowing to CoBank. As stressed by the Liquidation Trustee at the hearing on the Motion, the Settlement Agreement contains the following consideration, all of which materially impacted the relationship by and among the Debtors, CoBank, the Committee and the UST well beyond the actual sale transaction:

- The parties agreed to extend the maturity date under the Final DIP Order while CoBank agreed to increase the carve out by $350,000. (Sale Order at § 39(ii).)

- CoBank agreed to advance an additional $500,000 to the Debtors under the Final DIP Order. (Sale Order at § 39(iii).)

- The Debtors and the Committee agreed to give CoBank comprehensive releases and waivers with respect to arguably any and all causes of action that could have been asserted against CoBank by the Debtors and/or the Committee. (Sale Order at § 39(iv).)[13]

- The Debtor, the Committee and the UST agreed that CoBank, in its capacity as pre and post-petition lender, would be paid the net sale proceeds at closing on account of the post-petition loans and prepetition debt after application of the formula instead of requiring CoBank to wait for confirmation of a plan or a distribution by a Chapter 7 trustee after conversion. (Sale Order at § 39(v).)

- The parties agreed to subordinate, to the extent necessary, certain administrative expenses of professionals so as to protect against administrative insolvency. (Sale Order at §§ 39(vi), (vii).)

- CoBank agreed to waive the first $80,000 of distributions it would otherwise receive for its "unsecured deficiency claim." (Sale Order at § 39(ix).)

- In contemplation of a confirmable plan of liquidation, the parties agreed to earmark and hold in escrow the amount of $500,000 for distribution to general unsecured creditors under any such plan. (Sale Order at §§ 39(viii), (x).)

- The parties agreed to request that the court establish a bar date for the filing of proofs of claim in order to facilitate the formulation of a plan of liquidation. (Sale Order at § 39(x).)

The cumulative effect of these provisions was to provide a means by which to allow CoBank to immediately exit these cases after receiving over $29 million and releases from the Debtors, their estates, and the Committee. In turn, the Debtors and the Committee were provided sufficient funding to propose a liquidating plan, while ensuring that general unsecured creditors would receive at least some distribution from the Debtors' estates. It is difficult to understand how these settlement provisions are confined to the sale transaction, as CoBank contends.

---

[13]    The global nature of the settlement is further augmented by subsection 39(iv) of the Sale Order, which gave all parties in interest (other than those appearing at the sale hearing) an opportunity to object to the releases granted in favor of CoBank before they became effective.

CoBank also mischaracterizes the impact of the Sale Order on the Settlement Agreement. The Settlement Agreement was incorporated into the Sale Order as a matter of convenience for the parties. Although the Settlement Agreement was a byproduct of the sale, it is separate and distinct from the other provisions of the Sale Order. (*See* Sale Order at § 39(xi).)  For all intents and purposes, it is more accurately described as a wind-down agreement than a settlement relating to the sale.

Somewhat relatedly, the court cannot overlook the circumstances giving rise to the Settlement Agreement. *See In re Hughes-Bechtol, Inc.*, 2000 WL 1091509, at *8 (citing *Kendrick v. Bland*, 931 F.2d 421, 423 (6th Cir. 1991); *Brown v. Neeb*, 644 F.2d 551, 558 n.12 (6th Cir. 1981)) (bankruptcy court may consider purpose of settlement when construing consent decree). The Settlement Agreement was not derived from a dispute regarding the sale of the Debtors' assets. Rather, it occurred after a court-ordered mediation to address the issue of administrative insolvency, an issue that was first identified by the UST during first day hearings and asserted as cause to convert the Debtors' cases to Chapter 7 in a pending motion.  Absent resolution of the issue of administrative insolvency, the sale, which was supported by CoBank, was far from certain to occur in the face of numerous objections.

### C.    *CoBank's Remaining Claim Was Allowed*

CoBank further argues that the Liquidation Trustee's interpretation of subsection 39(ix) is inconsistent with the allowance of CoBank's claim. CoBank contends that because the exact dollar *amount* of its unsecured deficiency claim was not finally determined when the Sale Order was entered, CoBank could not possibly hold only an "allowed" unsecured deficiency claim. According to CoBank, the inability to precisely mathematically determine its unsecured deficiency

claim renders subsection 39(ix) effective only with respect to a deficiency claim arising from the acquired assets, but not its secured claim with respect to the non-acquired assets.

Setting aside the fact that CoBank's argument is difficult to understand, CoBank's position ignores subsection 39(v), which sets forth the formula by which to calculate the amount of CoBank's unsecured deficiency claim. As part of the Settlement Agreement, CoBank agreed that its claim amount would be mathematically calculated by applying the formula in subsection 39(v). The formula allowed the parties to resolve yet another issue, thereby moving one step closer to a wind-down of the Debtors' estates. The only matter that could not be resolved was the precise amount of CoBank's remaining unsecured claim. However, the parties ultimately agreed to resolve this issue by requiring CoBank to file proof of its unsecured deficiency claim. (Sale Order at § 39(ix).) By structuring the settlement in this way, the Debtors and the Committee preserved an opportunity to object in the event that the dollar amount asserted in CoBank's proof of claim was inconsistent with the formula set forth subsection 39(v).

> D.    *The Parties' Extrinsic Evidence Is Inadmissible*

Finally, CoBank points to its secured proof of claim, as amended, and a letter from CoBank releasing only its liens on the assets acquired as part of the sale. CoBank contends that these documents demonstrate that CoBank retained its ability to assert a secured claim, even after the Sale Order was entered. However, they constitute extrinsic evidence that is inadmissible because the Settlement Agreement is unambiguous. *Sault Ste. Marie Tribe of Chippewa Indians*, 475 F.3d at 812 (citation omitted). Accordingly, it would be inappropriate for the court to consider them. *See id*. For the same reason, the court shall disregard the orders entered in other bankruptcy cases that the Liquidation Trustee cites in support of his definition of "allowed." *See id*.

**CONCLUSION**

In sum, the court concludes that subsection 39(ix) is clear and unambiguous. It is susceptible to only one reasonable interpretation. When read in conjunction with the other provisions of the Settlement Agreement and in light of the circumstances under which the settlement arose, the Settlement Agreement requires CoBank's remaining claim to be classified as a general unsecured claim entitled to a pro rata distribution under the confirmed Plan.[14]

For the foregoing reasons, the court shall deny the Motion. The court shall enter a separate order consistent with this Memorandum Decision.

---

[14]   In his response brief, the Liquidation Trustee formally objected to CoBank's amended proof of claim. The court recognizes the inherent overlap, but declines to fully adjudicate the proof of claim at this time. *Cf. Grand Traverse Dev. Co. Ltd. P'ship v. Bd. of Tr. of Gen. Ret. Sys. of City of Detroit (In re Grand Traverse Dev. Co. Ltd. P'ship)*, 150 B.R. 176, 184-85 (Bankr. W.D. Mich. 1993). The court shall instead confine its decision to the issue identified in the scheduling order.

**Signed: June 2, 2017**





John T. Gregg
United States Bankruptcy Judge